1  Ammar Harris #1116547
2  HDSP; P.O. Box 650
3  Indian Spring, NV 89070
4  Plaintiff in Pro Se
5
6              United States District Court
7                 District of Nevada
8
9   Ammar Harris              ) Case No. 3:21-CV-00380
10        Plaintiff,           )
11    -vs-                     ) Hon. Robert C. Jones
12  State of Nevada, et al.    ) Mag. Judge Carla Baldwin
13        Defendants.          )
14              JURY TRIAL DEMANDED
15
16   VERIFIED AMENDED COMPLAINT FOR DECLARATORY
17      AND INJUNCTIVE RELIEF AND DAMAGES
18
19              I. Introduction
20  1.) This is a § 1983 action filed by Plaintiff Ammar
21  Harris, a state prisoner, alleging violation of his
22  constitutional rights to receive adequate security and
23  medical care, seeking declaratory and injunctive relief
24  and money damages. Plaintiff also seeks declaratory,
25  injunction and damages pursuant to the Americans
26  with Disabilities Act and the Rehabilitation Act.

## II. Jurisdiction

2.) This action is brought pursuant to 42 USC § 1983, 1988 and 42 USCS §§ 12101 et seq., as well as the Fifth, Eighth, Ninth and Fourteenth Amendment of the United States Constitution. Jurisdiction is founded on 28 USC §§ 1331 and §§ 1343 and the aforementioned statutory and constitutional provisions. The Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 USC § 2201, 2202 and FRCP 57, 65.

## III. Venue

3.) Venue lies properly in this Court pursuant to 28 USC § 1391 (b).

## IV. Parties

4.) Plaintiff Ammar "Harris" at all times relevant was confined by the Nevada Department of Corrections (NDOC) at Ely State Prison "ESP" and High Desert State Prison "HDSP".

5.) Defendant Steven "Sisolak", is a state actor as Governor, and as member Board of Prison Commissioners (BOPC). The defendant Sisolak, is hereby sued in his individual and official capacity.

6.) Defendant Aaron "Ford", is a state actor as Attorney General, and as member Board of Prison Commissioners (BOPC). The defendant Ford, is hereby sued in his individual and official capacity.

7.) Defendant Barbara "Cegavske", is a state actor as Secretary of State, and as member Board of Prison commissioners (BOPC). The defendant Cegavske, is hereby sued in her individual and official capacity.

8.) Defendant Charles "Daniels", is a state actor as Director of "NDOC" (Nevada Department of Corrections). A state agency that manages the correctional facilities within the State of Nevada. He is ultimately responsible for the promulgation and enforcement of NDOC policies and procedures. The defendant Daniels, is hereby sued in his individual and official capacity.

9.) Defendant Brian "Williams" Sr., is a state actor as Deputy Director of "NDOC" (Nevada Department of Corr.). The defendant Williams, is hereby sued in his individual and official capacity.

10.) Defendant Michael "Minev", is a state actor as Medical Director of "NDOC" (Nevada Dept of Corr.). He is ultimately responsible for ensuring proper medical care at all NDOC facilities. The defendant Minev, is hereby sued in his individual and official capacity.

11.) Defendant William "Gittere", is a state actor as Warden of Ely State Prison, "ESP". The defendant Gittere, is hereby sued in his individual and official capacity.

12.) Defendant William "Reubart", is a state actor as Associate Warden of Operations at "ESP". The defendant Reubart, is hereby sued in his individual and official capacity.

13.) Defendant David "Drummond", is a state actor as Associate Warden of Programs at "ESP". The defendant Drummond, is hereby sued in his individual and official capacity.

14.) Defendant P. "Hernandez", is a state actor as caseworker at "ESP". The defendant Hernandez, is hereby sued in her individual and official capacity.

15.) Defendant Dana "Cole", is a state actor as Correctional Officer at "ESP". The defendant Cole, is hereby sued in his individual and official capacity.

16.) Defendant Mr. "Boyd", is a state actor as correctional Officer at "ESP". The defendant Boyd, is hereby sued in his individual and official capacity.

17.) Defendant Calvin "Johnson", is a state actor as Warden of High Desert State Prison, "HDSP". The defendant Johnson, is hereby sued in his individual and official capacity.

18.) Defendant F. "Dreesen", is a state actor as Associate Warden of Programs at "HDSP". The defendant Dreesen, is hereby sued in his individual and official capacity.

19.) Defendant Gregory "Bryan", is a state actor as Doctor at "HDSP". The defendant Bryan, is hereby sued in his individual and official capacity.

1  20.) Defendant State of "Nevada" is an authority
2  represented by a body of people politically organized
3  under one government and is solely responsible for
4  the actions and duties of all employees, officials, and
5  their agencies functioning under its jurisdiction.
6
7  The Secretary of State will accept service of proces
8  for the defendant State of Nevada. Barbara Cegavske
9
10  21.) Defendants Sisolak, Ford, Cegavske, Daniels,
11  Williams, Minev, Gittere, Reubart, Drummond, Hernandez,
12  Cole, Boyd, Dreesen, Johnson, Brian, Nevada, any
13  Doe, and each of them at all times herein mentioned,
14  was and/or is the agent, servant and employee of each
15  remaining defendants, and was at all times herein mentione
16  acting under <u>Color of State Law</u>, or acting within the
17  course, scope, and authority of said agency, service and
18  employment.
19
20
21
22
23
24
25
26

1   22.) The true identities of Defendant Does I-XXV,
2   are currently unknown to Plaintiff, who therefore sue
3   said Defendants by such fictitious names. Plaintiff, based
4   upon knowledge and information, reasonably believe and
5   therefore allege that each of the Defendants designated
6   herein as Does I-XXV may be responsible in some manner
7   for events and happenings herein referred to; that
8   Plaintiff will ask leave to amend this Complaint to
9   insert the true name(s) of said Defendant(s) when the
10  same have been ascertained by Plaintiff together with
11  the appropriate factual allegations and to join such
12  Defendant(s) as and when they become known in this
13  action in their true capacities.
14
15  23.) Plaintiff have been forced to incur reasonable
16  attorney's fee and costs in pursuit of this action
17  including, but not necessarily limited to, those
18  contemplated by 42 USCS § 1988.
19
20          V. Exhaustion of Available Remedies
21  24.) Plaintiff exhausted his administrative remedies
22  before filing this complaint, with respect to all claims.
23
24
25
26

1        FIRST CAUSE OF ACTION

2       29 USCS §§ 794 et seq., 42 USCS §§ 12101 et seq,

3     42 USCS §§ 1983, 1985, 1986, 1988 and 1997 et seq

4

5 Violation of Plaintiff's First, Fifth, Eighth, Ninth and

6       Fourteenth Amendment Rights.

7 Unconstitutional Conditions - Inadequate Security *

8       Medical * transportation.

9

10 Plaintiff hereby incorporate by reference all allegations

11 contained in all numbered paragraphs of this complaint

12 as if set forth fully here.

13

14 25.) On or about August 29th, 2020 while at Ely

15 State Prison, at approximately 8am Defendant Cole

16 asked Plaintiff if he were attending yard, which was

17 respectfully declined.

18

19 26.) At approximately 8:30am Defendant Cole started

20 opening multiple cell doors in the Deathrow Unit 1A, which

21 goes against security and safety policies.

22

23 27.) An inmate stood at Plaintiff cell door attempting

24 to gain entry, as he stood there, a gesture was made

25 to Defendant Cole, and Plaintiff's cell was opened, in

26 order to allow inmate entry.

1.  28.) Plaintiff immediate reaction was preventing that
2.  inmate from entering, as the door began to open, Plaintiff
3.  rushed through it.
4.
5.  29.) Thats the moment Plaintiff became aware, that
6.  inmate had a handmade weapon in his hand.
7.
8.  30.) Plaintiff alerted Defendant Cole and Boyd for aid,
9.  but they merely laughed and cheered on.
10.
11.  31.) Upon information and belief, the incident was
12.  allowed to occur based on racial tension, situations
13.  that transpired involving other inmates at ESP.
14.
15.  32.) Plaintiff attempted to defend himself to the best
16.  of his abilities, but unfortunately was unsuccessful.
17.
18.  33.) When officers came to intervene, Plaintiff was
19.  lying on the floor and bleeding.
20.
21.  34.) Plaintiff was given some treatment by Nurse Jones,
22.  and then transferred by EMS to William Bee Ririe
23.  Hospital, and placed into an induced coma.
24.
25.
26.

1   35.) On or about September 4th, 2020, Plaintiff
2   awoken at UMC Trauma, and was informed by the
3   Doctor, he was lucky to be alive because of the
4   injuries sustained from the assault.
5

6   36.) Doctor further informed Plaintiff that he had
7   succumbed twice and had to be revived, the knife
8   penetrated his brain causing Intra-Cranial Hemorrhage
9   in the left frontal lobe. There is an acute Fracture
10   in the left parietal bone, and Cervical spine damage.
11

12   37.) Plaintiff could not articulate himself, nor eat
13   due his injuries, the Doctor had to have a G-Tube
14   put in, in order for Plaintiff to take in nutrients.
15

16   38.) On or about September 11th, 2020, Plaintiff
17   was transferred to Summerlin Hospital for Pain
18   Management, Speech Pathology, Occupational
19   and Physical Therapy.
20

21   39.) Upon information and belief, Plaintiff learned
22   he was on the News and Internet, that the
23   events that transpired on August 29th, 2020, was
24   now public knowledge.
25

26

1.  40.) On or about October 1st, 2020, Plaintiff was
2.  informed by a Therapist that he was making a
3.  remarkable recovery, but she feared that NDOC would
4.  Stop it soon.
5.
6.  41.) On or about October 13th, 2020, Plaintiff was
7.  informed by the Doctor that after the removal of his
8.  Gastrostomy Tube, He would be returning to NDOC,
9.  the prison cited cost concern.
10.
11. 42.) On or about October 16th, 2020, Plaintiff was
12. given a copy of the Medical Order from the Doctor,
13. the Medical Order included a "Continuity of Care",
14. Pain Management and Physical/Occupational Therapy,
15. before Plaintiff left Summerlin Hospital.
16.
17. 43.) Plaintiff was taken to High Desert State Prison
18. and wheelchaired to the infirmary by C/O Lopez,
19. whom handed two binders of medical records to
20. Nurse Rios infront of CNA Sams.
21.
22. 44.) The right side of Plaintiff's body has severely
23. been affected, use of his right hand/arm and leg,
24. which makes utilizing them painful.
25.
26.

1. 45.) On or about October 14th, 2020, Defendant Bryan
2. visited Plaintiff, and was asked were there any pain,
3. Plaintiff answered in the affirmative.
4.
5. 46.) Plaintiff asked Defendant Bryan if he reviewed
6. the Medical Order and receiving rehabilitation, his
7. response, "No, we do not have the money to send
8. you to Physical Therapy, you are just going to have
9. to help yourself."
10.
11. 47.) Defendant Bryan Failed to conduct an examination
12. of Plaintiff before informing him, that he would not
13. be receiving any therapy.
14.
15. 48.) Plaintiff was diagnosed with Acquired Aphasia,
16. Ataxia, Hemianopsia, Apraxia and Hemiparesis.
17.
18. 49.) Upon information and belief, NDOC has a
19. history of downplaying injury sustained by
20. inmates in their custody, in order to assert
21. plausible deniability, medical staff follow a custom
22. or policy that negate the State's liability.
23.
24. 50.) Upon information and belief, Plaintiff became
25. aware of a Fictitious charge filed against him
26. for Murder while in the infirmary.

1    51.) Plaintiff was placed on bloodthinners while at
2    Summerlin Hospital, in order to increase circulation
3    in his affected limbs, Defendant Bryan discontinued
4    the use, and put Plaintiff on Baclofen without
5    informing him of the side effects.
6
7    52.) On or about November 6th, 2020, CNA Sams
8    informed Plaintiff that he really needed Therapy,
9    without, his condition would only get worse.
10
11   53.) on or about November 14th, 2020, Defendant
12   Bryan led Plaintiff to believe he was pending a
13   transfer to Northern Nevada Correctional Center
14   in order to discharge Plaintiff from infirmary, in
15   front of CNA Sam, Plaintiff was wheelchaired to
16   Disciplinary Segregation by C/O Job
17
18   54.) On or about November 24th, 2020, Plaintiff
19   received a Notice of Charges for Murder from
20   Defendant Cole, and was authorized by Defendants
21   Daniels, Williams, Gittere, Reubart, Drummond,
22   Dreesen and Johnson.
23
24   55.) Upon information and belief, the charges
25   was suppose to stop Plaintiff from exercising
26   his rights.

1    56.) On or about December 4th, 2020, Plaintiff
2    initiated an Emergency Medical "Man Down" because
3    he was still suffering from Pain, Headaches, Dizzyness,
4    Stomach Pain, Blurry Vision, Poor Blood Circulation,
5    and Blackouts, which Defendant Bryan was well
6    aware of before discharging Plaintiff from the
7    infirmary.
8
9    57.) When Nurse came to check on Plaintiff he
10   still had problems articulating because of his injuries,
11   which made the Nurse frustrated, She informed the
12   Plaintiff to write a Medical Kite.
13
14   58.) Upon information and belief, Plaintiff was
15   pending transfer to NNCC to see a Neurologist,
16   which later proved to be Untrue.
17
18   59.) Plaintiff started feeling Aggravated, Depressed,
19   Anger, Anxiety, Frustration, Hopelessness and Agony
20   because of being in Disciplinary Segregation charged
21   with a False Murder, Plaintiff tried to kill himself
22   twice because the situation, being disabled in
23   an institution that refuse to provide aid.
24
25
26

1  60.) Plaintiff sent a multitude of Medical Kites from

2  December, 2020 - March, 2021, detailing many issues

3  such as Pain, Blackouts, Atrophy, ect.

4

5  61.) On or about March 14th, 2021, Plaintiff Filed an

6  informal grievance, 2006-31-18343.

7

8  62.) On or about March 21st, 2021, Plaintiff Filed an

9  informal grievance, 2006-31-20319.

10

11  63.) On or about May 5th, 2021, Plaintiff a First

12  Level due to no response, 2006-31-18343 ①

13

14  64.) On or about May 6th, 2021, A plan, plot or

15  scheme took place involving Defendants Drummond,

16  Gittere, Reubart, Dreesen, Johnson to have them

17  Plaintiff transferred back to Ely State Prison

18  because I Filed a grievance, in order to stop Plaintiff

19  From exercising his rights. (ECF 10, 10-1)

20

21

22

23

24

25  ① Plaintiff filed a First level grievance*

26

65.) On or about May 19th, 2021, Plaintiff was wheelchaired to intake and force to forego it in order to board a transportation bus to Ely State Prison, despite Plaintiff visible ADA disability, No Does I-XXV did anything to intervene.

66.) Plaintiff was placed in full restraints despite asked for accomodation to be handcuffed in the front and had to be helped onto the bus.

67.) Plaintiff informed the bus operator that he was suppose to be transported by van because of his disability.

68.) In route to Ely State Prison, the bus came to an abrupt stop, by lack of proper safety restraints, Plaintiff hit his head on the back of the seat and fell forward, banging his head, and landing on his right side of his body, causing severe pain, Medical had to be summoned.

69.) Upon arrival to Ely State Prison, Plaintiff had to immediately be admitted into the infirmary because of injuries sustained.

70.) Plaintiff was not suppose to be transported by bus, its a clear Violation of the Americans with Disabilities Act.

71.) Defendants Nevada, Sisolak, Daniels entered into a Settlement Agreement with the United States, (Department Of Justice - DJ No 204-46-176 [1]) which violates the terms of said agreement.

72.) On or about May 23rd, 2021, Plaintiff contacted Defendant Gittere. (ECF 10, 10-1)

73.) On or about June 6th, 2021, Defendant Hernandez informed Plaintiff that he infact had to pay for copies of his grievances. (ECF 10, 10-1)

74.) On or about July 16th, 2021, Plaintiff a First Level due to no response, 2006-31-20319. [2]

75.) On or about August 1st, 2021, Plaintiff Filed a Second Level grievance due to no response, 2006-31-14343.

_____

[1] christine.Kim@usdoj.gov
https://www.ada.gov/nv-doc-sa.html
[2] Plaintiff filed a First Level grievance*

1   76.) On or about August 6th, 2021, Defendant Hernandez
2   provided Plaintiff with two memorandums, dated June
3   4th, 2021 and August 4th, 2021 preventing Plaintiff from
4   filing anything related to 2006-31-16343. (ECF 10, 10-1)
5
6   77.) Plaintiff asked Defendant Hernandez what the
7   memorandums meant, her response "If you keep
8   pushing the issue, something bad might happen",
9   which Plaintiff perceived was a threat. (ECF 1)
10
11  78.) Upon information and belief, threat was issued
12  by Defendant Hernandez on behalf of Defendants
13  Daniels, Williams, Gittere, Drummond, Reubart.
14
15      SECOND CAUSE OF ACTION
16      29 USCS § 794 et seq, 42 USCS §§ 12101 et seq,
17  42 USCS §§ 1983, 1985, 1986, 1988 and 1997 et seq
18
19  Violation of Plaintiff's First, Fifth, Eighth, Ninth
20      and Fourteenth Amendment Rights.
21
22  Unconstitutional Conditions - Failure to Supervise
23
24  Plaintiff hereby incorporate by reference all allegations
25  contained in all numbered paragraphs of this Complaint
26  as if set forth fully here.

79.) On or about August 28th, 2020, Defendant Daniels, williams, Gittere, Reubart, Drummond and Does I-XXV had a duty to train and supervise his subordinates to ensure policies, procedures, and/or regulations are followed, Fail to review and/or investigate if Staff error and/or misconduct was proximate cause, Fail to discipline Cole and Boyd, Fail to terminate a series of actions that would lead to a Constitutional Violation, Fail to protect Plaintiff from harm, despite Knowledge he were in danger because of acts by his subordinates, and did not take any action to negate it.

80.) Defendant Daniels, williams, Gittere, Reubart, Drummond and Does I-XXV were fully aware of the fraudulent Murder charge Cole filed against Plaintiff based on surveillance video of said events, and/or they conspired with Defendant Cole to engage in a Cover Up to negate liability. (ECF 10,10-1)

81.) Defendant Daniels, Williams, Gittere, Reubart, Drummond and Does I-XXV could have and/or should have known that a factitious charge would subject the Plaintiff to adverse treatment and/or Disciplinary Segregation after a traumatic ordeal.

1   82.) Defendant Daniels, Williams, Gittere, Reubart,
2   Drummond and Does I-XXV could have and/or
3   should have known there were threats against
4   Plaintiff life and/or liberty, based on interception
5   of monitored communication, phone, letters and/
6   or other intelligence gathering capabilities, and fail
7   to inform Plaintiff of such danger.
8

9   83.) Upon information and belief, Defendant Daniels,
10  Williams, Gittere, Reubart, Drummond and Does
11  I-XXV have in their possession intercepted threats
12  against Plaintiff dating as far back to 2014.
13

14  84.) On or about October 19th, 2020, Defendant
15  Daniels, Williams, Miniev, Johnson, Dreesen and Does
16  I-XXV had a duty to train and/or supervise his
17  subordinates to ensure policies, procedures, and/or
18  regulations are followed, fail to review and/or
19  investigate if staff error and/or misconduct was
20  proximate cause, fail to discipline Bryan, fail to
21  terminate a series of actions that would lead to
22  a constitutional violation, fail to protect Plaintiff
23  from harm, despite knowledge he were in danger
24  because of acts by his subordinates, and/or did
25  not take any action to negate it.
26

85.) Upon information and belief, On or about May 14th, 2021, Defendant Daniels, Williams, Johnson, Dreesen, Gittere, Reubart, Drummond and Does I-XXV, each of them, was and/or is joined Knowingly and/or Unknown in a plot, plan, and/or common scheme, and/or a conspiracy to subject Plaintiff to cruel and/or unusual punishment, and/or to deprive him of life, and/or liberty without due process of the law, and/or each defendant has acted in gross disregard of Plaintiff's right to safety at the behest of others acting in concert, and/or in consent, permission, and/or Knowledge of each of the other remaining defendants and/or agents.

86.) On or about May 19th, 2021, Defendant Daniels, Williams, Johnson, Dreesen and Does I-XXV had a duty to train and/or supervise his subordinates to ensure policies, procedures, and/or regulations are followed, fail to review and/or investigate if staff error and/or misconduct was proximate cause, fail to discipline, fail to terminate a series of actions that would lead to a constitution violation, fail to protect Plaintiff from harm, despite Knowlegde he were in danger because of acts by his subordinates, and/or did not take any action to negate it.

87.) Upon information and belief, the events that transpired which violated Plaintiff's constitutional rights were captured on surveillence.

## THIRD CAUSE OF ACTION

29 USCS §§ 794 et seq., 42 USCS §§ 12101 et seq, 42 USCS §§ 1988, 1997 et seq

Plaintiff hereby incorporate by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

88.) Plaintiff is an individual with a disability that limits major life activities, such as Standing, Walking, Grooming, Bathing, Talking, Thinking, Hearing, Focusing, Articulating, showing[1], and other daily functions.

89.) Plaintiff is qualifed to receive medical services and reasonable transportations accomodations based on disabilities, and was hereby denied

90.) Plaintiff is aware that Defendant Nevada receive Federal financial assistance for the Department of Corrections.

---

[1] Showering *

91.) Defendant Nevada, Sisolak, Cegavske, Ford, Daniels entered into a Settlement Agreement with the United States Department of Justice (DJ No 204-46-176[1]) regarding violations of the Americans with Disabilities Act by the Nevada Department of Corrections.

92.) Defendant Nevada, Sisolak, Cegavske, Ford, Daniels are in violation of the terms and/or provisions of said Agreement.

## LEGAL CLAIMS

Plaintiff hereby incorporate by reference all allegations contained in all numbered paragraphs of this Complaint as if set forth fully here.

[1] Christine.Kim@usdoj.gov
www.ada.gov/nv_doc_sa.html

93.) Defendants, their agents and employees, with knowledge of Plaintiff's security, medical and transportation needs, and/or with deliberate indifference to such needs, have acted or failed to act in such a way as to deprive Plaintiff of necessary and adequate security, medical care and transportation thereby endangering the Plaintiff's health and well being. Such acts and omissions of the Defendants violate rights secured to Plaintiff under the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

94.) Defendants, their agents and employees, with knowledge of Plaintiff's security, medical and transportation needs, and/or with deliberate indifference to such needs, have acted or failed to act in such manner as to prevent adequate security, medical treatment and care, and transportation from reaching Plaintiff thereby endangering the Plaintiff's health and well being. Such act and omissions of the Defendants violate rights secured to the Plaintiff under the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

95.) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs have a duty under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution to provide needed medical care to inmates of High Desert State Prison, HDSP in conformity with the standards for delivery of such medical care in the State of Nevada as a whole.

96.) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs, or with deliberate indifference to such medical needs, acted or failed to act in such a way as to provide medical care to Plaintiff in conformity with medical care in the State of Nevada as a whole and have in fact provided medical care which does not meet such standards thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution

1    47.) Defendants, Knowing of the security, Medical
2    and transportation needs of Plaintiff, and Knowing
3    also of the inadequacies and deficiencies in the
4    security and medical facilities staffing procedures
5    at Ely State Prison, ESP and High Desert State
6    Prison, HDSP, have a duty under the Fifth, Eighth,
7    Ninth, and Fourteenth Amendments to establish and
8    implement policies, practices and procedures designed
9    to assure that Plaintiff receive adequate security,
10   Medical care and treatment, and transportation.
11
12   48.) Defendants, Knowing of the security, medical
13   and transportation needs of Plaintiff, and with
14   deliberate indifference to the inadequacies and
15   deficiencies in the security staffing and procedures
16   at Ely State Prison, ESP and Medical Facilities and
17   transportation at High Desert State Prison, HDSP,
18   have failed and neglected to establish and implement
19   policies, practices and procedures designed to assure
20   that Plaintiff receive adequate security, Medical treatment
21   and care, and transportation at the standards therefor
22   in Nevada as a whole, or have adopted policies,
23   practices, and procedures which defendants Knew,
24   or reasonably should have Known, would be
25   ineffective in delivering adequate security, medical
26   care and treatment, and transportation at such

1   standards; thereby endangering the Plaintiff's health
2   and well being in violation of rights secured to Plaintiff
3   by the Fifth, Eighth, Ninth and Fourteenth Amendments
4   to the United States Constitution.
5
6   99.) Defendants, knowing of the security, medical
7   and transportation needs of Plaintiff have a duty
8   under the Fifth, Eighth, Ninth and Fourteenth
9   Amendments to the Constitution of the United States
10  to instruct, supervise, and train their employees and
11  agents to assure the delivery of adequate security,
12  medical care, and transportation to Plaintiff which
13  is consistent with the standards in the State of
14  Nevada as a whole.
15
16  100.) Defendants, knowing of the security, medical
17  and transportation needs of Plaintiff or with
18  deliberate indifference to such needs, have failed
19  to instruct, supervise and train their employees and
20  agents in such a manner as to assure the delivery
21  of adequate security, medical care, and transportation
22  to Plaintiff which is consistent with the standards
23  in the State of Nevada as a whole, thereby endangering
24  the Plaintiff's health and well being in violation of
25  rights secured to Plaintiff by the Fifth, Eighth, Ninth
26  and Fourteenth Amendments to the U.S.C.

1    101.) Defendants subjected Plaintiff to punishment
2    in Disciplinary Segregation for a factitious charge in
3    Violation of the First, Fifth, Eighth, Ninth and Four-
4    teenth Amendment to the United States Constitution.
5
6    102. Defendants retaliated against Plaintiff for
7    seeking to redress the Government for Violations
8    to Plaintiff First, Fifth, Eighth, Ninth, and Fourteenth
9    Amendments to the United States Constitution.
10
11   103. Defendants are a public entity within the meaning
12   of the Americans with Disabilities Act, and those
13   subject to its provisions and any implementing
14   regulations, defendants have Violated Plaintiff's rights
15   to equal treatment or opportunities to participate in
16   and/or benefits from the services, programs and
17   activities of the institution where Plaintiff was
18   classified, Plaintiff can participate in such services,
19   programs, and activities, with reasonable accomodations,
20   but is being denied the accomodations in a discriminatory
21   manner, regardless of his disability.
22
23
24
25
26

1   104.) Defendants' actions and/or omissions were
2   negligent and/or reckless and/or intentional.
3
4   105.) Defendants actions and/or omissions were
5   committed under color of law and/or pursuant to
6   policies, customs, practices, rules, regulations,
7   ordinaces①, statutes and/or usage of the State
8   Of Nevada, the Department of Social Services
9   and Housing of the State of Nevada, the
10  Corrections Division of DSSH, and/or Ely State
11  Prison, ESP and High Desert State Prison, HDSP.
12
13  106.) Plaintiff has no adequate and sufficient remedy
14  at law with which to address the wrongs alleged
15  herein and will continue to suffer irreparable injury
16  from the conditions of Defendants unless he is
17  granted the equitable relief prayed for herein.
18
19  107.) As a direct and proximate result of the
20  above described actions and omissions of defendants
21  plaintiff has suffered general damages in amounts
22  in excess of $75,000.00, exclusive of interest
23  and costs, the exact amounts of which will
24  be proven at trial.
25  _____
26  ① Ordinances *

## PRAYER

WHEREFORE, Plaintiff prays for relief and judgement against the Defendants, and each of them as follow:

1.) That the Court determines and enter judgment declaring that the acts and omissions of the Defendants, as set forth above, violates rights secured to Plaintiff by the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution;

2.) That upon hearing, the Court issue a TRO/ preliminary and permanent injunction:

a.) Enjoining the Defendants, their employees, agents, and successors in office from violating the terms and/or provisions set in full of the Settlement Agreement entered into by the United States Department of Justice and the State of Nevada.

1    b.) Enjoining the Defendants, their employees, agents
2    and successors in office from providing medical care
3    and treatment to Plaintiff that is inconsistent with
4    the standards of medical care and treatment in the
5    State of Nevada as a whole;
6
7    c.) Enjoining the Defendants, their employees, agents
8    and successors in office from refusing to provide
9    and/or delaying provisions of necessary medical
10   treatment and care to Plaintiff either at suitable
11   and adequate facilities within Nevada Department
12   of Corrections, NDOC or elsewhere;
13
14   d.) Enjoining the Defendants, their employees, agents
15   and successors in office from failing to instruct,
16   supervise and train their employees and agents in
17   such a manner as to assure the delivery of medical
18   treatment and care to Plaintiff which is consistent
19   with the standards of medical care in the State of
20   Nevada as a whole;
21
22
23
24
25
26

1    3.) That the Court establish a panel of independent
2    medical experts to regularly evaluate the delivery of
3    medical treatment and care at Nevada Department
4    of Corrections, NDOC and insure the compliance of
5    Defendants and their successors in office with the
6    Court's Orders herein;
7
8    4.) That each Defendant pay General damages in
9    the amount $75,000.00; for Pain, suffering and shock;
10
11   5.) That each Defendant pay Punitive damages in
12   the amount $75,000.00 for knowingly placing him
13   in danger ....; and mental/emotional distress; ①
14
15   6.) That each Defendant pay Exemplary damages
16   in the amount $75,000.00 on account of wrong
17   done to Plaintiff was aggravated by circumstances
18   of malice, wanton, wicked and deceptive conduct;
19
20   7.) That each Defendant pay Compensatory damages
21   in the amount $150,000.00 for Future Harm to
22   Plaintiff;
23
24   _____
25   ① and for mental/emotion distress and injuries.
26

4.) That the Defendants be required to pay pre-judgment interest, legal cost and expenses, including reasonable provision for Plaintiff's attorney fees.

9.) That the Court grant such further and additional relief that is appropriate herein

Dated this 1st day of January, 2022

Respectfully Submitted
/s/ A.H
Ammar Harris

DEMAND FOR JURY TRIAL

Plaintiff Ammar Harris hereby demands a trial by jury as to all issues so triable herein.

Dated this 1st day of January, 2022

/s/ A.H.
Ammar Harris

# VERIFICATION

1

2

3    I Ammar Harris have read the foregoing complaint
4    and hereby verify that the matters alleged therein are
5    true, except as to matters alleged upon information
6    and belief, and, as to those, I believe them to be true
7    and all papers, pleadings and documents on file herein.
8    I certify under penalty of perjury that the foregoing is
9    true and correct. 28 USC § 1746

10

11    Executed at Indian Springs, NV
12    on 1st day of January, 2022.

13

14                           /s/ A.H.
15                           Ammar Harris

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT - A - "AGREEMENT":

Settlement Agreement with the
United States Department of
Justice and the State of
Nevada.


32 Pgs. Enclosed.

# SETTLEMENT AGREEMENT
# BETWEEN THE UNITED STATES OF AMERICA AND
# TTHE STATE OF NEVADA EX REL. NEVADA DEPARTMENT OF
# CORRECTIONS
# DJ NO. 204-46-176

Press Release

## I.  BACKGROUND

1.  This Settlement Agreement is entered into by and among the United States of America and the State of Nevada ex rel. Nevada Department of Corrections.

2.  The United States Department of Justice ("Department") is responsible for administering and enforcing the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

3.  The Nevada Department of Corrections ("NDOC") operates the State of Nevada's prison system. The State of Nevada and the NDOC (collectively, "Nevada") are each public entities within the meaning of the ADA, 42 U.S.C. § 12131(1), and are therefore subject to the requirements of Title II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. Part 35.

4.  This Agreement arises out of an investigation that the Department initiated in December 2014, after receiving complaints from inmates with disabilities who were then in the custody of the NDOC. Over the course of the investigation, the Department visited NDOC correctional institutions, interviewed inmates with disabilities and NDOC employees, and reviewed documents, including those produced by inmates and the NDOC. On June 20, 2016, the Department issued a letter of findings concluding that the NDOC had violated Title II of the ADA by: (1) segregating inmates with HIV pursuant to the NDOC's "House Alike / House Alone" policy, which directs NDOC

4/1/2021

HIV; (2) denying inmates with HIV equal employment opportunities through

they could earn credits to reduce the lengths of their sentences; and (3) denyin

with disabilities, including those with mobility disabilities, HIV, or certain oth

medical or mental health conditions, equal opportunities to benefit from the s

programs, and activities associated with the NDOC's minimum and commun

classification levels.

5. On May 23, 2017, Nevada amended Nev. Rev. Stat. Ann. ("NRS") § 209.3

repealing its prior rule mandating the segregation of inmates with HIV from

population and the routine disclosure of inmates' HIV status to nonmedical

staff and administrators. The amended statute and NDOC's policies permit

segregation of inmates with HIV under circumstances when the offender eng

behavior that increases the risk of transmitting the virus as determined by re

the NDOC. The amended statute also permits disclosure of an inmate's HIV

nonmedical correctional staff and administrators without clear guidance as t

such disclosures should be made.

6. Nevada alleges that it began integrating inmates with HIV into the general

population in or around the summer of 2016. On June 7, 2017, the NDOC

rescinded its "House Alike / House Alone" policy, and on May 15, 2018, th

made these changes permanent. The United States substantiated that Nevad

to integrate inmates with HIV in or around 2016 and 2017. During Nevada

to integrate these inmates, some of the inmates' confidential medical inforr

not protected from disclosure, and therefore some of these inmates continu

discrimination based on their disability.

7. The United States and Nevada agree that it is in the Parties' best interes

United States believes it is in the public interest, to fully and finally resolv

The Parties therefore voluntarily enter into this Agreement.

8. <u>General Obligations</u>: Nevada shall comply with the requirements of Title II of t
ADA and its implementing regulation by, *inter alia*, housing inmates with HIV in
integrated settings alongside other inmates, ensuring equal employment opportuni
for inmates with disabilities, and ensuring that inmates with disabilities have equal
opportunities to benefit from the services, programs, and activities associated with
NDOC's minimum and community-trustee classification levels. Among other thin

a.  Nevada shall not provide inmates with disabilities opportunities that are
unequal to those afforded to inmates who do not have disabilities. Nor shall
deny inmates with disabilities the opportunity to participate in or benefit from
Nevada's aids, benefits, services, or programs. *See* 28 C.F.R. § 35.130(b)(1).

b.  Nevada shall not provide different or separate aids, benefits, or services to
individuals with disabilities or to any class of individuals with disabilities tha
provided to others unless such action is necessary to provide qualified individ
with disabilities with aids, benefits, or services that are as effective as those
provided to others. *See id.* § 35.130(b)(1)(iv).

c.  Nevada shall reasonably modify its policies, practices, and procedures whe
necessary to avoid discrimination on the basis of disability, unless Nevada can
demonstrate that making modifications would fundamentally alter the nature o
its services, programs, or activities. *See id.* § 35.130(b)(7).

d.  Nevada shall not impose or apply eligibility criteria that screen out or tend t
screen out inmates with disabilities from fully and equally enjoying Nevada's
services, programs, or activities, unless it can show that such criteria are
necessary for its provision of those services, programs, or activities. *See id.* §
35.130(b)(8).

e.  Nevada shall not, unless it is appropriate to make an exception, place inmate
with disabilities in facilities that do not offer the same programs as the facilitie
where they otherwise would be housed. *See id.* § 35.152(b)(2)(iii).

    f.   Nevada shall administer its services, programs, and activities—includ[ing]

housing of inmates—in the most integrated setting appropriate to the ne[eds of]

inmates with disabilities. *See id.* §§ 35.130(d), 35.152(b)(2).

## III.  SPECIFIC RELIEF

### A.  Housing and Medical Care for Inmates with HIV

9.   <u>Prohibition Against Segregating Inmates Based on HIV Status</u>: Nevad[a shall]
not segregate inmates with HIV solely on the basis of their HIV status a[nd will]
house inmates with HIV in integrated settings alongside other inmates. [Nevada]
will take all appropriate steps, including amending any rules, policies, p[ractices]
or other directives, to effectuate its obligation to comply with this obliga[tion.]
Specifically, Nevada shall implement a housing policy that prohibits iso[lating or]
segregating inmates with HIV solely on the basis of their HIV status.  O[n ...]
2017, the NDOC temporarily rescinded its policy mandating the segrega[tion of]
inmates with HIV based solely on their HIV diagnosis.  On May 15, 20[..,]
NDOC made these changes permanent.

10.   <u>Reception, Evaluation, and Housing of New Inmates with HIV</u>: Neva[da shall]
ensure that, for purposes of custody-level classification and placement, [every]
inmate with HIV who enters NDOC custody is processed without regar[d to HIV]
status from the time the inmate enters the NDOC system and continuing [through]
the inmate's transfer into the general population or other appropriate ho[using for his]
status; provided that, Nevada may provide private and confidential eval[uation,]
medical treatment, and counseling to any incoming inmate with HIV as [provided]
in this Agreement.

11.   <u>Counseling and Election for Inmates with HIV</u>: Nevada shall continu[e to]
ensure that inmates with HIV will not be housed alone, unless they are
maximum-custody inmates or subject to disciplinary, protective, or
administrative segregation for reasons unrelated to their HIV status, or [...]

a cell with another inmate with HIV based solely on their HIV status. In a[...]

Nevada shall do the following:

a. <u>Counseling and Election Sessions</u>: Within thirty (30) days of the [...]
required by Paragraph 26, (1) Nevada shall confidentially and indivi[...]
notify inmates with HIV who are housed alone or with another inma[...]
HIV that they may request a change in housing arrangement; and (2[...]
appropriate medical and mental health personnel from the NDOC w[...]
conduct a confidential, private counseling session with each inmate[...]
HIV to ask whether the inmate wants a change in housing arrangem[...]
and to address the inmate's options, questions, and concerns.

b. <u>Responding to Requests for Housing Changes</u>: Nevada shall mak[...]
changes necessary to meet the housing requests of inmates with HIV[...]
elect for a cell change within thirty (30) days of the inmate's submis[...]
a completed cell change request form.

c. <u>Counseling and Election at Any Time</u>: After the initial counseling[...]
election session, any inmate with HIV who initially did not elect to[...]
housing may at any time: (1) request a follow-up private counseling[...]
session at which appropriate NDOC medical and mental health staff[...]
address the inmate's options, questions, or concerns about integratio[...]
(2) elect to change housing by completing a cell change request for[...]
submitting it to the appropriate NDOC staff members as per[...]
Administrative Regulation and Operational Procedures. Nevada mu[...]
respond to the inmate's request for private counseling within ten (10[...]
business days, and all requested counseling sessions shall be provid[...]
within thirty (30) days. Nevada must respond to the inmate's electio[...]
change housing in accordance with the requirements outlined in sub[...]
(b) of this Paragraph.

    d.   <u>Confidentiality of Completed Cell Change Request Forms and</u>

<u>Counseling Sessions</u>: Any and all cell change request forms submit

pursuant to this section of the Agreement shall be maintained

confidentially by Nevada, and access to such forms shall be permitt

to medical or mental health staff, the ADA Coordinators, the ADA

Compliance Officers, and NDOC personnel with a need to know the

information to complete the transfer of an inmate with HIV to an

institution and housing assignment appropriate to the inmate's custo

classification. Nevada shall also conduct all counseling sessions wit

inmates in a private manner that ensures that their HIV status remain

confidential.

12.  <u>Medical Care for Inmates with HIV</u>:

    a.   NDOC Medical Directives 125, 206, and any other similar directiv

shall be revised to ensure consistency with care guidelines published

National Institutes of Health, including all guidelines regarding anti-

retroviral therapy. *See* Aberg, JA, et al., Primary Care Guidelines for

Management of Persons Infected with HIV: 2013 Updates by the HIV

Medicine Association of the Infectious Diseases Society of America,

Clinical Infectious Diseases 58(1):e1 (Jan. 2014),

https://doi.org/10.1093/cid/cit665; Dep't Health & Human Servs.,

Guidelines for the Use of Antiretroviral Agents in Adults and Adolesc

with HIV (2019), https://aidsinfo.nih.gov/

contentfiles/lvguidelines/adultandadolescentgl.pdf.

    b.   Nevada shall ensure that inmates with HIV are regularly treated and

managed by an HIV specialist, have timely access to anti-retroviral

therapy, and that the NDOC ensures continuity of care with respect to

medication refills and medical treatment when inmates are transferred

between facilities.

13. <u>HIV Education and Counseling for Inmates</u>: The NDOC shall revise its "
information handouts" referenced at AR 610.01(4), and any similar handout
cover the methods by which HIV is and is not transmitted; the use, and effic
of anti-retroviral therapies in the treatment of HIV; methods of preventing H
transmission; and other information about HIV, consistent with similar
publications issued by the Centers for Disease Control and Prevention, Natio
Institutes of Health, and U.S. Department of Health and Human Services. W
thirty (30) days of the United States' approval of these revised informational
handouts (*see* Paragraph 38, *infra*), Nevada shall post these revised handouts
conspicuous common areas throughout the housing units, chapel, medical,
culinary, gym, and other group rooms. In addition, Nevada shall ensure that
inmates receive the revised informational handouts at intake, and that at intak
at the time inmates are informed that they have HIV, inmates with HIV will b
provided with the option of confidential and discreet counseling from an
appropriate (1) medical professional and (2) mental health professional, and I
the opportunity to ask questions and obtain answers from these professionals.

14. <u>Review of Disciplinary Sanction, Segregation, or Detention for Inmates wi</u>
<u>HIV</u>: Nevada shall review all disciplinary sanctions, segregation, and detentio
imposed on inmates with HIV after the NDOC began desegregating inmates v
HIV until the Effective Date of the Agreement to determine whether any
disciplinary sanction, segregation, or detention should be removed from the
inmate's record and whether any credits or other benefits should be restored to
the inmate. This includes, but is not limited to, disciplinary sanctions,
segregation, or detention imposed on an inmate with HIV who refused a new a
assignment due to fears that such an assignment may risk their safety or the
confidentiality of their medical information. Nevada shall provide its review a
proposed corrective actions to the United States within sixty (60) days for
approval. Within thirty (30) days of the United States' approval of the review
and proposed corrective actions, Nevada shall begin to implement the correctiv

15. <u>Confidentiality of Medical Information</u>: Nevada shall ensure the confidentiality of inmates' health information, including HIV status. Neva take all appropriate steps, such as amending any rules, policies, protocols, other directives, to effectuate this obligation.

   a. Nevada shall ensure that inmates' HIV status will not be disclose any Nevada staff other than medical and mental health staff, except limited set of those persons identified in NRS § 209.385(3) who are involved in the hearing and appeal processes described in Paragraph *infra*.

   b. Nevada's treatment of inmates' medical information shall be cons with, at a minimum, the guidelines set forth in Ctrs. for Disease Con HIV Testing Implementation Guidance for Correctional Settings § II 2009) [hereinafter "CDC Guidelines for HIV Testing in Corrections" https://stacks.cdc.gov/view/cdc/5279.

   c. Nevada shall not identify inmates with HIV with a specific medic restriction code. Nevada shall remove any HIV-specific medical res code from all NDOC medical classification forms and, before utilizi such revised forms, shall provide the revised forms to the United Sta its review and approval. Nevada will eliminate or redact any HIV-sp medical restriction code from all inmate records capable of being ed For hard copy records, and for digital inmate records that cannot be or redacted without corrupting data, Nevada will treat all such docu as confidential material in accordance with, at a minimum, the CDC Guidelines for HIV Testing in Corrections. An inmate's HIV status not be shared with or made available to non-medical or non-mental staff unless authorized by law.

   d. Nevada confirms that it has ceased disseminating lists of inmates

4/1/2021          SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL...

Case 3:21-cv-00380-CLB    Document 17    Filed 03/30/22    Page 44 of 67

this Agreement, continue to cease disseminating lists of inmates with

to Nevada staff and permanently destroy any and all lists it has previo

circulated.

e.    Within fifteen (15) days of the training required by Paragraph 26,

Nevada shall explain to each inmate with HIV the changes to the med

classification forms privately, in the presence of only appropriate med

or mental health staff. At these meetings, Nevada shall provide each

inmate with a form to sign denoting that the inmate has been advised of

changes Nevada has implemented to keep the inmate's HIV status and

related medical information confidential.

f.    Any and all counseling and evaluation of inmates who test positive

or who have HIV at any time during incarceration shall be conducted

privately and confidentially, in the presence of only appropriate medica

mental health staff. Such counseling and evaluation shall be consisten

with, at minimum, the CDC Guidelines for HIV Testing in Corrections

g.    The fact that an inmate is consulting with an HIV specialist—whethe

person or through the use of telemedicine technology—shall itself be

treated as personal medical information, to be kept confidential from ot

inmates, correctional officers, and other Nevada personnel, with the

exception of medical and mental health staff. Any and all appointments

telemedicine conferences with HIV specialists shall be staggered or

otherwise conducted in such a way as to ensure that inmates consulting

with HIV specialists are not required to travel as a group to or from thei

appointments, and that appointments are conducted as discreetly as

possible.

h.    In the event that a Nevada employee or inmate comes into contact wit

the blood or bodily fluids of an inmate, Nevada shall, in accordance with

the requirements and procedures set forth in the Occupational Safety and

Health Administration's Bloodborne Pathogens Standard, 29 C.F.R.
§ 1910.1030(f)(3), conduct a confidential medical evaluation, and foll
up with the person who was exposed.

16. <u>Inmates Who Pose a Danger to Others</u>: Notwithstanding the foregoing, N
may follow its discipline and controlled housing protocols if an individual
inmate, regardless of whether he or she has HIV, poses a direct threat to the
health or safety of others as set forth in Paragraph 45 and NDOC AR 707.1.
Nevada will repeal any disciplinary or segregation policy targeting inmates
HIV and will instead apply the same discipline and segregation protocols,
including the process for hearings and appeals, to all inmates.

B.    Equal Employment Opportunities for Inmates with Disabilities

17. <u>Non-Discrimination in Employment of Inmates with HIV</u>: Nevada shall e
that inmates with HIV have equal access to work assignments, including tho
the canteen, culinary, food services, infirmary, and allied health services. To
extent any HIV-specific medical restriction code cannot be removed or reda
from inmate digital records without corrupting data, NDOC staff will disreg
this code and place any inmate with HIV in any work assignment for which
she is otherwise qualified and that he or she accepts.

18. <u>Revisions to Work Assignment Process</u>: Nevada shall ensure that its work
assignment process and all related forms, including medical classification fo
provide inmates with disabilities with equal opportunities to obtain work
assignments and credits. To accomplish this, Nevada shall, *inter alia*:

a.    Ensure that NDOC job advertisements, as well as medical classifica
medical evaluation, and work-assignment selection processes, do not
unnecessarily employ eligibility criteria that screen out or tend to scre
out inmates with disabilities;

    b.   Ensure that inmates with disabilities are offered a range of potentia

        work assignments with varying physical requirements (i.e., from sede

        clerical tasks to manual labor);

    c.   Implement a policy and procedure for inmates to request reasonabl

        modifications; and

    d.   Make reasonable modifications to allow inmates with disabilities to

        work-related eligibility requirements and to perform work assignment

19.   <u>Individualized Medical and Mental Health Determinations</u>: Nevada shall

    conduct an individualized assessment of each inmate when assessing his or h

    medical or mental fitness to work in a particular job assignment.

    a.   Nevada may use a form with general medical and mental health cod

        identify whether an inmate has certain physical limitations or health-re

        issues that may interfere with his or her ability to participate in certain

        work assignments. These codes, and the form associated with them, mu

        require medical and mental health staff to document the nature, severity

        and expected duration of an inmate's limitations.

    b.   These codes, and the form associated with them, must require medica

        and mental health staff to also identify whether there are reasonable

        modifications that would permit the inmate to work in these job

        assignments, i.e., perform the essential functions of the job. Nevada wil

        provide such inmates with the reasonable modifications necessary to

        ensure that these inmates can participate unless Nevada establishes that

        such an accommodation or modification constitutes a fundamental

        alteration.

    c.   If Nevada identifies that an inmate has certain physical limitations or

        health-related issues that will prevent the inmate from participating, eve

        with reasonable modifications in a specific work assignment for which

or she is otherwise eligible, Nevada shall so inform the inmate and

the inmate that he or she may seek a reevaluation from a NDOC hea

provider. Should the inmate request such a reevaluation, Nevada sh

ensure that within thirty (30) days of the inmate's request, a health

who has been personally involved in the inmate's care reviews the i

medical and mental health files, personally examines the inmate (if

necessary), and makes an individualized determination as to whethe

medical or mental health issues should preclude the inmate from be

assigned to that particular work area and whether there are reasonab

modifications that would permit the inmate to work in that particula

area.

d.   Nevada shall provide written guidance and live training to, and en

completion of live training by, all medical and mental health provid

make such work clearance determinations. The written guidance an

training will cover: (1) the types of work assignments available and

physical requirements of each assignment, (2) examples of reasonab

modifications that may be available for inmates with disabilities for

work assignment, and (3) Nevada's duty to provide reasonable

modifications and to not discriminate against inmates with disabiliti

20.   Work Credits: Nevada shall ensure non-discrimination in the eligibility

inmates with disabilities to earn work credits.

a.   Inmates with disabilities who, with or without reasonable modific

are eligible to work, but because of their disabilities have been place

waiting list pending the availability of an appropriate work assignme

shall earn the full number of work credits that they would have been

eligible to earn had they worked while waiting for an assignment.

b.   Notwithstanding the foregoing, Nevada need not award inmates v

to Nevada Division of Forestry crew members when these crew men

are away from camp for firefighting or emergency assignments.

C.   Custody-Level Classifications and Placements for Inmates with Disabilities

21.   <u>Equal Opportunity</u>: Nevada shall ensure that inmates with disabilities hav

equal opportunities to participate in and benefit from the services, programs

activities (*e.g.*, work credits, institutional placement) available to inmates at

custody levels for which they are eligible.

22.   <u>Non-Discrimination in Custody-Level Classifications</u>: Nevada shall not, o

basis of mental health conditions, medical conditions, mobility impairments

medical treatment needs such as an inmate's need for medications designate

Nevada as non-keep-on-person ("NKOP"), or other disabilities, exclude inm

with disabilities from classification to the custody levels for which they othe

are eligible.

a.   Nevada shall ensure that its rules, policies, protocols, and other

directives provide for non-discrimination against inmates with disabilit

in custody-level determinations. When an inmate with a disability is

otherwise eligible for classification to a particular custody level, Nevad

shall classify the inmate to that custody level without consideration of t

inmate's mental health conditions, medical conditions, mobility

impairments, medical treatment needs (*e.g.*, NKOP medications), or oth

disabilities. In situations where placement at the custody level to which

inmate is eligible for classification is not possible due to a lack of capac

or a legitimate administrative determinant (*see* Paragraph 23(a)), Nevad

shall nonetheless classify the inmate to the custody level for which he o

she is eligible and follow the procedures and requirements set forth in

Paragraph 23 to determine the appropriate housing placement for the

inmate.

23. <u>Non-Discrimination in Custody-Level Placements</u>: Nevada shall not, o basis of mental health conditions, medical conditions, mobility impairmer medical treatment needs (*e.g.*, NKOP medications), or other disabilities, e inmates from placement at the custody levels for which they are otherwise eligible—including lower-custody placements such as transitional-housin facilities, conservation camps, and minimum-custody beds at prisons—un such action is necessary to provide qualified individuals with disabilities v aids, benefits, or services that are as effective as those provided to others unless necessary pursuant to a legitimate safety requirement or direct thre determination.

   a. Nevada shall, to the extent it has not already, develop appropriate necessary, and specific administrative determinants for housing inm with disabilities at a higher security level than their designated cust level classification, where necessary to address specific medical, m health, dental, or custody concerns. Each administrative determinar have a designated code that clearly identifies the reason for housing inmate at a higher security level than his or her custody-level classification. The administrative determinant will be specific, narr drawn, and necessary to ensure non-discrimination against inmates disabilities.

   b. Nevada shall revise NDOC Medical Directive 414 and any other policies, practices, or procedures for assessing inmate medical and r health conditions—including Nevada's assignment of inmates to me and mental health categories and restrictions—to ensure that any ho or other restriction that Nevada imposes on an inmate because of his medical or mental health disability is medically necessary.

   c. If Nevada identifies that an inmate has a disability that may preve or her from being housed in certain custody-level placements for wl

the inmate that he or she may seek a reevaluation from a Nevada heal

provider. Should the inmate request such a reevaluation, Nevada shal

ensure that within thirty (30) days of the inmate's request, a health pr

who has been personally involved in the inmate's care reviews the inm

medical and mental health files, personally examines the inmate (if

necessary), and makes an individualized determination as to whether a

medical or mental health issues should preclude the inmate from being

transferred to the custody-level placement for which he or she is other

eligible. Nevada shall consider and implement all possible alternatives

do not constitute an undue burden to avoid housing the inmate at a hig

custody placement. If no such alternative is available, Nevada shall

classify the inmate to the lower-custody classification level, but may h

the inmate at the higher custody level so long as Nevada provides the

inmate with the same privileges and benefits (*e.g.*, opportunities to earr

work credits) that Nevada provides to inmates housed in lower-custody

placements. Such an inmate shall be given priority to transfer to a lowe

custody placement when such placement becomes available.

d.   Nevada shall provide written guidance and live training to, and ensur

completion of live training by, all health providers involved in the

individualized health determinations required under this Paragraph and

Paragraph 24, *infra*. The written guidance and training will cover: (1) t

types of housing placements available and the physical requirements of

each placement, (2) reasonable modifications (including self-

administration of medication) that may be available for inmates with

disabilities at each housing- and custody-level placement, and (3) Nevac

duty to provide reasonable modifications and to not discriminate against

inmates with disabilities in housing placement decisions.

24.   <u>Periodic Classification and Capacity Reviews</u>: Every six (6) months from th

procedures implementing the requirements of Paragraphs 21-23, Nevada
conduct reviews of the custody-level classifications and housing placeme
inmates with disabilities. If, based on such reviews, Nevada or the Unite
anticipates that, within the next six (6) months, facilities will not have the
capacity to house inmates with disabilities according to their custody leve
the administrative determinants discussed in Paragraph 23, Nevada shall
plan to make modifications (e.g., converting portions of medium-custody
facilities to minimum-custody units) to ensure that, inmates with disabilit
housed according to their custody-level classifications. Nevada shall sub
these plans for the United States' review and approval every six (6) mont
the date the United States approves Nevada's revised policies, practices,
procedures implementing the requirements of Paragraphs 21-23, and Nev
shall incorporate and implement any revisions the United States may mak
these plans unless those revisions constitute an undue burden.

25. NKOP Medications and Reasonable Modifications at NDOC Facilities
Currently Do Not Employ Full-Time Medical or Mental Health Staff: Ne
shall make reasonable modifications to its policies, practices, and procedu
ensure that inmates with disabilities have an equal opportunity to be plac
lower-custody facilities, such as transitional-housing facilities and conser
camps, when such reasonable modifications to its policies, practices, and
procedures do not constitute a fundamental alteration. Nevada shall not
categorically exclude inmates with disabilities from placement at such lo
custody facilities, because such inmates require specialized or routine me
mental health care or require NKOP medications. Nevada shall conduct
individualized assessment of each inmate with a disability who qualifies
placement at such lower-custody facilities and reasonably modify its poli
practices, and procedures to ensure that the inmate has an equal opportun
participate. This includes but is not limited to training and designating
appropriate staff to store NKOP medications for inmates to self-administ

procedures, employing telemedicine, and periodically transporting inmates

disabilities to facilities where they can receive medical or mental health car

Nevada will take all appropriate steps, including amending any rules, polic

protocols, or other directives, to effectuate its obligation to comply with thi

obligation.

D.    Training

26.    <u>Training for Nevada Staff</u>: Nevada shall provide live training to, and ensu

completion of such training by, all NDOC employees as well as State of Nev

employees whose positions require them to regularly interact with NDOC

inmates (*e.g.*, Nevada Division of Forestry staff), concerning:

     a.    Title II of the ADA;

     b.    Nevada's policy toward discrimination, retaliation, coercion,

         intimidation, harassment, threats, or abuse against inmates on the basis

         disability, as well as toward interference with rights protected by the A

         or this Agreement;

     c.    The matters addressed in Section III.A. of this Agreement, including

         i.    HIV and the methods by which it is and is not transmitted;

         ii.    Nevada's plans to fully integrate inmates with HIV in housing;

           and

         iii.    Nevada's policies for keeping inmates' medical information,

           including disabilities, confidential;

     d.    The matters addressed in Section III.B. of this Agreement, including

         Nevada's:

         i.    Revised medical clearance policies, procedures, and practices f

           work assignments;

    ii.   Revised medication administration policies, procedures, an[d]

    practices;

    iii.   Revised policies, practices, and procedures for providing in[mates]

    with disabilities with health care services in NDOC facilities t[hat]

    currently do not employ full-time medical or mental health sta[ff]

    iv.   Obligation to provide inmates with disabilities with equal

    opportunities to participate in Nevada's services, programs an[d]

    activities, including work assignments, and Nevada's plans to [provide]

    equal opportunities going forward; and

    v.   New work credit and work assignment processes (designed [to]

    ensure equal opportunities for inmates with disabilities), inclu[ding]

    the availability of reasonable accommodations and the admini[strative]

    procedures by which inmates may request them;

e.   The matters addressed in Section III.C. of this Agreement, includ[ing:]

    i.   Nevada's revised policies and procedures for custody-level

    classifications and placements; and

    ii.   The periodic classification and capacity reviews that Neva[da will]

    conduct pursuant to this Agreement;

f.   Nevada's revised disciplinary, complaint, and grievance policies;

g.   The identities, roles, and responsibilities of Nevada's ADA Comp[liance]
Officer and ADA Coordinators; and

h.   This Agreement, including the steps that Nevada has taken, and [will]
continue to take to ensure that its obligations under this Agreement [are]
met.

27. <u>Training for New Employees</u>: For the term of this Agreement, Nevada sh
ensure that all new NDOC employees, and all other State of Nevada employ
whose positions require them to regularly interact with NDOC inmates, com
the live training outlined in Paragraph 26, during the orientation and on-boa
process—and no later than thirty (30) days after assuming duties.

28. <u>HIV Educational Program</u>: Nevada shall provide an educational program
inmates concerning HIV, transmission, the steps Nevada has already taken to
integrate inmates with HIV into the general population; Nevada's plans to fu
integrate inmates with HIV and address discrimination against inmates with
and Nevada's plans to ensure equal employment opportunities for inmates w
HIV. This program includes the presentation to inmates of video(s), approve
the United States, on HIV, transmission, harassment, and discrimination, and
shall provide inmates with the opportunity for questions immediately after
viewing the video. Such questions will be answered by a member of the ND
medical staff who is knowledgeable about HIV and methods of transmission,
a member of NDOC's security staff who is knowledgeable about NDOC's
revised policies, practices, and procedures as set forth in this Agreement. Ne
shall also advise inmates of their right to submit complaints or grievances
directly to the ADA Compliance Officer or relevant ADA Coordinators.

29. <u>Training for New Inmates at Reception and Intake</u>: For the term of this
Agreement, during the processing and evaluation process for all new inmates,
and no later than fifteen (15) days after an inmate enters NDOC custody, Neva
shall ensure that all new inmates have received the training outlined in Paragra
28.

E. Discipline and Grievances

30. <u>Discipline of Inmates or Staff for Discrimination on the Basis of Disability</u>:
Nevada shall implement revised policies requiring Nevada to take appropriate
disciplinary action against inmates or staff who subject inmates with disabiliti

to discrimination, retaliation, coercion, intimidation, harassment, threats, c

abuse, or who interfere with rights protected by the ADA or this Agreeme

including confidentiality of HIV status, on the basis of those inmates'

disabilities.

31.   Grievance Policy: Nevada shall implement revised procedures to ensure

grievances by inmates who allege discrimination on the basis of disability

promptly reviewed, reported to the ADA Compliance Officer and relevant

Coordinators, and addressed by appropriate action.

F.   ADA Compliance Officer and Coordinators

32.   ADA Compliance Officer: Nevada has designated, and will continue to

designate, at least one employee in NDOC headquarters to serve as the NI

ADA Compliance Officer.  This individual shall coordinate Nevada's effo

comply with and carry out its responsibilities under Title II and this Agree

33.   ADA Coordinators: Nevada has designated, and will continue to design

least one employee in each of the NDOC's correctional facilities to serve

facility's ADA Coordinator.  Each ADA Coordinator will coordinate his o

facility's efforts to comply with and carry out the facility's responsibilities

Title II and this Agreement.

34.   General Responsibilities: The ADA Compliance Officer and ADA

Coordinators are and shall continue to be responsible for coordinating the

integration of inmates with HIV and other disabilities; carrying out Nevad

ADA responsibilities; ensuring that inmate work assignments do not discr

based on disability; reviewing inmate work assignment disability accomm

requests; ensuring that services, programs, and activities are readily acces

and usable by inmates with disabilities; coordinating and ensuring that the

meets its program access obligations for inmates with disabilities; ensurin

inmates with disabilities are assigned the appropriate custody-level classi

and housed according to their custody levels; and investigating and assistin

the resolution of ADA complaints or grievances.

35. <u>Grievances</u>: The ADA Compliance Officer and each ADA Coordinator a

responsible and will continue to be responsible for overseeing, supervising,

assisting in all investigations, and the resolution of grievances alleging that

on an ADA recognized disability, a Nevada employee or inmate has subject

inmate to discrimination, harassment, intimidation, retaliation, or interferenc

with the inmate's rights under the ADA or this Agreement. All such grievan

shall be promptly reported to the ADA Compliance Officer and relevant AD

Coordinators or their designees, who shall review the grievances and recomm

appropriate action, including disciplinary action. As part of the training

discussed in Section III.D., Nevada shall advise inmates of their right to subr

grievances directly to the ADA Compliance Officer or relevant ADA

Coordinators. For purposes of this Agreement, grievances shall have the sam

meaning and procedures as all other grievances contemplated and required ur

AR 740 and the Prison Litigation Reform Act (PLRA).

G. Implementation Requirements and Schedule

36. <u>System-Wide Policies, Practices, and Procedures</u>: Nevada shall amend syst

wide policies, practices, and procedures; and any related directives, forms, lis

and other system-wide documents to reflect the requirements of this Agreeme

Nevada shall send the full text of these revisions to the United States for revie

and approval.

37. <u>Individual NDOC Facilities' Policies, Practices, and Procedures</u>: Nevada sh

amend, or where appropriate, issue new policies, practices, and procedures—a

any related directives, forms, lists, or other documents (*e.g.*, inmate and

employee handbooks)—for all individual facilities within the NDOC system, t

ensure that they reflect and comply with the changes made pursuant to this

38. <u>Implementation Schedule</u>: To implement the requirements set forth in
Agreement, Nevada shall make the revisions required by Paragraphs 36
create written guidance and training materials; and provide, and ensure t
completion of, live training on the matters listed in Paragraph 26. Unless
otherwise specified in this Agreement, Nevada shall complete these task
accordance with the following schedule:

   a. In accordance with the timetable below, Nevada shall submit fo
United States' review and approval the revisions required by Para

     i. Within fourteen (14) days of the Effective Date of this Ag
Matters addressed in Section III.E.

     ii. Within sixty (60) days of the Effective Date of the Agreer
Matters addressed in Section III.A. and III.C.

     iii. Within ninety (90) days of the Effective Date of this Agre
Matters addressed in Section III.B.

   b. The United States shall review and may provide comments on a
documents submitted for its review and approval. Within forty-fiv
receiving the United States' comments, Nevada shall incorporate t
comments and submit the revised document for the United States'
approval. Within forty-five days of the United States' approval, N
shall distribute and implement the revised document.

   c. Within sixty (60) days of the United States' approval of a docu
revised pursuant to Paragraph 36, Nevada shall:

     i. Submit for the United States' review and approval writte
guidance and training materials (*e.g.*, PowerPoint presentati
policy documents, pamphlets, brochures) covering the subj
of the revision; and

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL.

Case 3:21-cv-00380-CLB    Document 17    Filed 03/30/22    Page 58 of 67

ii. Revise facility-specific policies, practices, and procedures, a

other documents, as required by Paragraph 37.

d. Within thirty (30) days of receiving the United States' comments

concerning any written guidance or training materials, Nevada shall

incorporate those comments that bring Nevada's materials into compl

with the ADA and submit the revised materials for the United States'

approval. Within thirty (30) days of the United States' approval, Nev

shall provide, and ensure completion of, the live training required in

Paragraph 26.

## IV.    REPORTING, MONITORING, ENFORCEMENT

39. Reporting: Beginning six (6) months after the Effective Date of this Agreement,

every three (3) months thereafter for the first year of this Agreement, Nevada shall

submit written reports (including supporting documentation) to the United States,

delineating all steps taken during the reporting period to comply with each substant

provision of this Agreement. Thereafter, for the duration of the Agreement, Nevad

shall submit a report every six (6) months. Each report shall include the following

the preceding reporting period:

a. Grievances: A copy of every grievance by an inmate relating to disability-

based discrimination, harassment, or any other issue covered by this Agreeme

and Nevada's response to or resolution of the grievance.

b. Inmate Data: The unique identifier of every inmate with a medical or ment

health restriction within the NDOC system, by NDOC facility, custody-level

classification, the date the inmate was classified to that custody level, the cust

level of the facility in which the inmate is currently housed, the date the inmat

was placed in the facility in which he or she is currently housed, the inmate's

medical and mental health classification (including restrictions), housing unit,

work assignment (if any), and number of work credits earned (if any). The

reporting, monitoring, and enforcement under this Agreement and shall n

identical to inmates' existing offender ID number.

c. Integration of Inmates with HIV: A list of all inmates, by unique identi

with HIV that indicates whether each inmate has elected to integrate, as w

all cell change request forms signed by the inmates to indicate their electi

d. Confidentiality: If an inmate's confidential medical information was sh

with non-medical or mental health staff, an explanation of the circumstan

led to each disclosure.

e. Legitimate Safety Requirement and Direct Threat: A copy of every leg

safety requirement or direct threat determination Nevada has made about

inmate with regards to a medical or mental health restriction.

f. Custody-Level Classifications and Placements: A detailed description

instance in which:

    i. Nevada has employed an alternative to avoid housing an inmate

    disability at a custody level above that to which the inmate has bee

    classified;

    ii. Nevada has housed an inmate with a disability at a custody level

    that to which the inmate has been classified, as well as the reason w

    Nevada did not house that inmate at the appropriate custody level;

    iii. An inmate with a disability has requested an individualized healt

    determination pursuant to Paragraph 23. Nevada's description shal

    include the date the inmate made the request, the date Nevada evalu

    the inmate, the ultimate outcome of Nevada's evaluation, and Neva

    rationale for that outcome.

g. Medications: A copy of every denial Nevada has issued regarding an i

4/1/2021   SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL...

Case 3:21-cv-00380-CLB   Document 17   Filed 03/30/22   Page 60 of 67

as keep-on-person medication.

    h.   <u>Periodic Classification and Capacity Reviews</u>: All reviews and plans requ[ired]
         by Paragraph 24.

    i.   <u>Discipline</u>: Any discipline taken against any inmates or Nevada employee[s]
         discrimination or harassment against inmates with disabilities.

    j.   <u>Training</u>: For all training required by Section III.D., Nevada shall submit
         written reports detailing: the date and time of each training; a copy of the age[nda]
         and materials (*e.g.*, handouts, PowerPoint presentations) used for each traini[ng];
         the names (and for employees, names and titles) of the individuals who atten[ded]
         the training; and for employee trainings, copies of the training sign-in sheets.

    k.   <u>All Other Relevant Documents</u>: All other documents requested by the Uni[ted]
         States relevant to this Agreement and to the United States' determination of
         Nevada's ongoing compliance with this Agreement.

40.   <u>Delivery of Reporting Materials</u>: All materials sent to the United States pursuant [to]
     this Agreement shall be sent by e-mail to undersigned counsel (or to alternate email
     addresses that the United States may designate during the term of this Agreement). [If]
     the materials cannot be e-mailed, then the materials shall be sent to the following
     address by common carrier other than the U.S. Postal Service: Chief, Disability Rig[hts]
     Section, Civil Rights Division, U.S. Department of Justice, 4 Constitution Square, 1[50]
     M Street NE, Washington, D.C. 20002. The cover letter shall include a subject line
     referencing the Nevada Department of Corrections and DJ No. 204-46-176.

41.   <u>Monitoring</u>: Nevada shall make facilities, policies, records (including inmate med[ical]
     records), personnel, and any other information the United States may request, availa[ble]
     to the United States to facilitate the United States' monitoring of Nevada's complian[ce]
     with this Agreement. Upon request from the United States, Nevada shall make
     arrangements for the United States to conduct confidential and private telephonic,
     videophone, or in-person interviews with inmates.

42. <u>Enforcement</u>: The United States may review compliance with this Agreement

time throughout the Term of the Agreement. After receipt of each report referen

Paragraph 39, the United States may assess Nevada's compliance with this Agre

and confer with Nevada. If the United States believes that Nevada has failed to

in a timely manner with any requirement of this Agreement, or if any requireme

been violated, the United States will notify Nevada in writing and the Parties wi

attempt to resolve the issue in good faith. If the Parties are unable to reach a

satisfactory conclusion within thirty (30) days of the date the United States notif

Nevada, the United States may file a civil action in federal district court to enfor

terms of this Agreement, or take any other action to enforce Title II of the ADA.

United States agrees that any civil action will be filed in the United States Distri

Court of Nevada.

43. <u>Remedies</u>: The Parties agree that money damages alone would be an insuffici

remedy for breach of this Settlement Agreement, that such breach would represe

irreparable harm, and that each non-breaching Party shall be entitled to specific

performance as well as such other injunctive relief (without the posting of any b

without proof of actual damages) as may be granted by a federal district court.

remedies sought in the event of a breach of this Agreement or a violation of the

shall be cumulative and in addition to, and not in lieu of, all other remedies avai

this Agreement, in law or in equity.

44. <u>Non-Waiver</u>: Failure by the United States to enforce any provision or deadlin

Agreement shall not be construed as a waiver of the right of the United States to

enforce any deadline or provision of this Agreement.

V.   MISCELLANEOUS PROVISIONS

45. <u>Legitimate Safety Requirements and Direct Threat</u>: Pursuant to 28 C.F.R.

§ 35.130(h) and § 35.139 and notwithstanding any other provision in the Agreem

Nevada may implement and maintain (a) legitimate safety requirements necessa

inmates with disabilities to higher-custody classifications or to exclude inmates w
disabilities from a particular service, program, or activity based upon a determina
that the inmate poses a direct threat to the health or safety of others—defined as a
significant risk to the health or safety of others that cannot be eliminated by Nevad
modification of policies, practices, or procedures, or the provision of auxiliary aid
services.

    a.   Nevada shall only implement legitimate safety requirements or make a di
threat determination on the basis of actual risks, and not on mere speculation
stereotypes, or generalizations about inmates with disabilities, including inm
with HIV.

    b.   In determining whether an inmate poses a direct threat to the health or safe
of others, Nevada must make an individualized assessment, based on reasona
judgment that relies on current medical knowledge or on the best available
objective evidence to ascertain: (1) the nature, duration, and severity of the ri
(2) the probability that the potential injury will actually occur; and (3) wheth
reasonable modifications of policies, practices, or procedures, or the provisio
auxiliary aids or services, will mitigate the risk.

    c.   Sources for medical knowledge in imposing safety requirements and maki
determination that an inmate poses a direct threat include knowledgeable and
appropriate medical and mental health personnel, as well as guidance from pu
health authorities, such as the Centers for Disease Control, the U.S. Public He
Service, the National Institutes of Health, and the National Commission on
Correctional Health Care.

    d.   A determination that an inmate with a disability poses a direct threat to the
health or safety of others because of the inmate's disability shall be made by a
Warden or Associate Warden in consultation with appropriate NDOC
headquarters personnel, including the ADA Compliance Officer and any relev

separate inmates or place an inmate with a disability in a controlled housi
status in circumstances presenting an immediate threat to the health or sa
others.

e.   Any legitimate safety requirement or direct threat determination made
to this Paragraph shall be in writing; shall include the facts and circumsta
Warden or Associate Warden believe justify the determination; shall be si
the Warden or Associate Warden; and shall be preserved. An inmate with
disability may only be assigned to a higher-custody classification or exclu
from a particular service, program, or activity based upon a legitimate saf
requirement or direct threat determination for only as long as necessary to
safe operation of the program or as long as the direct threat remains. Any
legitimate safety requirements or direct threat determinations concerning
other disabilities shall be reported to the United States for the term of this
Agreement consistent with the reporting requirements identified in Sectio
*supra.*

46.   <u>Consideration</u>: In consideration for this Agreement, the United States agrees
its investigation (DJ No. 204-46-176) without further enforcement action, excep
provided in Section IV of this Agreement.

47.   <u>Effective Date</u>: The effective date of this Agreement is the date of the last sig
below.

48.   <u>Term</u>: The duration of this Agreement will be three (3) years from the Effecti

49.   <u>Early Termination</u>: This Agreement or a distinct, severable part of the Agree
will terminate earlier than three years if the United States determines that Neva
demonstrated durable compliance with Title II of the ADA and this Agreement,
that distinct, severable part, as applicable. In determining whether Nevada has
demonstrated durable compliance with a part of the Agreement, the Departmen

50. <u>Definitions</u>: Unless otherwise specified, terms in this Agreement have the same meaning as in Title II of the ADA and its implementing regulation.

    a. <u>"State of Nevada"</u>: The term "State of Nevada" means the State of Nevada, its agencies, officials, employees, agents, contractors, or sub-contractors, including individuals whose positions require them to interact regularly with NDOC inmates.

    b. <u>"NDOC"</u>: The term "NDOC" means the Nevada Department of Corrections and its officials, employees, agents, contractors, or sub-contractors, including Offender Management Division staff, wardens, medical and mental health staff, correctional officers, and case workers.

    c. <u>"Employee," "Staff," and "Personnel"</u>: The terms "employee," "staff," and "personnel" mean any official, employee, agent, contractor, or sub-contractor.

51. <u>Counterparts</u>: This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same Agreement. Facsimile or electronic signatures are acceptable.

52. <u>Severability</u>: If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

53. <u>Binding Nature of Agreement</u>. This Agreement shall be binding upon Nevada and the United States, their agents, and their employees.

54. <u>Authority</u>: The individuals signing this Agreement represent that they are authorized to do so on behalf of the respective entity for which they have signed.

55. <u>Entire Agreement</u>: This Agreement constitutes the entire agreement between the United States and Nevada on the matters raised herein and no other statement or promise written or oral, made by any party or agents of any party, that is not contained in this written Agreement shall be enforceable.

56. Extensions: Any time limits for performance that this Agreement imposes ma
extended by the mutual written agreement of the Parties. The Parties acknowled
such written agreement may be completed by e-mail so long as the e-mail has sp
language designed to bind either party.

57. Successor Liability: This Agreement is binding on Nevada and its successors,
including any successor legislature, Director of the NDOC, or Governor of the S
Nevada.

58. Other Violations: This Agreement shall have no impact upon the rights or cla
any individual not identified in this Agreement who has made, or may make, cla
against Nevada, even for issues addressed herein. This Agreement is not intend
remedy any violations or potential violations of the ADA or any other law, othe
those specifically addressed by this Agreement. Nothing in this Agreement shal
preclude the United States from filing a separate action under the ADA, or any
law, for any alleged violation not covered by this Agreement.

59. Costs and Fees: The United States and Nevada will bear the cost of their own
and expenses incurred in connection with this Agreement.

60. Publicity: This Agreement and any amendment hereto shall be public docume

**AGREED AND CONSENTED TO:**

**FOR THE UNITED STATES OF**
**AMERICA**

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

KATHLEEN P. WOLFE

KEVIN J. KIJEWSKI
Deputy Chief

/s/
CHRISTINE KIM
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
202-305-0043 (telephone)
202-305-4486 (facsimile)
christine.kim@usdoj.gov

Date: 2/11/21

**FOR THE STATE OF NEVADA EX REL.**
**NEVADA DEPARTMENT OF**
**CORRECTIONS**

/s/
STEVEN SISOLAK
Governor
State Capitol Building
101 N. Carson Street
Carson City, NV 89701
(775) 684-5670 (telephone)
(775) 684-5683 (facsimile)

/s/
CHARLES A. DANIELS
Director
Nevada Department of Corrections
Stewart Facility
5500 Snyder Avenue, Bldg. 17
Carson City, Nevada 89701
775-887-3285 (telephone)
775-687-6715 (facsimile)

Date: 2/9/21

ADA Enforcement Page | ADA Home Page