Ammar Harris #1116547
HDSP, P.O.Box 650
Indian Springs, NV
Plaintiff in Pro Se

## United States District Court
## District of Nevada

| | |
|---|---|
| Ammar Harris,<br>        Plaintiff, | Case # 3:21-CV-00380 |
| Vs | Hon. Robert C. Jones |
| State of Nevada,<br>        Defendant. | Mag. Judge Carla Baldwin |

## JURY TRIAL DEMANDED

## VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

### I. Introduction

1.) This is a 42 USCS §§ 1983 action filed by Plaintiff, a state prisoner, alleging violations of his constitutional rights to receive adequate security, medical care and transportation, seeking declaratory, injunctive relief and damages pursuant to Title II of the Americans With Disabilities Act on his own behalf and on behalf of those similarly situated.

2.) Defendants' actions, detailed herein, deny basic human needs, inflict unnecessary and wanton pain and suffering, and put Plaintiff and the class at substantial risk of physical injury, all in violation of Plaintiff rights under the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff seek injunctive and declaratory relief to remedy these ongoing violations of rights for himself as well as for a class of those similarly situated.

## II. Jurisdiction And Venue

3.) This action arises under 42 USCS § 1993, 1988 and 42 USC §§ 12101 et seq to redress the deprivations under color of state law of rights, privileges and immunities secured by the Constitution of the United States. The rights sought to be redressed are guaranteed by the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 USCS §§ 1331 and 1343, and the aforementioned statutory, constitutional provisions. The Court has jurisdiction to grant class, declaratory and injunctive pursuant to Fed.R.Civ.P 23, 57 and 65.

4.) Venue is proper in the District of Nevada under 28 USCS §§ 1391. The Plaintiff is incarcerated there, the acts complained of occurred there, and the Defendants work there.

### III. Parties

5.) Plaintiff Ammar Harris at all times relevant was confined by the Nevada Department of Corrections, "NDOC", at Ely State Prison, "ESP" and High Desert State Prison, "HDSP."

6.) Defendant State of "Nevada" is an authority represented by a body of people politically organized under one government and is solely responsible for the actions and duties of all employees, officials, and their agencies functioning under its jurisdiction.

The Secretary of State will accept service of process for the Defendant State of Nevada. Barbara Cegavske.

7.) Defendant Steven "Sisolak", is the Governor of the State of Nevada. As Governor, Sisolak is the President of the Board of State Prison Commissioners "Board", the State governmental body responsible for oversight of all prisons in Nevada. As part of its oversight duties, the Board receives semiannual reports from the State's Health Officer on correctional facilities' compliance with the medical services standards established under Nevada statute. Defendant Sisolak is sued in his official capacity.

(Injunctive Relief Only)

8.) Defendant Barbara "Cegavske", is the Secretary of State of Nevada. As Secretary of State, Cegavske is the Secretary of the Board, the state governmental body responsible for oversight of all prisons in Nevada. Defendant Cegavske is sued in her official capacity.

(Injunctive Relief Only)

9.) Defendant Aaron "Ford", is the Attorney General of the State of Nevada. As Attorney General, Ford is a member of the Board. Defendant Ford is sued in his official capacity.

(Injunctive Relief only)

10.) Defendant Charles "Daniels", is the Director of the NDOC. As Director, Daniels is responsible for NDOC's daily functioning and administration. Under Nevada law, the Director of NDOC is also responsible for establishing policies and procedures, as well as standards for medical services in prisons with the approval of the Board. Defendant Daniels is sued in his official capacity.

11.) Defendant Brian "Williams" Sr., is the Deputy Director of the NDOC. Defendant Williams is sued in his official capacity.

12.) Defendant Michael "Minev", is the Medical Director for NDOC. As Medical Director, Minev is responsible for the administration and provision of medical care services to individuals in NDOC's custody. Dr. Minev's duties include ensuring the quality and adequacy of medical care services provided to prisoners at HDSP. Defendant Minev is sued in his official capacity.

13.) Defendant William "Gittere", is the Warden of ESP. As Warden, Gittere is responsible for the daily functioning and administration of ESP, including the safe, secure and humane treatment of all prisoners incarcerated there. Defendant Gittere is sued in his official capacity.

14.) Defendant William "Reubart", is the Associate Warden of Operations of ESP. Defendant Reubart is sued in his official capacity.

15.) Defendant David "Drummond", is the Associate Warden of Programs of ESP. Defendant Drummond is sued in his official and individual capacity.

16.) Defendant P. "Hernandez", is a Caseworker of ESP. Defendant Hernandez is sued in her official and individual capacity.

17.) Defendant Dana "Cole", is a Security Officer of ESP. Defendant Cole is sued in his official and individual capacity.

18.) Defendant Mr. "Boyd", is a security officer of ESP. Defendant Boyd is sued in his official and individual capacity.

19.) Defendant Calvin "Johnson", is the Warden of HDSP. As Warden, Johnson is responsible for the daily functioning and administration of HDSP, including the safe, secure and humane treatment of all prisoners incarcerated there. Defendant Johnson is sued in his official capacity.

20.) Defendant F. "Dreesen", is the Associate Warden of Programs of HDSP, Dreesen is responsible for the daily processing of prisoner grievances. Defendant Dreesen is sued in his official and individual capacity.

21.) Defendant Gregory "Bryan", is the Doctor of HDSP. Defendant Bryan is sued in his official and individual capacity.

22.) "Defendants" Sisolak, Ford, Cegavske, Daniels, Williams, Minev, Gittere, Reubart, Drummond, Hernandez, Cole, Boyd, Dreesen, Johnson, Bryan, any Doe, and each of them at all times herein mentioned, was and/or is the agent, servant and employee of each remaining defendants, and was at all times herein mentioned, acting under Color of State Law, or acting within the course, scope, and authority of said agency, service and employment.

23.) The true identities of Defendant Does 1-10, are currently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff, based upon knowledge and information, reasonably believe and therefore allege that each of the Defendants designated herein as Does 1-10 may be in some manner responsible for events and happenings herein referred to; that Plaintiff will ask leave to amend this complaint to insert the true name(s) of said Defendant(s) when the same have been ascertained by Plaintiff together with the appropriate factual allegations and to join such Defendant(s) as and when they become known in this action in their true capacities.

24.) Plaintiff have been forced to incur reasonable attorney's fee and costs in pursuit of this action including, but not necessarily limited to, those contemplated by 42 USCS § 1998.

### IV. Exhaustion of Available Remedies

25.) Plaintiff exhausted his administrative remedies before filing this complaint, with respect to all claims.

## V. Factual Allegations

I. Defendants Fail to Provide Adequate Security, Medical Care and Transportation Causing Significant Injury and Unnecessary and Wanton Infliction of Pain.

26.) (ALL INMATES) ESP is a maximum security prison in Ely, Nevada designed to house over 1,000 men, including Death Row.

27.) On or about August 29th, 2020 While at ESP at approximately 9am Defendant Cole asked Plaintiff if he were attending yard, which was respectfully declined. At approximately 9:30am Defendant Cole started opening up multiple cell doors in the Death Row Unit which negates policy and practice.

28.) An inmate stood at Plaintiff cell door attempting to gain entry, as he stood there, a gesture was made to Defendant Cole, and Plaintiff's cell was opened, in order for the inmate to attack Plaintiff.

29.) Plaintiff became aware, that the inmate had a weapon in his hand, Plaintiff alerted Defendant Cole and Boyd for aid, but they merely laughed and cheered on

30.) Plaintiff attempted to defend himself to the best of his abilities, but unfortunately was unsuccessful, when officers came to intervene, Plaintiff was lying on the floor bleed.

31.) Defendant Cole and Boyd fail to follow policy and procedures resulting to Plaintiff's Injury and Unnecessary and Wanton Infliction of Pain, depriving him of life and liberty without due process of the law.

32.) Defendant Cole and Boyd conduct was deliberate indifference to Plaintiff's health and security.

33.) Plaintiff was given some treatment by Nurse Jones, and then transferred by EMS to William Bee Ririe Hospital.

34.) Plaintiff injuries were Serials, invoking Administration Regulation 404.01 (Emergency Situation Procedures) and 420.02 (Deaths or Serials Injury Reporting Requirements) which noticified Defendant Daniels, Williams, Gittere, Reubart, Drummond.

35.) Defendants have statutory responsibilities pursuant to NRS 209.131 and NRS 209.161 which is codified in the Administrative Regulations.

36.) On or about September 4th 2020, Plaintiff awoke at UMC Trauma, and was informed by the Doctor, He was lucky to be alive because of the injuries sustained from the assault.

37.) Doctor further informed Plaintiff that he had succumbed twice and had to be revived, the knife penetrated his brain causing Intra-Cranial Hemorrhage in the left Frontal lobe. There is an acute fracture in the left parietal bone, and Cervical spine damage.

38.) Plaintiff could not articulate himself, nor eat due to his injuries, the Doctor had to have a G-Tube put in, in order for Plaintiff to take in nutrients.

39.) On or about September 11th, 2020, Plaintiff was transferred to Summerlin Hospital for Speech Pathology, Pain Management, Physical Therapy and Occupational Therapy.

40.) Plaintiff watched a News Report on TV about the events that transpired on August 29th, 2020 involving himself.

41.) On or about October 1st, 2020, Plaintiff was informed by his Therapist that he was making a remarkable recovery, but she feared that NDOC would stop it soon.

42.) On or about October 13th, 2020, Plaintiff was informed by his Doctor that after the removal of his Gastrostomy Tube, he would be returning to NDOC, prison cited financial concerns.

43.) On or about October 16th, 2020, Plaintiff was given a copy of the Medical Order from his Doctor, the Medical Order included a "Continuity of Care", Pain Management and Physical/Occupational Therapy.

44.) Plaintiff was taken to High Desert State Prison and wheelchaired to the infirmary by C/O Lopez, pursuant to Administrative Regulation 609.01, handed two binders of Plaintiff medical records to Nurse Sams and Rios.

45.) On or about October 19th, 2020, Defendant Bryan visited Plaintiff and was asked were there any pain, Plaintiff answered in the affirmative.

46.) Plaintiff asked Defendant Bryan if he reviewed the Medical Order, and about receiving rehabilitation, Defendant Bryan response, "No, we do not have the money to send you to Physical/Occupational Therapy, you are just going to have to help yourself."

47.) Defendant Bryan fail to conduct an examination of Plaintiff before informing him that he would not be receiving any therapy.

48.) Plaintiff was diagnosed with Acquired Aphasia, Ataxia, Hemianopsia, Apraxia and Hemiparesis.

49.) Upon information and belief, NDOC has a history of downplaying injuries sustained by inmates in their custody, in order to assert plausible deniability, Medical staff Follow a custom and/or policy in order to negate the State's liability.

50.) Plaintiff was placed on bloodthinners while at Summerlin Hospital, in order to increase circulation in his affected limbs, Defendant Bryan discontinued the use, and put Plaintiff on Baclofen, which Plaintiff later learned that Baclofen should not be given to stroke patients, Defendant Bryan fail to inform Plaintiff of the side effects.

51.) Defendant Bryan became aware of Plaintiff's pending Fictitious charge For Murder While in the infirmary.

52.) On or about November 6th, 2020, Nurse Sams informed Plaintiff that he really needed Therapy, without it his conditions would only get worse.

53.) On or about November 19th, 2020, Defendant Bryan led Plaintiff to believe he was pending a transfer to Northern Nevada Correctional Center for Medical Treatment, in order to discharge Plaintiff from the infirmary.

54.) Defendant Bryan Fail to follow policies and procedures resulting in Plaintiff's Injury and Unnecessary and Wanton Infliction of Pain, depriving him of life and liberty without due process of the law.

55.) Defendant Bryan conduct was deliberate indifference to Plaintiff's Serious Medical Needs, and well being.

56.) Plaintiff Serious Medical Needs, invoking Administrative Regulation 615.01 (Levels and Continuity of Care) and Administrative Regulation 639.01 and 639.02 (Medical Records) and (Confidentiality of Medical Records) which notified Defendant Ford, Daniels, Williams, Johnson, Dreeson, and Miner.

57.) Defendants have Statutory responsibilities pursuant to NRS 209.131, 209.291 and NRS 209.381

58.) Plaintiff was wheelchaired to Disciplinary/Punitive Segregation by C/o Job, the conditions were no hot water, minimum food/ smaller portions, no heat during winter, and no access to the canteen.

59.) On or about November 24th, 2020, Plaintiff received a Notice of Charges for Murder from Defendant Cole regarding August 29th, 2020 events, and was authorized by Defendants Daniels, Williams, Gittere, Reubart, Drummond, Dreesen and Johnson.

60.) Per policies and procedures, every Notice of Charges has to be ~~when~~ entered into NOTIS, Defendant Daniels, Williams, Gittere, Reubart, Drummond, Dreesen and Johnson could of and/or should of known of the Fictitious Charge for Murder.

61.) Upon information and belief, NDOC has a policy and/or custom of issuing Fictitious Notice of Charges to prevent inmates from petitioning the goverment for a redress of grievances.

62.) On or about December 4th, 2020, Plaintiff initiated an Emergency Medical because of his severe pain and suffering, headaches, dizziness, stomach pain, blurry vision, poor blood circulation and blackouts.

63.) Plaintiff started feeling Aggravated, Depressed, Anger, Anxiety, Frustration, Hopelessness and Agony because of being in Disciplinary / Punitive Segregation, Plaintiff tried to kill himself twice because of the ordeal.

64.) Defendants fail to follow policies and procedures, resulting in Plaintiff's Injury and Unnecessary and wanton infliction of Pain, depriving him of life and liberty without due process of the law.

65.) Defendants conduct was deliberate indifference to Plaintiff's health and well being.

66.) Defendants have statuary responsibities pursuant to NRS 209.131 and NRS 209.161

67.) On or about March 14th, 2021, Plaintiff filed an Informal Grievance, 2006-31-14343

68.) On or about March 21st, 2021, Plaintiff filed an Informal Grievance, 2006-31-20319

69.) On or about May 5th, 2021, Plaintiff filed a First Level Grievance due to no response, 200631-14343

70.) Upon information and belief, on or about May 6th, 2021, Defendants Drummond, Gittere, Reubart, Dreesen and Johnson had Plans to have Plaintiff transferred back to Ely State Prison, in order to prevent a petition to the government for a redress.

71.) On or about May 19th, 2021 Plaintiff was wheelchaired to intake and forced to forego it in order to board a bus for transportation to ESP, despite Plaintiff Visible ADA disability, no Does 1-10 did anything to intervene.

72.) Plaintiff was placed in full restraints, despite the pain being caused, and asked Does 1-10 for reasonable accomodation to be handcuffed in the front, Plaintiff had to be helped onto the bus, and Denied his request.

73.) In route to ESP, the bus came to an abrupt stop, by lack of seat belts, Plaintiff Flew forward, hitting his head on the back of the seat in front of him, falling on the floor and banging his head, and reaggravating his injuries, causing severe pain and suffering, Defendants Does 1-10 bad to report the incident to Defendant Johnson and Gittere.

74.) Upon arrival to ESP, Plaintiff had to immediately be admitted into the infirmary because of injuries sustained

75.) Defendant Does 1-10 fail to follow policies and procedures resulting in Plaintiff's Injury and Unnecessary and wanton Infliction of Pain, depriving him of life and liberty without due process of the law.

76.) Defendants Does 1-10 conduct was deliberate indifference to Plaintiff's health and well.

77.) Plaintiff made a request for a reasonable accommodation based solely on his disability, Defendant Does 1-10 denied said request, denying Plaintiff's Equal Protection under the law.

II. Defendants Drummond and Hernandez While Acting In Concert With Each Other, Conspired To Retaliate and Threaten Plaintiff For Petitioning The Government For A Redress.

78.) Plaintiff hereby incorporates all his supporting facts to Count I of this complaint, as if fully stated herein.

79.) On or about June 6th, 2021, Defendant Hernandez informed Plaintiff that he had to pay for copies of his grievances

80. On or about July 16th, 2021, Plaintiff filed a First Level Grievance, due to no response, 2006-31-20319.

81.) On or about August 1st, 2021, Plaintiff Filed a Second Level Grievance, due to no response, 2006-31-18343

82.) On or about August 6th, 2021, Defendant Hernandez provided Plaintiff with two memorandums issued by Defendant Drummond, depriving the right to Petition the Government for a Redress.

83.) Plaintiff asked Defendant Hernandez for clarity, her response, "if you keep pushing the issue, something bad may happen." which had a chilling effect on Plaintiff, he perceive the threat to be real. (ECF No. 1)

84.) Administrative Regulation 740 (Inmate Grievance Procedure) 740.01 (Administration of Inmate Grievances)

1. All grievances, whether accepted or not, will be entered into NOTIS.

740.05 (Remedies to Grievances)

C. Protect inmates from criminal or prohibited acts committed by Departmental employees and staff....

E. To provide a disabled or physically impaired inmate with reasonable accommodation or reasonable modification.

740.08 (Informal Grievance)

2. Grievances should be reviewed, investigated and responded to by the Department Supervisor....

A. High Risk Prisoner (HRP) status.
(1) Informal Level Grievance will be responded to by the Warden or designee.
(2) First Level Grievance will be responded to by the Deputy Director or designee.
(3) Second Level Grievance will be responded to by the Director or designee.

85.) Defendant Drummond and Hernandez retaliated against Plaintiff for filing a grievance to Petition the Government for a Redress regarding events that transpired on August 28th, 2020, which violates Administrative Regulation 339 (Employee Ethics and Conduct, Corrective or Disciplinary Action, and Prohibitions and Penalties.) and threaten Plaintiff which had a chilling effect, enough to shock the conscious.

III. Defendants Fail to Provide Reasonable Accommodation for Plaintiff in Violation of Title II of the Americans with Disabilities Act, causing Significant Injury and Unnecessary and Wanton Infliction of Pain

86. Plaintiff hereby incorporates all his supporting facts to Count I and II of this complaint, as if fully stated herein.

-19-

87.) Plaintiff is an individual with a disability that limits major life activities, such as Standing, Walking, Grooming, Bathing, Talking, Thinking, Hearing, Focusing, Reading, Writing, Articulating and other daily functions.

88.) Plaintiff is qualified to receive medical services and reasonable transportation accomodations based on disabilities, and was hereby denied.

89.) Plaintiff is aware that Defendant Nevada receive Federal Financial assistance for the Department of Corrections.

90.) On or about December 2014, the Department of Justice initiated an investigation after receiving complaints from inmates with disabilities who were then in the custody of the NDOC.

91.) On or about June 20th, 2016, the Department issued a finding letter, concluding that the NDOC had violated Title II of the ADA.

92.) On or about April 1st, 2021, Defendant Nevada, Sisolak, and Daniels entered into a Settlement Agreement with the Department of Justice ( DJ No. 204-46-176) regarding Violations of Title II of the ADA by NDOC.[1]

_____

[1] Christine Kim - Christine.Kim@USDOJ.gov
www.ada.gov/nv_doc_ga.html

— 20 —

93.) Defendant Nevada, Sisolak and Daniels are in violation of the terms and/or provision of said Agreement.

C. Custody-Level Classifications and Placements for Inmates with Disabilities.

    21. Equal Opportunity

    22. Non-Discrimination in Custody-Level Classifications

    23. Non-Discrimination in Custody-Level Placement

D. Training

    26. Training for Nevada Staff

E. Discipline and Grievances

    30. Discipline of Inmates or Staff for Discrimination on the Basis of Disability

    31. Grievance Policy

    34. General Responsibilities

II. General Relief

    4(a)  See. 29 C.F.R. § 35.130(b)(1).

    4(b)  See id 29 C.F.R. § 35.130(b)(1)(iv).

    4(c)  See id. 29 C.F.R §§ 35.130(b)(7)

    4(d)  See id. 29 C.F.R § 35.130(b)(4)

IV. Defendants Fail to Supervise with Deliberate Indifference to Plaintiff's Safety and Security, health and Well being.

94) Plaintiff hereby incorporates all his supporting Facts to Count I, II and III of this complaint, as fully stated herein.

95.) On or about August 29th, 2020, Defendants Daniels, Williams, Gittere, Reubart, Drummond and Does 1-10 had a duty to train and supervise his Subordinates to ensure policies, procedures and/or regulations are followed, Fail to review and/or investigate if Staff error and/or misconduct was proximate cause, Fail to discipline Cole and Boyd, Fail to terminate a series of actions that would lead to a constitutional Violation, Fail to protect Plaintiff from harm, despite Knowledge he were in danger because of acts by his Subordinates and did not take any action to negate it.

96.) Defendants Daniels, Williams, Gittere, Reubart, Drummond and Does 1-10 were fully aware of the factitious charge Cole filed against Plaintiff based on Surveillance Video of said events, and/or they conspired with Defendant Cole to engage in a cover up to negate liability.

97.) Defendants Daniels, Williams, Gittere, Reubart, Drummond and Does 1-10 could have and/or should have Known that a factitious charge would subject Plaintiff to adverse treatment and/or Disciplinary/Punitive Segregation after a traumatic order.

-22-

98.) Defendants Daniels, Williams, Gittere, Reubart, Drummond, and Does 1-10 could have and/or should have known there were threats against Plaintiff life and/or liberty, based on on interception of monitored communication, phone, letters and/or other intelligence gathering capabilities, and Fail to inform Plaintiff of such danger.

99.) Upon information and belief, Defendant Daniels, Williams, Gittere, Reubart, Drummond and Does 1-10 have in their possession intercepted threats against Plaintiff dating as far back to 2014.

100.) On or about October 14th, 2020, Defendant Daniels, Williams, Minev, Johnson, Dreesen and Does 1-10 had a duty to train and/or supervise his subordinates to ensure policies, procedures, and/or regulations are followed, Fail to review and/or investigate if staff error and/or misconduct was proximate cause, Fail to discipline Bryan, Fail to terminate a series of actions that would lead to a constitutional violation, Fail to protect Plaintiff from harm, despite knowledge he were in danger because of acts by his subordinates, and/or did not take any action to negate it.

101.) On or about May 14th, 2021, Defendant Daniels, Williams, Johnson, Dreesen, Gittere, Reubart, Drummond and Does 1-10, each of them, was and/or is joined knowingly and/or unknowingly in a plot, plan, and/or common scheme, and/or a conspiracy to subject Plaintiff to Cruel and/or Unusual Punishment, and/or to Deprive him of Life and/or Liberty without due process of the law, and/or each defendant Has acted in gross disregard of Plaintiff's right to safety at the behest of others acting in concert, and/or in consent, permission, and/or knowledge of each the other remaining defendants and/or agents.

102.) Defendant Daniels, Williams, Johnson, Dreesen and Does 1-10, had a duty to train and/or supervise his subordinates to ensure policies, procedures and/or regulations are followed, fail to review and/or investigate if staff error and/or Misconduct was proximate cause, Fail to discipline Does 1-10, Fail to terminate a series of actions that would lead to a constitutional Violation, fail to protect Plaintiff from harm, despite knowledge he was in danger because of acts by his subordinates, and/or did not take any action to negate it.

# LEGAL CLAIMS

103.) Defendants, their agents and employees, with knowledge of Plaintiff's security, medical and transportation needs, and/or with deliberate indifference to such needs, have acted or failed to act in such a way as to deprive Plaintiff of necessary and adequate security, medical care and transportation thereby causing significant injury and unnecessary and wanton infliction of pain. Such acts and omissions of the Defendants violate rights secured to Plaintiff under the Eighth and Fourteenth Amendments to the United States Constitution.

104.) Defendants, their agents and employee, with knowledge of Plaintiff security, medical and transportation needs, and/or with deliberate indifference to such needs, have acted or failed to act in such manner as to prevent adequate security, medical treatment and care, and transportation from reaching Plaintiff thereby endanger the Plaintiff's health and well being and depriving him of life and/or liberty without due process of the law. Such acts and omissions of the Defendants violate rights secured to the Plaintiff under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

105.) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs have a duty under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution to provide needed medical care to inmates of HDSP, in conformity with the standards for delivery of such medical care in the State of Nevada as a whole.

106.) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs or with deliberate indifference to such medical needs, acted or failed to act in such a way as to provide medical care to Plaintiff in conformity with medical care in the State of Nevada as a whole and have in fact provided medical care which does not meet such standards thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

107.) Defendants, knowing of the security, medical and transportation needs of Plaintiff, and knowing also of the inadequacies and deficiencies in the security and medical facilities staffing procedures at ESP and HDSP, have a duty under the Fifth, Eighth, Ninth and Fourteenth Amend. to establish and implement policies, practices and procedures designed to assure that Plaintiff receive adequate security, medical care and treatment, and transportation.

108.) Defendants, Knowing of the security, medical and transportation needs of Plaintiff, and with deliberate indifference to the inadequacies and deficiencies in the security staffing and procedures at ESP, and medical facilities and transportation at HDSP, have failed and neglected to establish and implement policies, practices and procedures designed to assure that Plaintiff receive adequate security, medical care and treatment, and transportation at the standards therefor in Nevada as a whole, or have adopted policies, practices and procedures which defendants knew, or reasonably should have known, would be ineffective in delivering adequate security, medical care and treatment, and transportation at such standards, thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

109.) Defendants, Knowing of the security, medical and transportation needs of Plaintiff have a duty under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution to instruct, supervise and train their employees and agents to assure the delivery of adequate security, medical care, and transportation to Plaintiff which is consistent with the standards in the State of Nevada as a whole.

110.) Defendants, knowing of the security, medical and transportation needs of Plaintiff or with deliberate indifference to such needs, have failed to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of adequate security, medical care, and transportation to Plaintiff which is consistent with the standards in the State of Nevada as a whole; thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

111.) Defendants subjected Plaintiff to Cruel and Unusual Punishment in Disciplinary/Punitive Segregation in violation of the Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

112.) Defendants retaliated against Plaintiff for seeking to redress the Government for violations to Plaintiff First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

113.) Defendants are a public entity within the meaning of the Americans with Disabilities Act, and those subject to its provisions and any implementing regulations, defendants have violated Plaintiff rights to equal treatment or opportunities to participate in or benefit from the services, programs and activities of the institution where was classified, Plaintiff can participate in such services, programs, and activities, with reasonable accomodations, but is being denied the accomodations in a discriminatory manner, regardless of his disability.

114.) Defendants actions and/or omissions were negligent and/or reckless and/or intentional.

115.) Defendants actions and/or omissions were committed under color of law and/or pursuant to policies, customs, practices, rules, regulations, ordinances, statutes, and/or usage of the State of Nevada, the Department of Social Services and Housing of the State of Nevada, the Corrections Division of DSSH, and/or Ely State Prison, ESP and High Desert State Prison, HDSP.

116.) Plaintiff has no adequate and sufficient remedy at law with which to address the wrongs alleged herein and will continue to suffer irreparable physical injuries from the conditions of Defendants unless he is granted the equitable relief prayed for herein.

117.) As a direct and proximate result of the above described actions and omissions of defendants, plaintiff has suffered general damages in the amounts in excess of $75,000, exclusive of interest and costs, the exact amounts of which will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement against the Defendants, and each of them as follow:

1.) That the Court determines and enter judgement declaring that the acts and omissions of the Defendants, as set forth above, violates rights secured to Plaintiff by the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution;

2.) That upon hearing, the Court issue a TRO/preliminary and permanent injunction;

a.) Enjoining the Defendants, their employees, agents, and successors in offices from violating the terms and/or provisions set in full of the Settlement Agreement regarding Title II of the ADA, entered into by the United States and the State of Nevada.

b.) Enjoining the Defendants, their employees, agents and successors in office from providing medical care and treatment to plaintiff that is inconsistent with the standards of medical care and treatment in the State of Nevada as a whole;

c.) Enjoining the Defendants, their employees, agents, and successors in office from refusing to provide and/or delaying provisions of necessary medical treatment and care to Plaintiff either at suitable and adequate facilities within NDOC or elsewhere;

d.) Enjoining the Defendants, their employees, agents and successors in office from failing to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of medical treatment and care to Plaintiff which is consistent with the standards of medical care in the State of Nevada as a whole;

3) That the Court establish a panel of independent medical experts to regularly evaluate the delivery of medical treatment and care at NDOC and insure the compliance of Defendants and their successors in offices with the Court's order herein;

4.) That each Defendant pay General damages in the amount $75,000; For pain, suffer and shock;

5.) That each Defendant pay Punitive damages in the amount $75,000 For Knowingly placing him in danger, and physical injuries and For mental/emotional distress;

6.) That each Defendant pay Exemplary damages in the amount $75,000 on account of wrong done to Plaintiff was aggravated by circumstances of malice, wanton, wicked and deceptive conduct;

7.) That each Defendant pay compensatory damages in the amount $150,000 For Future harm to Plaintiff;

8.) That the Defendants be required to pay pre-judgement interest, legal cost and expenses, including reasonable provision For Plaintiff's attorney fees;

9.) That the Court grant such Further and additional relief that is appropriate herein.

Dated this 20th day of April, 2022.

Respectfully Submitted
/s/ A.H.
Ammar Harris

## Verification

I Ammar Harris have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged upon Information and Belief, and as to those, I believe them to be true and all papers, pleadings and documents on file herein.

I certify under penalty of perjury that the foregoing is true and correct. 28 Usc §§ 1746

Executed at Indian Springs, NV
on 20th day of April, 2022.

/s/ A.H.
Ammar Harris

# CERTIFICATE OF ELECTRONIC FILING

I hereby certify that service of the above and foregoing
be Electronic Filed to the following;

Nevada Attorney General
Aaron D. Ford
Email: aginfo@ag.nv.gov

Sgro and Roger
Anthony P. Sgro
Email: tsgro@sgroandroger.com

U.S. Department of Justice
Christine Kim
Email: christine.kim@usdoj.gov

/s/ A.H.
Ammar Harris

EXHIBIT - A "Agreement"

Title II of the ADA
Settlement Agreement
With the United States
and the State of Nevada

32 Pages

Letter From DOJ

2 Pages

34 Pages Enclosed

4/1/2021     SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB     Document 21     Filed 04/21/22     Page 37 of 71

# SETTLEMENT AGREEMENT
# BETWEEN THE UNITED STATES OF AMERICA AND
# TTHE STATE OF NEVADA EX REL. NEVADA DEPARTMENT OF
# CORRECTIONS
# DJ NO. 204-46-176

Press Release

## I.  BACKGROUND

1.  This Settlement Agreement is entered into by and among the United States of America and the State of Nevada ex rel. Nevada Department of Corrections.

2.  The United States Department of Justice ("Department") is responsible for administering and enforcing the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

3.  The Nevada Department of Corrections ("NDOC") operates the State of Nevada's prison system. The State of Nevada and the NDOC (collectively, "Nevada") are each public entities within the meaning of the ADA, 42 U.S.C. § 12131(1), and are therefore subject to the requirements of Title II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. Part 35.

4.  This Agreement arises out of an investigation that the Department initiated in December 2014, after receiving complaints from inmates with disabilities who were then in the custody of the NDOC. Over the course of the investigation, the Department visited NDOC correctional institutions, interviewed inmates with disabilities and NDOC employees, and reviewed documents, including those produced by inmates and the NDOC. On June 20, 2016, the Department issued a letter of findings concluding that the NDOC had violated Title II of the ADA by: (1) segregating inmates with HIV pursuant to the NDOC's "House Alike / House Alone" policy, which directs NDOC facilities not to house inmates with HIV in the same cells as inmates who do not have

HIV; (2) denying inmates with HIV equal employment opportunities through which they could earn credits to reduce the lengths of their sentences; and (3) denying inmates with disabilities, including those with mobility disabilities, HIV, or certain other medical or mental health conditions, equal opportunities to benefit from the services, programs, and activities associated with the NDOC's minimum and community-trustee classification levels.

5.   On May 23, 2017, Nevada amended Nev. Rev. Stat. Ann. ("NRS") § 209.385, repealing its prior rule mandating the segregation of inmates with HIV from the general population and the routine disclosure of inmates' HIV status to nonmedical correctional staff and administrators.  The amended statute and NDOC's policies permit the segregation of inmates with HIV under circumstances when the offender engages in behavior that increases the risk of transmitting the virus as determined by regulation of the NDOC.  The amended statute also permits disclosure of an inmate's HIV status to nonmedical correctional staff and administrators without clear guidance as to when such disclosures should be made.

6.   Nevada alleges that it began integrating inmates with HIV into the general population in or around the summer of 2016.  On June 7, 2017, the NDOC temporarily rescinded its "House Alike / House Alone" policy, and on May 15, 2018, the NDOC made these changes permanent.  The United States substantiated that Nevada took steps to integrate inmates with HIV in or around 2016 and 2017.  During Nevada's attempts to integrate these inmates, some of the inmates' confidential medical information was not protected from disclosure, and therefore some of these inmates continued to face discrimination based on their disability.

7.   The United States and Nevada agree that it is in the Parties' best interests, and the United States believes it is in the public interest, to fully and finally resolve this matter. The Parties therefore voluntarily enter into this Agreement.

II.   GENERAL RELIEF

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 39 of 71

8. <u>General Obligations</u>: Nevada shall comply with the requirements of Title II of the ADA and its implementing regulation by, *inter alia*, housing inmates with HIV in integrated settings alongside other inmates, ensuring equal employment opportunities for inmates with disabilities, and ensuring that inmates with disabilities have equal opportunities to benefit from the services, programs, and activities associated with the NDOC's minimum and community-trustee classification levels. Among other things:

    a.   Nevada shall not provide inmates with disabilities opportunities that are unequal to those afforded to inmates who do not have disabilities. Nor shall it deny inmates with disabilities the opportunity to participate in or benefit from Nevada's aids, benefits, services, or programs. *See* 28 C.F.R. § 35.130(b)(1).

    b.   Nevada shall not provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others. *See id.* § 35.130(b)(1)(iv).

    c.   Nevada shall reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability, unless Nevada can demonstrate that making modifications would fundamentally alter the nature of its services, programs, or activities. *See id.* § 35.130(b)(7).

    d.   Nevada shall not impose or apply eligibility criteria that screen out or tend to screen out inmates with disabilities from fully and equally enjoying Nevada's services, programs, or activities, unless it can show that such criteria are necessary for its provision of those services, programs, or activities. *See id.* § 35.130(b)(8).

    e.   Nevada shall not, unless it is appropriate to make an exception, place inmates with disabilities in facilities that do not offer the same programs as the facilities where they otherwise would be housed. *See id.* § 35.152(b)(2)(iii).

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 1:21-cv-00490   Document 21   Filed 04/21/22   Page 40 of 71

      f.    Nevada shall administer its services, programs, and activities—including its housing of inmates—in the most integrated setting appropriate to the needs of inmates with disabilities. *See id.* §§ 35.130(d), 35.152(b)(2).

III.    SPECIFIC RELIEF

    A.    Housing and Medical Care for Inmates with HIV

        9.    <u>Prohibition Against Segregating Inmates Based on HIV Status</u>: Nevada shall not segregate inmates with HIV solely on the basis of their HIV status and shall house inmates with HIV in integrated settings alongside other inmates. Nevada will take all appropriate steps, including amending any rules, policies, protocols, or other directives, to effectuate its obligation to comply with this obligation. Specifically, Nevada shall implement a housing policy that prohibits isolating or segregating inmates with HIV solely on the basis of their HIV status. On June 7, 2017, the NDOC temporarily rescinded its policy mandating the segregation of inmates with HIV based solely on their HIV diagnosis. On May 15, 2018, the NDOC made these changes permanent.

      10.    <u>Reception, Evaluation, and Housing of New Inmates with HIV</u>: Nevada shall ensure that, for purposes of custody-level classification and placement, each inmate with HIV who enters NDOC custody is processed without regard to HIV status from the time the inmate enters the NDOC system and continuing through the inmate's transfer into the general population or other appropriate housing status; provided that, Nevada may provide private and confidential evaluation, medical treatment, and counseling to any incoming inmate with HIV as set forth in this Agreement.

      11.    <u>Counseling and Election for Inmates with HIV</u>: Nevada shall continue to ensure that inmates with HIV will not be housed alone, unless they are maximum-custody inmates or subject to disciplinary, protective, or administrative segregation for reasons unrelated to their HIV status, or housed in

a cell with another inmate with HIV based solely on their HIV status. In addition, Nevada shall do the following:

    a.   <u>Counseling and Election Sessions</u>: Within thirty (30) days of the training required by Paragraph 26, (1) Nevada shall confidentially and individually notify inmates with HIV who are housed alone or with another inmate with HIV that they may request a change in housing arrangement; and (2) appropriate medical and mental health personnel from the NDOC will conduct a confidential, private counseling session with each inmate with HIV to ask whether the inmate wants a change in housing arrangement, and to address the inmate's options, questions, and concerns.

    b.   <u>Responding to Requests for Housing Changes</u>: Nevada shall make all changes necessary to meet the housing requests of inmates with HIV who elect for a cell change within thirty (30) days of the inmate's submission of a completed cell change request form.

    c.   <u>Counseling and Election at Any Time</u>: After the initial counseling and election session, any inmate with HIV who initially did not elect to change housing may at any time: (1) request a follow-up private counseling session at which appropriate NDOC medical and mental health staff will address the inmate's options, questions, or concerns about integration; and (2) elect to change housing by completing a cell change request form and submitting it to the appropriate NDOC staff members as per Administrative Regulation and Operational Procedures. Nevada must respond to the inmate's request for private counseling within ten (10) business days, and all requested counseling sessions shall be provided within thirty (30) days. Nevada must respond to the inmate's elections to change housing in accordance with the requirements outlined in subsection (b) of this Paragraph.

d.  Confidentiality of Completed Cell Change Request Forms and

Counseling Sessions: Any and all cell change request forms submitted

pursuant to this section of the Agreement shall be maintained

confidentially by Nevada, and access to such forms shall be permitted only

to medical or mental health staff, the ADA Coordinators, the ADA

Compliance Officers, and NDOC personnel with a need to know the

information to complete the transfer of an inmate with HIV to an

institution and housing assignment appropriate to the inmate's custody

classification.  Nevada shall also conduct all counseling sessions with

inmates in a private manner that ensures that their HIV status remains

confidential.

12.  Medical Care for Inmates with HIV:

a.  NDOC Medical Directives 125, 206, and any other similar directives

shall be revised to ensure consistency with care guidelines published by the

National Institutes of Health, including all guidelines regarding anti-

retroviral therapy.  *See* Aberg, JA, et al., Primary Care Guidelines for the

Management of Persons Infected with HIV: 2013 Updates by the HIV

Medicine Association of the Infectious Diseases Society of America,

Clinical Infectious Diseases 58(1):e1 (Jan. 2014),

https://doi.org/10.1093/cid/cit665; Dep't Health & Human Servs.,

Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents

with HIV (2019), https://aidsinfo.nih.gov/

contentfiles/lvguidelines/adultandadolescentgl.pdf.

b.  Nevada shall ensure that inmates with HIV are regularly treated and

managed by an HIV specialist, have timely access to anti-retroviral

therapy, and that the NDOC ensures continuity of care with respect to

medication refills and medical treatment when inmates are transferred

between facilities.

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 43 of 71

13.    HIV Education and Counseling for Inmates: The NDOC shall revise its "AIDS information handouts" referenced at AR 610.01(4), and any similar handouts, to cover the methods by which HIV is and is not transmitted; the use, and efficacy, of anti-retroviral therapies in the treatment of HIV; methods of preventing HIV transmission; and other information about HIV, consistent with similar publications issued by the Centers for Disease Control and Prevention, National Institutes of Health, and U.S. Department of Health and Human Services. Within thirty (30) days of the United States' approval of these revised informational handouts (see Paragraph 38, infra), Nevada shall post these revised handouts in conspicuous common areas throughout the housing units, chapel, medical, culinary, gym, and other group rooms. In addition, Nevada shall ensure that all inmates receive the revised informational handouts at intake, and that at intake or at the time inmates are informed that they have HIV, inmates with HIV will be provided with the option of confidential and discreet counseling from an appropriate (1) medical professional and (2) mental health professional, and have the opportunity to ask questions and obtain answers from these professionals.

14.    Review of Disciplinary Sanction, Segregation, or Detention for Inmates with HIV: Nevada shall review all disciplinary sanctions, segregation, and detention imposed on inmates with HIV after the NDOC began desegregating inmates with HIV until the Effective Date of the Agreement to determine whether any disciplinary sanction, segregation, or detention should be removed from the inmate's record and whether any credits or other benefits should be restored to the inmate. This includes, but is not limited to, disciplinary sanctions, segregation, or detention imposed on an inmate with HIV who refused a new cell assignment due to fears that such an assignment may risk their safety or the confidentiality of their medical information. Nevada shall provide its review and proposed corrective actions to the United States within sixty (60) days for approval. Within thirty (30) days of the United States' approval of the review and proposed corrective actions, Nevada shall begin to implement the corrective actions.

15. <u>Confidentiality of Medical Information</u>: Nevada shall ensure the confidentiality of inmates' health information, including HIV status. Nevada will take all appropriate steps, such as amending any rules, policies, protocols, or other directives, to effectuate this obligation.

     a.    Nevada shall ensure that inmates' HIV status will not be disclosed to any Nevada staff other than medical and mental health staff, except to a limited set of those persons identified in NRS § 209.385(3) who are involved in the hearing and appeal processes described in Paragraph 16, *infra*.

     b.    Nevada's treatment of inmates' medical information shall be consistent with, at a minimum, the guidelines set forth in Ctrs. for Disease Control, HIV Testing Implementation Guidance for Correctional Settings § III (Jan. 2009) [hereinafter "CDC Guidelines for HIV Testing in Corrections"], https://stacks.cdc.gov/view/cdc/5279.

     c.    Nevada shall not identify inmates with HIV with a specific medical restriction code. Nevada shall remove any HIV-specific medical restriction code from all NDOC medical classification forms and, before utilizing any such revised forms, shall provide the revised forms to the United States for its review and approval. Nevada will eliminate or redact any HIV-specific medical restriction code from all inmate records capable of being edited. For hard copy records, and for digital inmate records that cannot be edited or redacted without corrupting data, Nevada will treat all such documents as confidential material in accordance with, at minimum, the CDC Guidelines for HIV Testing in Corrections. An inmate's HIV status may not be shared with or made available to non-medical or non-mental health staff unless authorized by law.

     d.    Nevada confirms that it has ceased disseminating lists of inmates with HIV to Nevada staff, and agrees to, immediately upon the Effective Date of

this Agreement, continue to cease disseminating lists of inmates with HIV
to Nevada staff and permanently destroy any and all lists it has previously
circulated.

e.    Within fifteen (15) days of the training required by Paragraph 26,
Nevada shall explain to each inmate with HIV the changes to the medical
classification forms privately, in the presence of only appropriate medical
or mental health staff.  At these meetings, Nevada shall provide each
inmate with a form to sign denoting that the inmate has been advised of the
changes Nevada has implemented to keep the inmate's HIV status and
related medical information confidential.

f.    Any and all counseling and evaluation of inmates who test positive for
or who have HIV at any time during incarceration shall be conducted
privately and confidentially, in the presence of only appropriate medical or
mental health staff.   Such counseling and evaluation shall be consistent
with, at minimum, the CDC Guidelines for HIV Testing in Corrections.

g.    The fact that an inmate is consulting with an HIV specialist—whether in
person or through the use of telemedicine technology—shall itself be
treated as personal medical information, to be kept confidential from other
inmates, correctional officers, and other Nevada personnel, with the
exception of medical and mental health staff.  Any and all appointments or
telemedicine conferences with HIV specialists shall be staggered or
otherwise conducted in such a way as to ensure that inmates consulting
with HIV specialists are not required to travel as a group to or from their
appointments, and that appointments are conducted as discreetly as
possible.

h.    In the event that a Nevada employee or inmate comes into contact with
the blood or bodily fluids of an inmate, Nevada shall, in accordance with
the requirements and procedures set forth in the Occupational Safety and

Health Administration's Bloodborne Pathogens Standard, 29 C.F.R.
§ 1910.1030(f)(3), conduct a confidential medical evaluation, and follow
up with the person who was exposed.

16.    <u>Inmates Who Pose a Danger to Others</u>: Notwithstanding the foregoing, Nevada
may follow its discipline and controlled housing protocols if an individual
inmate, regardless of whether he or she has HIV, poses a direct threat to the
health or safety of others as set forth in Paragraph 45 and NDOC AR 707.1.
Nevada will repeal any disciplinary or segregation policy targeting inmates with
HIV and will instead apply the same discipline and segregation protocols,
including the process for hearings and appeals, to all inmates.

B.    Equal Employment Opportunities for Inmates with Disabilities

17.    <u>Non-Discrimination in Employment of Inmates with HIV</u>: Nevada shall ensure
that inmates with HIV have equal access to work assignments, including those in
the canteen, culinary, food services, infirmary, and allied health services.  To the
extent any HIV-specific medical restriction code cannot be removed or redacted
from inmate digital records without corrupting data, NDOC staff will disregard
this code and place any inmate with HIV in any work assignment for which he or
she is otherwise qualified and that he or she accepts.

18.    <u>Revisions to Work Assignment Process</u>: Nevada shall ensure that its work
assignment process and all related forms, including medical classification forms,
provide inmates with disabilities with equal opportunities to obtain work
assignments and credits.  To accomplish this, Nevada shall, *inter alia*:

a.    Ensure that NDOC job advertisements, as well as medical classification,
medical evaluation, and work-assignment selection processes, do not
unnecessarily employ eligibility criteria that screen out or tend to screen
out inmates with disabilities;

b.   Ensure that inmates with disabilities are offered a range of potential
work assignments with varying physical requirements (i.e., from sedentary
clerical tasks to manual labor);

c.   Implement a policy and procedure for inmates to request reasonable
modifications; and

d.   Make reasonable modifications to allow inmates with disabilities to meet
work-related eligibility requirements and to perform work assignments.

19.   <u>Individualized Medical and Mental Health Determinations</u>: Nevada shall
conduct an individualized assessment of each inmate when assessing his or her
medical or mental fitness to work in a particular job assignment.

a.   Nevada may use a form with general medical and mental health codes to
identify whether an inmate has certain physical limitations or health-related
issues that may interfere with his or her ability to participate in certain
work assignments. These codes, and the form associated with them, must
require medical and mental health staff to document the nature, severity,
and expected duration of an inmate's limitations.

b.   These codes, and the form associated with them, must require medical
and mental health staff to also identify whether there are reasonable
modifications that would permit the inmate to work in these job
assignments, i.e., perform the essential functions of the job. Nevada will
provide such inmates with the reasonable modifications necessary to
ensure that these inmates can participate unless Nevada establishes that
such an accommodation or modification constitutes a fundamental
alteration.

c.   If Nevada identifies that an inmate has certain physical limitations or
health-related issues that will prevent the inmate from participating, even
with reasonable modifications, in a specific work assignment for which he

or she is otherwise eligible, Nevada shall so inform the inmate and advise the inmate that he or she may seek a reevaluation from a NDOC health provider.  Should the inmate request such a reevaluation, Nevada shall ensure that within thirty (30) days of the inmate's request, a health provider who has been personally involved in the inmate's care reviews the inmate's medical and mental health files, personally examines the inmate (if necessary), and makes an individualized determination as to whether any medical or mental health issues should preclude the inmate from being assigned to that particular work area and whether there are reasonable modifications that would permit the inmate to work in that particular work area.

d.    Nevada shall provide written guidance and live training to, and ensure completion of live training by, all medical and mental health providers who make such work clearance determinations.  The written guidance and training will cover: (1) the types of work assignments available and the physical requirements of each assignment, (2) examples of reasonable modifications that may be available for inmates with disabilities for each work assignment, and (3) Nevada's duty to provide reasonable modifications and to not discriminate against inmates with disabilities.

20.    Work Credits: Nevada shall ensure non-discrimination in the eligibility of inmates with disabilities to earn work credits.

a.    Inmates with disabilities who, with or without reasonable modifications, are eligible to work, but because of their disabilities have been placed on a waiting list pending the availability of an appropriate work assignment, shall earn the full number of work credits that they would have been eligible to earn had they worked while waiting for an assignment.

b.    Notwithstanding the foregoing, Nevada need not award inmates with disabilities in other work assignments the same number of credits awarded

to Nevada Division of Forestry crew members when these crew members

are away from camp for firefighting or emergency assignments.

C.    Custody-Level Classifications and Placements for Inmates with Disabilities

21.    <u>Equal Opportunity</u>: Nevada shall ensure that inmates with disabilities have

equal opportunities to participate in and benefit from the services, programs, and

activities (*e.g.*, work credits, institutional placement) available to inmates at the

custody levels for which they are eligible.

22.    <u>Non-Discrimination in Custody-Level Classifications</u>: Nevada shall not, on the

basis of mental health conditions, medical conditions, mobility impairments,

medical treatment needs such as an inmate's need for medications designated by

Nevada as non-keep-on-person ("NKOP"), or other disabilities, exclude inmates

with disabilities from classification to the custody levels for which they otherwise

are eligible.

a.    Nevada shall ensure that its rules, policies, protocols, and other

directives provide for non-discrimination against inmates with disabilities

in custody-level determinations.  When an inmate with a disability is

otherwise eligible for classification to a particular custody level, Nevada

shall classify the inmate to that custody level without consideration of the

inmate's mental health conditions, medical conditions, mobility

impairments, medical treatment needs (*e.g.*, NKOP medications), or other

disabilities.  In situations where placement at the custody level to which the

inmate is eligible for classification is not possible due to a lack of capacity

or a legitimate administrative determinant (*see* Paragraph 23(a)), Nevada

shall nonetheless classify the inmate to the custody level for which he or

she is eligible and follow the procedures and requirements set forth in

Paragraph 23 to determine the appropriate housing placement for the

inmate.

23. <u>Non-Discrimination in Custody-Level Placements</u>: Nevada shall not, on the basis of mental health conditions, medical conditions, mobility impairments, medical treatment needs (*e.g.*, NKOP medications), or other disabilities, exclude inmates from placement at the custody levels for which they are otherwise eligible—including lower-custody placements such as transitional-housing facilities, conservation camps, and minimum-custody beds at prisons—unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others or unless necessary pursuant to a legitimate safety requirement or direct threat determination.

    a.    Nevada shall, to the extent it has not already, develop appropriate, necessary, and specific administrative determinants for housing inmates with disabilities at a higher security level than their designated custody-level classification, where necessary to address specific medical, mental health, dental, or custody concerns. Each administrative determinant will have a designated code that clearly identifies the reason for housing an inmate at a higher security level than his or her custody-level classification. The administrative determinant will be specific, narrowly drawn, and necessary to ensure non-discrimination against inmates with disabilities.

    b.    Nevada shall revise NDOC Medical Directive 414 and any other policies, practices, or procedures for assessing inmate medical and mental health conditions—including Nevada's assignment of inmates to medical and mental health categories and restrictions—to ensure that any housing or other restriction that Nevada imposes on an inmate because of his or her medical or mental health disability is medically necessary.

    c.    If Nevada identifies that an inmate has a disability that may prevent him or her from being housed in certain custody-level placements for which he or she is otherwise eligible, Nevada shall so inform the inmate and advise

the inmate that he or she may seek a reevaluation from a Nevada health provider. Should the inmate request such a reevaluation, Nevada shall ensure that within thirty (30) days of the inmate's request, a health provider who has been personally involved in the inmate's care reviews the inmate's medical and mental health files, personally examines the inmate (if necessary), and makes an individualized determination as to whether any medical or mental health issues should preclude the inmate from being transferred to the custody-level placement for which he or she is otherwise eligible. Nevada shall consider and implement all possible alternatives that do not constitute an undue burden to avoid housing the inmate at a higher-custody placement. If no such alternative is available, Nevada shall classify the inmate to the lower-custody classification level, but may house the inmate at the higher custody level so long as Nevada provides the inmate with the same privileges and benefits (*e.g.*, opportunities to earn work credits) that Nevada provides to inmates housed in lower-custody placements. Such an inmate shall be given priority to transfer to a lower-custody placement when such placement becomes available.

d.  Nevada shall provide written guidance and live training to, and ensure completion of live training by, all health providers involved in the individualized health determinations required under this Paragraph and Paragraph 24, *infra*. The written guidance and training will cover: (1) the types of housing placements available and the physical requirements of each placement, (2) reasonable modifications (including self-administration of medication) that may be available for inmates with disabilities at each housing- and custody-level placement, and (3) Nevada's duty to provide reasonable modifications and to not discriminate against inmates with disabilities in housing placement decisions.

24.  Periodic Classification and Capacity Reviews: Every six (6) months from the date the United States approves Nevada's revised policies, practices, and

procedures implementing the requirements of Paragraphs 21-23, Nevada shall conduct reviews of the custody-level classifications and housing placements of inmates with disabilities. If, based on such reviews, Nevada or the United States anticipates that, within the next six (6) months, facilities will not have the capacity to house inmates with disabilities according to their custody levels and the administrative determinants discussed in Paragraph 23, Nevada shall adopt a plan to make modifications (*e.g.*, converting portions of medium-custody facilities to minimum-custody units) to ensure that, inmates with disabilities are housed according to their custody-level classifications. Nevada shall submit these plans for the United States' review and approval every six (6) months from the date the United States approves Nevada's revised policies, practices, and procedures implementing the requirements of Paragraphs 21-23, and Nevada shall incorporate and implement any revisions the United States may make to these plans unless those revisions constitute an undue burden.

25. NKOP Medications and Reasonable Modifications at NDOC Facilities That Currently Do Not Employ Full-Time Medical or Mental Health Staff: Nevada shall make reasonable modifications to its policies, practices, and procedures to ensure that inmates with disabilities have an equal opportunity to be placed at lower-custody facilities, such as transitional-housing facilities and conservation camps, when such reasonable modifications to its policies, practices, and procedures do not constitute a fundamental alteration. Nevada shall not categorically exclude inmates with disabilities from placement at such lower-custody facilities, because such inmates require specialized or routine medical or mental health care or require NKOP medications. Nevada shall conduct an individualized assessment of each inmate with a disability who qualifies for placement at such lower-custody facilities and reasonably modify its policies, practices, and procedures to ensure that the inmate has an equal opportunity to participate. This includes but is not limited to training and designating appropriate staff to store NKOP medications for inmates to self-administer, training appropriate staff about emergency and medical and mental health

procedures, employing telemedicine, and periodically transporting inmates with disabilities to facilities where they receive medical or mental health care. Nevada will take all appropriate steps, including amending any rules, policies, protocols, or other directives, to effectuate its obligation to comply with this obligation.

### D. Training

26. <u>Training for Nevada Staff</u>: Nevada shall provide live training to, and ensure completion of such training by, all NDOC employees as well as State of Nevada employees whose positions require them to regularly interact with NDOC inmates (*e.g.*, Nevada Division of Forestry staff), concerning:

   a. Title II of the ADA;

   b. Nevada's policy toward discrimination, retaliation, coercion, intimidation, harassment, threats, or abuse against inmates on the basis of disability, as well as toward interference with rights protected by the ADA or this Agreement;

   c. The matters addressed in Section III.A. of this Agreement, including:

      i. HIV and the methods by which it is and is not transmitted;

      ii. Nevada's plans to fully integrate inmates with HIV in housing; and

      iii. Nevada's policies for keeping inmates' medical information, including disabilities, confidential;

   d. The matters addressed in Section III.B. of this Agreement, including Nevada's:

      i. Revised medical clearance policies, procedures, and practices for work assignments;

    ii.   Revised medication administration policies, procedures, and practices;

    iii.   Revised policies, practices, and procedures for providing inmates with disabilities with health care services in NDOC facilities that currently do not employ full-time medical or mental health staff;

    iv.   Obligation to provide inmates with disabilities with equal opportunities to participate in Nevada's services, programs and activities, including work assignments, and Nevada's plans to ensure equal opportunities going forward; and

    v.   New work credit and work assignment processes (designed to ensure equal opportunities for inmates with disabilities), including the availability of reasonable accommodations and the administrative procedures by which inmates may request them;

e.   The matters addressed in Section III.C. of this Agreement, including:

    i.   Nevada's revised policies and procedures for custody-level classifications and placements; and

    ii.   The periodic classification and capacity reviews that Nevada will conduct pursuant to this Agreement;

f.   Nevada's revised disciplinary, complaint, and grievance policies;

g.   The identities, roles, and responsibilities of Nevada's ADA Compliance Officer and ADA Coordinators; and

h.   This Agreement, including the steps that Nevada has taken, and will continue to take to ensure that its obligations under this Agreement are met.

27. <u>Training for New Employees</u>: For the term of this Agreement, Nevada shall ensure that all new NDOC employees, and all other State of Nevada employees whose positions require them to regularly interact with NDOC inmates, complete the live training outlined in Paragraph 26, during the orientation and on-boarding process—and no later than thirty (30) days after assuming duties.

28. <u>HIV Educational Program</u>: Nevada shall provide an educational program to inmates concerning HIV, transmission, the steps Nevada has already taken to integrate inmates with HIV into the general population, Nevada's plans to fully integrate inmates with HIV and address discrimination against inmates with HIV, and Nevada's plans to ensure equal employment opportunities for inmates with HIV. This program includes the presentation to inmates of video(s), approved by the United States, on HIV, transmission, harassment, and discrimination, and shall provide inmates with the opportunity for questions immediately after viewing the video. Such questions will be answered by a member of the NDOC medical staff who is knowledgeable about HIV and methods of transmission, and a member of NDOC's security staff who is knowledgeable about NDOC's revised policies, practices, and procedures as set forth in this Agreement. Nevada shall also advise inmates of their right to submit complaints or grievances directly to the ADA Compliance Officer or relevant ADA Coordinators.

29. <u>Training for New Inmates at Reception and Intake</u>: For the term of this Agreement, during the processing and evaluation process for all new inmates, and no later than fifteen (15) days after an inmate enters NDOC custody, Nevada shall ensure that all new inmates have received the training outlined in Paragraph 28.

E.   Discipline and Grievances

30. <u>Discipline of Inmates or Staff for Discrimination on the Basis of Disability</u>: Nevada shall implement revised policies requiring Nevada to take appropriate disciplinary action against inmates or staff who subject inmates with disabilities

to discrimination, retaliation, coercion, intimidation, harassment, threats, or abuse, or who interfere with rights protected by the ADA or this Agreement, including confidentiality of HIV status, on the basis of those inmates' disabilities.

31.    Grievance Policy: Nevada shall implement revised procedures to ensure that grievances by inmates who allege discrimination on the basis of disability are promptly reviewed, reported to the ADA Compliance Officer and relevant ADA Coordinators, and addressed by appropriate action.

F.    ADA Compliance Officer and Coordinators

32.    ADA Compliance Officer: Nevada has designated, and will continue to designate, at least one employee in NDOC headquarters to serve as the NDOC's ADA Compliance Officer.  This individual shall coordinate Nevada's efforts to comply with and carry out its responsibilities under Title II and this Agreement.

33.    ADA Coordinators: Nevada has designated, and will continue to designate, at least one employee in each of the NDOC's correctional facilities to serve as the facility's ADA Coordinator.  Each ADA Coordinator will coordinate his or her facility's efforts to comply with and carry out the facility's responsibilities under Title II and this Agreement.

34.    General Responsibilities: The ADA Compliance Officer and ADA Coordinators are and shall continue to be responsible for coordinating the integration of inmates with HIV and other disabilities; carrying out Nevada's ADA responsibilities; ensuring that inmate work assignments do not discriminate based on disability; reviewing inmate work assignment disability accommodation requests; ensuring that services, programs, and activities are readily accessible to and usable by inmates with disabilities; coordinating and ensuring that the NDOC meets its program access obligations for inmates with disabilities; ensuring that inmates with disabilities are assigned the appropriate custody-level classifications

4/1/2021     SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB     Document 21     Filed 04/21/22     Page 37 of 71

and housed according to their custody levels; and investigating and assisting in the resolution of ADA complaints or grievances.

35.   <u>Grievances</u>: The ADA Compliance Officer and each ADA Coordinator are responsible and will continue to be responsible for overseeing, supervising, and assisting in all investigations, and the resolution of grievances alleging that based on an ADA recognized disability, a Nevada employee or inmate has subjected an inmate to discrimination, harassment, intimidation, retaliation, or interference with the inmate's rights under the ADA or this Agreement. All such grievances shall be promptly reported to the ADA Compliance Officer and relevant ADA Coordinators or their designees, who shall review the grievances and recommend appropriate action, including disciplinary action. As part of the training discussed in Section III.D., Nevada shall advise inmates of their right to submit grievances directly to the ADA Compliance Officer or relevant ADA Coordinators. For purposes of this Agreement, grievances shall have the same meaning and procedures as all other grievances contemplated and required under AR 740 and the Prison Litigation Reform Act (PLRA).

G.   Implementation Requirements and Schedule

36.   <u>System-Wide Policies, Practices, and Procedures</u>: Nevada shall amend system-wide policies, practices, and procedures; and any related directives, forms, lists, and other system-wide documents to reflect the requirements of this Agreement. Nevada shall send the full text of these revisions to the United States for review and approval.

37.   <u>Individual NDOC Facilities' Policies, Practices, and Procedures</u>: Nevada shall amend, or where appropriate, issue new policies, practices, and procedures—and any related directives, forms, lists, or other documents (*e.g.*, inmate and employee handbooks)—for all individual facilities within the NDOC system, to ensure that they reflect and comply with the changes made pursuant to this Agreement.

38.   <u>Implementation Schedule</u>: To implement the requirements set forth in this
Agreement, Nevada shall make the revisions required by Paragraphs 36 and 37;
create written guidance and training materials; and provide, and ensure the
completion of, live training on the matters listed in Paragraph 26.  Unless
otherwise specified in this Agreement, Nevada shall complete these tasks in
accordance with the following schedule:

a.   In accordance with the timetable below, Nevada shall submit for the
United States' review and approval the revisions required by Paragraph 36:

i.   Within fourteen (14) days of the Effective Date of this Agreement:
Matters addressed in Section III.E.

ii.   Within sixty (60) days of the Effective Date of the Agreement:
Matters addressed in Section III.A. and III.C.

iii.   Within ninety (90) days of the Effective Date of this Agreement:
Matters addressed in Section III.B.

b.   The United States shall review and may provide comments on all
documents submitted for its review and approval.  Within forty-five (45) of
receiving the United States' comments, Nevada shall incorporate those
comments and submit the revised document for the United States'
approval.  Within forty-five days of the United States' approval, Nevada
shall distribute and implement the revised document.

c.   Within sixty (60) days of the United States' approval of a document
revised pursuant to Paragraph 36, Nevada shall:

i.   Submit for the United States' review and approval written
guidance and training materials (*e.g.*, PowerPoint presentations,
policy documents, pamphlets, brochures) covering the subject matter
of the revision; and

4/1/2021          SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 59 of 71

        ii.   Revise facility-specific policies, practices, and procedures, and other documents, as required by Paragraph 37.

    d.   Within thirty (30) days of receiving the United States' comments concerning any written guidance or training materials, Nevada shall incorporate those comments that bring Nevada's materials into compliance with the ADA and submit the revised materials for the United States' approval. Within thirty (30) days of the United States' approval, Nevada shall provide, and ensure completion of, the live training required in Paragraph 26.

## IV.   REPORTING, MONITORING, ENFORCEMENT

39.   <u>Reporting</u>: Beginning six (6) months after the Effective Date of this Agreement, and every three (3) months thereafter for the first year of this Agreement, Nevada shall submit written reports (including supporting documentation) to the United States, delineating all steps taken during the reporting period to comply with each substantive provision of this Agreement. Thereafter, for the duration of the Agreement, Nevada shall submit a report every six (6) months. Each report shall include the following for the preceding reporting period:

    a.   <u>Grievances</u>: A copy of every grievance by an inmate relating to disability-based discrimination, harassment, or any other issue covered by this Agreement, and Nevada's response to or resolution of the grievance.

    b.   <u>Inmate Data</u>: The unique identifier of every inmate with a medical or mental health restriction within the NDOC system, by NDOC facility, custody-level classification, the date the inmate was classified to that custody level, the custody level of the facility in which the inmate is currently housed, the date the inmate was placed in the facility in which he or she is currently housed, the inmate's medical and mental health classification (including restrictions), housing unit, work assignment (if any), and number of work credits earned (if any). The unique identifier for each inmate will be created by Nevada for purposes of

Case 3:21-cv-00380-CLB   Document 21   Filed 04/31/23   Page 60 of 71

reporting, monitoring, and enforcement under this Agreement and shall not be identical to inmates' existing offender ID number.

c.  <u>Integration of Inmates with HIV</u>: A list of all inmates, by unique identifier, with HIV that indicates whether each inmate has elected to integrate, as well as all cell change request forms signed by the inmates to indicate their elections.

d.  <u>Confidentiality</u>: If an inmate's confidential medical information was shared with non-medical or mental health staff, an explanation of the circumstances that led to each disclosure.

e.  <u>Legitimate Safety Requirement and Direct Threat</u>: A copy of every legitimate safety requirement or direct threat determination Nevada has made about an inmate with regards to a medical or mental health restriction.

f.  <u>Custody-Level Classifications and Placements</u>: A detailed description of each instance in which:

   i.   Nevada has employed an alternative to avoid housing an inmate with a disability at a custody level above that to which the inmate has been classified;

   ii.  Nevada has housed an inmate with a disability at a custody level above that to which the inmate has been classified, as well as the reason why Nevada did not house that inmate at the appropriate custody level;

   iii. An inmate with a disability has requested an individualized health determination pursuant to Paragraph 23. Nevada's description shall include the date the inmate made the request, the date Nevada evaluated the inmate, the ultimate outcome of Nevada's evaluation, and Nevada's rationale for that outcome.

g.  <u>Medications</u>: A copy of every denial Nevada has issued regarding an inmate with a disability's request, pursuant to Paragraph 23, to maintain any medication

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 61 of 71

as keep-on-person medication.

    h.   Periodic Classification and Capacity Reviews: All reviews and plans required by Paragraph 24.

    i.   Discipline: Any discipline taken against any inmates or Nevada employees for discrimination or harassment against inmates with disabilities.

    j.   Training: For all training required by Section III.D., Nevada shall submit written reports detailing: the date and time of each training; a copy of the agenda and materials (e.g., handouts, PowerPoint presentations) used for each training; the names (and for employees, names and titles) of the individuals who attended the training; and for employee trainings, copies of the training sign-in sheets.

    k.   All Other Relevant Documents: All other documents requested by the United States relevant to this Agreement and to the United States' determination of Nevada's ongoing compliance with this Agreement.

40.   Delivery of Reporting Materials: All materials sent to the United States pursuant to this Agreement shall be sent by e-mail to undersigned counsel (or to alternate email addresses that the United States may designate during the term of this Agreement). If the materials cannot be e-mailed, then the materials shall be sent to the following address by common carrier other than the U.S. Postal Service: Chief, Disability Rights Section, Civil Rights Division, U.S. Department of Justice, 4 Constitution Square, 150 M Street NE, Washington, D.C. 20002. The cover letter shall include a subject line referencing the Nevada Department of Corrections and DJ No. 204-46-176.

41.   Monitoring: Nevada shall make facilities, policies, records (including inmate medical records), personnel, and any other information the United States may request, available to the United States to facilitate the United States' monitoring of Nevada's compliance with this Agreement. Upon request from the United States, Nevada shall make arrangements for the United States to conduct confidential and private telephonic, videophone, or in-person interviews with inmates.

Case 3:21-cv-00380-CLB  Document 21  Filed 04/21/22  Page 62 of 71

42.  <u>Enforcement</u>: The United States may review compliance with this Agreement at any time throughout the Term of the Agreement. After receipt of each report referenced in Paragraph 39, the United States may assess Nevada's compliance with this Agreement and confer with Nevada. If the United States believes that Nevada has failed to comply in a timely manner with any requirement of this Agreement, or if any requirement has been violated, the United States will notify Nevada in writing and the Parties will attempt to resolve the issue in good faith. If the Parties are unable to reach a satisfactory conclusion within thirty (30) days of the date the United States notifies Nevada, the United States may file a civil action in federal district court to enforce the terms of this Agreement, or take any other action to enforce Title II of the ADA. The United States agrees that any civil action will be filed in the United States District Court of Nevada.

43.  <u>Remedies</u>: The Parties agree that money damages alone would be an insufficient remedy for breach of this Settlement Agreement, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance as well as such other injunctive relief (without the posting of any bond and without proof of actual damages) as may be granted by a federal district court. Any remedies sought in the event of a breach of this Agreement or a violation of the ADA shall be cumulative and in addition to, and not in lieu of, all other remedies available in this Agreement, in law or in equity.

44.  <u>Non-Waiver</u>: Failure by the United States to enforce any provision or deadline in this Agreement shall not be construed as a waiver of the right of the United States to enforce any deadline or provision of this Agreement.

V.  MISCELLANEOUS PROVISIONS

45.  <u>Legitimate Safety Requirements and Direct Threat</u>: Pursuant to 28 C.F.R. § 35.130(h) and § 35.139 and notwithstanding any other provision in the Agreement, Nevada may implement and maintain (a) legitimate safety requirements necessary for the safe operation of its services, programs, or activities, and (b) procedures to assign

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 63 of 71

inmates with disabilities to higher-custody classifications or to exclude inmates with disabilities from a particular service, program, or activity based upon a determination that the inmate poses a direct threat to the health or safety of others—defined as a significant risk to the health or safety of others that cannot be eliminated by Nevada's modification of policies, practices, or procedures, or the provision of auxiliary aids or services.

    a.   Nevada shall only implement legitimate safety requirements or make a direct threat determination on the basis of actual risks, and not on mere speculation, stereotypes, or generalizations about inmates with disabilities, including inmates with HIV.

    b.   In determining whether an inmate poses a direct threat to the health or safety of others, Nevada must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures, or the provision of auxiliary aids or services, will mitigate the risk.

    c.   Sources for medical knowledge in imposing safety requirements and making a determination that an inmate poses a direct threat include knowledgeable and appropriate medical and mental health personnel, as well as guidance from public health authorities, such as the Centers for Disease Control, the U.S. Public Health Service, the National Institutes of Health, and the National Commission on Correctional Health Care.

    d.   A determination that an inmate with a disability poses a direct threat to the health or safety of others because of the inmate's disability shall be made by a Warden or Associate Warden in consultation with appropriate NDOC headquarters personnel, including the ADA Compliance Officer and any relevant ADA Coordinators; provided that NDOC correctional officers may temporarily

separate inmates or place an inmate with a disability in a controlled housing status in circumstances presenting an immediate threat to the health or safety of others.

e.   Any legitimate safety requirement or direct threat determination made pursuant to this Paragraph shall be in writing; shall include the facts and circumstances the Warden or Associate Warden believe justify the determination; shall be signed by the Warden or Associate Warden; and shall be preserved.  An inmate with a disability may only be assigned to a higher-custody classification or excluded from a particular service, program, or activity based upon a legitimate safety requirement or direct threat determination for only as long as necessary to ensure safe operation of the program or as long as the direct threat remains.  Any legitimate safety requirements or direct threat determinations concerning HIV or other disabilities shall be reported to the United States for the term of this Agreement consistent with the reporting requirements identified in Section IV, *supra*.

46.   Consideration: In consideration for this Agreement, the United States agrees to close its investigation (DJ No. 204-46-176) without further enforcement action, except as provided in Section IV of this Agreement.

47.   Effective Date: The effective date of this Agreement is the date of the last signature below.

48.   Term: The duration of this Agreement will be three (3) years from the Effective Date.

49.   Early Termination:  This Agreement or a distinct, severable part of the Agreement will terminate earlier than three years if the United States determines that Nevada has demonstrated durable compliance with Title II of the ADA and this Agreement, or with that distinct, severable part, as applicable. In determining whether Nevada has demonstrated durable compliance with a part of the Agreement, the Department may assess collectively all the requirements of the Agreement to determine whether the intended outcome of the part has been achieved.

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 65 of 71

50.   <u>Definitions</u>: Unless otherwise specified, terms in this Agreement have the same meaning as in Title II of the ADA and its implementing regulation.

    a.   <u>"State of Nevada"</u>: The term "State of Nevada" means the State of Nevada and its agencies, officials, employees, agents, contractors, or sub-contractors, including individuals whose positions require them to interact regularly with NDOC inmates.

    b.   <u>"NDOC"</u>: The term "NDOC" means the Nevada Department of Corrections and its officials, employees, agents, contractors, or sub-contractors, including Offender Management Division staff, wardens, medical and mental health staff, correctional officers, and case workers.

    c.   <u>"Employee," "Staff," and "Personnel"</u>: The terms "employee," "staff," and "personnel" mean any official, employee, agent, contractor, or sub-contractor.

51.   <u>Counterparts</u>: This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same Agreement. Facsimile or electronic signatures are acceptable.

52.   <u>Severability</u>: If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

53.   <u>Binding Nature of Agreement</u>. This Agreement shall be binding upon Nevada and the United States, their agents, and their employees.

54.   <u>Authority</u>: The individuals signing this Agreement represent that they are authorized to do so on behalf of the respective entity for which they have signed.

55.   <u>Entire Agreement</u>: This Agreement constitutes the entire agreement between the United States and Nevada on the matters raised herein and no other statement or promise written or oral, made by any party or agents of any party, that is not contained in this written Agreement shall be enforceable.

56.    <u>Extensions</u>: Any time limits for performance that this Agreement imposes may be extended by the mutual written agreement of the Parties. The Parties acknowledge that such written agreement may be completed by e-mail so long as the e-mail has specific language designed to bind either party.

57.    <u>Successor Liability</u>: This Agreement is binding on Nevada and its successors, including any successor legislature, Director of the NDOC, or Governor of the State of Nevada.

58.    <u>Other Violations</u>: This Agreement shall have no impact upon the rights or claims of any individual not identified in this Agreement who has made, or may make, claims against Nevada, even for issues addressed herein. This Agreement is not intended to remedy any violations or potential violations of the ADA or any other law, other than those specifically addressed by this Agreement. Nothing in this Agreement shall preclude the United States from filing a separate action under the ADA, or any other law, for any alleged violation not covered by this Agreement.

59.    <u>Costs and Fees</u>: The United States and Nevada will bear the cost of their own fees and expenses incurred in connection with this Agreement.

60.    <u>Publicity</u>: This Agreement and any amendment hereto shall be public documents.

**AGREED AND CONSENTED TO:**

**FOR THE UNITED STATES OF AMERICA**

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

KATHLEEN P. WOLFE
Special Litigation Counsel

1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-CLB    Document 21    Filed 04/21/22    Page 67 of 71

KEVIN J. KIJEWSKI
Deputy Chief

/s/
CHRISTINE KIM
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
202-305-0043 (telephone)
202-305-4486 (facsimile)
christine.kim@usdoj.gov

Date: 2/11/21

**FOR THE STATE OF NEVADA EX REL.**
**NEVADA DEPARTMENT OF**
**CORRECTIONS**

/s/
STEVEN SISOLAK
Governor
State Capitol Building
101 N. Carson Street
Carson City, NV 89701
(775) 684-5670 (telephone)
(775) 684-5683 (facsimile)

/s/
CHARLES A. DANIELS
Director
Nevada Department of Corrections
Stewart Facility
5500 Snyder Avenue, Bldg. 17
Carson City, Nevada 89701
775-887-3285 (telephone)
775-687-6715 (facsimile)

Date: 2/9/21

ADA Enforcement Page | ADA Home Page



**U.S. Department of Justice**

Office of Justice Programs

*Office for Civil Rights*

---

*Washington, D.C. 20531*

September 28, 2021

Ammar Harris 1116547
P.O. Box 1989
Ely, NV   89301

     Re:    Harris v. Ely State Prison/Nevada Department of Correction (21-OCR-1883)

Dear Mr. Harris:

The Office for Civil Rights (OCR) at the Office of Justice Programs (OJP), U.S. Department of Justice (DOJ), received notice of your Complaint against Ely State Prison/Nevada Department of Correction.

The OCR is responsible for ensuring that recipients of financial assistance from the OJP, the Office on Violence Against Women, and the Office of Community Oriented Policing Services comply with federal laws that prohibit discrimination in employment and the delivery of services or benefits based on one or more of these protected classifications: race, color, national origin, religion, sex, and disability, among others.

For the OCR to proceed with reviewing your Complaint, please provide the OCR with specific details about your allegations, including dates, times, places, and the names and contact information of alleged perpetrators and witnesses.

Please complete and return the enclosed Complaint Verification Information form.   Although some responses may repeat information that you previously provided, please answer all applicable questions and return this form.   The OCR must know how you (or whomever you are filing on behalf of) are treated differently from others, how rules and regulations are applied differently, or how programs and activities that are routinely available to others are not made available to you (or whomever you are filing on behalf of) because of one of the protected classifications listed above.   Once we receive your response, we will use the information to determine whether the OCR has the authority to investigate your allegations.

Please also complete and return the enclosed Complainant Consent/Identity Release Form.   The OCR may need to reveal your identity to persons at the agency or organization under investigation to investigate your allegations and receive information about you.   If your Complaint was filed on behalf of someone else, that person must complete and sign the Complainant Consent/ Identity Release Form.   Although consent is voluntary, the OCR may not be able to investigate the Complaint unless this release is authorized.

Ammar Harris
September 28, 2021
Page 2 of 2

The forms can be mailed to Office of Justice Programs, U.S. Department of Justice, Office for Civil Rights, 810 7th St. NW, Washington, DC 20531. **If you do not return both forms within forty-five (45) days from the date of this letter, the OCR will administratively close your complaint. You will not receive further correspondence from the OCR if this occurs.**

If the forms are properly completed and returned within the requested time period, the OCR will assign an attorney to your Complaint to determine whether an investigation is appropriate. If the OCR initiates an investigation, it will provide the agency or organization under investigation with an opportunity to respond to your allegations and provide supporting documentation.

Thank you for contacting the DOJ with your concerns.

Sincerely,

X *Michael L. Alston*

Michael L. Alston
Director, Office for Civil Rights
Signed by: MICHAEL ALSTON

Enclosures

CVF
IRS