# NEVADA DEPARTMENT OF CORRECTIONS
# GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris                    I.D. NUMBER: 1116547

INSTITUTION: HDSP                    UNIT #: 4B-1

GRIEVANCE #: _____    GRIEVANCE LEVEL: informal

GRIEVANT'S STATEMENT CONTINUATION:    PG. 2    OF 2

escort, may include chase vehicles if desinated by
the Warden. Included is the incident report, OIC 485369,
if the c/o's would have simply performed their duties
by performing an unclothed body search before yard
as outlined in the Orientation Handbook, I would
have never been injuried.
I would like the following remedies;

* Access to an outside institution for rehabilitation.
* Compensation in the sums of a $1,000,000.
* Media credits in the sums of $25,000
* A device that stimulates muscles. (Bioness)
* A stereo, TV w/ remote control
* An actual matress. (Back pains)

— The whole incident was caught on camera.

Original:    Attached to Grievance
Pink:        Inmate's Copy

RECEIVED

MAR 16 2021

HDSP

G(3)

DOC – 3097 (01/02)

# State of Nevada
# Department of Corrections

### DISCIPLINARY FORM II
### SUMMARY OF HEARING OFFICER'S INQUIRY AND DISPOSITION

| INMATE INFORMATION | | HEARING INFORMATION | |
|---|---|---|---|
| INMATE NAME: HARRIS, AMMAR 1116547 | | DATE OF HEARING: 11/17/2020 | TIME OF HEARING: 06:29 pm |
| CURRENT LOCATION: HDSP-U4-B-1-A; ; NC | | NAME OF HEARING OFFICER: BRYANT, ANTONIO | |
| OIC#: 485309   IR#: IR 2020-ESP-001727 | | DATE OF SERVICE OF NOTICE OF CHARGES: 08/28/2020 | |
| WAIVE PREPARATION: N | | WAIVE HEARING: N   REFUSE TO SIGN: N | |

### IF LATE, PROVIDE EXPLAINATION OF EXCEPTIONAL CIRCUMSTANCE

Work load

### CHARGES

| Chrg | Description | Plea |
|---|---|---|
| MJ16 | Murder | Not Guilty |

### PRELIMINARY STATEMENT OF OFFENDER

Inmate was asked and did not want to make a statement.

### PRELIMINARY INSTITUTION PRESENTATION

On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris' #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. . Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio. Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand. At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied. I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

### PRELIMINARY HEARING OFFICER ACTION

| Chrg | Description | RChrg | Description | Finding |
|---|---|---|---|---|
| MJ16 | Murder | MJ16 | Murder | Refer to Disciplinary Hearing |

### RESULTS OF INFORMAL SUMMARY HEARING

| Line | Description | Mths | Days | Eff. Date | End Date | SSL | Rest. Act | Penalty Comment |
|---|---|---|---|---|---|---|---|---|

### EVIDENCE RELIED ON FOR PRELIMINARY HEARING

| Date | UserName | Statement |
|---|---|---|
| 11/17/2020 | A. Bryant | Officer report and inmate statement. |

### ADVISEMENT TO DISCIPLINARY COMMITTEE

Counsel Substitute Requested: ☐   Name of Counsel Substitute:

### WITNESS INFORMATION

Witness Decision Justification:   Inmate was asked and does not want any witnesses.

| Name | NDOC/ID# | Decision | Reason | Table |
|---|---|---|---|---|

RECEIVED

MAR 16 2021

HDSP

G(4)

# NEVADA DEPARTMENT OF CORRECTIONS
## ELY STATE PRISON

## MEMORANDUM

**Date:** September 23, 2021

Inmate: Ammar Harris        # 1116547        9A 3

FROM:
        David Drummond, AW – Ely State Prison

SUBJECT:    **Grievance 2006.31.18343**

_____

        This grievance has been rejected 3 times.   Per OP 740 If a grievance has been rejected and returned to the inmate for additional information and this information has not been provided the grievance will be considered abandoned. Your grievance may not be resubmitted and if it is re-submitted, it will be placed in your grievance file without any action.

Note: Inmate Harris, failed resubmit at the informal level to proceed the grievance process.

_____A.H._____                      __10/1/ 21__
Inmate's signature                                 Date received

                                                    __10/1/21__
Caseworker's signature                            Date received



LOG NUMBER: 20063118343

# NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Ammar Harris                  I.D. NUMBER: 1116547

INSTITUTION: ESP                    UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31.18343 , ON THE SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.                              DATE: 8/7/21

WHY DISAGREE: I disagree. ✗

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 9/17/21

SECOND LEVEL RESPONSE: Memorandum

_____ GRIEVANCE UPHELD_____ GRIEVANCE DENIED_____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE:_____ TITLE:_____ DATE:_____

GRIEVANCE COORDINATOR SIGNATURE:_____ DATE: 9/23/21

INMATE SIGNATURE: A.H.                              DATE: 10/1/21

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

H(1)

DOC 3094 (12/01)

Declaration Pursuant To: N.R.S 208.165

I, Ammar Harris, of inmate identification
number: 1116547, am a lawfully committed
prisoner of the Nevada Department of
Corrections, presently in the lawful care
and custody of Ely State Prison, located at:
12000 North Bottliwick Road, (Mailing) P.O.
Box 1989, in City of: Ely, County: Lithite Pine,
State: Nevada, 89301. Does affirm that the
attached document entitled: 2006.31.18343,
is true and correct to the best of my knowledge
and belief, and any false statement of material
Fact made there in shall be subjected to the
pains and penalties of perjury pursuant to:
N.R.S 208.165,
This, 7th, Day of: August, 2021.

Inmate signature: A.H.
Inmate Name (Printed): Ammar Harris
Address: Ely State Prison
          P.O. Box 1989, Ely, Nevada 89301

(+(2)





# Nevada Department of Corrections
# Improper Grievance Memo

*ESP*

**TO INMATE:**   *Harris, Ammar       #1116547*           HDSP 6A 21

**FROM:**   *David Drummond, AW – Ely State Prison*

**DATE:**                 *April 6, 2021*

*RE: Improper Grievance #   2006.31.18343       2ⁿᵈ Rejection*

---

The attached grievance is being returned to you for the following reason(s):

| | |
|---|---|
| **NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.** | |
| ☐ Non-grievable issues | |
| ☐ State and federal court decision | |
| ☐ State, federal and local laws and regulations | |
| ☐ Parole Board decision | |
| ☐ Lacks standing | |
| ☐ Untimely submission. | |
| ☐ Inmate elected NOT to sign and date any grievance form. | |
| ☐ Grievance was granted. | |
| ☐ Abuse of Inmate Grievance Procedure | |
| ☐ A threat of serious bodily injury to a specific individual | |
| ☐ Specific claims or incidents previously filed by the same inmate | |
| ☐ Obscene, profane and derogatory language | |
| ☐ More than one (1) grievance per week, Monday through Sunday | |
| ☐ Other specify: | |

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.
☐ No factual harm/loss noted and/or no remedy requested.
☐ More than two (2) continuation forms (DOC 3097) per grievance
☐ Alteration of the grievance forms or continuation forms.
■ Other specify*: Inmate Harris, Per AR 740 grievance will be submitted correctly. You failed to follow AR 740 by submitting this grievance to the grievance coordinator to be properly be signed and mailed to Ely State Prison. However you must attached an Administrative Claim form when requesting compensation. Re-submit at the informal level with all forms attached.*     A.H.  7/6/21

| | | | |
|---|---|---|---|
| Witness Signature | Date | Inmate Signature | Date |

cc: Original – Inmate
    Copy - Grievance File

DOC-3098 (01/19)

Log Number _2006 3118 343_

# NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: _Ammar Harris_     I.D. NUMBER: _1116549_

INSTITUTION: _ESP_     UNIT: _1A-21_

GRIEVANT'S STATEMENT: _I was involved in an altercation at Ely_ _State Prison which has left me severely disabled, if it hadn't_ _been for the failure of C/O D. Cole and Boyd not following_ _proper procedures set by administration, this incident would_ _have never occurred. See Attachments!_

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: _M M_ DATE: _3-14-21_ TIME: _8am_

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE:_____ TIME: _____

GRIEVANCE RESPONSE: _Doc 3098_

_____

_____

_____

_____

CASEWORKER SIGNATURE: _____ DATE: _____

____GRIEVANCE UPHELD ____ GRIEVANCE DENIED ____ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: ~~_____~~ DATE: _4/6/21_

_____ INMATE AGREES _A.H_ INMATE DISAGREES

INMATE SIGNATURE: _A.H._ DATE: _7/8/21_

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |


I(1)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris                    I.D. NUMBER: 1116547

INSTITUTION: ESP                      UNIT #: 1A-21

GRIEVANCE #: _____           GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:    PG. 1 OF 2

Per NDOC Ely State Prison's Offender orientation hand-
book, Maximum Custody: Classification of maximum
custody inmates is the designated status for administrative
or disciplinary segregation or disciplinary detention for
close custody inmates. Maximum custody characteristics
consist of fenced perimeters and gun towers, single
occupancy cells, confinement to a cell except for schedule
exercise periods, showers, visits, professional interviews,
telephone calls and hearings, Direct Supervision when
inmates are outside of their cells, out of cell activities
are limited to separate and secure areas, Unclothed
Body Searches on inmates Exiting and Returning to
housing units, movement will be in restraints under
escort, inmates designated as High Risk Potential, inmates
under Sentence of Death, and transportation outside
the institution will be under restraints, under armed

Original:    Attached to Grievance
Pink:        Inmate's Copy

I(2)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris    I.D. NUMBER: 1116549

INSTITUTION: ~~NNCC~~ ESP    UNIT #: 1A-21

GRIEVANCE #: _____    GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:    PG. 2    OF 2

escorts may include chase vehicle if designated by the Warden.
Included is the incident report, OIC# 485309, if officer
Cole and Boyd would have simply performed their duties
by conducting an unclothed body search before yard, as
outlined in the Orientation Handbook, I would have never
been injuried. The whole incident was captured on camera.

I would like the following remedies:
* Access to an outside institution for rehabilitation.
* Compensation in the sums of a $1,000,000. for pain/suffering.
* Media credits in the sums of $50,000.
* A device that stimulates muscle activity. (Bioness)
* A stereo, TV w/ remote control.
* An actual mattress. (Back pains)
* The termination of Cole and Boyd.

Original:    Attached to Grievance
Pink:    Inmate's Copy

I (3)



# State of Nevada
# Department of Corrections
## DISCIPLINARY FORM I
## NOTICE OF CHARGES

| INMATE INFORMATION | VIOLATION INFORMATION |
|---|---|

**INMATE NAME:** HARRIS, AMMAR 1116547

**CHARGING EMPLOYEE** D. Cole

**CURRENT LOCATION** HDSP-U4-B-1-A; ; ;NC

**DATE OF INCIDENT:** 08/28/2020

**OIC#:**    485309    **IR#:**   IR-2020-ESP-001727

**DATE CHARGES WRITTEN:**   08/28/2020

## CHARGES AND EVIDENCE

| Chrg | Description | Evidence | Evidence Disposition |
|---|---|---|---|
| MJ16: | Murder | Staff reports | |

## REPORT OF VIOLATION

On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening  the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris' #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. . Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio.  Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand. At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied.  I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

| CHARGING EMPLOYEE SIGNATURE | SUPERVISOR SIGNATURE |
|---|---|

_____     _____

| SERVICE OF NOTICE OF CHARGES | DISTRIBUTION |
|---|---|

**DATE OF SERVICE:** _____ **TIME OF SERVICE:** _____        Primary Hearing Officer (Original)

**PRINTED NAME OF HEARING OFFICER** _____        Charging employee (Copy)

**SIGNATURE OF HEARING OFFICER** _____

**SIGNATURE OF INMATE** _____        Inmate (Copy)

(Signature indicates receipt of notice only. It is not a plea; refusal to sign should be noted)

I(4)

--------------------------------------------------------------



ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
MICHAEL R. BRUNET

March 30, 2021

ELY STATE PRISON

APR – 2 2021

WARDEN'S OFFICE

**VIA USPS**
Nevada Ely State Prison
4569 North State Route
Ely, Nevada 89301

Attn: Warden William Gittere

Re:    *AMMAR HARRIS, High Desert State Prison Inmate # 1116547*

Dear Warden Gittere,

This office represents Ammar Harris, High Desert State Prison Inmate # 1116547, in two matters pending before the Eighth Judicial District Court, Clark County, Nevada. Mr. Harris has requested that we forward you the enclosed documents on his behalf in an unrelated matter that we do not represent him in.

Respectfully,

ALANNA BONDY, ESQ.
**SGRO & ROGER**

I(5)

Enclosures: As stated

ACB/bs

Exhibit - 2 - Grievance 2006-31-20319

GRIEVANCES

A - NDOC Memo

A(1) - 2nd Level

A(2) - NDOC Memo

A(3) - 1st Level

A(4) - Page 1

A(5) - Page 2

A(6) - Page 3

A(7) - Declaration



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:**  _Harris, Ammar_           _#1116547_         _9A 3_

**FROM:**  _David Drummond, AW – Ely State Prison_

**DATE:**           _September 23, 2021_

**RE: Improper Grievance #** _2006.31.20319_      _2ⁿᵈRejection_

The attached grievance is being returned to you for the following reason(s):

---

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**
- ☐ Non-grievable issues
  - ☐ State and federal court decision
  - ☐ State, federal and local laws and regulations
  - ☐ Parole Board decision
  - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
  - ☐ A threat of serious bodily injury to a specific individual
  - ☐ Specific claims or incidents previously filed by the same inmate
  - ☐ Obscene, profane and derogatory language
  - ☐ More than one (1) grievance per week, Monday through Sunday
  - ☐ Other specify:

---

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified. Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.**
- ☐ The grievance contains more than one (1) appropriate issue. Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted and/or no remedy requested.
- ☐ More than two (2) continuation forms (DOC 3097) per grievance
- ☐ Alteration of the grievance forms or continuation forms.

- ☑ Other specify: **_Inmate Harris, wrong form, resubmit at the First level with all forms attached._**

| Witness Signature | Date 10/1/21 | Inmate Signature A.H. 10/1/21 | Date |

---

cc: Original – Inmate
Copy - Grievance File

LOG NUMBER: 20063120319

# NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Ammar Harris                    I.D. NUMBER: 1116547

INSTITUTION: ESP                    UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31-20319 , ON THE
SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION
IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.                    DATE: 9/9/21

WHY DISAGREE: Because not providing adequate medical
care due to financial restraint is not a justifiable reason.

GRIEVANCE COORDINATOR SIGNATURE: _____    DATE: 9/17/21

SECOND LEVEL RESPONSE: _____

Doc 3098

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 9/23/21

INMATE SIGNATURE: AH                    DATE: 10/1/21

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |


A(1)

DOC 3094 (12/01)



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:**  *Harris, Ammar     #1116547*          *9A 3*

**FROM:**  *David Drummond, AW – Ely State Prison*

**DATE:**  _____  *July 27, 2021*  _____

**RE: Improper Grievance #**  *2006.31.20319     1st Rejection*

---

The attached grievance is being returned to you for the following reason(s):

---

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**

- ☐ Non-grievable issues
    - ☐ State and federal court decision
    - ☐ State, federal and local laws and regulations
    - ☐ Parole Board decision
    - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
    - ☐ A threat of serious bodily injury to a specific individual
    - ☐ Specific claims or incidents previously filed by the same inmate
    - ☐ Obscene, profane and derogatory language
    - ☐ More than one (1) grievance per week, Monday through Sunday
    - ☐ Other specify:

---

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

- ☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted **and/or** no remedy requested.
- ◼ ***More than two (2) continuation forms (DOC 3097) per grievance. Per AR 740.04.2.E.***
- ☐ Alteration of the grievance forms or continuation forms
- ☐ Other specify:

_____   9/8/21          A.H.  9/8/21
Witness Signature              Date          Inmate Signature          Date

---

cc: Original – Inmate
    Copy - Grievance File

A(2)

DOC-3098 (01/19)

Log Number 20219

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: Ammar Harris                    I.D. NUMBER: 1116547

INSTITUTION: ESP                    UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31-20319 , IN A FORMAL MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.                    DATE: 7/16/21

WHY DISAGREE: Filed an informal on 3/21/21, its been more than 90 days without a response, proceeding to my first level grievance.

(Medical)

GRIEVANCE COORDINATOR SIGNATURE ~~~~~~~~~                    DATE: 7/21/21

FIRST LEVEL RESPONSE: _____

Doc 3098

_____ GRIEVANCE UPHELD_____ GRIEVANCE DENIED_____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE:_____TITLE: _____ DATE: 8/27/21

GRIEVANCE COORDINATOR SIGNATURE ~~~~~~~~~                    DATE 8/27/21

_____ INMATE AGREES AH _____ INMATE DISAGREES

INMATE SIGNATURE: A.H.                    DATE: 9/9/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |


A(3)

DOC 3093 (12/01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris                I.D. NUMBER: 1116547

INSTITUTION: ESP                  UNIT #: 9A-3

GRIEVANCE #: 2006-31-20319   GRIEVANCE LEVEL: First

GRIEVANT'S STATEMENT CONTINUATION:   PG. 1 OF 3

On Oct 16, 2020, I was placed in the infirmary at HDSP after returning from Summerlin Hospital where I was being treated for a traumatic brain injury, which resulted in me having a stroke, the right side of my body has severely been affected, the uses of my right arm/hand and the ability to walk, just recently regained my cognitive capabilities. I was assigned to Dr. Bryan, asked him about me receiving rehabilitation, his response," No, we don't have the money to send you to rehab." "You're just going to have too help yourself." The discharge paperwork from the hospital had recommendations for continuity of care, I was diagnosed with the following, Acquired Aphasia, Hemianopsia, Apraxia and Hemiparess, which can only be improved with rehabilitation, failure to do so my condition will get

Original:      Attached to Grievance
Pink:          Inmate's Copy

A(4)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME. _Ammar Harris_          I.D. NUMBER: _1116547_

INSTITUTION: _ESP_          UNIT #: _4A-3_

GRIEVANCE #: _2006-31-20319_     GRIEVANCE LEVEL: _First_

GRIEVANT'S STATEMENT CONTINUATION:     PG. _2_    OF _3_

Worse, by not taking any action would be consider medical neglect / indifference. I've made several attempts before being discharged on Nov. 19th, 2020 to be given proper care for the following; Headaches, Dizzyness, Stomach Pain, Blurry Vision, Poor Blood Circulation and Blackouts, the only remedy given for these problems were Ibuprofen. I sent numerous medical kites requesting help. I requested a medical device that stimulates muscle contraction to retain function of my affected limbs, Dr. Bryan said he was ordering one for me cause sending me to rehab was too expensive, that hasn't happened which has cause atrophy in my right arm, possibly preventing future recovery due to neglect. Dr. Rios informed that I would be sent to see a Neurologist in Nov 2020 to diagnose my on-going problem. Because of the extent of my injuries,

Original:     Attached to Grievance
Pink:         Inmate's Copy

A(5)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME. Ammar Harris                     I.D. NUMBER: 1116547

INSTITUTION: ESP                       UNIT #: 9A-3

GRIEVANCE #: 2006-31-20319   GRIEVANCE LEVEL: First

GRIEVANT'S STATEMENT CONTINUATION:   PG. 3 OF 3

Medical indifference for failure to follow
recommendations made regarding Continuity of
Care by Summerlin Hospital.

_____ I request the following remedies;
Access to an outside rehabilitation facility.
Medical device that stimulate muscle contraction.
To see a Neurologist
TV with remote
Stereo
compensation in the sums of $250,000 for neglect
medit credits in the sums of $50,000 for Pain/suffering

Original:     Attached to Grievance
Pink:         Inmate's Copy

A(b)

DOC – 3097 (01/02)

## <u>DECLARATION PURSUANT TO: N.R.S. 208.165</u>

I, _____Ammar Harris_____, OF INMATE IDENTIFICATION
NUMBER:_____1116547_____, AM A LAWFULLY
COMMITTED PRISONER OF THE NEVADA DEPARTMENT OF
CORRECTIONS, PRESENTLY IN THE LAWFUL CARE AND
CUSTODY OF ELY STATE PRISON, LOCATED AT: 12000 NORTH
BOTHWICK ROAD, (MAILING) P.O. BOX 1989, IN CITY OF: ELY,
COUNTY: WHITE PINE, STATE: NEVADA, 89301. DOES AFFIRM
THAT        THE        ATTACHED        DOCUMENT
ENTITLED:_____2006-31-20319_____,
IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE &
BELIEF, AND ANY FALSE STATEMENT OF MATERIAL FACT
MADE THERE IN SHALL BE SUBJECTED TO THE PAINS AND
PENALTIES OF PERJURY PURSUANT TO: <u>N.R.S. 208.165</u>,
THIS, 16th DAY OF:_____July_____,2021.


INMATE SIGNATURE:_____A.H._____

INMATE NAME (PRINTED):_____Ammar Harris_____
ADDRESS: ELY STATE PRISON
          P.O. BOX 1989, ELY, NEVADA 89301


A(7)

# EXHIBIT 3 - "AdminReg"

A.R.: 400 (General Security / Supervision)
3 Pages

A.R.: 420 (Death or Serious Injury)
11 pages

A.R.: 608 (Medical transfer of Inmates)
2 Pages

A.R.: 615 (Continuity of Care)
3 Pages

A.R. 639 (Medical Records)

A.R. 6 Pages

740 (Grievance Procedure)
14 Pages

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 400

## GENERAL SECURITY/SUPERVISION GUIDELINES

**Supersedes:** AR 400 (01/05/12) and AR 400 (Temporary, 03/01/13)
**Effective Date:** 03/19/13

## AUTHORITY

NRS 209.131, NRS 209.161, 42 U.S.C. § 15601, *et seq.* and 28 C.F.R. Part 115

## RESPONSIBILITY

The Deputy Directors are responsible for the Department's overall security programs and operations.

The Warden is responsible for maintaining a secure institutional environment that ensures the safety of the public, provides a safe working climate for employees, and offers humane and safe living conditions for inmates confined therein.

The Associate Warden/Designee is responsible for the management of the institution/facility security program and operations.

All employees of the Department have the responsibility to have knowledge of and comply with this regulation.

## 400.01   GENERAL SECURITY SUPERVISION GUIDELINES

1. The Warden will develop and maintain a local security and staff management plan that is available to all staff. The plan will include, at a minimum the following information:

   A. Administrative Regulations;

   B. Operational Procedures

   C. Memoranda and other instructional materials issued by the Warden and Associate Wardens to facilitate the implementation of the policies and procedures;

   D. All necessary staff assignment, roster and timekeeping records, in accordance with Department administrative regulations and policy;

E.  Post Orders that are current and which are readily available for employees assigned to posts.

F.  Emergency Response Manual.

2.  The Warden/Designee will develop a written schedule to ensure that checks are performed in all areas where information is maintained to ensure that current policies and procedures are in place.

3.  Daily Administrative Officer Inspection Tours:  A high priority will be placed in all Department institutions/facilities to ensure the visibility of top staff in the facility, where they are available to inmates, line staff, and mid-level managers for communication. Such actions will include, but are not limited to:

A.  The Warden or Associate Wardens will visit all housing areas every 48 hours during the standard work week, including but not limited to PREA mandated unannounced rounds as designated by the PREA Manager guide;

B.  The Warden or Associate Wardens will visit all activity areas every 72 hours during the standard work week;

C.  The Warden or Associate Wardens shall conduct a formal inspection of Prison Industries during each working day.

D.  Supervisory staff will tour the entire facility at least once each shift every day, including weekends and holidays, including but not limited to PREA mandated unannounced rounds as designated by the PREA Manager (Warden);

E.  Unoccupied areas may be toured once a week;

F.  An Associate Warden will receive a written report or logbook of all such tours will reflect any deficiencies observed and corrective actions taken; and

G.  Correctional staff will conduct a visual inspection of all cells and other living quarters once each shift.  A formalized report will be submitted to the Associate Wardens for each inspection or noted on the local post log and shift report.

H.  Correctional Officers will conduct formal inspections/searches in accordance with the provisions of AR 422, Search and Shakedown Procedure, and the applicable Post Orders.

4.  The Associate Wardens/Designees will conduct at least weekly inspections of all security devices and report results of the inspections in writing to the Warden.

5.  No inmates or groups of inmates will be given authority over other inmates, manage any institutional program, or have any policy or procedure setting role in the institution/facility.

**APPLICABILITY**

1.  This AR requires an Operational Procedure for all institutions/facilities.

2.  This AR requires an audit.

**REFERENCES**

ACA Standards, 4-4174, 4-4178, and 4-4182 through 4-4186; and 2008, 2010, and 2012 Standards Supplement

_____          _____
James G. Cox, Director                      Date

AR 400                                      Page 3 of 3

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 420

## INMATE DEATH OR SERIOUS INJURY PROCEDURE

**Supersedes:**    AR 420 (06/17/12); AR 420 (Temporary, 12/02/13); and AR 420 (Temporary, 02/18/14); 3/18/14; (Temporary, 01/03/17)
**Effective Date:** 03/07/17

**AUTHORITY:** NRS 120A.590, NRS 134.120, NRS 146.080; NRS 209.131; NRS 209.3815; NRS 440.165: NRS 440.175, NRS 440.415; NRS 450B; NRS 451.400

**PURPOSE:** To strive to avoid preventable deaths and injuries, to ensure appropriate care and notification; and to review the appropriateness of clinical and correctional policies and procedures; and to identify changes or the ability to improve operations.

**RESPONSIBILITY:**

The Deputy Director of Operations is responsible for the implementation of this procedure at all institutions and facilities.

The Warden is responsible for ensuring compliance with the Inmate Death Procedure at their respective facility and ensuring operational policies and procedures are developed; and staff is trained on the procedures.

All Department staff involved are responsible to have knowledge of and comply with this procedure.

## 420.01    INMATE DEATHS OR SERIOUS INJURY PROCEDURE – DISCOVERY

1. The first staff member(s) present at the scene of a serious injury or inmate death will call for assistance; and initiate first aid and/or cardiopulmonary resuscitation (CPR) as needed. If the offender is found hanging, the responder(s) will immediately cut him/her down and begin appropriate medical care. All NDOC housing locations and areas where inmates may be present will have approved cutting devices available to be used for the purpose of cutting down the inmate or removing ligatures (*note: custody staff do not have the authority to determine death or time of death*.)

    A. Every precaution should be taken to ensure the safety and security of all persons present;

    B. The response to the serious injury or possible inmate death will be based upon the unit's operating policies and procedures for the inmate population housed within. Every precaution should be taken to ensure that all evidence is protected.

2. Upon discovery of what appears to be a deceased inmate, the Shift Supervisor shall be notified immediately. The immediate area shall be secured and no one other than a medical staff member will be allowed to enter the cell until designated investigators, the coroner, or outside law enforcement officials arrive. The Shift Supervisor shall make the proper notifications in accordance with Section 420.02 of this administrative regulation.

3. Humane treatment of the inmate shall prevail.

    A. A hanging inmate shall immediately be cut down, leaving the ligature in place if the inmate is deceased.

    B. If the inmate does not appear to be deceased, life saving measures should be immediately initiated and the ligature removed and placed in secure location where the least amount of disturbance should occur.

    C. The body shall not be left unattended.

    D. The area or cell shall be secured.

    C. No item shall be moved from or about the secured area.

4. The scene shall be photographed and videotaped following the guidelines established in Administrative Regulation 458.

5. In any case where the inmate appears deceased , the staff person(s) who discovers the body shall write a comprehensive incident report prior to leaving the institution/facility. This report shall be approved by a supervisor and entered into NOTIS. The report will include at a minimum the following:

    A. Name of the staff person discovering the body, the name of the inmate and the names of any witnesses and name and number of cell partner if the body was discovered in the cell.

    B. Time of the discovery of the body, the body's appearance such as discoloration, puncture wounds or other evidence of trauma.

    C. A description of the scene such as cell number or area and the appearance of the area such as the cell was in disarray, or neat, bodily fluids such as blood in order to assist in the collection of evidence and investigative reports.

    D. Describe action taken upon discovery of the body such notification of other staff, supervisors or medical and the time of the notifications.

    E. Describe any attempts to provide first-aide or other actions such using the cut-down tool and the time that first-aide ceased and medical arrived.

  F. Enter the time that the body was released to medical or the body was removed from the scene.

  G. If investigators arrive at the scene and the staff person is still at the scene, enter the time that the investigators arrived.

6. Upon notification, Medical personnel shall proceed to the scene and confirm the death, but will in no way disturb the scene or any of the evidence.

  A. Only a Doctor of Medicine, a Doctor of Osteopathic Medicine, the Coroner, and a Coroner's Deputy; or when authorized, a Registered Nurse, or a Physician Assistant, can pronounce a person legally dead.

  B. In all instances, the appropriate Coroner will be contacted to examine the body and determine the cause of death.

  C. The Supervisory Staff member will notify the Inspector General for investigative response to the scene.

7. The Shift Supervisor shall have the primary responsibility for assuring that no evidence is moved or tampered with, including the complete preservation of the scene, prior to the arrival of the representative from the Inspector General's Office and the Coroner. Upon the arrival of the Coroner, staff shall assist and cooperate with the investigation as is appropriate and necessary.

8. Next of kin notification procedures will be initiated by the institutional Chaplain and/or Associate Warden of Programs.

9. After obtaining permission from the Coroner, and after the initial investigation is completed; the body of the deceased shall be covered and removed to the morgue, mortuary, or private room in the infirmary.

  A. The Director, in consultation with the designated medical director and the Inspector General of the Department, shall request the Coroner, or any other persons so authorized, to conduct an autopsy of any offender who dies while in the custody of the Department, if the next of kin:

   (1) Consents to the autopsy; or

   (2) Does not notify the Director of any objection to the autopsy within 72 hours after the death. Unless an objection is received by the Director from the next of kin within 72 hours of death, an autopsy will be requested in all cases.

   (3) In those cases where the next of kin declines the autopsy, the next of kin must submit their intent to refuse the autopsy, in writing, within the 72 hour time frame.

B. If the death is suspected to be a suicide (which will be considered an unresolved death) or if the death is under suspicious circumstances, the Coroner shall be requested to inform the morgue/mortuary that the body is not to be embalmed until a full and complete criminal investigation is conducted.

C. Bodies shall be removed as expeditiously as circumstances will permit.

10.  Investigation of crimes involving great bodily injury or homicides shall be coordinated between the Department's Inspector General's Office and relevant law enforcement officials.

A. The local sheriff's office may be requested to assist in appropriate aspects of the investigation, as circumstances require.

B. Requests for assistance from the Department of Public Safety, Investigations Division and the Attorney General's Office shall comply with related agency assist agreements and will be coordinated by the Department and local sheriff's office.

11.  Employees of the Department should assist the coroner or local law enforcement in the investigation, as is appropriate and to cooperate in every way necessary.

12.  States housing contract and interstate compact inmates in the Department will be notified concerning the incident by the Offender Management Division Administrator.

## 420.02    DEATHS OR SERIOUS INJURY REPORTING REQUIREMENTS

1.  If an inmate death or serious injury occurs in one of the institutions or facilities, the Shift Supervisor, Associate Warden or Warden shall immediately notify the following in sequential order and will include who the involved inmate(s) is/was, when the incident occurred, where the incident occurred and how the incident occurred:

A. On-duty medical staff;

B. The Warden, Associate Wardens or Facility Manager;

C. Inspector General;

D. Local Police Department or Sheriff's Office;

E. The Warden shall immediately notify the Director and the Deputy Director of Operations;

F. The Administrator of the Offender Management Division;

G. The Chaplain;

H. The Next of Kin;

1) The Chaplain shall inform the next of kin; and provide information that an autopsy will be requested unless the next of kin provides notification to the Director in writing, within 72 hours of the death. If the Chaplain is not available, the Associate Warden or designee shall notify the next of kin, and provide the autopsy information.

I) The Public Information Officer (PIO), who is responsible to notify the media;

1) The Warden/Designee is responsible for completing the PIO Information (NDOC Form 4520) and sending it to the PIO, within 24-hours, or as soon as possible.

## 420.03  DUTIES OF OTHERS

1. Physician/Doctor: The physician may consult with the Coroner to determine if the death was caused by natural or unnatural causes, or if suspicious circumstances exist.

2. Coroner

A. In the case of a death, the body shall be released only upon instructions from the coroner.

B. Prior to the removal of the deceased from institutional grounds, a body receipt for the remains will be obtained from the Coroner, mortuary, medical examiner, or otherwise authorized/designated personnel.

C. The body shall not be moved, except at the direction of the Coroner, and upon the completion of the initial investigation.

D. Autopsies and toxicology reports will be performed at the request of the Director as authorized by NRS 209.3815.

3. Institutional Warden or Facility Manager shall:

A. Initiate an investigation or take other custody measures as necessary, to include securing the crime scene.

B. Make appropriate notifications as set forth in Sections 420.02 and 420.03 of this Regulation.

4. Upon receiving information that an inmate has died, the Associate Warden shall:

A. Assure that all available records, including the "I" file, medical records, mail, and visiting records are secured.

B. Ensure that the Chaplain has access to information on the next-of-kin and/or to the list of names, relationships, and addresses of relative and friends to be notified in case of death as indicated previously by the inmate.

C. Ensure all reports are received and an incident report is submitted.

D. Prior to the release of the body, ensure that the inmate is positively identified.

E. Coordinate the Department's and other agency activities related to the incident.

F. Other duties as assigned.

5. Chaplain:

A. The Chaplain shall make reasonable efforts to promptly notify the next of kin.

B. When the Chaplain is not available, the Associate Warden or a designee shall notify the next-of-kin.

C. The next-of-kin information shall be maintained and updated every six-months by the institution/facility staff during the inmate's periodic classification review as directed in AR 636.

6. Offender Management Division Administrator will notify the Department's Statistician to obtain the death certificate.

## 420.04   DEATHS OCCURRING AT A PLACE REMOTE FROM AN INSTITUTION

1. If a death occurs in a camp, while fighting fire, or while in transit between institutions, the Department's officer in charge shall take the following actions:

A. Summon proper custodial support, as appropriate to the situation.

B. If necessary, summon nearest medical response for life support.

C. Notify the Inspector General.

D. Notify the Administrator of the OMD and the Warden of the gatekeeper institution by telephone and seek further instructions.

E. The Warden of the gatekeeper institution will notify the Director and the Deputy Director of Operations.

F. Notify all local officials, as required.

G. Complete and submit a final report containing the circumstances, investigations, all arrangements, etc., to the Warden of the gatekeeper institution, if applicable.

## 420.05   DISPOSITION OF THE DECEASED INMATE'S PROPERTY

1. The property of the deceased inmate shall be immediately secured, inventoried, and placed in safe storage at the institution or facility, pursuant to AR 711.

2. If all or part of the inmate's property is required for an investigation into the circumstances of the death, that property shall be accounted for by receipt to the investigative agency.

3. The Associate Warden or Facility Manager shall conduct such inquiry necessary to determine if that inmate died with or without a will. The Chaplain may be asked to help with this inquiry.

4. If a will exists, the inmate's property and any money on their account, after deductions, with the Department, shall be released to the executor of the estate by the Associate Warden or the Facility Manager, but only after any investigations are complete.

A. Funds received after the inmate's death will be returned to sender.

B. Distribution of dividends and other income received after the inmate's death will be determined on a case-by-case basis.

C. Without a known will, the inmate's property and any money on their account with the Department shall be released to the next-of-kin.

5. When an Inmate Dies:

A. Offender Management Division is to notify Chief of Inmate Banking or Designee by email within two (2) working days. Information to include Inmate name, Inmate number, date of death and institution/facility.

B. Inmate Banking Services will freeze inmate accounts until receipt of Affidavit of Distribution without Administration or after consultation with the Deputy Attorney General (DAG) concerning the appropriate legal documentation.

(1) The Associate Warden/Facility Manager is responsible to coordinate the release of all funds/property.

(2) All investigations shall be completed prior to the release of funds/property.

(3) The Associate Warden, Facility Manager, the Administrator of the OMD and an Administrator from Support Services, in consultation with a DAG shall determine the appropriate distribution of all funds and property.

(4) Without a known will and with no known next-of-kin, the accounts of the inmate shall remain frozen and the property held in safe storage.

6. If the inmate's property and funds are valued under $20,000, the Affidavit of Distribution without Administration requires the signature of the next-of-kin prior to distribution of funds and/or property per NRS 146.080, regardless if an inmate dies with or without a will.

    A. The original document shall be placed in the C-File.

    B. One copy shall be placed in the I-File.

    C. One copy shall remain with the property records.

    D. One copy shall be forwarded to Inmate Services.

7. The Associate Warden or the Facility Manager shall prepare documentation that serves to facilitate these actions and to record the results.

8. In any case there the inmate refuses to provide next of kin information and no last will and testament exists, and the Department cannot verify identification of an approved next of kin, all property of value will be maintained at the institution for a determined amount of time until the property can be reviewed distributed or destroyed according to the value of the property.

9. In any case where the inmate refuses to provide next of kin information and no last will and testament exists, and the Department cannot verify identification of an approved next of kin, all money will be referred to as abandoned property and relocated to its proper distribution authority.

## 420.06  INMATE DONATION OF REMAINS FOR ANATOMICAL PURPOSES

1. Inmates may, if they choose, sign a Consent Anatomical Disposition, DOC-2567, authorizing release of the inmate's body in the event of death to the School of Medical Science, University of Nevada, Reno. The acceptance shall be governed by the Uniform Anatomical Gift Act, NRS 451.440.

2. The next-of-kin of a deceased inmate may authorize release of the body for medical science according to the Uniform Anatomical Gift Act.  Form DOC-2567 Consent Anatomical Disposition is available for this purpose.

## 420.07  FUNERAL EXPENSES

1. When the family elects to claim the body of a deceased inmate, they shall be responsible for all costs incurred.  The Department may, upon approval of the Director or Deputy Director of Support Services, pay for shipping costs of the body, if the costs are less than cremation expenses.

2. In the event the family declines to claim the body, the Department will only pay for cremation costs for the deceased inmate.

**420.08   AUTOPSIES OR POST-MORTEM EXAMINATIONS**

Autopsies and toxicology reports should be performed on all deceased NDOC inmates per NRS 209.3815.

**420.09   DOCUMENTATION**

Records and reports required for deaths occurring on the Department's property, or during official absences from the institution, shall meet the following requirements:

    A. All personnel who possess information regarding the circumstances surrounding the death shall submit a report to the Warden/Facility Manager.  These reports shall be completed in accordance with the provisions of AR 332.

    B. The following personnel shall submit reports:

        (1)  Any staff member who was on the scene at the time of an incident or who responded to the scene during initial response;

        (2)  Any staff member(s) discovering the body; and

        (3)   Any medical personnel who attempted life-saving emergency treatment, including Form DOC-2514, Medical Report of Incident, Injury or Unusual Occurrence.

    C. Reports shall be as specific as possible, listing the employee's role, names of other persons on the scene, observations, and timing of events.

    D. The OMD is responsible for obtaining a death certificate, which will be placed in a locked filing cabinet to allow for confidentiality of the certificate. .

        (1)  In accordance with NRS 440.165 and 440.175, NDOC is not authorized to reproduce and/or disseminate any vital record such as a certificate of death.

**420.10   NEXT-OF-KIN DOCUMENTATION**

1. The Warden shall send a letter to the next-of-kin within one week of the inmate's death.  The letter shall express condolences and refer the next-of-kin to the Associate Warden or Facility Manager for the disbursement and distribution of personal property.

2. It is imperative that the "Next-of-Kin" form be maintained and updated in the Institutional file and in the case notes in the Nevada Offender Tracking Information System (NOTIS) to assure accurate information is available to administration at the time of illness or death of an inmate.

This information shall be entered at the initial intake process and shall be reviewed with the inmate and updated when applicable by Caseworkers at all regular reclassification hearings.

**APPLICABILTY**

1.  This AR requires an Operational Procedure for all institutions/facilities and impacted divisions of the Department.

2.  This AR requires an audit.

**REFERENCES**

ACA Standards 4-4425; 4-4395,


James Dzurenda, Director

3/7/17
Date



## NEXT OF KIN AUTOPSY REFUSAL FORM

Pursuant to Nevada Revised Statute 209.3815, the Director of the Nevada Department of Corrections (NDOC), in consultation with the Medical Director of the NDOC and the Inspector General of the NDOC, shall request that the coroner conduct an autopsy of any offender who dies while in the custody of the NDOC if the next of kin either: (1) consents to the autopsy, or (2) does not notify the Director of any objection to the autopsy within 72 hours after the death.

Because the language of the statute is mandatory and requires the Director to request an autopsy unless he receives direct notification otherwise, any next of kin refusing an autopsy must waive in writing their desire for same.

You, as the next of kin for deceased inmate _____,
                                                                    (inmate name and back number)

have been notified of your relative's passing while in NDOC custody. You have been notified within 72 hours of death and have opted to decline consent to an autopsy. By signing the form below, you acknowledge your intent to decline an autopsy for your next of kin and affirmatively state your objection to an autopsy.

By signing this form, you also acknowledge and agree that you will forgo any claims against the NDOC related to not knowing the cause of death and/or the reasons for death, since causation of death will not be able to be affirmatively determined once autopsy is refused and the body is released for burial or cremation.

_____          _____
Next of Kin Printed Name                               Date

_____
Next of Kin Signature

_____          _____
Receiving NDOC Staff Printed Name              Date of Receipt

_____
Receiving NDOC Staff Signature

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 608

## MEDICAL REQUIREMENTS FOR ROUTINE TRANSFER OF INMATES

**Supersedes:**      AR 608 (Temporary, 11/23/11)
**Effective date:**      06/17/12

**AUTHORITY:** NRS 209.131; NRS 209.291; NRS 209.381

**RESPONSIBILITY**

Medical Division staff has the responsibility to have knowledge of and comply with this procedure.

### 608.01   MEDICAL REQUIREMENTS FOR ROUTINE TRANSFER OF INMATES

1. Medical Division staff should be given at least twenty-four (24) hours notice prior to routine transfers in order to prepare for the continuity of care at the receiving institution and prevent unnecessary interruptions of medical care.

   A. Inmates being transferred from one institution to another where medical care is available may be cleared by a qualified member of the nursing staff.

   B. Inmates being transferred from an institution to a rural camp must be qualified for this housing based on their medical/dental/mental health classification.

   C. Inmates with mental health diagnoses or recent mental health care or treatment should be cleared by mental health staff of the departing institution prior to transfer.

2. Essential medications or other special treatment required en route, along with specific written instructions should be furnished to the transportation staff.

3. The transporting officer should hand deliver the sealed medical record and any non-KOP essential medications to authorized medical staff at the receiving institution.

4. Inmates may keep KOP (Keep On Person) medications approved by the medical staff during transportation.

5. The inmate's medical records should be transferred to the receiving institution Medical Records Section or to the camp medical officer.

**APPLICABILITY**

1. This regulation requires a Medical Directive for intrasystem transfers.

2. This regulation does not require an audit.


_____          _____
R. Bruce Bannister, D.O., Medical Director        Date
                                                  5-30-12


_____          _____
James G. Cox, Director                            Date
                                                  6/12/12

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 615

# LEVELS AND CONTINUITY OF CARE

**Supersedes:**    AR 615 (06/17/12) and AR 615 (Temporary, 04/23/13)
**Effective date:**   10/15/13

**AUTHORITY:** NRS 209.131; NRS 209.381

**RESPONSIBILITY**

Medical Division staff has the responsibility to have knowledge of and comply with this procedure.

## 615.01   LEVELS AND CONTINUITY OF CARE

1.  It is the policy of the Nevada Department of Corrections (NDOC) to make available the level of health care required by the inmates' medical condition and follow through by continuing with a treatment plan to an appropriate medical conclusion.  The care should be commensurate with proven effective, evidence based, medical practice.

2.  Each infirmary and health care unit will have procedures for assuring expedient access to the following levels of health care.

   A.  <u>Self Care</u> - Treatment for a condition that can be accomplished solely by the inmate and may include "over the counter" medications, i.e., aspirin.

   B.  <u>First Aid</u> - Care for a condition that requires the attention of a person trained in first aid procedures.  First aid kits will be available at designated areas of the institutions/facilities based on need.

   C.  <u>Non-Emergent</u> - situation in which the patient's condition requires medical attention, but can be scheduled in a timely manner and the individual will not suffer any adverse consequences.

   D.  <u>Emergency Care</u> - Treatment of an acute illness, injury, or unanticipated medical need which requires the immediate attention of a qualified health care provider and cannot be deferred until the next scheduled sick call or access period. Emergency care does not require pre-approval by the Utilization Review Panel (URP).

E.  Consultant Care - Treatment of medical complaints beyond the scope available at the institution. The need for this level of care is determined by the medical staff at the institution, and approved by the URP.

F.  Infirmary Care - In-patient and out-patient care for illnesses, which require observation and/or clinical management, but do not require admission to an acute care hospital.  This level may include long term convalescent care.

G.  Health Care Unit - Treatment for the ambulatory inmate with health care complaints that are evaluated and appropriate disposition is rendered.

H.  Hospital Care - In-patient bed care for an illness or diagnosis that requires twenty-four (24) hour clinical management in a hospital facility licensed to provide such service and approved by the URP.

3.  The Medical Director/designee will develop a system of procedures that provide inmates with continuity of medical care from admission to discharge from the institution, including referral to community care when needed.  The procedure(s) will include, but are not limited to:

A.  Providing adequate access to health care facilities and licensed health care providers.

B.  Timely initiation and follow through of medical treatment.

C.  Referral to medical personnel and facilities outside the institution when indicated.

D.  Providing for the continuity of medical care when the inmate is transferred to other facilities and sharing health information.

E.  Providing adequate information regarding the current clinical status of the inmate during community or institutional medical transfer or referrals.

**APPLICABILITY**

1.  This regulation requires a Medical Directive for Continuity of Care at each institutional Infirmary and at the Regional Medical Facility.

2. This regulation requires an audit.


_____    ___10/30/13___
Romeo Aranas, Medical Director          Date


_____    ___11/7/13___
James G. Cox, Director                  Date

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 639

# MEDICAL RECORDS

**Supersedes:**     AR 639 (01/05/12); (05/06/14, Temporary); 09/16/14; (01/11/18, Temporary)
**Effective date:**     03/01/18

**AUTHORITY:** NRS 49.265; 209.131; 458.055; 629.051; 629.061

**RESPONSIBILITY**

The Director has the overall responsibility for this administrative regulation.

The Director of the Medical Division and the Health Information Director have the responsibility to implement this regulation.

The Directors of Nursing have the responsibility to ensure that all staff within the Medical Division have knowledge of and comply with this regulation.

All medical records initiated by a practitioner operating within an institution must comply with this regulation.

**639.01    MEDICAL RECORDS**

1. The Nevada Department of Corrections (NDOC) maintains medical, dental, and mental health records for each inmate throughout the period of incarceration.

2. Medical records are initiated during the intake process.

3. The record will be standardized and uniform throughout the Department.

4. All original medical, dental, mental health care and substance abuse treatment data will be maintained in the medical record.

5. The record shall include documentation of all health related service provided to the inmate, both on-site and offsite

6. Copies of the medical record shall be kept in the outpatient mental-health services to facilitate mental health care.

7.  Practitioners responsible for conservation camps and transition centers will document medical information on any treatment received by inmates under their care.  Physicians, Physician Assistants, or Advanced Practitioners of Nursing are considered to be practitioners.

8.  Medical records or portions of medical records will not be destroyed, deleted or expunged.  If a mistake is made in a notation, the correction will be noted, dated and initialed by the medical person making the correction.

9.  The Directors of Nursing will provide On-The-Job Training for all medical staff to ensure that medical personnel are trained on how to make entries to the medical records and that staff are trained on HIPAA requirements and medical records confidentiality.

10.  A staff person designated by the Director of the Medical Division will review departmental training to ensure that all NDOC personnel are trained on the requirements of HIPAA and inmate medical records privacy requirements.

11.  The Director of Nursing or designee will provide only medically necessary information to correctional staff, regarding contagious or infectious diseases from the inmate's medical record, when an inmate has to be escorted, transported, guarded or restrained for the purposes of ensuring that correctional staff are taking the appropriate universal precautions whether the issue is an air-borne, blood or saliva contagion.  The information will not include specific diseases but only the precautions necessary.

12.  The Director of Nursing or designee will provide enough information to correctional staff from the inmate's medical record when the information is necessary for the taking or providing or medication to the inmate during escort, guarding or transporting.

## 639.02    CONFIDENTIALITY OF MEDICAL RECORDS

1.  Medical records will be maintained in secure files and will only be handled by authorized medical division staff and the following persons, on a need to know basis as authorized by the Medical Director:

    A.  Director or designee;

    B.  Deputy Directors;

    C.  Wardens;

    D.  Associate Wardens;

    E.  Attorney General staff; or

    F.  Other staff as authorized by the Director or Medical Director.

G. If medical records are transported from one facility to another, the medical records will be labeled confidential and sealed, so that they are not accessible by unauthorized personnel to include inmate clerks.

2. Inmates are only allowed access to their own medical file and will not be allowed access to any other inmate's medical file.

3. Medical information, such as progress notes, laboratory and radiology results, and other pertinent information, should be made available to authorized staff and practitioners in the Department.

4. Medical information should be released to outside healthcare providers only with written authorization (Form DOC 2548 Consent – Release of Medical Information) from the inmate, except for pertinent copies of the inmate medical records sent for approved outside consultations at the request of institutional physicians, or as required by law.

A. Original medical records should not leave the possession of department staff at any time. If consulting physicians need to maintain a medical record, copies should be made and the original record will be retained at the institution.

B. A notation will be made in the medical file that copies were made, which agency or outside provider is the recipient of the copies, the date which the copies were made and the reason the copies were made a copy of the court order will be maintained with the medical record.

5. Where required by law, appropriate public health agencies will be notified of reportable diseases.

6. Inmate's attorneys may obtain a copy of the medical records with the written request and authorization by the inmate.

7. Inmates are not constitutionally entitled to free copy work. Inmates may request limited copies of medical records for legal purposes by submitting a brass slip for the cost of the copies requested.

A. In order to receive the requested copies, inmates must have sufficient funds in their individual account in the Prisoners Personal Property Fund (PPF) to cover the cost of the requested copies.

B. Copies should be charged to the requesting attorney or inmate at the rate set by NRS 629.061.

C. Indigent inmates will be provided with copies.

8. Copies of the health record shall not be released directly to the inmate while incarcerated. Exception to this release shall be made only when an inmate is personally involved in a lawsuit

directly involving medical issues that would require the use of his/her medical records, as verified by the Office of the Attorney General.

9. Original medical records should not be sent to outside agencies unless ordered by the court.

    A. In the event original records are ordered in cases of litigation, they should be hand delivered by authorized Department staff.

10. All other requests for medical records will be transferred to the Health Information Archives Coordinator.

## 639.03    INMATE REVIEW OF MEDICAL RECORDS

1.    An inmate is prohibited from possessing any portion of their medical file on their person, in their cell or on the yard unless otherwise permitted by a court order.

2.    Inmates may request to review their medical record. The review will occur under the direct supervision of medical staff.

3.    Prior to an inmate's review of their medical record, the record shall be purged of all psychiatric/psychological materials, any materials received from an outside source which NDOC has requested with authorization from the inmate, and any information which may jeopardize the safety of the inmate or institution.

4.    Absent an inmate's personal litigation directly involving these psychiatric/psychological records, the records shall not be reviewed with an inmate without consultation with the treating (or a knowledgeable) psychiatric/psychological professional. If this consultant believes that the content of the psychological records, or any part thereof, may be counter-therapeutic or detrimental to the inmate's mental health, the records may be withheld pending a court order to release the records.

    A. Except under special circumstances, as determined by the Medical Director, attending practitioner or by court order, an inmate should only be permitted to review their medical records once per calendar year.

        a) Exception to this once annual review, during the course of litigation involving a medical issue of the inmates, the inmate will be allowed additional opportunity to review the medical record. Upon a request from the inmate to review his medical records for litigation purposes, all efforts will be made to make the records available within 3-5 working days from the date of the request.

        b) The inmate will be given one hour to review the medical record. If the inmate feels that additional time is needed for the review, the inmate is permitted to:
            i.    Request an additional review.
            ii.    Review the Medical Record at a date and time that is convenient and does not conflict with staff workload priorities.

    c) The inmate will be allowed to make separate notes regarding the information contained in his/her own medical record.

    d) Inmates are not permitted to remove documents from the medical record.

5.    Any inmate request for review that is denied by the Medical Director or attending practitioner shall be documented in the medical record, stating the reason for the denial.

## 639.04    TRANSFER OF INMATE MEDICAL RECORDS

1. When an inmate is transferred between institutions or facilities, the complete medical, mental health, and dental records will be transferred with the inmate.

    A. If the medical record cannot be found, a temporary record shall be used until the original is found.

2. All medical information accumulated and not filed shall be filed appropriately in the medical record before it is transferred.  If for unforeseen circumstances this cannot be accomplished the reasons will be documented and placed in the medical record. *For example; the inmate had to be emergency transferred due to enemy or safety reasons without notice.*

3. Medical record should be reviewed at the receiving institution by the nursing staff for the pertinent information, noting in the progress notes that this review was accomplished.

    A. Appointments and referrals will be made as indicated.  The relevant documentation will then be given to the Health Information Coordinator for quality control functions.

4. When an inmate is transferred out for treatment for an indefinite period of time, the institutional medical records office shall contact the Health Information Archives Coordinator to obtain pertinent medical records.

5. A copy of the medical record shall be sent to the receiving institution, the original medical record should remain in the medical records archives.

6. When an inmate is released from the Department, his medical records shall be forwarded to the medical records archives to be maintained according to applicable state, federal, and local laws, rules and regulations.

## APPLICABILITY

1. This regulation requires a Medical Directive for the management, format, access, and confidentiality of the health care record.

2. This regulation requires an audit.

**REFERENCES:**  ACA Standards 4th Edition, 4-4414 – 4416; 4-4413; 4-4415; 4-4352; 4-4400; 4-4393; 4-4096

Medical Director                          Date

James Dzurenda Director                   Date

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 740

# INMATE GRIEVANCE PROCEDURE

**Supersedes:**    AR 740 (02/12/10); and AR 740 (Temporary, 06/16/14); 09/16/14; (Temporary, 01/03/17); 03/07/17; 08/30/17
**Effective Date:** Temporary 11/20/18

**AUTHORITY:** NRS 209.131, 209.243; 41.031; 41.0322; 41.0375; 42 U.S.C. § 15601, *et seq.* and 28 C.F.R. Part 115

## PURPOSE:

The purpose of this Administrative Regulation ("AR") is to set forth the requirements and procedures of the administrative process that Nevada Department of Corrections ("NDOC") inmates must utilize to resolve addressable grievances and claims including, but not limited to, claims for personal property, property damage, disciplinary appeals, personal injuries, and any other tort or civil rights claim relating to conditions of confinement. Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims only if the inmate can factually demonstrate a loss or harm. This procedure describes the formal grievance processes and will guide NDOC employees in the administration, investigation, response and resolution of inmate grievances.
The provisions of this AR shall be effective on or after the effective date of this AR. The provisions of this AR are not retroactive and do not apply to incidents and/or claims that occurred prior to the effective date of this AR. Only inmate claims arising out of, or relating to, issues within the authority and control of the NDOC may be submitted for review and resolution by way of the grievance process. A good faith effort will be made to resolve legitimate inmate claims without requiring the inmate to file a formal grievance. This AR does not create any right, liberty or property interest, or establish the basis for any cause of action against the State of Nevada, its political subdivisions, agencies, boards, commissions, departments, officers or employees.

## RESPONSIBILITY

1.    The Director, through the Deputy Directors (DDs), shall be responsible in establishing and supervising an inmate grievance process that provides an appropriate response to an inmate's claim, as well as an administrative means for prompt and fair resolution of, inmate problems and concerns.

2.    The Deputy Director or designated Administrator shall be responsible for 2nd level grievances.

3.    The Warden through the Associate Wardens (AWs) shall be responsible in managing the grievance process at each institution and any facilities under the control of the parent institution. The AW may designate an Inmate Grievance Coordinator to conduct functions

required by this regulation under the AW authority and supervision.

**740.01    ADMINISTRATION OF INMATE GRIEVANCES**

1.    All grievances, whether accepted or not, will be entered into NOTIS.

2.    Each institution/facility shall establish locked boxes where all inmates have access to submit their grievances directly to the box.  Keys will be issued by the Warden, to an AW and/or a designated staff.

    A.    Lock boxes will be maintained in segregation/max units in a manner in which the inmate will be allowed to have direct access.  A designated staff may go cell to cell to pick up grievances in segregation /max units due to security and safety concerns, if necessary.

    B.    Emergency grievances will be handed to any staff member for immediate processing per this regulation.

3.    Grievances will be treated as legal correspondence and will be gathered daily, Monday through Friday, excluding holidays, by the AW or designated Grievance Coordinator(s) and or designated staff member.

4.    Grievance forms will be kept in housing units and may be accessed through the unit staff, the unit caseworker or in the Institutional Law Library.

5.    Grievances may be GRANTED, DENIED, PARTIALLY GRANTED, ABANDONED DUPLICATE NOT ACCEPTED, OR GRIEVABLE, RESOLVED, SETTLEMENT OR WITHDRAWN or referred to the Investigator General's Office at any level as deemed appropriate after the claim in the grievance has been investigated.  PREA grievances shall immediately be referred to the Inspector General.  Grievance findings or responses will not be titled "Substantiated."

6.    The Grievance Coordinator should record receipts, transmittals, actions, and responses on all grievances to NOTIS within three (3) working days of receipt.

    A.    The coordinator should sign, date and enter the approximate time as noted on DOC 3091, 3093 and 3094.

    B.    The front page of the grievance should be date stamped the day entered into NOTIS.

7.    Monthly and annual grievance reports generated by NOTIS will be reviewed by the Deputy Directors (DDs), Wardens and Associate Wardens (AWs) on a quarterly and annual basis.

**740.02    GRIEVANCE RECORDS**

1.    Grievance documents shall be stored at the facility/institution where the grievance issue occurred.  The results of the grievance shall be stored in NOTIS.

A.    Grievance files shall be in separate files for each inmate and maintained in alphabetical order.

B.    Grievance copies shall not be placed in an inmate's Institutional or Central File, nor shall they be available to employees not involved in the grievance process, unless the employee has a need for the information in the grievance or the responses to the grievance.

2.    Grievance files shall be maintained at each institution for a minimum of five (5) years following final disposition of the grievance.

3.    Employees who are participating in the disposition of a grievance shall have access to records essential to the disposition of the grievance only.

4.    Inmates will not have access to grievance records unless ordered by a court, as grievance records are considered confidential and they may be redacted, if appropriate.

5.    Upon completion of each level of the grievance process, the form and copies of all relevant attachments shall be maintained in the inmate's separate grievance file. Originals shall be given to the inmate.

**740.03   GRIEVANCE ISSUES**

1.    Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims, only if the inmate can factually demonstrate a loss or harm. Grievances may be filed to include, but not limited to, personal property, property damage, disciplinary appeals, personal injuries, and any other tort claim or civil rights claim relating to conditions of institutional life.  The inmate must state the action or remedy that will satisfy the claim in the grievance.

A.    If the inmate does not factually demonstrate a loss or harm and does not state the action or remedy that will satisfy the claim in the grievance, the grievance will not be accepted and returned to the inmate with an explanation as to what was missing in order for the grievance to be processed.

B.    A Grievance will not be used as an inmate request form (DOC 3012) to advise staff of issues, actions or conditions that they do not like but suffered no harm or loss.

C.    A Grievance must be legible, with a clearly defined remedy requested.

2.    All allegations of inmate abuse by Department staff, employees, agents or independent contractors, shall be immediately reported to the Warden, AWs, and the Inspector General's Office, in accordance with investigator guidelines via the NOTIS reporting system.

A.    Any grievance reporting of sexual abuse against an inmate will be referred to the Warden or designee for entry into the NOTIS reporting system and referral to the Office of the Inspector General.

B.    Inmates who allege abuse other than sexual abuse will be interviewed by a supervisor of the staff who allegedly committed the abuse to ascertain if he/she agrees to pursue administrative remedies, which will be documented in the NOTIS system.

3.    Only inmate claims arising out of, or relating to, issues within the authority and control of the Department may be submitted for review and resolution. Non-grievable issues include:

A.    State and federal court decisions.

B.    State, federal and local laws and regulations.

C.    Parole Board actions and/or decisions.

D.    Medical diagnosis, medication or treatment/care provided by a private/contract community hospital.

4.    Claims for which the inmate lacks standing will not be accepted, including, but not limited to:

A.    Filing a grievance on behalf of another inmate unless the inmate is so physically or emotionally handicapped as to be incapable of filing a grievance, and with the other inmate's approval, or in the case(s) of any third party reporting of Sexual Abuse.

B.    The inmate filing the grievance was not a direct participant in the matter being grieved, except a third party allegation of sexual abuse.

C.    An inmate may not file more than one (1) grievance per seven (7) day week, Monday through Sunday. More than one (1) grievance filed during the seven day week period will not be accepted, unless it alleges sexual abuse or it is an emergency grievance that involves health or safety claims.

D.    The inclusion of more than one grievance issue, per form will be cause for the grievance to not be accepted.

E.    Grievances that have the same issue in a previously filed grievance will not be accepted, even if the requested action or remedy is different on the subsequent grievance.

5.    In the event an inmate's claim is not accepted ornot within the intended scope of this Regulation, the inmate may not appeal that decision to the next procedural level.

6.     An inmate whose grievance is denied in its entirety may appeal the grievance to the next level, within the substantive and procedural requirements outlined herein, <u>unless the action requested has already been Granted at a lower level</u>.

        A.     Administrators or employees of the institution shall automatically allow appeals without interference unless the grievance is granted..

        B.     An inmate's election not to sign and date any grievance form at any level shall constitute abandonment of the claim.

        C.     If the Grievance is **"Granted"** at any level, the grievance process is considered complete and the inmate's administrative remedies exhausted, and the inmate cannot appeal the decision to a higher level.

7.     Time limits shall begin to run from the date an inmate receives a response.

8.     An overdue grievance response at any level is not an automatic finding for the inmate.

        A.     The response must be completed, even if it is overdue.

        B.     The inmate may proceed to the next grievance level, if a response is overdue.

        C.     The overdue response does not count against the inmate's timeframe for an appeal if he or she waits for the response before initiating the appeal.

9.     Inmates who participate in or utilize the Inmate Grievance Procedure shall <u>not be subjected to retaliation</u>, i.e. an assertion that an employee took some adverse action against an inmate for filing a grievance, except as noted in 740.05, where the action did not reasonably advance a legitimate correctional goal.

        A.     Retaliation is a grievable issue.

        B.     An unfounded claim of retaliation will be handled as an abuse of the grievance procedure and a disciplinary action may be taken.

10.     Comprehensive responses are required for inmate grievances.  Statements such as "Your grievance is denied" are not acceptable.  <u>An explanation is necessary.</u>

## 740.04   ABUSE OF THE INMATE GRIEVANCE PROCEDURE

1.     Inmates are encouraged to use the Grievance Procedure to resolve addressable claims where the inmate can define a specific loss or harm, however, they are prohibited from abusing the system by knowingly, willfully or maliciously filing excessive, frivolous or vexatious grievances, which are considered to be an abuse of the Inmate Grievance Procedure.  Any of the below listed violations will result in the grievance being not accepted and disciplinary action may be taken.

2.      It is considered abuse of the inmate grievance procedure when an inmate files a grievance that contains, but is not limited to:

    A.      A threat of serious bodily injury to a specific individual.

    B.      Specific claims or incidents previously filed by the same inmate.

    C.      Filing two (2) or more emergency grievances in a seven (7) day week period, Monday through Sunday which is deemed not to be emergencies may result in disciplinary action against the inmate for abuse of the grievance system. Disciplinary action may be generated by the Warden or designee for abuse of the emergency grievance process.

    D.      Obscene, profane, and derogatory language.

    E.      Contains more than one (1) appropriate issue, per grievance.

    F.      The claim or requested remedy changes or is modified from one level to another.

    G.      More than two (2) continuation forms (DOC 3097) per grievance.

    H.      Alteration of the grievance forms or continuation forms. This includes writing more than one line, on each line provided on the grievance form.

3.      If an inmate files a grievance as listed in (2), the Grievance Coordinator shall:

    A.      Return the original improper grievance with a Form DOC-3098, Improper Grievance Memorandum, noting the specific violation.

    B.      A copy will be put in the inmate's grievance file.

4.      An inmate who satisfies the criteria contained in 740.04 Section 2 above should:

    A.      Be brought to the attention of the Grievance Coordinator as soon as possible.

    B.      The Grievance Coordinator should review all documentation supporting the alleged abuse to determine if abuse has occurred and forward a written recommendation to the Warden.

    C.      If the recommendation is approved the Warden can assign the appropriate level supervisor or administrator to write a Notice of Charges on the inmate.

    D.      The supervisor or administrator will forward the Notice of Charges to the Warden for processing through the inmate disciplinary process.

E.  A conduct violation of this nature is not a form of retaliation.

F.  An inmate may not be disciplined for filing a grievance related to alleged sexual abuse unless the Department has demonstrated that the inmate filed the grievance in bad faith.

G.  NDOC will not respond to an improper grievance that results in a DOC-3098 under AR 740.

## 740.05  REMEDIES TO GRIEVANCES

1.  Grievance remedies should be determined with the goal of appropriately resolving legitimate claims at the lowest level of review possible, considering each institution's particular operational, security and safety concerns.

2.  Remedies available for grievances may include, but are not limited to, the following:

A.  Resolve unsafe or unsanitary conditions of confinement.

B.  Address the violation of an inmate's constitutional, civil or statutory rights.

C.  Protect inmates from criminal or prohibited acts committed by Departmental employees and staff or other inmates.

D.  Revise, clarify and implement written Departmental and institutional rules or procedures necessary to prevent further violations.

E.  To provide a disabled or physically impaired inmate with reasonable accommodation or reasonable modification.

F.  Monetary reimbursement for property loss, damage, personal injury, tort, or civil rights claims arising out of an act or omission of the Department of Corrections or any of its agents, former officers, employees or contractors.

3.  The staff person rendering a decision on a grievance for a proposed monetary remedy may be submitted to the Deputy Director of Support Services who may award monetary damages at any level of the Inmate Grievance.  Once approved:

A.  A Form DOC-3096, Administrative Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims, except for personal property damage or loss.

B.      A Form DOC-3027, Property Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims for personal property damage or loss.

C.      When property claims are settled informally at an institution, DOC-3027 Property Release Agreement will be completed.

4.      Compensation for loss of personal property, property damage, personal injury or any other claim arising out of a tort shall not exceed five hundred ($500.00).

## 740.06    INMATE TRANSFERS

1.      Inmates transferred to another institution pending the resolution of a filed grievance shall have the grievance completed at the sending institution at all levels.

A.      The receiving institution is responsible for logging in and tracking the grievance through NOTIS.

B.      All responses and correspondence shall be conducted via first class mail to the Grievance Coordinator at the receiving institution.

2.      Timeframes do not apply if the inmate has been transferred. Grievances shall be processed as soon as practicable and timeframes shall be adhered to as closely as possible If an inmate's sentence expires or leaves the Department on parole, the grievance will be finalized on the current level. No further appeal may occur. It is the responsibility of the inmate to provide a forwarding address during the release process in order to receive a grievance response.

## 740.07    EMERGENCY GRIEVANCE PROCEDURE

1.      An emergency shall be considered life threatening for the inmate or a Safety and Security risk for the institution.

2.      An Emergency Grievance (Form DOC-1564) received by any staff member shall be immediately delivered to the nearest supervisor no later than is reasonable and necessary to prevent serious injury or a breach of security. The Emergency Grievance shall be reviewed within 24-hours of receipt and documented in NOTIS.

3.      Any emergency grievance alleging that an inmate is subject to substantial risk of imminent sexual abuse shall be immediately forwarded to the highest ranking staff member on duty so that corrective action may be taken immediately which may include moving the inmate to administrative segregation for protective custody.

A.      The inmate shall receive a response to the emergency grievance within 24-hours, with a final facility decision about whether the inmate is in substantial risk of imminent sexual abuse within two (2) regular calendar days.

       B.      The response, final decision and the action taken in response to the emergency grievance will be documented.  Action taken can include, but is not limited to:

          (1)    Refer the information to the Inspector General's Office;

          (2)    Afford the inmate appropriate medical, mental health care; and

          (3)    Address any safety considerations.

4.     The shift supervisor may confer with the on duty medical staff, Warden or Associate Warden, to determine whether the grievance constitutes an emergency.

5.     The highest-ranking staff member on duty, with the aid of an authorized Department official, shall immediately take any corrective measures necessary to prevent a substantial risk of injury or breach of security.

6.     The Department official receiving the Emergency Grievance should respond to the filing inmate no later than is necessary to prevent serious injury or a breach of security.

7.     In the event the inmate requests further review of a claim not deemed an emergency, the inmate may file a grievance appeal commencing at the Informal Level.

8.     A copy of the emergency grievance will be forwarded to the Grievance Coordinator for entry into NOTIS for processing and tracking purposes.

## 740.08     INFORMAL GRIEVANCE

1.     At the Informal Level, an inmate shall file a grievance (Form DOC-3091) after failing to resolve the matter by other means such as discussion with staff or submitting an inmate request form (DOC 3012).

2.     Grievances should be reviewed, investigated and responded to by the Department Supervisor that has responsibility over the issue that is being grieved or designated person.

       A.      High Risk Prisoner (HRP) status.  HRP is a high risk potential offender that creates risk to inmates and staff.

          (1)  Informal Level grievances will be responded to by the Warden or designee.

          (2) First Level grievances will be responded to by the Deputy Director or designee.

          (3) Second level grievances will be responded to by the Director or designee.

       B.      Informal grievances addressing medical or dental issues should be responded to by a charge nurse or designee of the Director of Nursing at the institution.

C.     Informal grievances addressing mental health issues should be responded to by the Psychologist III, or Mental Health Supervisor at each facility.

D.     If the person who would normally respond to a grievance is the subject of the grievance, the Supervisor over the person should respond to the Informal Grievance.

3.     The response to the grievance should be substantial, referencing all policies, procedures, rationale, and/or circumstances in finding for or against the inmate.

4.     The inmate shall file an informal grievance within the time frames noted below:

A.     Within six (6) months, in compliance with NRS 209.243, if the issue involves personal property damage or loss, personal injury, medical claims or any other tort claims, including civil rights claims.

B.     Within ten (10) calendar days if the issue involves any other issues within the authority and control of the Department including, but not limited to, classification, disciplinary, mail and correspondence, religious items, and food.

C.     When a grievance cannot be filed because of circumstances beyond the inmate's control, the time will begin to start from the date in which such circumstances cease to exist.

D.     Time frames are waived for allegations of sexual abuse regardless of when the incident is alleged to have occurred.

5.     An inmate shall use Form DOC-3097, Grievant Statement Continuation Form, if unable to present the details of their claim in the space provided, limited to two continuation form pages or a maximum of twon continuation form pages. All documentation and factual allegations available to the inmate must be submitted at this level with the grievance.

6.     All grievances submitted should also include the remedy sought by the inmate to resolve this claim. Failure to submit a remedy will be considered an improper grievance and shall not be accepted.

7.     If the inmate's remedy to their grievance includes monetary restitution or damages, then the inmate will get the following forms from unit staff, unit caseworker, or law libraries:

A.     Form DOC-3026, Inmate Property Claim, which shall be completed and submitted in addition to the grievance for all property loss or damage claims.

B.     Form DOC-3095, Administrative Claim Form, which shall be completed and submitted in addition to the grievance for all personal injury, tort, or civil rights claims.

8. Failure by the inmate to submit a proper Informal Grievance form to the Grievance Coordinator or designated employee, within the time frame noted in 740.08, number 4, shall constitute abandonment of the inmate's grievance at this, and all subsequent levels.

   A. When overdue grievances are received, they will be logged into NOTIS.

   B. The grievance response Form DOC-3098 will note that the inmate exceeded the timeframe and no action will be taken.

9. If the issue raised is not grievable, or the grievance is a duplicate of a prior grievance, the Grievance Coordinator will return the grievance to the inmate with Form 3098 noting the reason.

10. The inmate shall file an Informal Grievance form that states "for tracking purposes" when an issue goes directly to the Warden (first level) for a decision such as disciplinary appeals, visiting denials, any allegation of sexual abuse or mail censorship.

11. Grievances alleging staff misconduct pursuant to *Administrative Regulation (AR) 339 "Employee Ethics and Conduct, Corrective or Disciplinary Action, and Prohibitions and Penalties"* will be reviewed by the Warden and if deemed appropriate will be forwarded to the Office of the Inspector General through NOTIS.

   A. The Informal Response will reflect this action being initiated.

   B. The Inspector General's Office will have 90 calendar days to respond to this allegation.

12. The time limit for a response to the informal grievance is forty-five (45) calendar days from the date the grievance is received by the grievance coordinator to the date returned to the inmate.

   A. The inmate must file an appeal within five (5) calendar days of receipt of the response to proceed to the next grievance level.

   B. Transmission of the grievance to another institution may result in exceeding this timeframe.

**740.09    FIRST LEVEL GRIEVANCE**

1. A First Level Grievance (Form DOC-3093) should be reviewed, investigated and responded to by the Warden at the institution where the incident being grieved occurred, even if the Warden is the subject of the grievance.

   A. The Warden may utilize any staff in the development of a grievance response. The grievance will be responded to by a supervisor that has authority over the issue claimed in the grievance.

B.   First Level medical/dental issues should be responded to by the highest level of Nursing Administration at the institution (DONs I or II).

C.   First Level mental health issues should be responded to by the Psychologist IV or highest ranking Psychologist at the institution.

D.   First Level property issues should be responded to by the Associate Warden of Operations.

2.   All grievances containing allegations of sexual abuse will be referred to the Inspector General's Office for investigation.

A.   Allegations of sexual abuse will not be referred to a staff member who is the subject of the accusation of sexual abuse.

B.   The Inspector General's Office shall make a final decision on the merits of any portion of the sexual abuse grievance within 90 calendar days of the initial filing of the grievance and if applicable the matter assigned for official investigation.

C.   The Inspector General's Office may claim an extension of time to respond to a sexual abuse grievance of up to an additional 70 calendar days if the normal time period for response is insufficient to make an appropriate decision.

D.   The Inspector General's Office shall notify the inmate in writing of any such extension and provide a date by which a decision will be made.

E.   Upon the completion of the investigation into sexual abuse the inmate shall be informed of the outcome of the investigation by the Inspector General's Office.

3.   At this level the inmate shall provide a justification to continue to the first level.

4.   A First Level Grievance that does not comply with procedural guidelines shall be returned to the inmate, with instructions using Form DOC-3098.

A.   Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates shall be permitted to assist inmates in filing a grievance(s) relating to allegations of sexual abuse.

B.   If a third party files on behalf of the inmate, the facility may require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf.

C.   If a third party files on behalf of the inmate, the facility may also require as a condition of processing the grievance, the alleged victim to personally pursue any subsequent steps in the grievance process.

5.   The time limit for a response to the inmate for the First Level grievance is forty-five (45) calendar days from the date the grievance is received by the grievance coordinator to the date returned to inmate.

A.   The inmate must file an appeal within five (5) calendar days of receipt of the response to proceed to the next grievance level.

B.   Transmission of the grievance to another institution may result in exceeding this timeframe.

## 740.10 SECOND LEVEL GRIEVANCE

1.   A Second Level Grievance (Form DOC - 3094) should be reviewed and responded to by the:

A.   Deputy Director of Operations for facility custody or security operations that do not include programs.

B.   Deputy Director of Programs for all program issues such as education, visiting, or religious programming.

C.   The Deputy Director of Support Services for fiscal, property and telephone issues.

D.   The Offender Management Administrator (OMA) for classification and timekeeping issues.

E.   The Medical Director for medical/ dental issues, including medical co-pays or charges.

F.   The Mental Health Director for mental health issues.

G.   The inmate may appeal the decision related to a sexual abuse grievance response from the Inspector General's Office within five (5) calendar days of the grievance, with a subsequent response from the Deputy Director for security, program, religious and operations.

2.   The Grievance Coordinator shall forward copies of all related documents and the appeal to the Deputy Director for review and distribution to other Appointing Authorities and Division Heads.

3.    The time limit for a response to the inmate for the Second Level grievance is sixty (60) calendar days, not including transmittal time, from the date the grievance is received by the grievance coordinator to the date it is returned to inmate.

4.    Administrators shall respond to the Second Level Grievance, specifying the decision and the reasons for the decision, and return it to the Grievance Coordinator.

**APPLICABILITY**

1. This regulation requires an operational procedure for each institution and facility.

2. This regulation requires an audit.

**REFERENCES**

ACA Standards, 4th Edition and 2008 Supplement, 4-4105, 4-4276, 4-4284, 4-4344, 4-4394, 4-4429, 4-4429-1

_____
James Dzurenda, Director

11/20/18
Date