Ammar Harris # 1116547
High Desert State Prison

United States District Court
District of Nevada

| | |
|---|---|
| Ammar Harris,<br>Plaintiff, | Case # 3:21-CV-00380 |
| vs. | Hon. Robert C. Jones |
| State of Nevada,<br>Defendant. | Mag. Judge Carla Baldwin |

## JURY TRIAL DEMANDED

## THIRD AMENDED VERIFIED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND DAMAGES

### I. Introduction

1.) This is a 42 USCS § 1983, 1988 action filed by Plaintiff, a state prisoner, alleging unconstitutional conditions of confinement, regarding adequate security, medical care and transportation, seeking declaratory, injunctive relief and damages pursuant to 42 USCS § 12101 et seq (ADA) and 29 USCS § 794 et seq (RA) on his own behalf and on behalf of those similarly situated.

2.) Defendants' actions, detailed herein, deny basic human needs, inflict unnecessary and wanton pain and suffering, and put Plaintiff and the class at substantial risk of physical injury, all in violation of Plaintiff rights under the Eighth and and Fourteenth Amendments to the United States Constitution. Plaintiff seek injunctive and declaratory relief to remedy these ongoing violations of rights for himself as well as for a class of those similarly situated.

## II. Jurisdiction/Venue

3.) This action arises under 42 USCS §§ 1983, 1988 and 42 USCS §§ 12101 et seq, 29 USCS §§ 794 et seq, to redress the deprivations under color of state law of rights, privileges and immunities secured by the constitution of the United States. The rights sought to be redressed are guaranteed by the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 USCS §§ 1331, 1343 and the aforementioned statutory, constitutional provisions. The Court has jurisdiction to grant class, declaratory and injunctive relief to 28 USCS §§ 2201, 2202, 2283, 2284 and Fed.R.Civ.P 23, 57 and 65.

4.) Venue is proper in the District of Nevada, 28 USCS §§ 1391. The Plaintiff is incarcerated there, the acts complained of occured there, and the Defendants work there.

III. Parties

5.) Plaintiff Ammar Harris at all times relevant was confined by the Nevada Department of Corrections, "NDOC", at Ely State Prison, "ESP" and High Desert State Prison, "HDSP."

6.) Defendant State of "Nevada" is an authority represented by a body of people politically organized under one government and is solely responsible for the actions and duties of all employees, officials, and their agencies functioning under its jurisdiction.

The Secretary of State will accept service of process for the Defendant State of Nevada. Barbara Cegavske.

7.) Defendant Steven "Sisolak", is the Governor of the State of Nevada. As Governor, Sisolak is the President of the Board of State Prison Commissioners "Board", the state governmental body responsible for oversight of all prisons in Nevada. As part of its oversight duties, the Board receives semiannual reports from the State's Health Officer on correctional facilities' compliance with the medical services standards established under Nevada statute. Defendant Sisolak is sued in his official capacity.

( Injunctive Relief Only )

8.) Defendant Barbara "Cegavske", is the Secretary of State of Nevada. As Secretary of State, Cegavske is the Secretary of the Board, the state governmental body responsible for oversight of all prisons in Nevada. Defendant Cegavske is sued in her official capacity.

(Injunctive Relief Only)

9.) Defendant Aaron "Ford", is the Attorney General of the State of Nevada. As Attorney General, Ford is a member of the Board. Defendant Ford is sued in his official capacity.

(Injunctive Relief Only)

10.) Defendant Charles "Daniels", is the Director of the NDOC. As Director, Daniels is responsible for NDOC's daily functioning and administration. Under Nevada law, the Director of NDOC is also responsible for establishing policies and procedures, as well as standards for medical services in prisons with the approval of the Board. Defendant Daniels is sued in his official capacity.[1]

11.) Defendant Brian "Williams" Sr., is the Deputy Director of the NDOC. Defendant Williams is sued in his official capacity, and individual

[1] , and individual.

-4-

12.) Defendant Michael "Minev", is the Medical Director For NDOC. As Medical Director, Minev is responsible for the administration and provision of medical care services to individuals in NDOC's custody. Dr. Minev's duties include ensuring the quality and adequacy of medical care services provided to prisoners at HDSP. Defendant Minev is sued in his official capacity, and individual.

13.) Defendant William "Gittere", is the Warden of ESP. As Warden, Gittere is responsible for the daily functioning and administration of ESP, including the safe, secure and humane treatment of all prisoners incarcerated there. Defendant Gittere is sued in his official capacity, and individual.

14.) Defendant William "Reubart", is the Associate Warden of Operations of ESP. Defendant Reubart is sued in his official capacity; and individual.

15.) Defendant David "Drummond", is the Associate Warden of Programs of ESP. Defendant Drummond is sued in his official and individual capacity; and individual.

16.) Defendant P. "Hernandez", is a Caseworker of ESP. Defendant Hernandez is sued in her official and individual capacity.

17.) Defendant Dana "Cole", is a Security Officer of ESP. Defendant Cole is sued in his official and individual capacity.

~ 5 ~

18.) Defendant Mr. "Boyd", is a Security Officer of ESP. Defendant Boyd is sued in his official and individual capacity.

19.) Defendant Calvin "Johnson", is the Warden of HDSP. As Warden, Johnson is responsible for the daily functioning and administration of HDSP, including the safe, secure and humane treatment of all prisoners incarcerated there. Defendant Johnson is sued in his official capacity, and individual.

20.) Defendant F. "Dreesen", is the Associate Warden of Programs of HDSP, Dreesen is responsible for the daily processing of prisoner grievances. Defendant Dreesen is sued in his official and individual capacity, and individual.

21.) Defendant Gregory "Bryan", is the Doctor of HDSP. Defendant Bryan is sued in his official and individual capacity.

22.) Defendant "DOE", is the Nursing Director of HDSP. Defendant DOE is sued in his/her official and individual capacity.

23.) Defendant "DOE", is a Nurse at HDSP. Defendant DOE is sued in his/her official and individual capacity.

24.) Defendant "DOE", is an Administrator at HDSP. Defendant DOE is sued in his/her official and individual capacity.

25.) Defendant "DOE," is a Security/Transportation Officer at HDSP. Defendant DOE is sued in His official and individual capacity.

26.) "Defendants" Sisolak, Ford, Cegavske, Daniels, Williams, Minev, Gittere, Reubart, Drummond, Hernandez, Cole, Boyd, Dreesen, Johnson, Bryan, any Doe, and each of them at all times herein mentioned, was and/or is the agent, servant and employee of each remaining defendants, and was at all times herein mentioned, acting under Color of State Law or acting within the course, scope, and authority of said agency, service and employment.

27.) The true identities of Defendant Doe, are currently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff, based upon knowledge and information, reasonably believe and therefore allege that each of the Defendants designated herein as Doe may be in some manner responsible for events and happenings herein referred to; that Plaintiff will ask for leave to amend this Complaint to insert the true name(s) of said Defendant(s) when the same have been ascertained by Plaintiff together with the appropriate factual allegations and to join such Defendant(s) as and when they become known in this action in their true capacities.

IV. Exhaustion of Available Remedies.

28.) Plaintiff exhausted his administrative remedies before filing this complaint, with respect to all claims.

—7—

# V. Factual Allegations

I. Defendant Cole, Boyd, Brikam, any Doe Failed to Provided Adequate Security, Medical Care and Transportation Causing Significant Physical Injury and/or Unnecessary and Wanton Infliction of Pain.

29.) ESP is a maximum security prison in Ely, Nevada designed to house over 1,000 men (ALL Inmates), including Death Row.

30.) On or about August 29th, 2020, While at ESP, at approx. 8am Defendant Cole asked Plaintiff if he were attending yard, which was declined. Approx. 8:30am Defendant Cole started opening up multiple cell doors in the Deathrow Unit.

31.) An inmate stood at Plaintiff cell attempting to gain entry, as he stood there, a gesture was made to Defendant Cole, and Plaintiff's cell was intentionally opened, in order for the inmate to attack him, noticing the weapon in his hand, Plaintiff alerted Defendant Cole and Boyd for aid, but they merely laughed and cheered on.

32.) Plaintiff attempted to defend himself to the best of his abilities, but was unsuccessful, when officers came to intervene, Plaintiff was laying on the floor bleeding.

33.) Defendant Cole and Boyd failed to provide adequate security and/or neglected their statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law.

34.) Defendant cole and Boyd conduct was deliberate indifference to Plaintiff's Health and Safety.

35.) Defendant Cole and Boyd have Statutory responsibilities pursuant the NDOC Administrative Regulations.

36.) Plaintiff was given some treatment by Nurse Jones. and then transferred by EMS to William Bee Ririe Hospital.

37.) Plaintiff injuries were Serious, triggering A.R. 404.01 (Emergency Situation Procedures), and A.R. 420.02 (Death or Serious Injury Reporting Requirements) which notified Defendant Daniels, Williams, Gittere, Reubart, Drummond.

38.) On or about September 4th, 2020, Plaintiff awoke at UMC Trauma, and was informed by Dr. John Anson, he was lucky to be alive because of the injuries sustained from the assault.

39) Dr. John Anson further informed Plaintiff that he had succumbed twice and had to be revived, the weapon penetrated his brain causing Intra-Cranial Hemorrhage in the left frontal lobe. There is an acute fracture in the left parietal bone and lumbar spine damage.

40.) Plaintiff could not articulate himself due to the "Traumatic Brain Injury", suffered a "Stroke" and could not eat, Dr. John Anson had to order a Gastrostomy Tube put in, for Plaintiff to take in nutrients.

41.) On or about September 11th, 2020, Plaintiff was transfer to Summerlin Hospital for Speech Pathology, Pain Management, Physical/Occupational Therapy.

42.) Plaintiff watched a News Report on TV about events that transpired on August 29th, 2020, involving himself.

43.) On or about October 1st, 2020, Plaintiff was informed by his therapist that he was making good progress, but she feared that NDOC would stop it soon.

44.) On or about October 13th, 2020, Plaintiff was informed by Dr. Curtis Huynh that after the removal of his G-Tube, he would be returning to NDOC, prison cited financial concerns.

45.) On or about October 16th, 2020, Plaintiff was given a copy of the Medical Plan from Dr. Curtis Huynh, which included a "Continuity of Care," Pain Management and a follow up appointment with Plaintiff's neurosurgeon, Dr. John Anson.

46.) Plaintiff was taken to HDSP and wheelchaired to the infirmary by C/O Lopez, pursuant to A.R. 608.01, officer handed two binders of Plaintiff medical records to Nurse Sams and Rios.

47.) On or about October 19th, 2020, Defendant Bryan saw Plaintiff and was asked "were there any pain," which was answered in the affirmative.

48.) Plaintiff asked Bryan if he reviewed the "Medical Plan", and about receiving rehabilitation, his response, "No, we do not have the money to send you to Physical Therapy, you are just going to have to help yourself."

49.) Defendant Bryan failed to conduct a physical examination and/or Neglected his statutory responsibilities before denying Plaintiff medical services.

50.) Plaintiff was diagnosed with Acquired Aphasia, Ataxia, Hemianopsia, Apraxia and Hemiparesis.

51.) Upon information and belief, NDOC has a history of downplaying injuries sustained by ~~inmates~~[2] in their custody, in order to assert plausible deniability, medical staff follow a custom in order to negate the State's liability.

52.) Plaintiff is aware of the District pending docket involving similar allegations.

53.) Plaintiff was placed on bloodthinners while at Summerlin Hospital, in order to increase circulation in his affected limbs, Defendant Bryan discontinued the use, and put Plaintiff on Baclofen, which Plaintiff later learned that Baclofen should ~~be given to~~[1] stroke patients, Defendant Bryan failed to inform Plaintiff of the side effects and/or neglected his statutory responsibilities

54.) On or about November 6th, 2020, Nurse Sams informed Plaintiff that he really needed to see a Neurologist, without it his conditions would only get worse.

55.) On or about November 19th, 2020, Defendant Bryan led Plaintiff to believe he was pending a transfer to Northern Nevada Correctional Center for a Neurology appointment, and had Plaintiff agree to being discharged from the infirmary in order to go, but there was no pending appointment.

(1) should not be given to*
(2) All inmates*

~ 12 ~

56.) Plaintiff informed Defendant Bryan that he was still having dizziness, blurry vision, blackouts, headaches with severe pain, His response "I'll prescribe you something" but never did, failed he failed to take any action.

57.) Defendant Bryan failed to follow the Medical plan and/or intentionally did not schedule the appointment with Plaintiff's neurosurgeon.

58.) Defendant Bryan failed to provide adequate medical care and treatment and/or neglected his statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process and/or equal protection under the law.

59.) Defendant Bryan conduct was deliberate indifference to Plaintiff's serious Medical Needs and well being.

60.) Plaintiff serious Medical Needs, ~~invoking~~ [1] A.R. 615.01 (Levels and Continuity of care), A.R. 639.01 (Medical Records), A.R. 639.02 (Confidentiality of Medical Records) which notified Defendant Ford, Daniels, Williams, Johnson and Minev.

~~61.) [illegible struck-through text]~~

[1] Triggering*

— 13 —

61.) On or about May 19th, 2021, Plaintiff was wheelchaired to intake and forced to forgo it in order to board a transportation bus to ESP, despite Plaintiff visible disability, no Defendants Does acted to intervene.

62.) Plaintiff asked for a reasonable accomodation to be taken by Van, Defendant Doe responsed, "Its not in the trans' order." the request was denied.

63.) Plaintiff was placed in Five Point restraints, despite the pain being caused, Plaintiff asked Defendant Doe for a reasonable accomodation based on his Traumatic Brain Injury to be handcuffed in the front cause the stroke, the request was denied, Defendant Does had to help Plaintiff on to the bus.

64.) In route to ESP, the bus came to an abrupt stop,(1) by lack of seat belts, Plaintiff flew forward, hitting his head on the back of the seat in front of him, falling to the ground and landing on his right side, reaggraveting his injuries causing severe pain and suffering, Defendant Does had to report the incident to Defendant Johnson and Gittere.

65.) Upon arrival to ESP, Plaintiff had to immediately be admitted into the infirmary because of injuries sustained.

(1) Defendant Doe slammed the brakes, and the bus came to an abrupt stop.*

65.) Defendant Doe failed to provide adequate transportation and/or neglected his statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law.

66.) Defendant Doe conduct was deliberate indifference to Plaintiff's health and safety.

II. Defendant Cole Acted to Prevent Plaintiff From Petitioning The Goverment For A Redress and/or Causing Significant Physical Injury and/or Unnecessary and Wanton Infliction of Pain.

67.) Plaintiff hereby incorporates all his supporting facts to Count I of this complaint, as if fully stated herein.

68.) on or about November ~~24~~ 14th, 2020, Plaintiff was wheelchaired to Punitive Segregation by C/O Job, the conditions were no hot water, smaller food portions, no heat during the winter, and no access to the canteen.

69.) on or about November 24th, 2020, Plaintiff received a Notice of Charges for Murder from Defendant Cole regarding August 24th events.

—15—

70.) Upon information and belief, NDOC has a custom of issuing fictitious Notice of Charges to prevent (All Inmates) from petitioning the government for a redress.

71.) Defendant Cole Filed a fictitious Charge causing adverse ~~treatment~~, to intentionally prevent Plaintiff from petitioning the government for a redress.

72.) Plaintiff started feeling Aggravated, Depressed, Anger, Anxiety, Frustration, Hopelessness and Agony from being in Punitive Segregation, Plaintiff tried to kill himself twice resulting from the ordeal.

73.) Defendant Cole Acted to Prevent Plaintiff from Petitioning The Government for A Redress and/or neglected statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law.

74) Defendant Cole action had a chilling effect on Plaintiff, enough to ~~hurt~~ shock the conscience.

75.) Defendant Cole conduct was deliberate indifference to Plaintiff's health and well being.

(1) treatment to Plaintiff, *

— 16 —

III. Defendant Drummond, Dreesen, Hernandez While Acting In Concert With Each Other, Conspired To Retaliate and Threaten Plaintiff From Petitioning The Government For A Redress and/or Causing Significant Physical Injury and/or Unnecessary and Wanton Infliction of Pain.

76.) Plaintiff hereby incorporates all his supporting facts to Count I, II of this complaint, as if fully stated herein.

77.) On or about March 14th, 2021, Plaintiff filed a grievance about the events of August 29th, 2020, naming all Defendants to give proper notice pleading.

78.) On or about May 5th, 2021, Plaintiff proceeded to the next level of the grievance due to no response.

79.) Plaintiff grievances, triggered A.R.740.03 (Grievance Issues) pointly A.R.740.03(2) and A.R.740.08 (Informal Grievance) pointly A.R.740.08(2)(A) which notified Defendant Dreesen and Drummond.

80.) On or about May 6th, 2021, Defendant Dreesen and Drummond was and/or is joined Knowingly and/or Unknowingly in a plot, plan and/or common scheme and/or a conspiracy to retaliate against Plaintiff from Petitioning The government for a redress, by having him transferred to ESP.

— 17 —

81.) On or about May 23th, 2021, Plaintiff sent an Inmate Request "Kite" to Defendant Gittere request an audience, his response, "What about?"

82.) On or about June 6th, 2021, Defendant Hernandez informed Plaintiff that infact he had to pay for copies of his grievances.

83.) On or about August 1st, 2021, Plaintiff filed his final grievance regarding events on August 29th, 2021.

84.) On or about August 6th, 2021, Defendant Hernandez provided Plaintiff with two memorandums issued by Defendant Drummond, depriving the right to petition the government for a redress, in violation of 42 USC § 1997d.

85.) Plaintiff asked Defendant Hernandez for clarity, her response, "If you keep pushing the issue, something bad may happen to you." Which had a chilling effect on Plaintiff, he perceived that threat to be real. (ECF No. 1)

86.) Plaintiff filed a grievance about the threat, triggering AR 740.01 (Administration of Inmate Grievances.)

1. All grievances, whether accepted or not, will be entered into Notis.

and 740.05 (Remedies to Grievances)

~ 18 ~

C. Protect inmates from criminal or prohibited acts committed by Departmental employees and staff...

E. To provide a disabled or physically impaired inmates with reasonable accomodation or reasonable modification

and 740.06 (Informal Grievance)

2. Grievances should be reviewed, investigated and responded to by the Department Supervisor...

A. High Risk Prisoner (HRP) Status.

(1) Informal Level Grievance will be responded to by the Warden....

(2) First Level Grievance will be responded to by the Deputy Director....

(3) Second Level Grievance will be responded to by the Director....

87.) Defendant Drummond, Dreesen, Hernande retaliated against Plaintiff from him petitioning the government for a redress and threaten Plaintiff, enough to shock the conscience and/or neglected their statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law, and conduct was deliberate indifference to Plaintiff's health and safety.

-19-

IV. Defendant Nevada, Sisolak, Daniels Failed to Provide Reasonable Modifications for Plaintiff in Violation of Title II of the ADA and RA, Causing Significant Injury and/or Unnecessary and Wanton Infliction of Pain.

88.) Plaintiff hereby incorporates all his supporting facts to Count I, II and III of this complaint, as if fully stated herein.

89.) Plaintiff is an individual with a disability that limits major life activities, such as Standing, Walking, Grooming, Showering, Articulating, hearing, focusing, Reading, Writing and other daily functions.

90.) Plaintiff is qualified to receive medical services and reasonable transportation modifications based on his Traumatic Brain Injury and/or Stroke and was herein denied.

91.) Plaintiff is aware that Defendant Nevada receive Federal financial assistance for NDOC.

92.) On or about December 2014, the Department of Justice initiated an investigation after receiving complaints from inmates with disabilities who were then in the custody of the NDOC.

93.) On or about June 20th, 2016 the Department issued a finding letter, concluding that the NDOC had violated Title II of the ADA.

94.) On or about February 10th, 2021 Defendant Nevada, Sisolak, Daniels entered into a Settlement "Agreement" with the Dept. of Justice (DJ No. 204-46-176) regarding violations of Title II of the ADA by NDOC.[1]

II. General Relief — 4(a), 4(b), 4(c), 4(d)
C. Custody — 21., 22., 23.
D. Training — 26.
E. Discipline and Grievances — 30, 31., 34.

95.) Defendant Nevada, Sisolak, Daniels Neglected his statutory responsibilities and/or violated the terms and/or provisions of said Agreement and/or failed to enforce Agreement resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law, and conduct was deliberate indifference to Plaintiff's Health and safety.

[1] Christine Kim — Christine.Kim@USDOJ.gov
www.ada.gov/nv-doc-sa.html

-21-

96) Plaintiff made a reasonable request for accomodations and/or modifications in policies to be transported by Medical Van and/or handcuffed in the front based on Traumatic Brain Injury and/or stroke and was discriminated against on the basis of his disability.

V. Defendant Daniels, Williams, Minev, Gittere, Reubart, Drummond, Johnson, Dreesen, and Doe failed to supervise causing significant Physical Injury and/or Unnecessary and wanton Infliction of Pain, and conduct was Deliberate Indifference to Plaintiff's Health and Safety.

97.) Plaintiff hereby incorporates all his supporting facts to Count I, II, III and IV of this complaint, as if fully stated herein.

98.) On or about August 29th, 2020 Defendant Daniels, Williams, Gittere, Reubart, Drummond, and Doe failed to supervise, failed to review and/or investigate if staff error and/or misconduct was proximate cause, failed to discipline and/or neglected his statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law, and conduct was deliberate indifference to Plaintiff's Health and Safety.

99.) Defendant Daniels, Williams, Gittere, Reubart, Drummond, and Doe were fully aware of the factitious charge Defendant Cole filed against Plaintiff based on surveillance video of said events, and/or they conspired with him to engage in a cover up to negate liability.

100.) Defendant Daniels, Williams, Gittere, Reubart, Drummond, and Doe could have and/or should have known that a factitious charge would subject Plaintiff to adverse treatment and/or punitive segregation after a traumatic brain injury.

101.) Defendant Daniels, Williams, Gittere, Reubart, Drummond, and Doe could have and/or should have known there were threats against Plaintiff life and/or liberty, based on interceptions of monitored communications, phone calls, letters and/or other intelligence gathering capabilities, and failed to inform Plaintiff of such danger.

102.) Upon information and belief, Defendant Daniels, Williams, Gittere, Reubart, Drummond, and Doe have in his possession intercepted threats against Plaintiff dating as far back to 2014.

103.) On or about October 19th, 2020 Defendant Daniels, Williams, Miner, Johnson, Dreesen and Doe failed to supervise, failed to review and/or investigate if staff error and/or misconduct was proximate cause, failed to discipline and/or neglected his statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law,[1]

104.) On or about May 19th, 2021 Defendant Daniels, Williams, Johnson, Dreesen, Gittere, Reubart, Drummond and Doe, each of them, was and/or is joined Knowingly and/or Unknowingly in a plot, plan and/or common scheme, and/or a conspiracy to subject Plaintiff to Cruel and Unusual Punishment and/or to Deprive him of his liberty without due process and/or equal protection under the law, and/or each defendant has acted intentionally to disregard of Plaintiff's rights to safety at the behest of others acting in concert, and/or in consent, permission, and/or Knowledge of each of the other remaining defendants and/or agents, and conduct was deliberate indifference to Plaintiff's Health and safety.

[1], and conduct was deliberate indifference to Plaintiff's Health and safety.

105.) Defendant Daniels, Williams, Johnson, Gittere failed to supervise, failed to review and/or investigate if staff error and/or misconduct was proximate cause, failed to discipline and/or neglected his statutory responsibilities resulting to Plaintiff's Physical Injury and/or Unnecessary and Wanton Infliction of Pain and/or depriving him of liberty without due process of the law and/or equal protection under the law.,[1]

106.) Plaintiff have been forced to incur reasonable attorney's fee and costs in pursuit of this action including, but not necessarily limit to, those contemplated by 42 USCS § 1988.

## VI. Claims for Relief.

107.) Defendants, their agents and employees, with knowledge of Plaintiff security, medical and transportation needs, and with deliberate indifference to such needs, have acted or failed act in such manner as to deprive and/or prevent adequate security, medical care and treatment, and transportation from reaching Plaintiff thereby endangering Plaintiff's health and well being and depriving him of liberty without due process of the law and/or equal protection under the law. Such acts and omissions of the Defendants violate rights secured to the Plaintiff under the First, Fifth, Eighth and Fourteenth Amendment to the United States Constitution.

(1) and conduct was deliberate indifference to Plaintiff's health and safety.

— 25 —

108. ~~105.~~) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs have a duty under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution to provide needed medical care to inmates of HDSP, in conformity with the standards for delivery of such medical care in the State of Nevada as a whole.

109. ~~106.~~) Defendants, their agents and employees, with knowledge of Plaintiff's medical needs or with deliberate indifference to such medical needs, acted or failed to act in such a way as to provide medical care to Plaintiff in conformity with medical care in the State of Nevada as a whole and have in fact provided medical care which does not meet such standards thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

110. ~~107.~~) Defendants, knowing of the security, medical and transportation needs of Plaintiff, and knowing also of the inadequacies and deficiencies in the security and medical facilities staffing procedures at ESP and HDSP, have a duty under the Fifth, Eighth, Ninth and Fourteenth Amend. to establish and implement policies, practices and procedures designed to assure that Plaintiff receive adequate security, medical care and treatment, and transportation.

111. ~~110.~~) Defendants, knowing of the security, medical and transportation needs of Plaintiff, and with deliberate indifference to the inadequacies and deficiencies in the security staffing and procedures at ESP, and medical facilities and transportation at HDSP, have failed and neglected to establish and implement policies, practices and procedures designed to assure that Plaintiff receive adequate security, medical care and treatment, and transportation at the standards therefor in Nevada as a whole, or have adopted policies, practices and procedures which defendants knew, or reasonably should have known, would be ineffective in delivering adequate security, medical care and treatment, and transportation at such standards, thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

112. ~~111.~~) Defendants, knowing of the security, medical and transportation needs of Plaintiff have a duty under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution to instruct, supervise and train their employees and agents to assure the delivery of adequate security, medical care, and transportation to Plaintiff which is consistent with the standards in the State of Nevada as a whole.

113. ~~##.)~~ Defendants, Knowing of the Security, medical and transportation needs of Plaintiff or with deliberate indifference to such needs, have failed to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of adequate security, medical care, and transportation to Plaintiff which is consistent with the standards in the State of Nevada as a whole, thereby endangering the Plaintiff's health and well being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

114. ~~##.)~~ Defendants subjected Plaintiff to Cruel and Unusual Punishment in Disciplinary/Punitive Segregation in Violation of the Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

115. ~~##.)~~ Defendants retaliated against Plaintiff for seeking to redress the Government for violations to Plaintiff First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

116. #3.) Defendants are a public entity within the meaning of the Americans with Disabilities Act, and those subject to its provisions and any implementing regulations, defendants have violated Plaintiff rights to equal treatment or opportunities to participate in or benefit from the services, programs and activities of the institution where was classified, Plaintiff can participate in such services, programs, and activities, with reasonable accomodations, but is being denied the accomodations in a discriminatory manner, regardless of his disability.

117. #4.) Defendants actions and/or omissions were negligent and/or reckless and/or intentional.

118. #5.) Defendants actions and/or omissions were committed under color of law and/or pursuant to policies, customs, practices, rules, regulations, ordinances, statutes, and/or usage of the State of Nevada, the Department of Social Services and Housing of the State of Nevada, the Corrections Division of DSSH, and/or Ely State Prison, ESP and High Desert State Prison, HDSP.

119. #6.) Plaintiff has no adequate and sufficient remedy at law with which to address the wrongs alleged herein and will continue to suffer irreparable physical injuries from the conditions of Defendants unless he is granted the equitable relief prayed for herein.

120. ##.) As a direct and proximate result of the above described actions and omissions of defendants, plaintiff has suffered general damages in the amounts in excess of $75,000, exclusive of interest and costs, the exact amounts of which will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement against the Defendants, and each of them as follow:

1.) That the Court determines and enter judgement declaring that the acts and omissions of the Defendants, as set forth above, violates rights secured to Plaintiff by the First, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution;

2.) That upon hearing, the Court issue a TRO/ preliminary and permanent injunction;

a.) Enjoining the Defendants, their employees, agents, and successors in offices from violating the terms and/or provisions set in full of the Settlement Agreement regarding Title II of the ADA, entered into by the United States and the State of Nevada.

b.) Enjoining the Defendants, their employees, agents and successors in office from providing medical care and treatment to plaintiff that is inconsistent with the standards of medical care and treatment in the State of Nevada as a whole;

c.) Enjoining the Defendants, their employees, agents, and successors in office from refusing to provide and/or delaying provisions of necessary medical treatment and care to Plaintiff either at suitable and adequate facilities within NDOC or elsewhere;

d.) Enjoining the Defendants, their employees, agents and successors in office from failing to instruct, supervise and train their employees and agents in such a manner as to assure the delivery of medical treatment and care to Plaintiff which is consistent with the standards of medical care in the State of Nevada as a whole;

3.) That the Court establish a panel of independent medical experts to regularly evaluate the delivery of medical treatment and care at NDOC and insure the compliance of Defendants and their successors in offices with the Court's order herein;

4.) That each Defendant pay General damages in the amount $75,000 ; for pain, suffering and shock ;

5.) That each Defendant pay Punitive damages in the amount $75,000 for knowingly placing him in danger and physical injuries and for mental and emotional distress ;

6.) That each Defendant pay Exemplary damages in the amount $75,000 on account of wrong done to Plaintiff was aggravated by circumstances of malice, wanton, wicked and deceptive conduct ;

7.) That each Defendant pay compensatory damages in the amount $150,000 for future harm to Plaintiff ;

8.) That the Defendant be required to pay pre-judgment interest, legal cost and expenses, including reasonable provision for Plaintiff's attorney fees ;

9.) That the Court grant such further and additional relief that is appropriate herein.

Dated this 12th day of June, 2022.

Respectfully Submitted
/s/ A.H.

## VII. Verification

I, Ammar Harris have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged upon Information and Belief, and as to those, I believe them to be true and all papers, pleadings and documents on file therein.

I certify under penalty of perjury that the foregoing is true and correct. 28 USCS §§ 1746

Executed at Indian Springs, NV
on this 12th day of June, 2022.

/s/ A.H.

# CERTIFICATE OF ELECTRONIC FILING

I hereby certify that service of the above and foregoing be Electronic Filed to the following:

Nevada Attorney General
Aaron D. Ford
Email: aginfo@ag.nv.gov

Sgro and Roger
Anthony P. Sgro
Email: tsgro@sgroandroger.com

U.S. Department of Justice
Christine Kim
Email: christine.kim@usdoj.gov

/s/ A.H.
Ammar Harris

# EXHIBIT - A "Agreement"

Title II of the ADA
Settlement Agreement
With the United States
and the State of Nevada

32 Pages

Letter From DOJ

2 Pages

34 Pages Enclosed

# SETTLEMENT AGREEMENT
# BETWEEN THE UNITED STATES OF AMERICA AND
# TTHE STATE OF NEVADA EX REL. NEVADA DEPARTMENT OF
# CORRECTIONS
# DJ NO. 204-46-176

<u>Press Release</u>

## I.   BACKGROUND

1.   This Settlement Agreement is entered into by and among the United States of America and the State of Nevada ex rel. Nevada Department of Corrections.

2.   The United States Department of Justice ("Department") is responsible for administering and enforcing the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

3.   The Nevada Department of Corrections ("NDOC") operates the State of Nevada's prison system.  The State of Nevada and the NDOC (collectively, "Nevada") are each public entities within the meaning of the ADA, 42 U.S.C. § 12131(1), and are therefore subject to the requirements of Title II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. Part 35.

4.   This Agreement arises out of an investigation that the Department initiated in December 2014, after receiving complaints from inmates with disabilities who were then in the custody of the NDOC.  Over the course of the investigation, the Department visited NDOC correctional institutions, interviewed inmates with disabilities and NDOC employees, and reviewed documents, including those produced by inmates and the NDOC.  On June 20, 2016, the Department issued a letter of findings concluding that the NDOC had violated Title II of the ADA by: (1) segregating inmates with HIV pursuant to the NDOC's "House Alike / House Alone" policy, which directs NDOC facilities not to house inmates with HIV in the same cells as inmates who do not have

Case 3:21-cv-00380-RCJ-CLB   Document 41-27   Filed 12/05/22   Page 38 of 276

SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

4/1/2021

HIV; (2) denying inmates with HIV equal employment opportunities through which they could earn credits to reduce the lengths of their sentences; and (3) denying inmates with disabilities, including those with mobility disabilities, HIV, or certain other medical or mental health conditions, equal opportunities to benefit from the services, programs, and activities associated with the NDOC's minimum and community-trustee classification levels.

5. On May 23, 2017, Nevada amended Nev. Rev. Stat. Ann. ("NRS") § 209.385, repealing its prior rule mandating the segregation of inmates with HIV from the general population and the routine disclosure of inmates' HIV status to nonmedical correctional staff and administrators. The amended statute and NDOC's policies permit the segregation of inmates with HIV under circumstances when the offender engages in behavior that increases the risk of transmitting the virus as determined by regulation of the NDOC. The amended statute also permits disclosure of an inmate's HIV status to nonmedical correctional staff and administrators without clear guidance as to when such disclosures should be made.

6. Nevada alleges that it began integrating inmates with HIV into the general population in or around the summer of 2016. On June 7, 2017, the NDOC temporarily rescinded its "House Alike / House Alone" policy, and on May 15, 2018, the NDOC made these changes permanent. The United States substantiated that Nevada took steps to integrate inmates with HIV in or around 2016 and 2017. During Nevada's attempts to integrate these inmates, some of the inmates' confidential medical information was not protected from disclosure, and therefore some of these inmates continued to face discrimination based on their disability.

7. The United States and Nevada agree that it is in the Parties' best interests, and the United States believes it is in the public interest, to fully and finally resolve this matter. The Parties therefore voluntarily enter into this Agreement.

II.  GENERAL RELIEF

8. General Obligations: Nevada shall comply with the requirements of Title II of the ADA and its implementing regulation by, *inter alia*, housing inmates with HIV in integrated settings alongside other inmates, ensuring equal employment opportunities for inmates with disabilities, and ensuring that inmates with disabilities have equal opportunities to benefit from the services, programs, and activities associated with the NDOC's minimum and community-trustee classification levels. Among other things:

    a. Nevada shall not provide inmates with disabilities opportunities that are unequal to those afforded to inmates who do not have disabilities. Nor shall it deny inmates with disabilities the opportunity to participate in or benefit from Nevada's aids, benefits, services, or programs. *See* 28 C.F.R. § 35.130(b)(1).

    b. Nevada shall not provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others. *See id.* § 35.130(b)(1)(iv).

    c. Nevada shall reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability, unless Nevada can demonstrate that making modifications would fundamentally alter the nature of its services, programs, or activities. *See id.* § 35.130(b)(7).

    d. Nevada shall not impose or apply eligibility criteria that screen out or tend to screen out inmates with disabilities from fully and equally enjoying Nevada's services, programs, or activities, unless it can show that such criteria are necessary for its provision of those services, programs, or activities. *See id.* § 35.130(b)(8).

    e. Nevada shall not, unless it is appropriate to make an exception, place inmates with disabilities in facilities that do not offer the same programs as the facilities where they otherwise would be housed. *See id.* § 35.152(b)(2)(iii).

f. Nevada shall administer its services, programs, and activities—including its housing of inmates—in the most integrated setting appropriate to the needs of inmates with disabilities. *See id.* §§ 35.130(d), 35.152(b)(2).

III. SPECIFIC RELIEF

A. Housing and Medical Care for Inmates with HIV

9. <u>Prohibition Against Segregating Inmates Based on HIV Status</u>: Nevada shall not segregate inmates with HIV solely on the basis of their HIV status and shall house inmates with HIV in integrated settings alongside other inmates. Nevada will take all appropriate steps, including amending any rules, policies, protocols, or other directives, to effectuate its obligation to comply with this obligation. Specifically, Nevada shall implement a housing policy that prohibits isolating or segregating inmates with HIV solely on the basis of their HIV status. On June 7, 2017, the NDOC temporarily rescinded its policy mandating the segregation of inmates with HIV based solely on their HIV diagnosis. On May 15, 2018, the NDOC made these changes permanent.

10. <u>Reception, Evaluation, and Housing of New Inmates with HIV</u>: Nevada shall ensure that, for purposes of custody-level classification and placement, each inmate with HIV who enters NDOC custody is processed without regard to HIV status from the time the inmate enters the NDOC system and continuing through the inmate's transfer into the general population or other appropriate housing status; provided that, Nevada may provide private and confidential evaluation, medical treatment, and counseling to any incoming inmate with HIV as set forth in this Agreement.

11. <u>Counseling and Election for Inmates with HIV</u>: Nevada shall continue to ensure that inmates with HIV will not be housed alone, unless they are maximum-custody inmates or subject to disciplinary, protective, or administrative segregation for reasons unrelated to their HIV status, or housed in

a cell with another inmate with HIV based solely on their HIV status. In addition, Nevada shall do the following:

a.    <u>Counseling and Election Sessions</u>: Within thirty (30) days of the training required by Paragraph 26, (1) Nevada shall confidentially and individually notify inmates with HIV who are housed alone or with another inmate with HIV that they may request a change in housing arrangement; and (2) appropriate medical and mental health personnel from the NDOC will conduct a confidential, private counseling session with each inmate with HIV to ask whether the inmate wants a change in housing arrangement, and to address the inmate's options, questions, and concerns.

b.    <u>Responding to Requests for Housing Changes</u>: Nevada shall make all changes necessary to meet the housing requests of inmates with HIV who elect for a cell change within thirty (30) days of the inmate's submission of a completed cell change request form.

c.    <u>Counseling and Election at Any Time</u>: After the initial counseling and election session, any inmate with HIV who initially did not elect to change housing may at any time: (1) request a follow-up private counseling session at which appropriate NDOC medical and mental health staff will address the inmate's options, questions, or concerns about integration; and (2) elect to change housing by completing a cell change request form and submitting it to the appropriate NDOC staff members as per Administrative Regulation and Operational Procedures. Nevada must respond to the inmate's request for private counseling within ten (10) business days, and all requested counseling sessions shall be provided within thirty (30) days. Nevada must respond to the inmate's elections to change housing in accordance with the requirements outlined in subsection (b) of this Paragraph.

Case 3:21-cv-00380-RCB-CLB Document 27 Filed 02/25/2022 Page 42 of 276

d. Confidentiality of Completed Cell Change Request Forms and Counseling Sessions: Any and all cell change request forms submitted pursuant to this section of the Agreement shall be maintained confidentially by Nevada, and access to such forms shall be permitted only to medical or mental health staff, the ADA Coordinators, the ADA Compliance Officers, and NDOC personnel with a need to know the information to complete the transfer of an inmate with HIV to an institution and housing assignment appropriate to the inmate's custody classification. Nevada shall also conduct all counseling sessions with inmates in a private manner that ensures that their HIV status remains confidential.

12. Medical Care for Inmates with HIV:

a. NDOC Medical Directives 125, 206, and any other similar directives shall be revised to ensure consistency with care guidelines published by the National Institutes of Health, including all guidelines regarding anti-retroviral therapy. *See* Aberg, JA, et al., Primary Care Guidelines for the Management of Persons Infected with HIV: 2013 Updates by the HIV Medicine Association of the Infectious Diseases Society of America, Clinical Infectious Diseases 58(1):e1 (Jan. 2014), https://doi.org/10.1093/cid/cit665; Dep't Health & Human Servs., Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV (2019), https://aidsinfo.nih.gov/ contentfiles/lvguidelines/adultandadolescentgl.pdf.

b. Nevada shall ensure that inmates with HIV are regularly treated and managed by an HIV specialist, have timely access to anti-retroviral therapy, and that the NDOC ensures continuity of care with respect to medication refills and medical treatment when inmates are transferred between facilities.

13.    HIV Education and Counseling for Inmates: The NDOC shall revise its "AIDS

information handouts" referenced at AR 610.01(4), and any similar handouts, to

cover the methods by which HIV is and is not transmitted; the use, and efficacy,

of anti-retroviral therapies in the treatment of HIV; methods of preventing HIV

transmission; and other information about HIV, consistent with similar

publications issued by the Centers for Disease Control and Prevention, National

Institutes of Health, and U.S. Department of Health and Human Services. Within

thirty (30) days of the United States' approval of these revised informational

handouts (see Paragraph 38, infra), Nevada shall post these revised handouts in

conspicuous common areas throughout the housing units, chapel, medical,

culinary, gym, and other group rooms. In addition, Nevada shall ensure that all

inmates receive the revised informational handouts at intake, and that at intake or

at the time inmates are informed that they have HIV, inmates with HIV will be

provided with the option of confidential and discreet counseling from an

appropriate (1) medical professional and (2) mental health professional, and have

the opportunity to ask questions and obtain answers from these professionals.

14.    Review of Disciplinary Sanction, Segregation, or Detention for Inmates with

HIV: Nevada shall review all disciplinary sanctions, segregation, and detention

imposed on inmates with HIV after the NDOC began desegregating inmates with

HIV until the Effective Date of the Agreement to determine whether any

disciplinary sanction, segregation, or detention should be removed from the

inmate's record and whether any credits or other benefits should be restored to

the inmate. This includes, but is not limited to, disciplinary sanctions,

segregation, or detention imposed on an inmate with HIV who refused a new cell

assignment due to fears that such an assignment may risk their safety or the

confidentiality of their medical information. Nevada shall provide its review and

proposed corrective actions to the United States within sixty (60) days for

approval. Within thirty (30) days of the United States' approval of the review

and proposed corrective actions, Nevada shall begin to implement the corrective

actions.

15. <u>Confidentiality of Medical Information</u>: Nevada shall ensure the confidentiality of inmates' health information, including HIV status. Nevada will take all appropriate steps, such as amending any rules, policies, protocols, or other directives, to effectuate this obligation.

   a.   Nevada shall ensure that inmates' HIV status will not be disclosed to any Nevada staff other than medical and mental health staff, except to a limited set of those persons identified in NRS § 209.385(3) who are involved in the hearing and appeal processes described in Paragraph 16, *infra*.

   b.   Nevada's treatment of inmates' medical information shall be consistent with, at a minimum, the guidelines set forth in Ctrs. for Disease Control, HIV Testing Implementation Guidance for Correctional Settings § III (Jan. 2009) [hereinafter "CDC Guidelines for HIV Testing in Corrections"], https://stacks.cdc.gov/view/cdc/5279.

   c.   Nevada shall not identify inmates with HIV with a specific medical restriction code. Nevada shall remove any HIV-specific medical restriction code from all NDOC medical classification forms and, before utilizing any such revised forms, shall provide the revised forms to the United States for its review and approval. Nevada will eliminate or redact any HIV-specific medical restriction code from all inmate records capable of being edited. For hard copy records, and for digital inmate records that cannot be edited or redacted without corrupting data, Nevada will treat all such documents as confidential material in accordance with, at minimum, the CDC Guidelines for HIV Testing in Corrections. An inmate's HIV status may not be shared with or made available to non-medical or non-mental health staff unless authorized by law.

   d.   Nevada confirms that it has ceased disseminating lists of inmates with HIV to Nevada staff, and agrees to, immediately upon the Effective Date of

this Agreement, continue to cease disseminating lists of inmates with HIV to Nevada staff and permanently destroy any and all lists it has previously circulated.

e.    Within fifteen (15) days of the training required by Paragraph 26, Nevada shall explain to each inmate with HIV the changes to the medical classification forms privately, in the presence of only appropriate medical or mental health staff. At these meetings, Nevada shall provide each inmate with a form to sign denoting that the inmate has been advised of the changes Nevada has implemented to keep the inmate's HIV status and related medical information confidential.

f.    Any and all counseling and evaluation of inmates who test positive for or who have HIV at any time during incarceration shall be conducted privately and confidentially, in the presence of only appropriate medical or mental health staff. Such counseling and evaluation shall be consistent with, at minimum, the CDC Guidelines for HIV Testing in Corrections.

g.    The fact that an inmate is consulting with an HIV specialist—whether in person or through the use of telemedicine technology—shall itself be treated as personal medical information, to be kept confidential from other inmates, correctional officers, and other Nevada personnel, with the exception of medical and mental health staff. Any and all appointments or telemedicine conferences with HIV specialists shall be staggered or otherwise conducted in such a way as to ensure that inmates consulting with HIV specialists are not required to travel as a group to or from their appointments, and that appointments are conducted as discreetly as possible.

h.    In the event that a Nevada employee or inmate comes into contact with the blood or bodily fluids of an inmate, Nevada shall, in accordance with the requirements and procedures set forth in the Occupational Safety and

4/1/2021    SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00860-MED-CLB Document 1-1 Filed 11/05/2421  Page 46 of 276

Health Administration's Bloodborne Pathogens Standard, 29 C.F.R.
§ 1910.1030(f)(3), conduct a confidential medical evaluation, and follow
up with the person who was exposed.

16.    Inmates Who Pose a Danger to Others: Notwithstanding the foregoing, Nevada
may follow its discipline and controlled housing protocols if an individual
inmate, regardless of whether he or she has HIV, poses a direct threat to the
health or safety of others as set forth in Paragraph 45 and NDOC AR 707.1.
Nevada will repeal any disciplinary or segregation policy targeting inmates with
HIV and will instead apply the same discipline and segregation protocols,
including the process for hearings and appeals, to all inmates.

B.    Equal Employment Opportunities for Inmates with Disabilities

17.    Non-Discrimination in Employment of Inmates with HIV: Nevada shall ensure
that inmates with HIV have equal access to work assignments, including those in
the canteen, culinary, food services, infirmary, and allied health services.  To the
extent any HIV-specific medical restriction code cannot be removed or redacted
from inmate digital records without corrupting data, NDOC staff will disregard
this code and place any inmate with HIV in any work assignment for which he or
she is otherwise qualified and that he or she accepts.

18.    Revisions to Work Assignment Process: Nevada shall ensure that its work
assignment process and all related forms, including medical classification forms,
provide inmates with disabilities with equal opportunities to obtain work
assignments and credits.  To accomplish this, Nevada shall, *inter alia*:

a.    Ensure that NDOC job advertisements, as well as medical classification,
medical evaluation, and work-assignment selection processes, do not
unnecessarily employ eligibility criteria that screen out or tend to screen
out inmates with disabilities;

b.   Ensure that inmates with disabilities are offered a range of potential
     work assignments with varying physical requirements (i.e., from sedentary
     clerical tasks to manual labor);

c.   Implement a policy and procedure for inmates to request reasonable
     modifications; and

d.   Make reasonable modifications to allow inmates with disabilities to meet
     work-related eligibility requirements and to perform work assignments.

19.   <u>Individualized Medical and Mental Health Determinations</u>: Nevada shall
conduct an individualized assessment of each inmate when assessing his or her
medical or mental fitness to work in a particular job assignment.

a.   Nevada may use a form with general medical and mental health codes to
     identify whether an inmate has certain physical limitations or health-related
     issues that may interfere with his or her ability to participate in certain
     work assignments. These codes, and the form associated with them, must
     require medical and mental health staff to document the nature, severity,
     and expected duration of an inmate's limitations.

b.   These codes, and the form associated with them, must require medical
     and mental health staff to also identify whether there are reasonable
     modifications that would permit the inmate to work in these job
     assignments, i.e., perform the essential functions of the job.  Nevada will
     provide such inmates with the reasonable modifications necessary to
     ensure that these inmates can participate unless Nevada establishes that
     such an accommodation or modification constitutes a fundamental
     alteration.

c.   If Nevada identifies that an inmate has certain physical limitations or
     health-related issues that will prevent the inmate from participating, even
     with reasonable modifications, in a specific work assignment for which he

Case 2:21-cv-00390-RCF-CLB Document 27-5 Filed 03/29/22 Page 48 of 276

or she is otherwise eligible, Nevada shall so inform the inmate and advise the inmate that he or she may seek a reevaluation from a NDOC health provider. Should the inmate request such a reevaluation, Nevada shall ensure that within thirty (30) days of the inmate's request, a health provider who has been personally involved in the inmate's care reviews the inmate's medical and mental health files, personally examines the inmate (if necessary), and makes an individualized determination as to whether any medical or mental health issues should preclude the inmate from being assigned to that particular work area and whether there are reasonable modifications that would permit the inmate to work in that particular work area.

d.    Nevada shall provide written guidance and live training to, and ensure completion of live training by, all medical and mental health providers who make such work clearance determinations. The written guidance and training will cover: (1) the types of work assignments available and the physical requirements of each assignment, (2) examples of reasonable modifications that may be available for inmates with disabilities for each work assignment, and (3) Nevada's duty to provide reasonable modifications and to not discriminate against inmates with disabilities.

20.    <u>Work Credits</u>: Nevada shall ensure non-discrimination in the eligibility of inmates with disabilities to earn work credits.

a.    Inmates with disabilities who, with or without reasonable modifications, are eligible to work, but because of their disabilities have been placed on a waiting list pending the availability of an appropriate work assignment, shall earn the full number of work credits that they would have been eligible to earn had they worked while waiting for an assignment.

b.    Notwithstanding the foregoing, Nevada need not award inmates with disabilities in other work assignments the same number of credits awarded

to Nevada Division of Forestry crew members when these crew members
are away from camp for firefighting or emergency assignments.

C.    Custody-Level Classifications and Placements for Inmates with Disabilities

21.    <u>Equal Opportunity</u>: Nevada shall ensure that inmates with disabilities have
equal opportunities to participate in and benefit from the services, programs, and
activities (*e.g.*, work credits, institutional placement) available to inmates at the
custody levels for which they are eligible.

22.    <u>Non-Discrimination in Custody-Level Classifications</u>: Nevada shall not, on the
basis of mental health conditions, medical conditions, mobility impairments,
medical treatment needs such as an inmate's need for medications designated by
Nevada as non-keep-on-person ("NKOP"), or other disabilities, exclude inmates
with disabilities from classification to the custody levels for which they otherwise
are eligible.

a.    Nevada shall ensure that its rules, policies, protocols, and other
directives provide for non-discrimination against inmates with disabilities
in custody-level determinations. When an inmate with a disability is
otherwise eligible for classification to a particular custody level, Nevada
shall classify the inmate to that custody level without consideration of the
inmate's mental health conditions, medical conditions, mobility
impairments, medical treatment needs (*e.g.*, NKOP medications), or other
disabilities. In situations where placement at the custody level to which the
inmate is eligible for classification is not possible due to a lack of capacity
or a legitimate administrative determinant (*see* Paragraph 23(a)), Nevada
shall nonetheless classify the inmate to the custody level for which he or
she is eligible and follow the procedures and requirements set forth in
Paragraph 23 to determine the appropriate housing placement for the
inmate.

23. <u>Non-Discrimination in Custody-Level Placements</u>: Nevada shall not, on the basis of mental health conditions, medical conditions, mobility impairments, medical treatment needs (*e.g.*, NKOP medications), or other disabilities, exclude inmates from placement at the custody levels for which they are otherwise eligible—including lower-custody placements such as transitional-housing facilities, conservation camps, and minimum-custody beds at prisons—unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others or unless necessary pursuant to a legitimate safety requirement or direct threat determination.

    a.   Nevada shall, to the extent it has not already, develop appropriate, necessary, and specific administrative determinants for housing inmates with disabilities at a higher security level than their designated custody-level classification, where necessary to address specific medical, mental health, dental, or custody concerns. Each administrative determinant will have a designated code that clearly identifies the reason for housing an inmate at a higher security level than his or her custody-level classification. The administrative determinant will be specific, narrowly drawn, and necessary to ensure non-discrimination against inmates with disabilities.

    b.   Nevada shall revise NDOC Medical Directive 414 and any other policies, practices, or procedures for assessing inmate medical and mental health conditions—including Nevada's assignment of inmates to medical and mental health categories and restrictions—to ensure that any housing or other restriction that Nevada imposes on an inmate because of his or her medical or mental health disability is medically necessary.

    c.   If Nevada identifies that an inmate has a disability that may prevent him or her from being housed in certain custody-level placements for which he or she is otherwise eligible, Nevada shall so inform the inmate and advise

the inmate that he or she may seek a reevaluation from a Nevada health provider. Should the inmate request such a reevaluation, Nevada shall ensure that within thirty (30) days of the inmate's request, a health provider who has been personally involved in the inmate's care reviews the inmate's medical and mental health files, personally examines the inmate (if necessary), and makes an individualized determination as to whether any medical or mental health issues should preclude the inmate from being transferred to the custody-level placement for which he or she is otherwise eligible. Nevada shall consider and implement all possible alternatives that do not constitute an undue burden to avoid housing the inmate at a higher-custody placement. If no such alternative is available, Nevada shall classify the inmate to the lower-custody classification level, but may house the inmate at the higher custody level so long as Nevada provides the inmate with the same privileges and benefits (*e.g.*, opportunities to earn work credits) that Nevada provides to inmates housed in lower-custody placements. Such an inmate shall be given priority to transfer to a lower-custody placement when such placement becomes available.

d.    Nevada shall provide written guidance and live training to, and ensure completion of live training by, all health providers involved in the individualized health determinations required under this Paragraph and Paragraph 24, *infra*. The written guidance and training will cover: (1) the types of housing placements available and the physical requirements of each placement, (2) reasonable modifications (including self-administration of medication) that may be available for inmates with disabilities at each housing- and custody-level placement, and (3) Nevada's duty to provide reasonable modifications and to not discriminate against inmates with disabilities in housing placement decisions.

24.    <u>Periodic Classification and Capacity Reviews</u>: Every six (6) months from the date the United States approves Nevada's revised policies, practices, and

procedures implementing the requirements of Paragraphs 21-23, Nevada shall conduct reviews of the custody-level classifications and housing placements of inmates with disabilities. If, based on such reviews, Nevada or the United States anticipates that, within the next six (6) months, facilities will not have the capacity to house inmates with disabilities according to their custody levels and the administrative determinants discussed in Paragraph 23, Nevada shall adopt a plan to make modifications (*e.g.*, converting portions of medium-custody facilities to minimum-custody units) to ensure that, inmates with disabilities are housed according to their custody-level classifications. Nevada shall submit these plans for the United States' review and approval every six (6) months from the date the United States approves Nevada's revised policies, practices, and procedures implementing the requirements of Paragraphs 21-23, and Nevada shall incorporate and implement any revisions the United States may make to these plans unless those revisions constitute an undue burden.

25.   <u>NKOP Medications and Reasonable Modifications at NDOC Facilities That Currently Do Not Employ Full-Time Medical or Mental Health Staff</u>: Nevada shall make reasonable modifications to its policies, practices, and procedures to ensure that inmates with disabilities have an equal opportunity to be placed at lower-custody facilities, such as transitional-housing facilities and conservation camps, when such reasonable modifications to its policies, practices, and procedures do not constitute a fundamental alteration. Nevada shall not categorically exclude inmates with disabilities from placement at such lower-custody facilities, because such inmates require specialized or routine medical or mental health care or require NKOP medications. Nevada shall conduct an individualized assessment of each inmate with a disability who qualifies for placement at such lower-custody facilities and reasonably modify its policies, practices, and procedures to ensure that the inmate has an equal opportunity to participate. This includes but is not limited to training and designating appropriate staff to store NKOP medications for inmates to self-administer, training appropriate staff about emergency and medical and mental health

procedures, employing telemedicine, and periodically transporting inmates with
disabilities to facilities where they can receive medical or mental health care.
Nevada will take all appropriate steps, including amending any rules, policies,
protocols, or other directives, to effectuate its obligation to comply with this
obligation.

D.    Training

26.    Training for Nevada Staff: Nevada shall provide live training to, and ensure
completion of such training by, all NDOC employees as well as State of Nevada
employees whose positions require them to regularly interact with NDOC
inmates (*e.g.*, Nevada Division of Forestry staff), concerning:

a.    Title II of the ADA;

b.    Nevada's policy toward discrimination, retaliation, coercion,
intimidation, harassment, threats, or abuse against inmates on the basis of
disability, as well as toward interference with rights protected by the ADA
or this Agreement;

c.    The matters addressed in Section III.A. of this Agreement, including:

i.    HIV and the methods by which it is and is not transmitted;

ii.    Nevada's plans to fully integrate inmates with HIV in housing;
and

iii.    Nevada's policies for keeping inmates' medical information,
including disabilities, confidential;

d.    The matters addressed in Section III.B. of this Agreement, including
Nevada's:

i.    Revised medical clearance policies, procedures, and practices for
work assignments;

Case 3:21-cv-00380-RCB-CLB Document 18-2 Filed 08/18/23 Page 54 of 276

    ii.    Revised medication administration policies, procedures, and

         practices;

    iii.    Revised policies, practices, and procedures for providing inmates

         with disabilities with health care services in NDOC facilities that

         currently do not employ full-time medical or mental health staff;

    iv.    Obligation to provide inmates with disabilities with equal

         opportunities to participate in Nevada's services, programs and

         activities, including work assignments, and Nevada's plans to ensure

         equal opportunities going forward; and

    v.    New work credit and work assignment processes (designed to

         ensure equal opportunities for inmates with disabilities), including

         the availability of reasonable accommodations and the administrative

         procedures by which inmates may request them;

e.    The matters addressed in Section III.C. of this Agreement, including:

    i.    Nevada's revised policies and procedures for custody-level

         classifications and placements; and

    ii.    The periodic classification and capacity reviews that Nevada will

         conduct pursuant to this Agreement;

f.    Nevada's revised disciplinary, complaint, and grievance policies;

g.    The identities, roles, and responsibilities of Nevada's ADA Compliance

   Officer and ADA Coordinators; and

h.    This Agreement, including the steps that Nevada has taken, and will

   continue to take to ensure that its obligations under this Agreement are

   met.

27. <u>Training for New Employees</u>: For the term of this Agreement, Nevada shall ensure that all new NDOC employees, and all other State of Nevada employees whose positions require them to regularly interact with NDOC inmates, complete the live training outlined in Paragraph 26, during the orientation and on-boarding process—and no later than thirty (30) days after assuming duties.

28. <u>HIV Educational Program</u>: Nevada shall provide an educational program to inmates concerning HIV, transmission, the steps Nevada has already taken to integrate inmates with HIV into the general population, Nevada's plans to fully integrate inmates with HIV and address discrimination against inmates with HIV, and Nevada's plans to ensure equal employment opportunities for inmates with HIV. This program includes the presentation to inmates of video(s), approved by the United States, on HIV, transmission, harassment, and discrimination, and shall provide inmates with the opportunity for questions immediately after viewing the video. Such questions will be answered by a member of the NDOC medical staff who is knowledgeable about HIV and methods of transmission, and a member of NDOC's security staff who is knowledgeable about NDOC's revised policies, practices, and procedures as set forth in this Agreement. Nevada shall also advise inmates of their right to submit complaints or grievances directly to the ADA Compliance Officer or relevant ADA Coordinators.

29. <u>Training for New Inmates at Reception and Intake</u>: For the term of this Agreement, during the processing and evaluation process for all new inmates, and no later than fifteen (15) days after an inmate enters NDOC custody, Nevada shall ensure that all new inmates have received the training outlined in Paragraph 28.

E. Discipline and Grievances

30. <u>Discipline of Inmates or Staff for Discrimination on the Basis of Disability</u>: Nevada shall implement revised policies requiring Nevada to take appropriate disciplinary action against inmates or staff who subject inmates with disabilities

SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA…

to discrimination, retaliation, coercion, intimidation, harassment, threats, or abuse, or who interfere with rights protected by the ADA or this Agreement, including confidentiality of HIV status, on the basis of those inmates' disabilities.

31. <u>Grievance Policy</u>: Nevada shall implement revised procedures to ensure that grievances by inmates who allege discrimination on the basis of disability are promptly reviewed, reported to the ADA Compliance Officer and relevant ADA Coordinators, and addressed by appropriate action.

F. ADA Compliance Officer and Coordinators

32. <u>ADA Compliance Officer</u>: Nevada has designated, and will continue to designate, at least one employee in NDOC headquarters to serve as the NDOC's ADA Compliance Officer. This individual shall coordinate Nevada's efforts to comply with and carry out its responsibilities under Title II and this Agreement.

33. <u>ADA Coordinators</u>: Nevada has designated, and will continue to designate, at least one employee in each of the NDOC's correctional facilities to serve as the facility's ADA Coordinator. Each ADA Coordinator will coordinate his or her facility's efforts to comply with and carry out the facility's responsibilities under Title II and this Agreement.

34. <u>General Responsibilities</u>: The ADA Compliance Officer and ADA Coordinators are and shall continue to be responsible for coordinating the integration of inmates with HIV and other disabilities; carrying out Nevada's ADA responsibilities; ensuring that inmate work assignments do not discriminate based on disability; reviewing inmate work assignment disability accommodation requests; ensuring that services, programs, and activities are readily accessible to and usable by inmates with disabilities; coordinating and ensuring that the NDOC meets its program access obligations for inmates with disabilities; ensuring that inmates with disabilities are assigned the appropriate custody-level classifications

4/1/2021 SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-BLB-CLB Document 27 Filed 02/23/2022 Page 53 of 276

and housed according to their custody levels; and investigating and assisting in the resolution of ADA complaints or grievances.

35. <u>Grievances</u>: The ADA Compliance Officer and each ADA Coordinator are responsible and will continue to be responsible for overseeing, supervising, and assisting in all investigations, and the resolution of grievances alleging that based on an ADA recognized disability, a Nevada employee or inmate has subjected an inmate to discrimination, harassment, intimidation, retaliation, or interference with the inmate's rights under the ADA or this Agreement. All such grievances shall be promptly reported to the ADA Compliance Officer and relevant ADA Coordinators or their designees, who shall review the grievances and recommend appropriate action, including disciplinary action. As part of the training discussed in Section III.D., Nevada shall advise inmates of their right to submit grievances directly to the ADA Compliance Officer or relevant ADA Coordinators. For purposes of this Agreement, grievances shall have the same meaning and procedures as all other grievances contemplated and required under AR 740 and the Prison Litigation Reform Act (PLRA).

G. Implementation Requirements and Schedule

36. <u>System-Wide Policies, Practices, and Procedures</u>: Nevada shall amend system-wide policies, practices, and procedures; and any related directives, forms, lists, and other system-wide documents to reflect the requirements of this Agreement. Nevada shall send the full text of these revisions to the United States for review and approval.

37. <u>Individual NDOC Facilities' Policies, Practices, and Procedures</u>: Nevada shall amend, or where appropriate, issue new policies, practices, and procedures—and any related directives, forms, lists, or other documents (*e.g.*, inmate and employee handbooks)—for all individual facilities within the NDOC system, to ensure that they reflect and comply with the changes made pursuant to this Agreement.

38. <u>Implementation Schedule</u>: To implement the requirements set forth in this Agreement, Nevada shall make the revisions required by Paragraphs 36 and 37; create written guidance and training materials; and provide, and ensure the completion of, live training on the matters listed in Paragraph 26. Unless otherwise specified in this Agreement, Nevada shall complete these tasks in accordance with the following schedule:

    a. In accordance with the timetable below, Nevada shall submit for the United States' review and approval the revisions required by Paragraph 36:

        i. Within fourteen (14) days of the Effective Date of this Agreement: Matters addressed in Section III.E.

        ii. Within sixty (60) days of the Effective Date of the Agreement: Matters addressed in Section III.A. and III.C.

        iii. Within ninety (90) days of the Effective Date of this Agreement: Matters addressed in Section III.B.

    b. The United States shall review and may provide comments on all documents submitted for its review and approval. Within forty-five (45) of receiving the United States' comments, Nevada shall incorporate those comments and submit the revised document for the United States' approval. Within forty-five days of the United States' approval, Nevada shall distribute and implement the revised document.

    c. Within sixty (60) days of the United States' approval of a document revised pursuant to Paragraph 36, Nevada shall:

        i. Submit for the United States' review and approval written guidance and training materials (*e.g.*, PowerPoint presentations, policy documents, pamphlets, brochures) covering the subject matter of the revision; and

       ii.    Revise facility-specific policies, practices, and procedures, and other documents, as required by Paragraph 37.

    d.    Within thirty (30) days of receiving the United States' comments concerning any written guidance or training materials, Nevada shall incorporate those comments that bring Nevada's materials into compliance with the ADA and submit the revised materials for the United States' approval. Within thirty (30) days of the United States' approval, Nevada shall provide, and ensure completion of, the live training required in Paragraph 26.

## IV.   REPORTING, MONITORING, ENFORCEMENT

39.   <u>Reporting</u>: Beginning six (6) months after the Effective Date of this Agreement, and every three (3) months thereafter for the first year of this Agreement, Nevada shall submit written reports (including supporting documentation) to the United States, delineating all steps taken during the reporting period to comply with each substantive provision of this Agreement. Thereafter, for the duration of the Agreement, Nevada shall submit a report every six (6) months. Each report shall include the following for the preceding reporting period:

    a.    <u>Grievances</u>: A copy of every grievance by an inmate relating to disability-based discrimination, harassment, or any other issue covered by this Agreement, and Nevada's response to or resolution of the grievance.

    b.    <u>Inmate Data</u>: The unique identifier of every inmate with a medical or mental health restriction within the NDOC system, by NDOC facility, custody-level classification, the date the inmate was classified to that custody level, the custody level of the facility in which the inmate is currently housed, the date the inmate was placed in the facility in which he or she is currently housed, the inmate's medical and mental health classification (including restrictions), housing unit, work assignment (if any), and number of work credits earned (if any). The unique identifier for each inmate will be created by Nevada for purposes of

4/1/2021 SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-RCB-CLB Document 2 Filed 12/06/2022 Page 60 of 276

reporting, monitoring, and enforcement under this Agreement and shall not be identical to inmates' existing offender ID number.

c. Integration of Inmates with HIV: A list of all inmates, by unique identifier, with HIV that indicates whether each inmate has elected to integrate, as well as all cell change request forms signed by the inmates to indicate their elections.

d. Confidentiality: If an inmate's confidential medical information was shared with non-medical or mental health staff, an explanation of the circumstances that led to each disclosure.

e. Legitimate Safety Requirement and Direct Threat: A copy of every legitimate safety requirement or direct threat determination Nevada has made about an inmate with regards to a medical or mental health restriction.

f. Custody-Level Classifications and Placements: A detailed description of each instance in which:

   i. Nevada has employed an alternative to avoid housing an inmate with a disability at a custody level above that to which the inmate has been classified;

   ii. Nevada has housed an inmate with a disability at a custody level above that to which the inmate has been classified, as well as the reason why Nevada did not house that inmate at the appropriate custody level;

   iii. An inmate with a disability has requested an individualized health determination pursuant to Paragraph 23. Nevada's description shall include the date the inmate made the request, the date Nevada evaluated the inmate, the ultimate outcome of Nevada's evaluation, and Nevada's rationale for that outcome.

g. Medications: A copy of every denial Nevada has issued regarding an inmate with a disability's request, pursuant to Paragraph 23, to maintain any medication

as keep-on-person medication.

h.   _Periodic Classification and Capacity Reviews_: All reviews and plans required by Paragraph 24.

i.   _Discipline_: Any discipline taken against any inmates or Nevada employees for discrimination or harassment against inmates with disabilities.

j.   _Training_: For all training required by Section III.D., Nevada shall submit written reports detailing: the date and time of each training; a copy of the agenda and materials (*e.g.*, handouts, PowerPoint presentations) used for each training; the names (and for employees, names and titles) of the individuals who attended the training; and for employee trainings, copies of the training sign-in sheets.

k.   _All Other Relevant Documents_: All other documents requested by the United States relevant to this Agreement and to the United States' determination of Nevada's ongoing compliance with this Agreement.

40.   _Delivery of Reporting Materials_: All materials sent to the United States pursuant to this Agreement shall be sent by e-mail to undersigned counsel (or to alternate email addresses that the United States may designate during the term of this Agreement).  If the materials cannot be e-mailed, then the materials shall be sent to the following address by common carrier other than the U.S. Postal Service: Chief, Disability Rights Section, Civil Rights Division, U.S. Department of Justice, 4 Constitution Square, 150 M Street NE, Washington, D.C. 20002.  The cover letter shall include a subject line referencing the Nevada Department of Corrections and DJ No. 204-46-176.

41.   _Monitoring_: Nevada shall make facilities, policies, records (including inmate medical records), personnel, and any other information the United States may request, available to the United States to facilitate the United States' monitoring of Nevada's compliance with this Agreement.  Upon request from the United States, Nevada shall make arrangements for the United States to conduct confidential and private telephonic, videophone, or in-person interviews with inmates.

Case 3:21-cv-00380-RCB-CLB Document 2-2 Filed 12/07/2022 Page 682 of 276

42.    Enforcement: The United States may review compliance with this Agreement at any time throughout the Term of the Agreement. After receipt of each report referenced in Paragraph 39, the United States may assess Nevada's compliance with this Agreement and confer with Nevada. If the United States believes that Nevada has failed to comply in a timely manner with any requirement of this Agreement, or if any requirement has been violated, the United States will notify Nevada in writing and the Parties will attempt to resolve the issue in good faith. If the Parties are unable to reach a satisfactory conclusion within thirty (30) days of the date the United States notifies Nevada, the United States may file a civil action in federal district court to enforce the terms of this Agreement, or take any other action to enforce Title II of the ADA. The United States agrees that any civil action will be filed in the United States District Court of Nevada.

43.    Remedies: The Parties agree that money damages alone would be an insufficient remedy for breach of this Settlement Agreement, that such breach would represent irreparable harm, and that each non-breaching Party shall be entitled to specific performance as well as such other injunctive relief (without the posting of any bond and without proof of actual damages) as may be granted by a federal district court. Any remedies sought in the event of a breach of this Agreement or a violation of the ADA shall be cumulative and in addition to, and not in lieu of, all other remedies available in this Agreement, in law or in equity.

44.    Non-Waiver: Failure by the United States to enforce any provision or deadline in this Agreement shall not be construed as a waiver of the right of the United States to enforce any deadline or provision of this Agreement.

V.    MISCELLANEOUS PROVISIONS

45.    Legitimate Safety Requirements and Direct Threat: Pursuant to 28 C.F.R. § 35.130(h) and § 35.139 and notwithstanding any other provision in the Agreement, Nevada may implement and maintain (a) legitimate safety requirements necessary for the safe operation of its services, programs, or activities, and (b) procedures to assign

4/1/2021 SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-RCB-CLB Document 27 Filed 02/24/22 Page 63 of 276

inmates with disabilities to higher-custody classifications or to exclude inmates with disabilities from a particular service, program, or activity based upon a determination that the inmate poses a direct threat to the health or safety of others—defined as a significant risk to the health or safety of others that cannot be eliminated by Nevada's modification of policies, practices, or procedures, or the provision of auxiliary aids or services.

   a.   Nevada shall only implement legitimate safety requirements or make a direct threat determination on the basis of actual risks, and not on mere speculation, stereotypes, or generalizations about inmates with disabilities, including inmates with HIV.

   b.   In determining whether an inmate poses a direct threat to the health or safety of others, Nevada must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence to ascertain: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures, or the provision of auxiliary aids or services, will mitigate the risk.

   c.   Sources for medical knowledge in imposing safety requirements and making a determination that an inmate poses a direct threat include knowledgeable and appropriate medical and mental health personnel, as well as guidance from public health authorities, such as the Centers for Disease Control, the U.S. Public Health Service, the National Institutes of Health, and the National Commission on Correctional Health Care.

   d.   A determination that an inmate with a disability poses a direct threat to the health or safety of others because of the inmate's disability shall be made by a Warden or Associate Warden in consultation with appropriate NDOC headquarters personnel, including the ADA Compliance Officer and any relevant ADA Coordinators; provided that NDOC correctional officers may temporarily

separate inmates or place an inmate with a disability in a controlled housing status in circumstances presenting an immediate threat to the health or safety of others.

    e.    Any legitimate safety requirement or direct threat determination made pursuant to this Paragraph shall be in writing; shall include the facts and circumstances the Warden or Associate Warden believe justify the determination; shall be signed by the Warden or Associate Warden; and shall be preserved. An inmate with a disability may only be assigned to a higher-custody classification or excluded from a particular service, program, or activity based upon a legitimate safety requirement or direct threat determination for only as long as necessary to ensure safe operation of the program or as long as the direct threat remains. Any legitimate safety requirements or direct threat determinations concerning HIV or other disabilities shall be reported to the United States for the term of this Agreement consistent with the reporting requirements identified in Section IV, *supra*.

46.   <u>Consideration</u>: In consideration for this Agreement, the United States agrees to close its investigation (DJ No. 204-46-176) without further enforcement action, except as provided in Section IV of this Agreement.

47.   <u>Effective Date</u>: The effective date of this Agreement is the date of the last signature below.

48.   <u>Term</u>: The duration of this Agreement will be three (3) years from the Effective Date.

49.   <u>Early Termination</u>: This Agreement or a distinct, severable part of the Agreement will terminate earlier than three years if the United States determines that Nevada has demonstrated durable compliance with Title II of the ADA and this Agreement, or with that distinct, severable part, as applicable. In determining whether Nevada has demonstrated durable compliance with a part of the Agreement, the Department may assess collectively all the requirements of the Agreement to determine whether the intended outcome of the part has been achieved.

4/1/2021     SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EXREL: NEVADA DEPA...

Case 3:21-cv-00380-RCB-CLB   Document 27   Filed 02/24/22   Page 65 of 276

50.   Definitions: Unless otherwise specified, terms in this Agreement have the same meaning as in Title II of the ADA and its implementing regulation.

    a.   "State of Nevada": The term "State of Nevada" means the State of Nevada and its agencies, officials, employees, agents, contractors, or sub-contractors, including individuals whose positions require them to interact regularly with NDOC inmates.

    b.   "NDOC": The term "NDOC" means the Nevada Department of Corrections and its officials, employees, agents, contractors, or sub-contractors, including Offender Management Division staff, wardens, medical and mental health staff, correctional officers, and case workers.

    c.   "Employee," "Staff," and "Personnel": The terms "employee," "staff," and "personnel" mean any official, employee, agent, contractor, or sub-contractor.

51.   Counterparts: This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same Agreement. Facsimile or electronic signatures are acceptable.

52.   Severability: If any term of this Agreement is determined by any court to be unenforceable, the other terms of this Agreement shall nonetheless remain in full force and effect.

53.   Binding Nature of Agreement. This Agreement shall be binding upon Nevada and the United States, their agents, and their employees.

54.   Authority: The individuals signing this Agreement represent that they are authorized to do so on behalf of the respective entity for which they have signed.

55.   Entire Agreement: This Agreement constitutes the entire agreement between the United States and Nevada on the matters raised herein and no other statement or promise written or oral, made by any party or agents of any party, that is not contained in this written Agreement shall be enforceable.

56.    <u>Extensions</u>: Any time limits for performance that this Agreement imposes may be extended by the mutual written agreement of the Parties. The Parties acknowledge that such written agreement may be completed by e-mail so long as the e-mail has specific language designed to bind either party.

57.    <u>Successor Liability</u>: This Agreement is binding on Nevada and its successors, including any successor legislature, Director of the NDOC, or Governor of the State of Nevada.

58.    <u>Other Violations</u>: This Agreement shall have no impact upon the rights or claims of any individual not identified in this Agreement who has made, or may make, claims against Nevada, even for issues addressed herein.  This Agreement is not intended to remedy any violations or potential violations of the ADA or any other law, other than those specifically addressed by this Agreement.  Nothing in this Agreement shall preclude the United States from filing a separate action under the ADA, or any other law, for any alleged violation not covered by this Agreement.

59.    <u>Costs and Fees</u>: The United States and Nevada will bear the cost of their own fees and expenses incurred in connection with this Agreement.

60.    <u>Publicity</u>: This Agreement and any amendment hereto shall be public documents.

**AGREED AND CONSENTED TO:**

**FOR THE UNITED STATES OF AMERICA**

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief

KATHLEEN P. WOLFE
Special Litigation Counsel

1/2021                 SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF NEVADA EX REL. NEVADA DEPA...

Case 3:21-cv-00380-RCB-CLB    Document 27    Filed 02/25/22    Page 67 of 276

KEVIN J. KIJEWSKI

Deputy Chief

/s/

CHRISTINE KIM

Trial Attorney

Disability Rights Section

Civil Rights Division

U.S. Department of Justice

950 Pennsylvania Avenue, N.W.

Washington, DC 20530

202-305-0043 (telephone)

202-305-4486 (facsimile)

christine.kim@usdoj.gov

Date: 2/11/21

**FOR THE STATE OF NEVADA EX REL.**

**NEVADA DEPARTMENT OF**

**CORRECTIONS**

/s/

STEVEN SISOLAK

Governor

State Capitol Building

101 N. Carson Street

Carson City, NV 89701

(775) 684-5670 (telephone)

(775) 684-5683 (facsimile)

/s/

CHARLES A. DANIELS

Director

Nevada Department of Corrections

Stewart Facility

5500 Snyder Avenue, Bldg. 17

Carson City, Nevada 89701

775-887-3285 (telephone)

775-687-6715 (facsimile)

Date: 2/9/21

**U.S. Department of Justice**

Office of Justice Programs

*Office for Civil Rights*

*Washington, D.C. 20531*

September 28, 2021

Ammar Harris 1116547
P.O. Box 1989
Ely, NV   89301

    Re:    Harris v. Ely State Prison/Nevada Department of Correction (21-OCR-1883)

Dear Mr. Harris:

The Office for Civil Rights (OCR) at the Office of Justice Programs (OJP), U.S. Department of Justice (DOJ), received notice of your Complaint against Ely State Prison/Nevada Department of Correction.

The OCR is responsible for ensuring that recipients of financial assistance from the OJP, the Office on Violence Against Women, and the Office of Community Oriented Policing Services comply with federal laws that prohibit discrimination in employment and the delivery of services or benefits based on one or more of these protected classifications: race, color, national origin, religion, sex, and disability, among others.

For the OCR to proceed with reviewing your Complaint, please provide the OCR with specific details about your allegations, including dates, times, places, and the names and contact information of alleged perpetrators and witnesses.

Please complete and return the enclosed Complaint Verification Information form.   Although some responses may repeat information that you previously provided, please answer all applicable questions and return this form.   The OCR must know how you (or whomever you are filing on behalf of) are treated differently from others, how rules and regulations are applied differently, or how programs and activities that are routinely available to others are not made available to you (or whomever you are filing on behalf of) because of one of the protected classifications listed above.   Once we receive your response, we will use the information to determine whether the OCR has the authority to investigate your allegations.

Please also complete and return the enclosed Complainant Consent/Identity Release Form.   The OCR may need to reveal your identity to persons at the agency or organization under investigation to investigate your allegations and receive information about you.   If your Complaint was filed on behalf of someone else, that person must complete and sign the Complainant Consent/ Identity Release Form.   Although consent is voluntary, the OCR may not be able to investigate the Complaint unless this release is authorized.

Ammar Harris
September 28, 2021
Page 2 of 2

The forms can be mailed to Office of Justice Programs, U.S. Department of Justice, Office for Civil Rights, 810 7th St. NW, Washington, DC 20531. **If you do not return both forms within forty-five (45) days from the date of this letter, the OCR will administratively close your complaint. You will not receive further correspondence from the OCR if this occurs.**

If the forms are properly completed and returned within the requested time period, the OCR will assign an attorney to your Complaint to determine whether an investigation is appropriate. If the OCR initiates an investigation, it will provide the agency or organization under investigation with an opportunity to respond to your allegations and provide supporting documentation.

Thank you for contacting the DOJ with your concerns.

Sincerely,

X *Michael L. Alston*

Michael L. Alston
Director, Office for Civil Rights
Signed by: MICHAEL ALSTON

Enclosures

CVF
IRS

EXHIBIT - I - "Injury"

William Bee Ririe Hospital

44 Pages



ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
JAYME N. RICHARDSON
LORIN M. TAYLOR
HUGO E. HERNANDEZ
KELLY B. STOUT

December 9, 2021
**LEGAL MAIL**

<u>**VIA USPS**</u>
Ammar Harris, #1116547
PO Box 650
High Desert Prison
Indian Springs, Nevada 89070-0650

    **Re:**   *STATE OF NEVADA VS. AMMAR HARRIS*
        **CASE NO. A-19-797786 and C-19-289275**

Dear Mr. Harris:

    Enclosed are the medical records we received from William Bee Ririe Hospital.

    If you have any questions or concerns regarding the foregoing, please do not hesitate to contact our office.

            Respectfully,

            */s/Tanya Hayden*

            TANYA HAYDEN., *Paralegal*
            *to Sgro & Roger*

ACB/th

Enclosures: As stated

RECEIVED 12/08/2021 05:27PM 7026654120       SGRO ROGER
12/08/2021 WED 17:17  FAX 7752894206 Medical Records                    ☑011/053

fonttblTimes New Roman;Times New Roman;Arial;Wingdings;Courier;

**Patient: HARRIS, AMMAR**
**MRN: 154965**
VisitID: 10273598
34y, M

**Clinical Report - Physicians/Mid Levels**
William Bee Ririe Critical Access Hospital
1500 Avenue H, Ely, NV 89301 775-289-3001
Registration Date/Time: 08/28/2020 10:02

Time Seen: 10:05 08/28/2020; initial patient contact, initial documentation.
Arrived- By ambulance.   Historian- patient and EMS personnel.

**HISTORY OF PRESENT ILLNESS**
Location of injuries- head and face.   Chief Complaint: REPORTED PHYSICAL ASSAULT (He is a prisoner at the prison. He was jumped with a home made shank.   He appears to be stabbed in the chin and left upper parietal area. He has a abrasion/laceration just under his left ear.   He appears confused. He has no abrasion of marks any where else on his body.).   This occurred just prior to arrival.

The patient sustained a blow and stab wound and was reportedly kicked.   (prison).

The patient complains of moderate pain.   The patient sustained a blow to the head, had loss of consciousness and was dazed.

**REVIEW OF SYSTEMS**
No numbness, dizziness, loss of vision, hearing loss or weakness.   No nausea or abdominal pain.   All other systems reviewed and are negative.

**PAST HISTORY**
Unknown.   Unobtainable.

**SOCIAL HISTORY**
No alcohol use.

**PHYSICAL EXAM**
**Head:** Left parietal area: 2.0 cm laceration.   **Chin:** moderate tenderness, subcutaneous laceration and small abrasion.
**Eyes:** Pupils equal, round and reactive to light.
**ENT:** No dental injury.   Left ear: superficial 2.0 cm laceration. SEE LACERATION PROCEDURE NOTE #3.
**Neck:** Neck non-tender.
**CVS:** Heart sounds normal.
**Respiratory:** Chest nontender.
**Abdomen:** No visible injury.   Soft.
**Back:** No tenderness.
**Skin:** Normal skin color.
**Extremities:** Pelvis stable.
**Neuro:** Oriented X 3.   No motor deficit.

**LABS, X-RAYS, AND EKG**
**CT C-Spine:** (Technique

CT scan of cervical spine without contrast. Coronal and sagittal reconstructed images obtained.

History : Pain, injury to cervical spine.

Findings

Images demonstrate there are mild degenerative endplate changes throughout the cervical spine. There is no acute fracture. There is no spondylolisthesis. There is no prevertebral soft tissue swelling.

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:18  FAX 7752894206 Medical Records                    ☑012/053

Impression :No acute cervical spine fracture.).
**CT Head:** (Technique

CT scan of head without contrast. Coronal and sagittal reconstructed images obtained.

History : Intra-cranial hemorrhage. Cerebrovascular accident.

Findings

Images demonstrate there is a large acute intraparenchymal hemorrhage in the left frontal lobe. There is acute hemorrhage along the falx within the midline. There is mild shift of the midline structures to the right. There is an acute fracture in the left parietal bone, anteriorly with a depressed fracture fragment. There is a metallic foreign body at the far inferior aspect of the right frontal lobe.

Impression
There is an acute depressed fracture in the left parietal bone, anteriorly. There is depression of the fracture fragment by approximately 5 mm. There is some overlying soft tissue swelling. There is a large acute intraparenchymal hemorrhage involving the left frontal lobe. There is acute hemorrhage along the falx within the midline. There is a metallic foreign body at the far inferior aspect of the right frontal lobe within the bone at the superolateral aspect of the right orbit).

**Laboratory Tests:**
CBC W/AUTO DIFF:   (COLL: 08/28/2020 10:40)            ( MsgRcvd 08/28/2020 10:53) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
|---|---|---|---|---|
| CBC W/AUTO DIFF | | | | |
| COMPLETE BLOOD COUNT | | | | |
| WBC | 9.69 | | K/uL | (4.50 - 11.00) |
| RBC | 5.16 | | M/uL | (4.70 - 6.10) |
| HEMOGLOBIN | 15.59 | | g/dL | (12.00 - 18.00) |
| HEMATOCRIT | 48.4 | | % | (40.0 - 54.0) |
| MCV | 94 | | fL | (80 - 99) |
| MCH | 30.20 | | pg | (27.00 - 34.00) |
| MCHC | 32.2 | | g/dL | (31.0 - 36.0) |
| RDW | 11.4 | | % | (11.0 - 14.0) |
| PLATELETS | 255 | | K/uL | (140 - 450) |
| MPV | 7.3 | | fL | (6.6 - 12.2) |
| %NEUT | 83 | | % | |
| %LYMPH | 11 | | % | |
| %MONO | 5 | | % | |
| %EOS | 0 | | % | |
| %BASO | 1 | | % | |
| #NEUT | 8.04 | | K/uL | (1.50 - 9.50) |
| #LYMPH | 1.06 | L | K/uL | (1.50 - 5.00) |
| #MONO | 0.51 | | K/uL | (0.10 - 1.00) |
| #EOS | 0.02 | | K/uL | (0.00 - 0.30) |
| #BASO | 0.06 | | K/uL | (0.00 - 0.20) |
| BLOOD SMEAR REVIEW | | NOT INDICATED | | |
| [CB] | | | | |

Comp Metabolic Panel:   (COLL: 08/28/2020 10:40)            ( MsgRcvd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **?(Reference)** |
|---|---|---|---|---|
| COMPREHENSIVE METABOLIC | | | | |
| COMPREHENSIVE METABOLIC PANEL | | | | |
| SODIUM | 139.00 | | mmol/L | (136 - 145) |
| POTASSIUM | 4.00 | | mmol/L | (3.50 - 5.10) |
| CHLORIDE | 109.00 | | mmol/L | (103 - 117) |
| CO2 | 19.17 | | mmol/L | (17.10 - 31.70) |
| ANION GAP | 15 | | | (10 - 20) |
| GLUCOSE | 141.00 | H | mg/dL | (70.00 - 110) |
| BUN | 13.00 | | mg/dL | (9.00 - 26.00) |
| CREATININE | 1.50 | H | mg/dL | (0.57 - 1.25) |
| BUN/CREAT | 9 | | | (7 - 25) |
| AGE | 34 | | yrs | |
| NON-AA GFR | 54 | | mL/min | |
| AFR AMER GFR | 65 | | mL/min | |

| | | | |
|---|---|---|---|
| CALCIUM | 9.10 | mg/dL | (8.60 - 10.30) |
| TOTAL PROTEIN | 7.60 | g/dL | (6.40 - 8.30) |
| ALBUMIN | 4.200 | g/dL | (3.500 - 5.200) |
| ALKALINE PHOS | 70.00 | U/L | (40.00 - 150) |
| SGPT/ALT | 46.00 | U/L | (0.00 - 55.00) |
| SGOT/AST | 31.00 | U/L | (5.00 - 34.00) |
| BILIRUBIN TOT | 0.50 | mg/dL | (0.20 - 1.20) |

Alcohol Blood:    (COLL: 08/28/2020 10:40)            ( MsgRcvd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
|---|---|---|---|---|
| ALCOHOL BLD | 10.50 | | mg/dL | (0.00 - 50.00) |

Use of blood alcohol results is restricted to medical (treatment) purposes only. Results >19 are positive for alcohol.

Lipase:    (COLL: 08/28/2020 10:40)            ( MsgRcvd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
|---|---|---|---|---|
| LIPASE | 20.00 | | U/L | (8.00 - 78.00) |

CT C-Spine wo IV cont:                        ( MsgRcvd 08/28/2020 11:15) Final results

**Exam**
<Observation_Test_Name>CT CERV SPINE WO CONTRAST</
  <Observati <Observation_To (<Observation_

CT Facial wo IV cont:                        ( MsgRcvd 08/28/2020 11:21) Final results

**Exam**
<Observation_Test_Name>CT SINUSES FACIAL AXIAL</Ob
  <Observati <Observation_To (<Observation_

## PROGRESS AND PROCEDURES

**Intubation:** Time: 11:35 08/28/2020.  Time-out completed immediately before the procedure.  ED physician and anesthesiologist at bedside.  Intubated with 7.5 cuffed endotracheal tube.  Head placed in sniffing position.  Size 4 MacIntosh blade used.  Intubated via orotracheal route,  Premedicated with fentanyl.  Administered induction agent- etomidate and neuromuscular blocking agent- rocuronium.  Complications of procedure; vomiting.  Placement confirmed by direct visualization, equal breath sounds and rise and fall of chest wall and end tidal CO2 monitor.  Tube secured with adhesive tape.  (Ketamine).  Tube marked (22 cm).  Technique: direct visualization.  Procedure successful; one attempt.

**Course of Care:** He has a large intracranial bleed.  I spoke with Dr Parco ( trauma doctor at UMC).  He suggest to intubate patient due to his GCS and will give Keppra for SZ prophalaxsis.

Critical care performed (60 minutes). Time includes: direct patient care, coordination of patient care, interpretation of data (laboratory data and pulse oximetry), review of patient's medical records and medical consultation- see progress notes. Procedures included in critical care time; phlebotomy and ventilator management. Procedures excluded from critical care time: intubation.

**Disposition:** Transferred to University Medical Center, Las Vegas Nevada.  Condition: serious.

## CLINICAL IMPRESSION

Open, penetrating head injury traumatic left cerebral hemorrhage. Parietal bone fracture. Loss of consciousness of unknown duration. Altered mental status. Neurological deficit. Coma.
Multiple deep lacerations to the scalp, head and nose. Foreign body present.

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:18  FAX 7752894206 Medical Records                    ☑014/053

(Electronically signed by Daniel W. Rollins, MD 08/28/2020 16:39)

RECEIVED 12/08/2021 05:27PM 7026654120        SGRO ROGER
12/08/2021 WED 17:18  FAX 7752894206 Medical Records                        ☑015/053

fonttblTimes New Roman;Times New Roman;Arial;Wingdings;Courier;

| | |
|---|---|
| **Patient: HARRIS, AMMAR** | **Clinical Report - Nurses** |
| **MRN: 154965** | William Bee Ririe Critical Access Hospital |
| VisitID: 10273598 | 1500 Avenue H, Ely, NV 89301 775-289-3001 |
| 34y, M | Registration Date/Time: 08/28/2020 10:02 |

**TRIAGE**

Arrived by EMS, and in handcuffs from jail (on stretcher).   Historian: (correction officers).
Triage time: 10:06 08/28/2020.   Acuity: LEVEL 2.
Chief Complaint: INJURY TO HEAD, NOSE and CHIN and LEFT EAR (parietal area).
This occurred just prior to arrival.   Mechanism of injury: a blow.   The patient had loss of consciousness lasting several minutes. (patient unable to speak).

Treatment PTA:
None.

Trauma activation: Pre-hospital notification of patient arrival was received.  --10:24 Kiruki, Evelyn, R.N.

10:07 08/28/20.   BP: 115/71. HR: 106. RR: 20. O2 saturation: 99%. Temp: 97.4 F. Pain level now unable to obtain due to patient condition.  --10:24 Kiruki, Evelyn, R.N.

10:06 08/28/20.

ABUSE ASSESSMENT: Abuse assessment: unable to obtain.  --11:36 Kiruki, Evelyn, R.N.
Weight: 113.3 kg estimated. Height/Length: 69 inches Estimated. BMI: 36.9.  --10:07 Kiruki, Evelyn, R.N.

**Medications**
Unable to Obtain.  --11:37 Kiruki, Evelyn, R.N.

**Allergies**
Unable to Obtain.  --11:37 Kiruki, Evelyn, R.N.

**PROBLEMS:**
Unable to answer.  --11:38 Kiruki, Evelyn, R.N.

ADDITIONAL SURGERIES:
Unable to answer.  --11:38 Kiruki, Evelyn, R.N.

**History**
SOCIAL HX: Smoker - current status unknown.   Alcohol use. (unable to obtain).   History of drug use. (unable to obtain).

SELF HARM ASSESSMENT: a self harm assessment was performed. The patient answered "no" to the question(s) "Have you recently felt down, depressed, or hopeless?", "Have you noticed less interest or pleasure in doing things?", "Do you have thoughts of harming or killing yourself?", "Are you here because you tried to hurt yourself?", "Have you ever tried to hurt yourself before today?", "Have you recently had thoughts about harming or killing others?" and "Do you have any dangerous items in your possession?".

NUTRITIONAL RISK ASSESSMENT: The nutritional risk assessment revealed no deficiencies.

FUNCTIONAL ASSESSMENT: Functional assessment: no impairments noted.

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:18  FAX 7752894206 Medical Records                    ☑016/053

LEARNING NEEDS ASSESSMENT: The learning needs assessment revealed no barriers.

SKIN INTEGRITY ASSESSMENT: Skin integrity risk assessment completed. No skin integrity risk identified.
--10:24 Kiruki, Evelyn, R.N.

10:06 08/28/20.
SOCIAL HX: The patient has not traveled outside the U.S. No infectious disease exposure.

SELF HARM ASSESSMENT: a self harm assessment was performed. The patient answered "no" to the question(s)
"Have you recently felt down, depressed, or hopeless?", "Have you noticed less interest or pleasure in doing things?",
"Do you have thoughts of harming or killing yourself?", "Are you here because you tried to hurt yourself?", "Have
you ever tried to hurt yourself before today?", "Have you recently had thoughts about harming or killing others?" and
"Do you have any dangerous items in your possession?".

FALL RISK ASSESSMENT: Fall risk assessment completed. Risk factors identified include patient history of fall.
--11:36 Kiruki, Evelyn, R.N.

**Interventions**
Identification band on patient.  To treatment room.  --10:24 Kiruki, Evelyn, R.N.

## PHYSICAL ASSESSMENT
HEENT: Head: laceration present in the left parietal area.  Nasal injury: subcutaneous 1.0 cm laceration with
controlled bleeding involving the left nasolacrimal duct.  Mucous membranes are pink.
CVS: Capillary refill less than 2 seconds.
SKIN: Skin is warm and dry.  --10:26 Kiruki, Evelyn, R.N.

## NURSING PROGRESS NOTES
10:06 08/28/20.  Reassurance given.  Two patient identifiers checked.  Bed placed in lowest position.  Brakes of
bed on.  Patient ready for evaluation- ED physician notified.  --10:27 Kiruki, Evelyn, R.N.

10:06 08/28/2020 Site #1 started prior to arrival by EMS via IV in the left hand with an 20g angiocath, with aseptic
technique and good blood return. Saline lock flushed with 5 mL saline.  --11:09 Kiruki, Evelyn, R.N.

10:48 08/28/20.  Patient transported to CT by stretcher with tech. (With 4 Cert officers at side).  --10:53 Barela,
Mary, CNA

10:50 08/28/20.  ( Patient shaved on the areas with lacerations).  --11:30 Kiruki, Evelyn, R.N.

11:00 08/28/2020 Arrived with bag #1 1000 mL IV Fluids IV NS; bolus of 500 mL wide open via site #1, Started by
EMS. Allergies verified and confirmed 5 rights. IV patency established. IV site checked: no pain, redness, or
swelling. IV flushed thoroughly pre- and post-medication administration. Information reviewed with patient including
reason for taking this medication, signs of allergic reaction and precautions. Verbalizes understanding.  --11:09
Kiruki, Evelyn, R.N.

11:02 08/28/20.  Patient returned by stretcher with tech. (With 4 cert officers).  --11:02 Kiruki, Evelyn, R.N.

11:15 08/28/20.  ( med x notified).  --11:15 Jill Desteunder, R.N.

11:26 08/28/20.  BP: 141/81. HR: 105. RR: 18. O2 saturation: 94%. Temp: 98.3 F. Pain level now: 0/10.  --11:26
Barela, Mary, CNA

11:15 08/28/20.  ( Foleys catheter inserted by Jeff RN, draining clear urine).  --11:31 Kiruki, Evelyn, R.N.

11:20 08/28/2020 Started 1000 mg of KEPPRA (LevETIRAcetam) IVPB in bag #1 100 mL; at 400 mL/hr over 15
minute(s) via site #1. Allergies verified. IV patency established. IV site checked: no pain, redness, or swelling. IV

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:18   FAX 7752894206 Medical Records                              ☒017/053

flushed thoroughly pre- and post-medication administration. Information reviewed with patient including reason for taking this medication, signs of allergic reaction and precautions. Verbalizes understanding (DRIP RATE CONFIRMED WITH PHARMACY). --11:28 Kiruki, Evelyn, R.N.

11:30 08/28/20.  ( Respiratory therapy, CRNA in attendance).  --11:30 Kiruki, Evelyn, R.N.

11:38 08/28/20.  BP: 128/83. HR: 89, RR: 16, O2 saturation: 100%. Temp: 98 F. Pain level now unable to obtain due to patient condition. Additional comments: Patient intubated at this time.  --11:43 Kiruki, Evelyn, R.N.

11:42 08/28/20.  --11:43 Kiruki, Evelyn, R.N.

11:49 08/28/20.  BP: 126/78. HR: 100. RR: 12. O2 saturation: 100%.  --11:50 Barela, Mary, CNA

11:53 08/28/20.  ( patient medical history faxed from Prisons).  --11:53 Kiruki, Evelyn, R.N.

12:01 08/28/2020 IV Fluids IV NS Discontinued; bag #1 upon transfer. Total amount infused: 500 mL. IV patency established. IV site checked: no pain, redness, or swelling. IV flushed thoroughly.  --12:03 Kiruki, Evelyn, R.N.

12:03 08/28/2020 katemine 500 mg in 500 mls saline   * Drip IV 500mgs started by flight team   --12:03 Kiruki, Evelyn, R.N.

**DISPOSITION / DISCHARGE**
11:49 08/28/20.  BP: 126/78. HR: 100. RR: 12. O2 saturation: 100%.  --12:06 Kiruki, Evelyn, R.N.

11:49 08/28/2020   Temp: 98.0 F.  --12:15 Kiruki, Evelyn, R.N.

12:15 08/28/20.  Pain level now unable to obtain due to patient condition.  --12:15 Kiruki, Evelyn, R.N.

11:49 08/28/20.  --12:15 Kiruki, Evelyn, R.N.

12:02 08/28/20.
Departure time: 12:02 08/28/2020.   Condition at departure: unchanged.   Transferred to University Medical Center, Las Vegas Nevada. Emtala forms provided to transport team and EMS via paper.   Transported via stretcher by EMS with monitor, IV, ambu bag and ventilator.  --12:06 Kiruki, Evelyn, R.N.

12:14 08/28/20.  Report was given via a phone call. Report included patient's care, treatment and condition (including any anticipated changes) and medications given to the patient in the ED. All questions were answered. Report was acknowledged and care was transferred. (Dominic).  --12:14 Kiruki, Evelyn, R.N.

Locked/Released at 08/28/2020 17:27 by Kiruki, Evelyn, R.N.

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:18  FAX 7752894206 Medical Records                    ☑018/053

WILLIAM BEE RIRIE
1500 AVE H, ELY, NV 89301

--------NAME-------- NUMBER SEX AGE  ADMIT   DISC.  XRAY# F/C  TYPE
HARRIS AMMAR        10273598 M   34  8/28/20         154965 DB3  E/R
    DATE OF BIRTH: 03/31/1986  M/R# 154965    PH#: 775-289-8800 RM ER02

     LOCATION:                    TRANSCRIBED: 08/28/20 11:45 MW
     CHEST 1V            71045     COMPLETED:                    82B3
     Reason for Study: Intubation Placement

     PHYSICIAN: ROLLINS DA

=================================================================
            R A D I O L O G Y   R E P O R T S
=================================================================
William Bee Ririe Hospital
1500 Avenue H
Ely, NV 89301
(775) 289-3001Radiology Report


THIS INTERPRETATION IS BASED ON THE RADIOLOGICAL EXAMINATION AND
CORRELATION WITH CLINICAL EXAMINATION IS MANDATORY

Patient: Harris Ammar(M)
Reason for Visit:  Intubation Placement
Study Ref: 33082832020028
Date of Birth:    Mar-31-1986
Patient Number: 154965
Referring MD: 500496 ROLLINS DANIEL MD
Referring MD phone:
Modality Type:    CR
Institution: WILLIAM BEE RIRIE HOSPITAL
Exam Date: Aug-28-2020 11:40am
Exam Type: CHEST 1V


Technique
Chest x-ray, 1 view.

History
Status post intubation.

Findings
A single view of chest demonstrates there is no infiltrate or pleural
effusion.  Cardiac silhouette is within normal limits.       Endotracheal tube
is in good position.

Impression

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:19  FAX 7752894206 Medical Records                                    ☑019/053

Endotracheal tube is in good position.
DIGITAL SIGNATURE

Signer name: Eric Goldberg
Organization: William Bee Ririe Hospital
Signed: 2020/08/28.11:45:26


Electronically Signed By:
E GOLDBERG, M.D.                    , RADIOLOGIST
Date/Time: 08/28/20 11:45

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:19  FAX 7752894206 Medical Records                    ☑020/053

```
PRINT DATE: 12/06/21 024          WILLIAM BEE RIRIE HOSPITAL                    PAGE   1
MEDICAL DIRECTOR                      1500 AVENUE H                         CLIA NUMBER
DANIEL MOCKLER, MD                  , ELY, NEVADA 89301                      29D0111765
     TIME:  9:23                    LABORATORY          -- COMPARATIVE REPORT

NAME.: HARRIS AMMAR                 SEX.......: M            ATTENDING: ROLLINS DANIEL MD
ACCT#: 10273598                     AGE.......,: 35 Y        SECOND...:
ROOM.: ER02  DISCH 08/28/20 - NO PENDING ORDERS   DOB.......: 03/31/1986      PRIM CARE.:WILLIAM BEE RIRIE HOSPIT
                                    PAT. PHONE: 7752898800
ADMIT: 08/28/20                     MR#.......: 154965
```

## CHEMISTRY

|  | 08/28/20 1040 |  | REFERENCE RANGE | | UNITS |
|---|---|---|---|---|---|
| SODIUM | 139.00 |  | 136 – | 145 | mmol/L |
| POTASSIUM | 4.00 |  | 3.50 – | 5.10 | mmol/L |
| CHLORIDE | 109.00 |  | 103 – | 117 | mmol/L |
| CO2 | 19.17 |  | 17.10 – | 31.70 | mmol/L |
| ANION GAP | 15 |  | 10 – | 20 | |
| GLUCOSE. | 141.00 H |  | 70.00 – | 110 | mg/dL |
| BUN | 13.00 |  | 9.00 – | 26.00 | mg/dL |
| BUN/CREAT | 9 |  | 7 – | 25 | |
| CREATININE | 1.50 H |  | 0.57 – | 1.25 | mg/dL |
| AGE | 34 |  |  |  | yrs |
| NON-AA GFR | 54 |  |  |  | mL/min |
| AFR AMER GFR | 65 |  |  |  | mL/min |
| CALCIUM | 9.10 |  | 8.60 – | 10.30 | mg/dL |
| TOTAL PROTEIN | 7.60 |  | 6.40 – | 8.30 | g/dL |
| ALBUMIN | 4.200 |  | 3.500 – | 5.200 | g/dL |
| ALKALINE PHOS | 70.00 |  | 40.00 – | 150 | U/L |
| SGPT/ALT | 46.00 |  | 0.00 – | 55.00 | U/L |
| SGOT/AST | 31.00 |  | 5.00 – | 34.00 | U/L |
| BILIRUBIN TOT | 0.50 |  | 0.20 – | 1.20 | mg/dL |
| LIPASE | 20.00 |  | 8.00 – | 78.00 | U/L |

```
  --ORDERED--   --COLLECTED--   --REC'D--   --RESULTED--   --VERIFIED---
  8/28/20 1010  8/28/20 1040   8/28/20 1042  8/28/20 1106  8/28/20 1106
  500           JNC            JNC           CM            CM

     ALCOHOL BLD        10.50      mg/dL     (L=0.00    H=50.00  )
```

Use of blood alcohol results is restricted to medical (treatment) purposes only.
Results >19 are positive for alcohol.

## TDM & TOXICOLOGY

|  | 08/28/20 1115 | REFERENCE RANGE | UNITS |
|---|---|---|---|
| AMPHETAMINES | NEGATIVE | NORMAL: NEGATIVE | |
| BARBITURATES | NEGATIVE | NORMAL: NEGATIVE | |
| BENZO | NEGATIVE | NORMAL: NEGATIVE | |
| BUP | NEGATIVE | NORMAL: NEGATIVE | |
| COCAINE | NEGATIVE | NORMAL: NEGATIVE | |
| METHAMPHET | NEGATIVE | NORMAL: NEGATIVE | |

```
PRINT: 12/06/21 09:23  HARRIS AMMAR                      024 Page:   1 CONTINUED
```

LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E-Error

RECEIVED  12/08/2021 05:27PM 7026654120        SGRO ROGER
12/08/2021 WED 17:19  FAX 7752894206 Medical Records                        ☑021/053

```
PRINT DATE: 12/06/21 024          WILLIAM BEE RIRIE HOSPITAL                  PAGE    2
MEDICAL DIRECTOR                       1500 AVENUE H                        CLIA NUMBER
DANIEL MOCKLER, MD                   ELY, NEVADA 89301                       2900711765
     TIME:  9:23                     LABORATORY          -- COMPARATIVE REPORT

NAME.: HARRIS AMMAR              SEX.......: M                ATTENDING: ROLLINS DANIEL MD
ACCT#: 10273590                 AGE.......: 35 Y             SECOND...:
ROOM.: ER02  DISCH 08/28/20 - NO PENDING ORDERS  DOB.......: 03/31/1986     PRIM CARE.:WILLIAM BEE RIRIE HOSPIT
                                PAT. PHONE: 7752098000
ADMIT: 08/28/20                 MR#.......: 154965
```

## TDM & TOXICOLOGY

|  | 08/28/20 1115 |  | REFERENCE RANGE | UNITS |
|---|---|---|---|---|
| MTD | NEGATIVE |  | NORMAL: NEGATIVE |  |
| OPIATES | NEGATIVE |  | NORMAL: NEGATIVE |  |
| OXYCODONE | NEGATIVE |  | NORMAL: NEGATIVE |  |
| PCP | NEGATIVE |  | NORMAL: NEGATIVE |  |
| PPX | NEGATIVE |  | NORMAL: NEGATIVE |  |
| TCA | NEGATIVE |  | NORMAL: NEGATIVE |  |
| THC | NEGATIVE |  | NORMAL: NEGATIVE |  |

### DRUG OF ABUSE INTERPRETATION

Interpret results utilizing appropriate cut-off values, clinical history,
and knowledge of interfering substances (See "Drug Reactivity Table" in the ER).
These are unconfirmed results and can only be used for medical (treatment) purposes.
For confirmation, please submit a written request along with another urine specimen if needed.

Cut-off values are listed below:

| | |
|---|---|
| THC | 50 ng/mL |
| PCP | 25 ng/mL |
| COCAINE | 150 ng/mL |
| METHAMPHET | 500 ng/mL |
| OPIATES | 100 ng/mL |
| AMPHETAMINES | 500 ng/mL |
| BENZO | 150 ng/mL |
| TCA | 300 ng/mL |
| MTD | 200 ng/mL |
| BARBITURATES | 200 ng/mL |
| OXYCODONE | 100 ng/mL |
| PPX | 300 ng/mL |
| BUP | 10 ng/mL |

## HEMATOLOGY

|  | 08/28/20 1040 |  | REFERENCE RANGE |  | UNITS |
|---|---|---|---|---|---|
| WBC | 9.69 |  | 4.50 - | 11.00 | K/uL |
| RBC | 5.16 |  | 4.70 - | 6.10 | M/uL |
| HEMOGLOBIN | 15.59 |  | 12.00 - | 18.00 | g/dL |
| HEMATOCRIT | 48.4 |  | 40.0 - | 54.0 | % |
| MCV | 94 |  | 80 - | 99 | fL |
| MCH | 30.20 |  | 27.00 - | 34.00 | pg |
| MCHC | 32.2 |  | 31.0 - | 36.0 | g/dL |
| RDW | 11.4 |  | 11.0 - | 14.0 | % |
| PLATELETS | 255 |  | 140 - | 450 | K/uL |

```
PRINT: 12/06/21 09:23  HARRIS AMMAR                       024 Page:   2 CONTINUED
```

LEGEND:  L-Low, H-High, C-Critical, A-Abnormal, *E-Error

RECEIVED 12/08/2021 05:27PM 7026654120    SGRO ROGER
12/08/2021 WED 17:19  FAX 7752894206 Medical Records                    ⊠022/053

```
PRINT DATE: 12/06/21 024          WILLIAM BEE RIRIE HOSPITAL                    PAGE   3
MEDICAL DIRECTOR                         1500 AVENUE H                       CLIA NUMBER
DANIEL NOCKLER, MD                       ELY, NEVADA 89301                   29D0711765
    TIME:  9:23                    LABORATORY              -- COMPARATIVE REPORT

NAME..: HARRIS AMMAR              SEX.,.....: M                  ATTENDING: ROLLINS DANIEL MD
ACCT#: 10273598                  AGE.......: 35 Y               SECOND...:
ROOM.: ER02  DISCH 08/28/20 - NO PENDING ORDERS   DOB.......: 03/31/1986    PRIM CARE.:WILLIAM BEE RIRIE HOSPIT
                                 PAT. PHONE: 7752898000
ADMIT: 08/28/20                  MR#.......: 154965 ·
```

## HEMATOLOGY

|          | 08/28/20<br>1040 | | REFERENCE<br>RANGE | UNITS |
|----------|------|--|-------|-------|
| MPV      | 7.3  | | 6.6 -  12.2 fL | |
| %NEUT    | 83   | | | % |
| %LYMPH   | 11   | | | % |
| %MONO    | 5    | | | % |
| %EOS     | 0    | | | % |
| %BASO    | 1    | | | % |
| #NEUT    | 8.04 | | 1.50 -  9.50 K/uL | |
| #LYMPH   | 1.06 L | | 1.50 -  5.00 K/uL | |
| #MONO    | 0.51 | | 0.10 -  1.00 K/uL | |
| #EOS     | 0.02 | | 0.00 -  0.30 K/uL | |
| #BASO    | 0.06 | | 0.00 -  0.20 K/uL | |

## URINALYSIS

|              | 08/28/20<br>1115 | | REFERENCE<br>RANGE | UNITS |
|--------------|--------|--|-------|-------|
| COLOR        | YELLOW | | NORMAL: Straw | |
| CLARITY      | CLEAR  | | NORMAL: Clear | |
| SPEC GRAVITY | >=1,030 A | | 1.005 - 1.020 | |
| pH           | 5.0    | | 5.5 - 7.5 | |
| GLUCOSE      | NEGATIVE | | NORMAL: Negative | |
| BILIRUBIN    | NEGATIVE | | NORMAL: Negative | |
| KETONE       | NEGATIVE | | NORMAL: Negative | |
| PROTEIN      | TRACE  | | NORMAL: Negative | |
| NITRITE      | NEGATIVE | | NORMAL: Negative | |
| BLOOD        | LARGE A | | NORMAL: Negative | |
| LEUK EST     | NEGATIVE | | NORMAL: Negative | |
| UROBILINOGEN | 0.2    | | 0.2 - 2.0 | |
| MICROSCOPIC  | See Below | | | |
| WBC          | None Seen | | NORMAL: None Seen | |
| RBC          | 10 - 20 A | | NORMAL: None Seen | |
| EPITHELIAL   | 0-10 /hpf | | NORMAL: None Seen | |
| BACTERIA     | None Seen | | NORMAL: None Seen | |
| MUCOUS       | 3+ A   | | NORMAL: None Seen | |
| CASTS        | See Below | | | |
| HYALINE CAST | 1-3/lpf A | | NORMAL: None Seen | |
| COARSE GRAN  | 0-1/lpf A | | NORMAL: None Seen | |
| FINE GRAN    | None Seen | | NORMAL: None Seen | |
| WBC CAST     | None Seen | | NORMAL: None Seen | |
| RBC CAST     | None Seen | | NORMAL: None Seen | |
| WAXY CAST    | None Seen | | NORMAL: None Seen | |
| FATTY CAST   | None Seen | | NORMAL: None Seen | |
| CRYSTALS     | None Seen | | | |

PRINT: 12/06/21 09:23 **HARRIS AMMAR**                        024 Page:    3 CONTINUED

LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E-Error

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:19  FAX 7752894206 Medical Records                    @023/053

```
PRINT DATE: 12/06/21 024          WILLIAM BEE RIRIE HOSPITAL                     PAGE   4
MEDICAL DIRECTOR                        1500 AVENUE H                           CLIA NUMBER
DANIEL MOCKLER, MD                     ELY, NEVADA 89301                        29D0711765
     TIME:  9:23                 LABORATORY            -- COMPARATIVE REPORT

NAME.: HARRIS AMMAR              SEX.......: M               ATTENDING: ROLLINS DANIEL MD
ACCT#: 10273598                 AGE.......: 35 Y            SECOND...:
ROOM.: ER02  DISCH 08/28/20 - NO PENDING ORDERS  DOB......: 03/31/1986   PRIM CARE.:WILLIAM BEE RIRIE HOSPIT
                                PAT. PHONE: 7752898800
ADMIT: 08/28/20                 MRJ.......: 154965
```

## URINALYSIS

|  | 08/28/20 |  |  | REFERENCE RANGE | UNITS |
|---|---|---|---|---|---|
|  | 1115 |  |  |  |  |
| TRICHOMONAS | ABSENT |  |  | NORMAL: None Seen |  |
| BUDDING YEAS | ABSENT |  |  | NORMAL: None Seen |  |
| SOURCE: | CLEAN CATCH |  |  |  |  |

## REFERENCE LAB

```
  --ORDERED--      --COLLECTED--    --REC'D--    --RESULTED--    --VERIFIED--
   8/28/20 1205    8/28/20 1115   8/28/20 1121  9/07/20 1458   9/07/20 1458
   KCP             .RN            JNC           ACQ            ACQ

        CULTURE URINE
           "IN PROGRESS,REPORT TO FOLLOW"




        DIAGNOSIS:           R

        Reference Laboratory reports may not be altered.
```

```
PRINT: 12/06/21 09:23  HARRIS AMMAR                              024 Page:  4    LAST
                 LEGEND: L-Low, H-High, C-Critical, A-Abnormal, *E-Error
```

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:19 FAX 7752894206 Medical Records          @024/053

**City of Ely Fire Department**
Patient Care Record
Name: HARRIS, AMAR                    Incident #: 200828-0943-ELYEMS     Date: 08/28/2020     Patient 1 of 1

## Patient Information

| | |
|---|---|
| HARRIS | 4569 N State Route 490 |
| AMAR | |
| | Ely |
| Male | NV |
| 03/31/1986 | 89301 |
| 34 Yrs, 4 Months, 28 Days | US |
| 200.0lbs - 90.7kg | 7752808800 |
| | Hispanic or Latino |
| 120700395 | |
| Black or African American | |

## Clinical Impression

Injury of Head
Injury of Face
Head Trauma
Head

Head Injuries

Moderate
Injuries - Injury to head
Injuries - Injury to face
Assault - Assault by sharp object (stabbing)
- Police/Jail - 08/28/2020

Trauma
Uncooperative
None Reported

Emergent (Yellow)

## Medication/Allergies/History

| Medications | Unable to Obtain - Patient Refused |
|---|---|
| Allergies | Unable to Obtain - Patient Refused |
| History | Unable to Obtain - Patient Refused |

## Vital Signs

| Time | AVPU | | | BP | | Pulse | | RR | | SpO2 | | | Temp | | | GCS | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09:00 | Voice | L | Lay | 121/98 A | 104 R | 24 R | 99 Ox | | 121 | 98.6 F/TY | | 0 | E=3+1+4 | .10 |
| 09:10 | Voice | L | Lay | 119/73 A | 97 R | 24 R | 98 Ox | | | | | 0 | E=3+1+4 | .10 |
| 09:45 | Voice | L | Lay | 113/73 A | 103 R | 20 R | 98 Ox | | | | | 0 | a=3+1+4 | 10 |

## ECG

| Time | Lead | Rhythm |
|---|---|---|
| 09:00 | 3-Lead | Sinus Rhythm |
| 09:10 | 3-Lead | Sinus Rhythm |
| 09:45 | 3-Lead | Sinus Rhythm |

## Flow Chart

| Time | Intervention | Detail | Provider |
|---|---|---|---|
| 08:58 | ALS Assessment | Patient Response: Unchanged; Successful; Complication: None; | PEREA, VICTORIA |
| 09:00 | Oxygen | Non Re-breather Mask (NRB); Flow Rate 15 lpm; Cohissants Prison nursing staff placed the patient on oxygen prior to our arrival; Patient Response: Improved; Successful; Complication: None; | PEREA, VICTORIA |
| 09:05 | IV Therapy | 18 ga; Antecubital-Left; Patient Response: Unchanged; Unsuccessful; Complication: None; | PEREA, VICTORIA |
| 09:07 | IV Therapy | 18 ga; Antecubital-Right; Patient Response: Unchanged; Unsuccessful; Complication: None; | PEREA, VICTORIA |
| 09:09 | IV Therapy | 20 ga; Hand-Left; Normal Saline (.9% NaCl); Total Fluid 80 ml; Patient Response: Improved; Successful; Complication: None; | PEREA, VICTORIA |

## Initial Assessment

| Category | Location | Detail | | |
|---|---|---|---|---|
| Mental Status | | | + | Combative |
| | | | - | Event Oriented, Person Oriented, Place Oriented, Time Oriented |
| Skin | | | | No Abnormalities |
| HEENT | Patient was uncooperative and would not answer questions | | + | Other, Swelling |
| | | Head/Face | + | Left: Dilated |
| | | Eyes | | Left: Blind, Left: Constricted, Left: Non-Reactive, Left: Other, Right: Blind, Right: Constricted, Right: Dilated, Right: Non-Reactive, Right: Other |
| | | Neck/Airway | | No Abnormalities |

Run Number: 200828000B
Patient Number: 10273918
Page 1 of 4
08/28/2020 16:18:12
Template Version: PCR-WEB-1.3.0
Data Version: 00020-00800000051B4CD6

RECEIVED 12/08/2021 05:27PM 7026654120     SGRO ROGER
12/08/2021 WED 17:19 FAX 7752894206 Medical Records                    ☒025/053

**City of Ely Fire Department**
Patient Care Record
Name: HARRIS, AMAR                 Incident #: 200828-0943-ELYEMS     Date: 08/28/2020     Patient 1 of 1

## Initial Assessment

| | | |
|---|---|---|
| Chest | Chest | No Abnormalities |
| | Heart Sounds | No Abnormalities |
| | Lung Sounds | LL: Clear, LU: Clear, RL: Clear, RU: Clear / LL: Absent, LL: Decreased, LL: Rales, LL: Rhonchi, LL: Wheezing, LU: Absent, LU: Decreased, LU: Rales, LU: Rhonchi, LU: Wheezing, RL: Absent, RL: Decreased, RL: Rales, RL: Rhonchi, RL: Wheezing, RU: Absent, RU: Decreased, RU: Rales, RU: Wheezing, RU: Rhonchi |
| Abdomen | General | No Abnormalities |
| | Left Upper | Distension, Guarding, Mass, Tenderness |
| | Right Upper | Distension, Guarding, Mass, Tenderness |
| | Left Lower | Distension, Guarding, Mass, Tenderness |
| | Right Lower | Distension, Guarding, Mass, Tenderness |
| Back | Cervical | No Abnormalities |
| | Thoracic | No Abnormalities |
| | Lumbar/Sacral | No Abnormalities |
| Pelvis/GU/GI | | No Abnormalities |
| Extremities | Left Arm | No Abnormalities |
| | Right Arm | No Abnormalities |
| | Left Leg | No Abnormalities |
| | Right Leg | No Abnormalities |
| | Pulse | Not Assessed |
| | Capillary Refill | Not Assessed |
| Neurological | Neurological | No Abnormalities |

Assessment Time: 08/28/2020 08:57:00

### Narration
Ely EMS was called to Ely State Prison for a patient who had been involved in a fight. Upon arrival all appropriate PPE precautions were taken and contact was made with the patient who was laying supine, patient was responsive to verbal stimuli but refused to give any information on what happened. Prison nursing staff informed us he had been in an altercation with loss of consciousness, with injuries to the top of the head. A rapid assessment showed a one inch laceration to the top-left side of his head and a one inch laceration to the left side of his face, all bleeding had been controlled at this time. At this point the patient was moved into the ambulance. The patient's vitals were taken which showed a lowered blood pressure, two IV attempts were made both unsuccessful, and third attempt was made in the had which was successful, Normal Saline was given, bringing the patient's blood pressure up. Enroute to the hospital, patient vitals were monitored and a full assessment showed another one inch laceration to the bottom of the lower jaw, and blood in the patient's nose. The wounds were cleaned up and covered. Upon arrival at WPRH a full report was given and patient care was transferred. Rescue 6 was cleaned, restocked, and placed back into service.

## Specialty Patient - Outbreak Screening

| | COVID-19 |
| | None. |
| No | | Travel End Date |
| No | | |
| No | | No |
| | | No |

## Incident Details / Destination Details / Incident Times

| Incident Details | | Destination Details | | Incident Times | |
|---|---|---|---|---|---|
| | Police/Jail | | Transported No Lights/Siren | | 08:38:47 |
| | Ely State Prison | | Closest Facility | | 08:38:57 |
| | 4569 N State Route 490 | | WILLIAM BEE RIRIE HOSPITAL | | 08:39:28 |
| | | | Law Enforcement | | 08:41:43 |
| | Ely | | Hospital | | |
| | White Pine | | Emergency Room | | |
| | NV | | 1500 Avenue H | | 08:55:97 |

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:20 FAX 7752894206 Medical Records                    ☑026/053

## City of Ely Fire Department
Patient Care Record

| Name: HARRIS, AMAR | | Incident #: 200828-0243-ELYEMS | Date: 08/28/2020 | Patient 1 of 1 |
|---|---|---|---|---|

**Incident Details**

| | | | | | |
|---|---|---|---|---|---|
| | 89301 | | Ely | | 08:35:50 |
| | Rescue 6 | | White Pine | | 08:27:26 |
| | Rescue 6 | | Nevada | | 09:53:21 |
| | 911 Response | | 89301 | | 09:53:40 |
| | Emergent | | City of Ely | | 10:18:43 |
| | AC-2 (B) Shift | | Improved | | |
| | Lackawanna | | | | |
| | Advanced Life Support | | | | |
| | Assault | | | | |
| | Priority 3 (lower Acuity) | | | | |

**Crew Members**

| | | | |
|---|---|---|---|
| PEREA, VICTORIA | Lead | 2009 Advanced Emergency Medical Technician(AEMT) (Nevada) - 73400) NREMT-Advanced Emergency Med Tech - A2040 |
| TILBY, MICHAEL | Driver | 2009 Advanced Emergency Medical Technician(AEMT) (Nevada) - 14814 |
| PENA, SEAN | Other | NREMT-Advanced Emergency Med Tech - A2032234 |

**Insurance Details**

| | | | | | |
|---|---|---|---|---|---|
| | Other Relationship | | | | Immediate |
| | | | | | |
| | 4550 N State Route 490 | | Other Insurance | | |
| | | | Nevada Dept. of Corrections | | |
| | | | 1207003535 | | |
| | Ely | | | | |
| | NV | | | | |
| | 89301 | | | | |
| | US | | | | |

**Mileage / Delays / Additional Agencies**

| Mileage | | Delays | | Additional Agencies |
|---|---|---|---|---|
| 1.0 | | Dispatch Delays | None/No Delay | |
| 3.3 | | Response Delays | None/No Delay | |
| 2.3 | Geo-verified | Scene Delays | None/No Delay | |
| | | Transport Delays | None/No Delay | |
| | | Turn Around Delays | None/No Delay | |

**Next of Kin**

| | | | | |
|---|---|---|---|---|
| | | | | Country: US |

**Consumables**

| | | | | | |
|---|---|---|---|---|---|
| Consumable Supplies Foal Gurney sheath, etc. | 1 | 3-Lead Cardiac Monitoring | 1 | Oxygen Treatment | 1 |
| Glucometer Testing | 1 | Intravenous Therapy | 1 | Small Gloves | 2 |
| Medium Gloves | 1 | Large Gloves | 2 | Normal Saline | 1 |
| IV Catheter 18g | 2 | IV Catheter 20g | 1 | | |

**Personal Items**

| | |
|---|---|
| None | |

**Patient Transport Details**

| | Stretcher | | Stretcher |
|---|---|---|---|
| | Supine | | Improved |

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:20  FAX 7752894206 Medical Records                    ☑027/053

## City of Ely Fire Department
### Patient Care Record

| Name: HARRIS,AMAN | | Incident #: 200828-0843-ELYEMS | Date: 08/28/2020 | Patient 1 of 1 |
|---|---|---|---|---|

**Transfer Details**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | ALS, Level 1 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Emergency, Immobilized, Reduced Mobility, Stretcher | | | |

Run Number: 200828000
Patient Number: 10273598

08/28/2020 16:18:12
Template Version: PCR-WEB-1.3.0
Data Version: 00020-0000000005184GDS

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:21 FAX 7752894206 Medical Records                    ☑028/053

## PATIENT TRANSFER ORDER

| PATIENT NAME Harris Ammar | PHYSICIAN Rollins, Daniel |
|---|---|

I direct that this patient be transferred consistent with these instructions.

| DESTINATION HOSPITAL UMC | _(obscured)_ |
|---|---|
| ACCEPTING PHYSICIAN Dr. J. Pascoe | ☐ AVAILABLE SPACE CONFIRMED  ☐ CONFIRMED BY  ☐ APPROPRIATE PERSONNEL CONFIRMED |

**MODE OF TRANSFER**

- ☐ Ambulance / ALS
- ☐ Ambulance / BLS
- ☐ Helicopter
- ☐ ALS Fixed Wing

**REQUIRED LIFE SUPPORT EQUIPMENT**

(ACLS)    PALS    Capability

**REQUIRED PERSONNEL TO ACCOMPANY PATIENT**

E.M.S.    (R.N.)

**MEDICAL ORDERS**

Questions: Call 775-269-3001 for assistance.
( ) Medication list / Medication reconciliation provided.

Radio contact is to be maintained during transfer, with on-line medical direction over the patient's care to be exercised by:

- ☐ This hospital
- ☐ Destination hospital
- ☐ Other _____

**COPIES OF ALL MEDICAL RECORDS TO ACCOMPANY PATIENT** Including tests, orders, consents, certification, and radiographic studies.

Date _____   Time 11:30 Am

_____
Physician Signature

COPIES: WHITE __ PATIENT RECORD
         YELLOW __ TRANSFERRED WITH PATIENT
         PINK __ RISK MANAGEMENT

IMPRINT PATIENT IDENTIFICATION

```
10273599 IM: MA02  154966     F/E-N/N
HARRIS AMMAR          M  34
4389 N ST RTE 490     XLV        , NV
ROLLINS DA            ROLLINS DA
WILLIAM BE    08/28/20 B/D 03/31/86
```

2/14

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER

12/08/2021 WED 17:21  FAX 7752894206 Medical Records                    ☑029/053

## ER PHYSICIAN'S CERTIFICATE FOR TRANSFER

I hereby certify that based upon the information available to me at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical care at another medical facility outweighs the increased risk to the individual, and in the case of labor, to the unborn child, from effecting the transfer.

THIS CERTIFICATION IS BASED UPON THE FOLLOWING:

BENEFITS: Specialty care, advanced diagnostics & procedural capability.

RISKS: Needed diagnostic ability, other resources and/or services not available at William Bee Ririe Hospital increasing risk for poor patient outcome. Risks associated with transfer e.g., plane crash.

All transfers have the inherent risks of traffic delays, accidents during transport, inclement weather, rough terrain or turbulence, and the limitations of equipment and personnel present in the vehicle.

PHYSICIAN NAME _____ DATE _8/28/20_ TIME _11:39_

PHYSICIAN SIGNATURE _____

NO PHYSICIAN PRESENT

NURSE'S SIGNATURE _____

On verbal orders of Dr. _____
received at _____ on _____

PHYSICIAN MUST COUNTERSIGN WITHIN 24 HOURS

## CONSENT TO TRANSFER

I hereby consent to transfer to another medical facility. I understand that it is the opinion of the physician responsible for my care that the benefits of transfer outweigh the risks of transfer. I have been informed of the risks and benefits upon which this transfer is being made. I have considered these risks and benefits, and consent to transfer.

_Patient unable to sign_ (can't sign)

Signature of Patient or Responsible Person

DATE _____ TIME _11:17_

WITNESS _Mary Bauer_

COPIES: WHITE - PATIENT RECORD
YELLOW - TRANSFERRED WITH PATIENT
PINK - RISK MANAGEMENT

IMPRINT PATIENT IDENTIFICATION

10273598 RM: ER02  154365        P/T-B/R
KANXIS ANOAR            M    34
4369 N ST RTE 490       ELY           , NV
ROLLING DA        ROLLING DA
WILLIAM BE    08/28/20  E/D 03/93/86

9/14

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:21  FAX 7752894206 Medical Records                    ☒030/053

**William Bee Ririe Hospital**
**1500 Avenue H**
**Ely, NV 89301**
**(775) 289-3001**

## Radiology Report

THIS INTERPRETATION IS BASED ON THE RADIOLOGICAL EXAMINATION AND CORRELATION WITH CLINICAL
EXAMINATION IS MANDATORY

| | |
|---|---|
| **Patient:** | Harris Ammar(M) |
| **Reason for Visit:** | |
| **Study Ref:** | 330827420200828 |
| **Date of Birth:** | Mar-31-1986 |
| **Patient Number:** | 10273598 |
| **Referring MD:** | ROLLINS DANIEL, MD |
| **Referring MD phone:** | |
| **Modality Type:** | CT |
| **Institution:** | William Bee Ririe Hosp |
| **Exam Date:** | Aug-28-2020 10:31am |
| **Exam Type:** | CT HEAD SCAN WO CONTRAST |

**Technique**
CT scan of head without contrast. Coronal and sagittal reconstructed images obtained.

**History**
Intra-cranial hemorrhage. Cerebrovascular accident.

**Findings**
Images demonstrate there is a large acute intraparenchymal hemorrhage in the left frontal
lobe. There is acute hemorrhage along the falx within the midline. There is mild shift of the
midline structures to the right. There is an acute fracture in the left parietal bone, anteriorly
with a depressed fracture fragment. There is a metallic foreign body at the far inferior aspect
of the right frontal lobe.

**Impression**
There is an acute depressed fracture in the left parietal bone, anteriorly. There is depression
of the fracture fragment by approximately 5 mm. There is some overlying soft tissue
swelling. There is a large acute intraparenchymal hemorrhage involving the left frontal lobe.
There is acute hemorrhage along the falx within the midline. There is a metallic foreign body
at the far inferior aspect of the right frontal lobe within the bone at the superolateral aspect of
the right orbit.

Findings discussed with Dr. Rollins at 11:12 AM 8/28/20.

https://medweb.wbrhely.org/wavelet/reports.cgi?opcode=download&ruid=49/0020;000d_1-3-46-670589...  08/29/2020

DIGITAL SIGNATURE

Signer name: Eric Goldberg
Organization: William Bee Ririe Hospital
Signed: 2020/08/28.11:12:29

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:21 FAX 7752894206 Medical Records                    ☑032/053

## Intermountain
### Laboratory Services

Intermountain Central Laboratory
5252 South Intermountain Drive
(801) 507-2110

| PATIENT NAME | DOB | GENDER | SOCIAL SECURITY |
|---|---|---|---|
| Harris, Ammar | 03/01/1968 | M | |
| MEDICAL RECORD/EMPI # | ACCOUNT # | HOME PHONE | WORK PHONE |
| 047090095 | 1233890095 | | |
| PHYSICIAN | ACCESSION # | COLLECTED | PRINTED |
| Unknown, Physician | F1468095 | 09/28/2020 14:16 | 09/07/2020 14:03 |
| PRACTICE NAME | | | CHART# |
| William Bee Ririe Medical Center | | | 047090095 |

| DIAGNOSTIC PROCEDURE | RESULTS IN RANGE | OUT OF RANGE | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| **Microbiology** | | | | |

**CULTURE,URINE**
RESULT
No Growth 2 Days

RESULT
Performed at Intermountain Central Laboratory, Murray, Utah

Reviewed by:

RECEIVED 12/08/2021 05:27PM 7026654120                SGRO ROGER
12/08/2021 WED 17:21  FAX 7752894206 Medical Records              ☑033/053

NOTES

4/28/20 Called to ER to intubate pt w/ head injury. 20mg Etomidate,
1140  50 mg Rocuronium 100 mcg Fentanyl used w/ RSI. Pt tolerated
      well + VS stayed... WNL ...charted on nursing record
      7.5 ETT passed on 1st attempt w/ complete G. view
      laryngoscope - 22 cm @ teeth _____ cu/A
                                    Ros. Costello

10273598 AM- RM02  154985        F/T-X/R
HARRIS ABRAM           M.  34
-4369 N ST RTE 490      ELY         , NV
ROLLINS DA       ROLLINS DA
WILLIAM BE       04/28/20. B/D 05/31/86

**PROGRESS NOTES**

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:21  FAX 7752894206 Medical Records                    ☑034/053

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WILLIAM BEE RIRIE HOSPIT | 2 | | | | 3a PAT. CNTL # 10273598001DB3 | | 4. TYPE OF BILL 0131 |
| 1500 AVE H | | | | | b. MED. REC # 154965 | | |
| ELY            NV 893012615 | | | | | 5 FED. TAX NO. 880115812 | 6 STATEMENT COVERS PERIOD FROM 082820 THROUGH 082920 | 7 |
| 775-289-3467 | | 8 PATIENT ADDRESS a | 4569 N ST RTE 490 | | | | |
| b PATIENT NAME a | | b ELY | | | c NV | d 89301 | e |
| HARRIS AMMAR | | | | | | | |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR | 14 TYPE | 15 SRC | 16 DHR | 17 STAT | 18 | 19 | 20 | CONDITION CODES 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03311986 | M | 082020 | 10 | L | 1 | 12 | 02 | | | | | | | | | | | | | |

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE SPAN CODE FROM THROUGH | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
|---|---|---|---|---|---|---|
| 11 082820 | | | | | | |

| 38 | | | 39 VALUE CODES CODE AMOUNT | 40 VALUE CODES CODE AMOUNT | 41 VALUE CODES CODE AMOUNT |
|---|---|---|---|---|---|
| HARRIS AMMAR | | a | 05 114400 | | |
| 4569 N ST RTE 490 | | b | | | |
| ELY            NV 89301 | | c | | | |
| | | d | | | |

| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 0258 | IV SOLUTIONS | | 082820 | 2 | 14400 | | |
| 0260 | IV HYDRATION EACH ADDL H | 96361 | 082820 | 1 | 19900 | | |
| 0260 | THERAPEUTIC IV INJ - IVP | 96374 | 082820 | 1 | 30400 | | |
| 0301 | LIPASE | 83690 | 082820 | 1 | 8000 | | |
| 0301 | ALCOHOL BLD | 80320 | 082820 | 1 | 15700 | | |
| 0301 | COMPREHENSIVE METABOLIC | 80053 | 082820 | 1 | 31500 | | |
| 0302 | URINE DRUG SCREEN PANEL* | 80306 | 082820 | 1 | 68900 | | |
| 0305 | CBC W/AUTO DIFF | 85025 | 082820 | 1 | 15700 | | |
| 0307 | .URINALYSIS W/MICRO | 81001 | 082820 | 1 | 8400 | | |
| 0324 | CHEST 1V | 71045TC | 082820 | 1 | 30900 | | |
| 0351 | CT HEAD SCAN WO CONTRAST | 70450TC | 082820 | 1 | 162000 | | |
| 0351 | CT SINUSES FACIAL AXIAL | 70486TC | 082820 | 1 | 162800 | | |
| 0352 | CT CERV SPINE WO CONTRAS | 72125TC | 082820 | 1 | 191300 | | |
| 0450 | EMERG ROOM | 9929125 | 082820 | 1 | 424300 | | |
| 0450 | EMERG ROOM | 31500 | 082820 | 1 | 000 | | |
| 0636 | LEVETIRACETAM INJ 100MG/ | J1953 | 082820 | 2 | 32000 | | |
| 0636 | FENTANYL INJ AMP 50 MCG | J3010 | 082820 | 1 | 1000 | | |
| 0636 | KETAMINE HCL  INJ 50 MG | J3490 | 082820 | 1 | 4800 | | |

| 0001 | PAGE 01 OF 01 | | CREATION DATE 090320 | TOTALS ➡ | 1221900 | |
|---|---|---|---|---|---|---|

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL. INFO | 53 ASG. BEN. | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI 1487648804 |
|---|---|---|---|---|---|---|
| NV DEPT OF CORRECTIONS | 880115812 | Y | Y | | 1221900 | 57 OTHER 880115812 PRV ID |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| HARRIS AMMAR | 18 | 120703535 | | 1116547 |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME |
|---|---|---|
| | 0110092050679 | UNEMPLOYED |

| 66 DX | 67 S06309A | A S020XXA | B R4020 | C R29818 | D S0192XA | E S0101XA | F G0121XA | G S01312A | H |
|---|---|---|---|---|---|---|---|---|---|
| | I | J | K | L | M | N | O | P | Q |

| 68 ADMIT DX | 69 S06309A | 70 PATIENT REASON DX | a | b | c | 71 PPS CODE | 72 ECI | a | X998XXA | b Y92149 | c | 73 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 74 PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI 1417018045 QUAL 0B 880115812 |
|---|---|---|---|---|
| | | | | LAST ROLLINS FIRST DANIEL |
| c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI QUAL |
| | | | | LAST FIRST |
| 80 REMARKS NV DEPT OF CORRECTI | 81CC B3 208D00000X | | 78 OTHER NPI QUAL |
| C/O HOMETOWN HEALTH | a | | LAST FIRST |
| PO BOX 981/03 | b | | 79 OTHER NPI QUAL |
| EL PASO TX 79998 | c | | E/B |

UB-04 CMS-1450          APPROVED OMB NO. 0938-0997                THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:22  FAX 7752894206 Medical Records                    Ø035/053

```
12/06/21              WILLIAM BEE RIRIE HOSPITAL                    PAGE 1
09:17 Monday          PATIENT ACCOUNT DETAIL 10273598 HARRIS ANWAR       R5ARDET


                      WILLIAM BEE RIRIE HOSPITAL
                      1500 AVE H
                      ELY                      NV 89301-2615
                      PHONE: 775-289-3467 TAX ID: 880115912

PATIENT---------------------------------       BILLING INFORMATION-----------
  NUM/NAME-: 10273598 HARRIS ANWAR                CREDIT----:              HOSP ORG.: 084
  SEX-----: M                                     BILL------:              FINAL ORG.:
  BIRTH----: 03/31/1986                           CYCLE-----: 1
  DOCTOR---: 500496 ROLLINS DA                    STAY TYPE-: 3  E/R
  MARITAL--: S                                    SERVICE---: ER
  SOC.SEC.-:                                       INSURANCE-: D83 NV DEPT OF CORRECTIONS   -O/P

GUARANTOR-------------------------------       ADMISSION------------------
  NAME-----: NDOC C/O HOMETOWN NEAL                DATE------: 08/28/20
  ADDRESS--: 4569 N ST RTE 490                     CODE------: E

        ELY              NV                     DISCHARGE-----------------
        89301                                     DATE------: 08/28/20    DAY STAY
  PHONE---: 7752896800                             CODE------: X   02/20


 A/R     SERV  TYPE SR 1  CHG/REC                                              ACCT
 DATE    DATE  TRAN TC C  NUMBER  QTY DESCRIPTION         CHARGE    CREDIT   BALANCE   CPT
----------------------------------------------------------------------------------------------
08/28/20       CHG  3BR2 3093690  1.00 LIPASE               88.00               88.00 83690
08/28/20       CHG  3BR2 3082056  1.00 ALCOHOL BLD         157.00              245.00 80320
08/28/20       CHG  3BR2 3080063  1.00 COMPREHENSIVE METABOLIC 315.00          560.00 80053
08/28/20       CHG  3BR2 3085025  1.00 CBC W/AUTO DIFF     157.00              717.00 85025
08/28/20       CHG  3BR2 2400456  1.00 LIDOCAINE W/ EPI  INJ 10MG/ML  21.00    738.00 J2490
08/28/20       CHG  3BR2 3080336  1.00 URINE DRUG SCREEN PANEL      609.00   1,427.00 80306
08/28/20       CHG  3BR2 2401139  2.00 LEVETIRACETAM INJ 100MG/ML (SWL) 320.00 1,747.00 J1953
08/28/20       CHG  3BR2 2400303  1.00 FENTANYL INJ ANJ 50 MCG ML 2 ML  10.00 1,757.00 J3010
08/28/20       CHG  3BR2 2400456 -1.00 LIDOCAINE W/ EPI  INJ 10MG/ML        21.00 1,736.00 J2490
08/28/20       CHG  3BR2 2400413  1.00 KETAMINE HCL  INJ 50 MG ML  10 ML  45.00 1,781.00 J3490
08/28/20       CHG  3BR2 2561012  1.00 SOD CHLOR 0.9%  500ML         72.00   1,853.00 J9740
08/28/20       CHG  3BR2 3081021  1.00 URINALYSIS W/MICRO           84.09   1,937.00 81001
08/28/20       CHG  3BR2 3020004  1.00 URINALYSIS PANEL              .00     1,937.00
08/28/20       CHG  3BR2 2561011  1.00 SOD CHLOR 0.9% 1000ML         72.00   2,009.00 J7030
08/28/20       CHG  3BR2 6001590  1.00 INTUBATE                      .00     2,009.00
08/28/20       CHG  3BR2 3570450  1.00 CT HEAD SCAN WO CONTRAST    1,620.00  3,629.00 70450TC
08/28/20       CHG  3BR2 3570486  1.00 CT SINUSES FACIAL AXIAL     1,622.00  5,251.00 70486TC
08/28/20       CHG  3BR2 3572125  1.00 CT CERV SPINE WO CONTRAST   1,913.00  7,164.00 72125TC
08/28/20       CHG  3BR2 3371010  1.00 CHEST 1V                     309.00   7,473.00 71045TC
09/02/20 08/28/20 CHG 3BR2 296361 1.00 IV HYDRATION EACH ADDL HR   199.00   7,672.00 96361
09/02/20 08/28/20 CHG 3BR2 296374 1.00 THERAPEUTIC IV INJ - IVP    304.00   7,976.00 96374
09/02/20
         08/28/20 CHG 3BR2 299291  1.00 CRITICAL CARE FIRST HR     873.00   8,849.00 99291
                                        CRITICAL CARE
09/02/20 08/28/20 CHG 3BR2 299291  1.00 CRITICAL CARE FIRST HR     873.00   8,849.00 99291
09/02/20 08/28/20 CHG 3BR2 499291  1.00 CRITICAL CARE FIRST 30-47 MIN 2,515.00 11,364.00 99291
09/02/20 08/28/20 CHG 3BR2 231601  1.00 INTUBATION, ENDOTRACHEAL ER PROCEDU 588.00 11,952.00 31500
09/02/20                                INTUBATION EN
         08/28/20 CHG 3BR2 231500  1.00 INTUBATION ENDOTRCHEAL EMERGENCY PR 267.00 12,219.00 31500
09/07/20 08/28/20 CHG 3BR2 3087086 1.00 CULTURE URINE              128.00   12,347.00 87086
11/23/20          PAY  ER  432964      D83 NV DEPT OF CORRECTIONS   -O/P         12,219.00   128.00

                    AR BALANCE.......................128.00
```

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:22  FAX 7752894206 Medical Records                    ☑036/053

```
12/06/21               WILLIAM BEE RIRIE HOSPITAL                        PAGE  2
08:17 Monday           PATIENT ACCOUNT DETAIL 10273595 HARRIS AMZAR      H5ARDET


                       WILLIAM BEE RIRIE HOSPITAL
                       1500 AVE H
                       ELY                    NV 89301-2615
                       PHONE: 775-289-3467 TAX ID#: 880115812


********************* CHARGE SUMMARY *********************
SUMMARY                                        DAYS NEC-
 CODE  DESCRIPTION                AMOUNT  DAYS  NECESSARY   UNITS
 36    EMERG ROOM                3,183.00                    2.00
 3I    IV THERAPY                  503.00                    2.00
 45    IV SOLP/IOMB                144.00                    2.00
 53    LAB IMMUNOLOGY              648.00                    1.00
 54    LAB/BACTO-MICRO             126.00                    1.00
 56    LAB/CHEMISTRY               960.00                    3.00
 57    LAB/HEMOTOLOGY              157.00                    1.00
 58    LAB/UROLOGY                  84.00                    1.00
 61    CT SCAN/HEAD              3,242.00                    2.00
 62    CT SCAN/BODY             1,913.00                    1.00
 7A    OX XRAY/CHEST               305.00                    1.00
 AN    DRUGS/DETAIL CODE           375.00                    4.00
 SL    PROF FEES E/R             1,140.00                    2.00
              TOTAL CHARGES.........12,347.00
              TOTAL ADJUSTMENTS..........0.00
              LESS PAYMENTS.........12,219.00
              AR BALANCE..............128.00
```

RECEIVED 12/08/2021 05:27PM 7026654120 SGRO ROGER
12/08/2021 WED 17:22 FAX 7752894206 Medical Records @037/003

08/28/2020  10:34        7752891268              ESP MEDICAL              PAGE  02/12

                    Nevada Department of Corrections                    Page 1 of 2
28/2020· 10:10          TRAL ADMINISTRATION                              OIRHSOAP
'ONES                 PATIENT MEDICAL RECORDS:                         6.04.4.2 NVSTDOC

            ID# : 0001116547        NAME: AMMAR HARRIS

PAPE NOTE STATUS: Complete:Y    , Completed Date: 08/28/2020    Completed By: DAJONES

| ATE | TIME | ENCOUNTER CODE LOCATION | PROVIDER | APPROVED BY | STATUS |
|------|------|--------------------------|----------|-------------|----------|
|      |      |                          |          |             | Appeared |
| 3/28/2020 | 09:30 | OCCUR | ELY STATE PRISON | JONES, | |

**SUBJECTIVE:**
...[DAJONES, 08/28/2020 10:09:57] Called to " Red Cow 2 " in Unit 1.

**OBJECTIVE:**
...[DAJONES, 08/28/2020 09:57:11] Active Medications: None
...[DAJONES, 08/28/2020 09:57:56] Vitals: .Pulse:80,RADIAL.Resp:28,BP Systolic:120,BP
diastolic:56,BP Position:

**ASSESSMENT:**
...[DAJONES, 08/28/2020 10:09:57] Inmate observed lying on floor on stomach/side. Profusely
bleeding laceration observed top/back of head. Skin flap laceration observed under left ear.
Small puncture wound with superficial laceration observed to side of left cheek outer corner of eye
with another smaller superficial laceration observed to the side of the first. Right outer nares
.aceration, Inmate in and out of consciousness. Skin cold and clammy to touch, lips cyanotic.
Inmate uncooperative, Reacts to verbal stimuli at times, Attempts to grasp when asked but can not
grasp, fingers unable to make a fist. Reacts to light to pupils, but pupils remain fixed.

**PLAN:**
...[DAJONES, 08/28/2020 09:57:08] NOTES: 9:57:08] AB 389
...[DAJONES, 08/28/2020 10:09:43] Pressure applied to head wound, AED applied. Cervical collar
and spinal board applied. Oxygen via non-rebreather mask @ 25L/min. Transported to local ER via
ambulance.

**EDUCATION:**

QUESTIONNAIRES LINKED TO THIS ENCOUNTER:

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:22 FAX 7752894206 Medical Records                          ☒038/053

08/28/2020 10:34    7752891208          ESP MEDICAL          PAGE 03/12

| DATE ORDERED | ORDERS<br>Leave no blank lines. Carry over orders must be signed and dated on each page. |
|---|---|
| 5/15/19<br>1445 | ① Dulcolax 5 mg ī po qd<br> prn constipation (KOP #10)<br> ② BP ✓ q wk × 3<br><br>Noted T Blac RN<br>5/15/19 @ 1730 |
| 3/4/2020 | Lidocaine 4% patch. Apply BID prn<br>#25 KOP)<br>T.O. Dr. Hanf / Jones<br>Noted 3/4/2020 1435 J. Jones |
| 8/28/2020<br>ESP | ① Transport patient to emergency room<br> by ambulance. J. Mullen RN<br>Noted J Mullen RN 8/28/20 @ 10:00 |

ALLERGIES: NKDA

NEVADA DEPARTMENT OF CORRECTIONS          NAME: Harris, Amanda
**PHYSICIAN'S ORDERS**                          Last          First     MI
(Signature of Physician shall follow each order)     ID# 1165 47



Definition: One of six clinics to which a patient may be assigned due to qualifying medical condition(s)

Criteria for Enrollment: The condition should be a <u>SERIOUS MEDICAL CONDITION</u> for which there is no known cure, which has been present for at least six (6) months, is expected to last for at least six months, and may benefit from the care of a practitioner (Physician, A.P.N., or P.A.) in order to help prevent deterioration of the patient's health.

Instructions: Email to UR Representative for entry into NOTIS.

| CHRONIC DISEASE CLINIC | MEDICAL DIAGNOSIS |
|---|---|
| Cardiovascular | HTN |
| Neurology | |
| Infectious Disease | |
| Endocrine | |
| Internal Medicine | |
| Pulmonary | |

Inmate Age: 3 1        Sex: M [X]  F [ ]        DOB: 3 / 31 / 86

Further explanation of medical diagnosis:
HTN

Requesting Physician Signature      (Print Name) Greg Martin        7 / 18 / 1 7
                                                                    Date

NEVADA DEPARTMENT OF CORRECTIONS       NAME: Harris , Ammar
                                              Last      First      MI
CHRONIC DISEASE CLINIC                 ID# 1165 47   LOCATION: ESP
ENROLLMENT FORM

Reference Medical Directive #447                          DOC 2689 (01/17)

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:22  FAX 7752894206 Medical Records                    ☑040/053

08/28/2020  10:34    7752891208              ESP MEDICAL                    PAGE  05/12
                              Nevada Department of Corrections      Date: 1-18-17


# CHRONIC DISEASE (CD) CLINIC FOLLOW-UP

Check all that apply

| ✓ | CD Clinic | Specific illness | ✓ | CD Clinic | Specific illness | ✓ | CD Clinic | Specific illness |
|---|-----------|------------------|---|-----------|------------------|---|-----------|------------------|
| ✓ | Cardiovascular | HTN | | Endocrine | | | Infectious Disease | |
| ✓ | Neurology | | | Internal Medicine | | | Pulmonary | |

## Current Medications (Name and Dosage)

### Subjective

| Asthma | | Infectious Disease | Y/N | Diabetes Mellitus | |
|--------|---|-------------------|-----|-------------------|---|
| # attacks in last month | | Nausea/ Vomiting | | # of hypoglycemic reactions since last visit | X |
| # short acting β agonist canisters in last month | X | abdominal pain | | | |
| | | diarrhea | | | |
| # of night time asthma symptoms/week | | rash | | Weight change since last visit | NO |
| Cardiovascular | Y/N | Other: | | Patient Adherence | Y/N |
| Chest Pain | NO | Seizure Disorder | | Medications? | yes |
| SOB | NO | # seizures since last visit | X | Diet? | yes |
| Edema | NO | All CD Clinics | | Exercise? | yes |
| Other HA | NO | Any new symptoms? | None | | |

## CHRONIC PAIN CLINIC ONLY

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | Functional Status | | |
|---|---|---|---|---|---|---|---|---|---|----|---|-------------------|---|---|
| No Pain | | | | | | | | | | Worst Possible Pain | | ☐ Improved | ☐ Stable | ☐ Worse |

### Objective

Vital Signs Temp_____  BP See Note  Pulse_____  Pulse Ox_____  Resp_____  Wt_____

| Labs Tests (if applicable to illness) | | | | | |
|---------------------------------------|-------------|------|-------------|------|-------------|
| Name | Date/Result | Name | Date/Result | Name | Date/Result |
| HgbA1C | | Total Cholesterol | | PEFR | |
| HIV VL | | LDL | | INR | |
| CD4 | | HDL | | Other: | |
| | | Triglycerides | | | |

Physical Examination:
HEENT  Normal                    Feet - Diabetes  N/A
Heart  Hypertension 150/90 - asymptomatic   Neurological  Intact
Lungs  Clear                     GU/Rectal  N/A
Abdomen  benign                  Other:

### Assessment

| | Degree of Control | | | Clinical Status | | | | F/U Interval | | |
|--|------|---|---|---|---|---|---|-----|------|------|
| Chronic Disease Condition | G | F | P | I | S | W | NA | 3mo | 2mo | 1mo |
| HTN | ☐ | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ | ☑ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

### Plan

| Nursing Plan | Practitioner Plan | (All orders must be written on DOC Form 2518 Physician Orders) |
|--------------|-------------------|----------------------------------------------------------------|
| ☑ Education | ☐ CD4 count | ☑ EKG | Practitioner Notes (Practitioner follow-up, periodic testing, specialist referral, other:) |
| ☐ Immunization: | ☐ Viral Load | ☐ CXR | Classified 3:2 |
| | ☐ LFT | ☑ Lipid Panel | CCC in 3 months for HTN |
| | ☐ UA | ☑ Chemistries | Enroll in CCC for HTN |
| | ☑ CBC | ☑ HgbA1C | Lysnan 25g PO QD     Labs |
| ☐ Practitioner Referral | ☐ Seizure Med Level | ☐ Urine Protein | Baseline ECG  ☐ See Progress Note |
| ☐ Other: | ☐ Peak Flow | ☐ HIV Ab | |
| | ☐ Pap Smear | ☑ O2 Saturation | |

Signature: _____                Title: APRN BC          Date: 7-18-17
Facility: ESP                   ID# 116542             Name: Harris, Ammar

RECEIVED 12/08/2021 05:27PM 7026654120    SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894206 Medical Records           @041/053

08/28/2020 18:34    7752891208           ESP MEDICAL            PAGE 06/12

| DIRECTIONS: | All inmates receiving KOPs are to sign this form. Camp Correctional Officers must return this form to their Gatekeeper Institution. File in Medical Records. | | | | |
|---|---|---|---|---|---|

ALLERGIES: NKDA ☑ NKDA

### PATIENT ACKNOWLEDGEMENT

I have received instructions for taking medication under the Keep on Person (KOP) program by the nurse. I understand it is my responsibility to see that my medication is not lost or stolen.

I understand that participation in the KOP program is a privilege and that if my medication is lost or stolen I may be withdrawn from the program.

I UNDERSTAND THAT ANY MEDICATIONS NOT USED AS PRESCRIBED WILL BE CONSIDERED CONTRABAND.

Signature: _____  Date: 5 / 17 / 2019

| Housing Unit | Date Ordered from Pharmacy | Date Received from Pharmacy | MEDICATIONS RECEIVED (Affix RX label if available) | SIGNATURE LINE | Date |
|---|---|---|---|---|---|
| 1A 2 | | 5/7/19 | Bisacodyl #D | Nurse / Inmate | 5 17 19 |
| 1A 21 | | 3/12/20 | Lidocaine Pain Patches #5 Boxes | Nurse / Inmate | 3 13 20 |

NEVADA DEPARTMENT OF CORRECTIONS
## KOP MEDICATION LOG
NAME: Harris, Ammar
ID# 1116547

Reference Medical Directive #504                    DOC 2300-0117

RECEIVED 12/08/2021 05:27PM 7026654120     SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894206 Medical Records                    042/053

08/28/2020  10:34   7752891288              ESP MEDICAL              PAGE  07/12



## Nevada State Public Health Laboratory

### University of Nevada, Reno

1660 North Virginia Street / Reno, Nevada 89503-0703
(775) 688-1335 / (775) 688-1460 Fax

Director: Mark W. Pandori PhD HCLD(ABB)  CLIA: 29D0652748  CAP: 2248701  NV State: 1479PHL-0

Ely State Prison
MAIN
4569 North State Route 490
Ely, NV, 89301

Patient Name :  HARRIS, AMMAR                  Accession No:  CL2020-00104880

DOB: 03/31/1986                     Date/Time Collected: 06/29/2020 09:04
Sex: Male                           Date/Time Received: 07/06/2020 19:03
Patient ID: 1116647                 Date/Time Reported: 07/07/2020 17:22

Ordering Clinician: HANF

| Assay | Result | Reference Interval |
|---|---|---|
| **SARS-CoV-2 TaqPath** | | |
| *Specimen Source:* | Nasal Swab | |
| TaqPath SARS-CoV-2 Interpretation | Not Detected | Not Detected |

The Nevada State Public Health Laboratory offers this test under an Emergency Use Authorization (EUA) provided by the Food and Drug Administration (FDA). That EUA is on file and available at the Nevada State Public Health Laboratory.

NOTE, The test results for any individual specimen may be influenced by factors beyond the control of the laboratory. For example, specimens that are not stored or transported under proper conditions (i.e. refrigerated for up to 72 hours or frozen for any length of time) can yield results that may not be reliable. Negative results from improperly managed specimens could be false.

Report Reviewed by:    Christopher Laverdure, MT(ASCP)
                                        Analyst

*Confidentiality, security, and integrity of patient data should be maintained in accordance with CLIA and HIPAA.*

Date/Time Printed :    07/07/2020   9:37:28PM                        Page 1 of 1

RECEIVED 12/08/2021 05:27PM 7026654120        SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894206 Medical Records                    043/053

08/28/2020  18:34   7752891208              ESP MEDICAL                  PAGE  08/12

   

**LabCorp**                                           **Patient Report**
Specimen ID: 213-071-0985-0
Control ID: 57189                        Acct #: 27067281     Phone: (775) 289-8000    Rte: 00
                                         Ely Prison
HARRIS, AMMAR A,  *repeat ((1st one      Medical Department
PO BOX 1989          clotted)            4569 North State Rte 490
NV ELY NV 89301                          Ely NV 89301

| Patient Details | Specimen Details | Physician Details |
|---|---|---|
| DOB: 03/31/1986 | Date collected: 08/01/2017 1011 Local | Ordering: G MARTIN |
| Age(y/m/d): 031/04/01 | Date received: 08/02/2017 | Referring: |
| Gender: M   SSN: ***-**-3535 | Date entered: 08/02/2017 | ID: 2093 |
| Patient ID: 0001116547 | Date reported: 08/02/2017 1706 ET | NPI: |

General Comments & Additional Information
Alternate Control Number: 5718901                        Alternate Patient ID: 1116547
Total Volume: Not Provided                               Fasting: No

Ordered Items
CBC With Differential/Platelet

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| CBC With Differential/Platelet | | | | | |
| WBC | 3.0 | Low | x10E3/uL | 3.4 - 10.8 | 01 |
| RBC | 4.94 | | x10E6/uL | 4.14 - 5.80 | 01 |
| Hemoglobin | 15.0 | | g/dL | 12.6 - 17.7 | 01 |
| Hematocrit | 47.3 | | % | 37.5 - 51.0 | 01 |
| MCV | 96 | | fL | 79 - 97 | 01 |
| MCH | 30.4 | | pg | 26.6 - 33.0 | 01 |
| MCHC | 31.7 | | g/dL | 31.5 - 35.7 | 01 |
| RDW | 13.7 | | % | 12.3 - 15.4 | 01 |
| Platelets | 361 | | x10E3/uL | 150 - 379 | 01 |
| Neutrophils | 27 | | % | | 01 |
| Lymphs | 58 | | % | | 01 |
| Monocytes | 7 | | % | | 01 |
| EOS | 7 | | % | | 01 |
| Basos | 1 | | % | | 01 |
| Neutrophils (Absolute) | 0.8 | Low | x10E3/uL | 1.4 - 7.0 | 01 |
| Lymphs (Absolute) | 1.7 | | x10E3/uL | 0.7 - 3.1 | 01 |
| Monocytes (Absolute) | 0.2 | | x10E3/uL | 0.1 - 0.9 | 01 |
| Eos (Absolute) | 0.2 | | x10E3/uL | 0.0 - 0.4 | 01 |
| Baso (Absolute) | 0.0 | | x10E3/uL | 0.0 - 0.2 | 01 |
| Immature Granulocytes | 0 | | % | | 01 |
| Immature Grans (Abs) | 0.0 | | x10E3/uL | 0.0 - 0.1 | 01 |
| Hematology Comments: | Note: | | | | 01 |

    Verified by microscopic examination.

| 01   POLGA  LabCorp Phoenix | Dir: Brian Poirier, MD |
|---|---|
| 5005 S 40th Street Ste 1200, Phoenix, AZ 85040-2969 | |

For inquiries, the physician may contact Branch: 001-288-0000 Lab: 800-788-9743

This document contains private and confidential health information protected by state and federal law.
If you have received this document in error, please call 800-788-9743          © 1995-2017 Laboratory Corporation of America® Holdings
                                                                              All Rights Reserved - Enterprise Report Version: 1.00

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894206 Medical Records                    ☑044/053

08/20/2020  16:34   7752891208                ESP MEDICAL                    PAGE  03/12




# ⚚ LabCorp                                                    **Patient Report**
Laboratory Corporation of America

Specimen ID: 205-944-9140-0                    Acct #: 27067281    Phone: (773) 289-8800    Rte: 00
Control ID: 57070                              Ely Prison
                                               Medical Department
HARRIS, AMMAR A.                               4569 North State Rte 490
4569 NORTH STATE R 490                         Ely NV 89301
NV 89301

| Patient Details | Specimen Details | Physician Details |
|---|---|---|
| DOB: 08/31/1986 | Date collected: 07/23/2017 0924 Local | Ordering: G MARTIN |
| Age(y/m/d): 031/03/23 | Date received: 07/24/2017 | Referring: |
| Gender: M    SSN: ***-**-3535 | Date entered: 07/24/2017 | ID:  2093 |
| Patient ID: 0001116547 | Date reported: 07/25/2017 1105 ET | NPI: |

General Comments & Additional Information
Alternate Control Number: 5707001                    Alternate Patient ID: 1116547
Total Volume: Not Provided                            Fasting: Yes

Ordered Items
Comp. Metabolic Panel (14); Lipid Panel; TSH

| TESTS | RESULT | FLAG | UNITS | REFERENCE INTERVAL | LAB |
|---|---|---|---|---|---|
| Comp. Metabolic Panel (14) | | | | | |
| Glucose, Serum | 90 | | mg/dL | 65 - 99 | 01 |
| BUN | 12 | | mg/dL | 6 - 20 | 01 |
| Creatinine, Serum | 1.19 | | mg/dL | 0.76 - 1.27 | 01 |
| eGFR If NonAfricn Am | 81 | | mL/min/1.73 | >59 | |
| eGFR If Africn Am | 94 | | mL/min/1.73 | >59 | |
| BUN/Creatinine Ratio | 10 | | | 9 - 20 | |
| Sodium, Serum | 143 | | mmol/L | 134 - 144 | 01 |
| Potassium, Serum | 3.9 | | mmol/L | 3.5 - 5.2 | 01 |
| Chloride, Serum | 103 | | mmol/L | 96 - 106 | 01 |
| Carbon Dioxide, Total | 20 | | mmol/L | 18 - 29 | 01 |
| Calcium, Serum | 9.5 | | mg/dL | 8.7 - 10.2 | 01 |
| Protein, Total, Serum | 7.2 | | g/dL | 6.0 - 8.5 | 01 |
| Albumin, Serum | 4.2 | | g/dL | 3.5 - 5.5 | 01 |
| Globulin, Total | 3.0 | | g/dL | 1.5 - 4.5 | |
| A/G Ratio | 1.4 | | | 1.2 - 2.2 | |
| Bilirubin, Total | 0.5 | | mg/dL | 0.0 - 1.2 | 01 |
| Alkaline Phosphatase, S | 86 | | IU/L | 39 - 117 | 01 |
| AST (SGOT) | 45 | High | IU/L | 0 - 40 | 01 |
| ALT (SGPT) | 43 | | IU/L | 0 - 44 | 01 |
| Lipid Panel | | | | | |
| Cholesterol, Total | 168 | | mg/dL | 100 - 199 | 01 |
| Triglycerides | 145 | | mg/dL | 0 - 149 | 01 |
| HDL Cholesterol | 46 | | mg/dL | >39 | 01 |
| VLDL Cholesterol Cal | 29 | | mg/dL | 5 - 40 | |
| LDL Cholesterol Calc | 93 | | mg/dL | 0 - 99 | |
| TSH | 1.730 | | uIU/mL | 0.450 - 4.500 | 01 |

Date Issued: 07/25/17 1105 ET                    FINAL REPORT                         Page 1 of 2
This document contains private and confidential health information protected by state and federal law.      © 1995-2017 Laboratory Corporation of America Holdings
If you have received this document in error, please call 800-788-9743.                All Rights Reserved - Enterprise Report Version: 1.00



**LabCorp**                                                              **Patient Report**
Laboratory Corporation of America

Patient: HARRIS, AMMAR A.                                   Specimen ID: 305-946-0140-0
DOB: 03/31/1986    Patient ID: 0001110547    Control ID: 57070    Date collected: 07/23/2017 0924 Local

01   PDLCA   LabCorp Phoenix                              Dir: Brian Poirier, MD
              5005 S 40th Street Ste 1200, Phoenix, AZ 85040-2988
       For inquiries, the physician may contact Branch: 001-288-9000 Lab: 800-788-9743



This document contains private and confidential health information protected by state and federal law.    © 1995-2017 Laboratory Corporation of America Holdings
If you have received this document in error, please call 800-788-9743    All Rights Reserved - Enterprise Report Version: 1.00

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894205 Medical Records                    ☑046/053

08/28/2020 10:34   7752891208              ESP MEDICAL           PAGE  01/12



## NEVADA DEPARTMENT OF CORRECTIONS
## ELY STATE PRISON
## MEDICAL DEPARTMENT – ESP INFIRMARY

## FAX COVER PAGE

TO: William B Rurie Hospital

FAX #: 775-289-2399

DATE: 8/28/2020
*******************************************************

FROM: ESP Medical

PHONE #: 775-289-1293

FAX #: 775-289-1208

Number of Pages including cover page __12__
*******************************************************

ATTN;

This electronic communication, including any attachment(s), may contain confidential information that is legally privileged. If you are not the intended recipient, any disclosure, distribution, or copying of the information contained herein is unauthorized and strictly prohibited. Should you receive this electronic communication in error, please notify the sender immediately, destroy all hard copies, and permanently delete all electronic copies from your computer(s)

FAX COVER SHEET – ESP – INFIRMARY                    July 17,2014

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:23  FAX 7752894206 Medical Records                              @047/053

fonttblTimes New Roman;Times New Roman;Arial;Wingdings;Courier;

**Patient: HARRIS, AMMAR**
**MRN: 154965**
VisitID: 10273598
34y, M

**Clinical Report – Physicians/Mid Levels**
William Bee Ririe Critical Access Hospital
1500 Avenue H, Ely, NV 89301 775-289-3001
Registration Date/Time: 08/28/2020 10:02

Time Seen: 10:05 08/28/2020; initial patient contact, initial documentation.
Arrived- By ambulance.  Historian- patient and EMS personnel.

**HISTORY OF PRESENT ILLNESS**
Location of injuries- head and face.  Chief Complaint: REPORTED PHYSICAL ASSAULT (He is a prisoner at the prison. He was jumped with a home made shank.  He appears to be stabbed in the chin and left upper parietal area. He has a abrasion/laceration just under his left ear.  He appears confused. He has no abrasion of marks any where else on his body.).  This occurred just prior to arrival.

The patient sustained a blow and stab wound and was reportedly kicked.  (prison).

The patient complains of moderate pain.  The patient sustained a blow to the head, had loss of consciousness and was dazed.

**REVIEW OF SYSTEMS**
No numbness, dizziness, loss of vision, hearing loss or weakness.  No nausea or abdominal pain.  All other systems reviewed and are negative.

**PAST HISTORY**
Unknown.  Unobtainable.

**SOCIAL HISTORY**
No alcohol use.

**PHYSICAL EXAM**
**Head:** Left parietal area: 2.0 cm laceration.  Chin: moderate tenderness, subcutaneous laceration and small abrasion.
**Eyes:** Pupils equal, round and reactive to light.
**ENT:** No dental injury.  Left ear: superficial 2.0 cm laceration. SEE LACERATION PROCEDURE NOTE #3.
**Neck:** Neck non-tender.
**CVS:** Heart sounds normal.
**Respiratory:** Chest nontender.
**Abdomen:** No visible injury.  Soft.
**Back:** No tenderness.
**Skin:** Normal skin color.
**Extremities:** Pelvis stable.
**Neuro:** Oriented X 3.  No motor deficit.

**LABS, X-RAYS, AND EKG**
**CT C-Spine:** (Technique

CT scan of cervical spine without contrast. Coronal and sagittal reconstructed images obtained.

History : Pain, injury to cervical spine.

Findings

Images demonstrate there are mild degenerative endplate changes throughout the cervical spine. There is no acute fracture. There is no spondylolisthesis. There is no prevertebral soft tissue swelling.

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:24  FAX 7752894206 Medical Records                                    ☑048/053

Impression :No acute cervical spine fracture.).
**CT Head:** (Technique

CT scan of head without contrast. Coronal and sagittal reconstructed images obtained.

History : Intra-cranial hemorrhage. Cerebrovascular accident.

Findings

Images demonstrate there is a large acute intraparenchymal hemorrhage in the left frontal lobe. There is acute hemorrhage along the falx within the midline. There is mild shift of the midline structures to the right. There is an acute fracture in the left parietal bone, anteriorly with a depressed fracture fragment. There is a metallic foreign body at the far inferior aspect of the right frontal lobe.

Impression
There is an acute depressed fracture in the left parietal bone, anteriorly. There is depression of the fracture fragment by approximately 5 mm. There is some overlying soft tissue swelling. There is a large acute intraparenchymal hemorrhage involving the left frontal lobe. There is acute hemorrhage along the falx within the midline. There is a metallic foreign body at the far inferior aspect of the right frontal lobe within the bone at the superolateral aspect of the right orbit).

**Laboratory Tests:**
CBC W/AUTO DIFF:   (COLL: 08/28/2020 10:40)            ( MsgRevd 08/28/2020 10:53) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
|---|---|---|---|---|
| CBC W/AUTO DIFF | | | | |
| COMPLETE BLOOD COUNT | | | | |
| WBC | 9.69 | | K/uL | (4.50 - 11.00) |
| RBC | 5.16 | | M/uL | (4.70 - 6.10) |
| HEMOGLOBIN | 15.59 | | g/dL | (12.00 - 18.00) |
| HEMATOCRIT | 48.4 | | % | (40.0 - 54.0) |
| MCV | 94 | | fl. | (80 - 99) |
| MCH | 30.20 | | pg | (27.00 - 34.00) |
| MCHC | 32.2 | | g/dL | (31.0 - 36.0) |
| RDW | 11.4 | | % | (11.0 - 14.0) |
| PLATELETS | 255 | | K/uL | (140 - 450) |
| MPV | 7.3 | | fL | (6.6 - 12.2) |
| %NEUT | 83 | | % | |
| %LYMPH | 11 | | % | |
| %MONO | 5 | | % | |
| %EOS | 0 | | % | |
| %BASO | 1 | | % | |
| #NEUT | 8.04 | | K/uL | (1.50 - 9.50) |
| #LYMPH | 1.06 | L | K/uL | (1.50 - 5.00) |
| #MONO | 0.51 | | K/uL | (0.10 - 1.00) |
| #EOS | 0.02 | | K/uL | (0.00 - 0.30) |
| #BASO | 0.06 | | K/uL | (0.00 - 0.20) |
| BLOOD SMEAR REVIEW | NOT INDICATED | | | |
| (CB) | | | | |

Comp Metabolic Panel:    (COLL: 08/28/2020 10:40)            ( MsgRevd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
|---|---|---|---|---|
| COMPREHENSIVE METABOLIC | | | | |
| COMPREHENSIVE METABOLIC PANEL | | | | |
| SODIUM | 139.00 | | mmol/L | (136 - 145) |
| POTASSIUM | 4.00 | | mmol/L | (3.50 - 5.10) |
| CHLORIDE | 109.00 | | mmol/L | (103 - 117) |
| CO2 | 19.17 | | mmol/L | (17.10 - 31.70 |
| ANION GAP | 15 | | | (10 - 20) |
| GLUCOSE. | 141.00 | H | mg/dL | (70.00 - 110) |
| BUN | 13.00 | | mg/dL | (9.00 - 26.00) |
| CREATININE | 1.50 | H | mg/dL | (0.57 - 1.25) |
| BUN/CREAT | 9 | | | (7 - 25) |
| AGE | 34 | | yrs | |
| NON-AA GFR | 54 | | mL/min | |
| AFR AMER GFR | 65 | | mL/min | |

RECEIVED  12/08/2021 05:27PM 7026654120        SGRO ROGER
12/08/2021 WED 17:24  FAX 7752894206 Medical Records                    ☒049/053

| CALCIUM | 9.10 | mg/dL | (8.60 - 10.30) |
| TOTAL PROTEIN | 7.60 | g/dL | (6.40 - 8.30) |
| ALBUMIN | 4.200 | g/dL | (3.500 - 5.200 |
| ALKALINE PHOS | 70.00 | U/L | (40.00 - 150) |
| SGPT/ALT | 46.00 | U/L | (0.00 - 55.00) |
| SGOT/AST | 31.00 | U/L | (5.00 - 34.00) |
| BILIRUBIN TOT | 0.50 | mg/dL | (0.20 - 1.20) |

Alcohol Blood:   (COLL: 08/28/2020 10:40)          ( MsgRcvd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
| ALCOHOL BLD | 10.50 | | mg/dL | (0.00 - 50.00) |

Use of blood alcohol results is restricted to medical (treatment) purposes only.Results >19 are positive for alcohol.

Lipase:   (COLL: 08/28/2020 10:40)          ( MsgRcvd 08/28/2020 11:06) Final results

| **Test** | **Result** | **Flag** | **Units** | **(Reference)** |
| LIPASE | 20.00 | | U/L | (8.00 - 78.00) |

CT C-Spine wo IV cont:          ( MsgRcvd 08/28/2020 11:15) Final results

**Exam**
<Observation_Test_Name>CT CERV SPINE WO CONTRAST</
 <Observati <Observation_Te (<Observation_

CT Facial wo IV cont:          ( MsgRcvd 08/28/2020 11:21) Final results

**Exam**
<Observation_Test_Name>CT SINUSES FACIAL AXIAL</Ob
 <Observati <Observation_Te (<Observation_

## PROGRESS AND PROCEDURES

**Intubation:** Time: 11:35 08/28/2020.  Time-out completed immediately before the procedure.  ED physician and anesthesiologist at bedside.  Intubated with 7.5 cuffed endotracheal tube.  Head placed in sniffing position.  Size 4 MacIntosh blade used.  Intubated via orotracheal route.  Premedicated with fentanyl.  Administered induction agent- etomidate and neuromuscular blocking agent- rocuronium.  Complications of procedure: vomiting.  Placement confirmed by direct visualization, equal breath sounds and rise and fall of chest wall and end tidal CO2 monitor. Tube secured with adhesive tape.  (Ketamine)  Tube marked (22 cm).  Technique: direct visualization.  Procedure successful; one attempt.

**Course of Care:** He has a large intracranial bleed.  I spoke with Dr Parco ( trauma doctor at UMC).  He suggest to intubate patient due to his GCS and will give Keppra for SZ prophalaxsis.

Critical care performed (60 minutes). Time includes: direct patient care, coordination of patient care, interpretation of data (laboratory data and pulse oximetry), review of patient's medical records and medical consultation- see progress notes. Procedures included in critical care time: phlebotomy and ventilator management. Procedures excluded from critical care time: intubation.

**Disposition:** Transferred to University Medical Center, Las Vegas Nevada.  Condition: serious.

## CLINICAL IMPRESSION

Open, penetrating head injury traumatic left cerebral hemorrhage. Parietal bone fracture. Loss of consciousness of unknown duration. Altered mental status. Neurological deficit. Coma.
Multiple deep lacerations to the scalp, head and nose. Foreign body present.

RECEIVED  12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:24  FAX 7752894206 Medical Records          ☑050/053

(Electronically signed by Daniel W.  Rollins, MD 08/28/2020 16:39)

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:24  FAX 7752894206 Medical Records                    ☒051/053

fonttblTimes New Roman;Times New Roman;Arial;Wingdings;Courier;

**Patient: HARRIS, AMMAR**
**MRN: 154965**
VisitID: 10273598
34y, M

**Clinical Report - Nurses**
William Bee Ririe Critical Access Hospital
1500 Avenue H, Ely, NV 89301 775-289-3001
Registration Date/Time: 08/28/2020 10:02

**TRIAGE**

Arrived by EMS, and in handcuffs from jail (on stretcher).  Historian: (correction officers).
Triage time: 10:06 08/28/2020.  Acuity: LEVEL 2.
Chief Complaint: INJURY TO HEAD, NOSE and CHIN and LEFT EAR (parietal area).
This occurred just prior to arrival.  Mechanism of injury: a blow.  The patient had loss of consciousness lasting several minutes. (patient unable to speak).

Treatment PTA:
None.

Trauma activation: Pre-hospital notification of patient arrival was received.  --10:24 Kiruki, Evelyn, R.N.

10:07 08/28/20.  BP: 115/71. HR: 106. RR: 20. O2 saturation: 99%. Temp: 97.4 F. Pain level now unable to obtain due to patient condition.  --10:24 Kiruki, Evelyn, R.N.

10:06 08/28/20.

ABUSE ASSESSMENT: Abuse assessment: unable to obtain.  --11:36 Kiruki, Evelyn, R.N.
Weight: 113.3 kg estimated, Height/Length: 69 inches Estimated. BMI: 36.9.  --10:07 Kiruki, Evelyn, R.N.

**Medications**
Unable to Obtain.  --11:37 Kiruki, Evelyn, R.N.

**Allergies**
Unable to Obtain.  --11:37 Kiruki, Evelyn, R.N.

**PROBLEMS:**
Unable to answer.  --11:38 Kiruki, Evelyn, R.N.

ADDITIONAL SURGERIES:
Unable to answer.  --11:38 Kiruki, Evelyn, R.N.

**History**
SOCIAL HX: Smoker - current status unknown.  Alcohol use. (unable to obtain).  History of drug use. (unable to obtain).

SELF HARM ASSESSMENT: a self harm assessment was performed. The patient answered "no" to the question(s) "Have you recently felt down, depressed, or hopeless?", "Have you noticed less interest or pleasure in doing things?", "Do you have thoughts of harming or killing yourself?", "Are you here because you tried to hurt yourself?", "Have you ever tried to hurt yourself before today?", "Have you recently had thoughts about harming or killing others?" and "Do you have any dangerous items in your possession?".

NUTRITIONAL RISK ASSESSMENT: The nutritional risk assessment revealed no deficiencies.

FUNCTIONAL ASSESSMENT: Functional assessment: no impairments noted.

LEARNING NEEDS ASSESSMENT: The learning needs assessment revealed no barriers.

SKIN INTEGRITY ASSESSMENT: Skin integrity risk assessment completed. No skin integrity risk identified.
--10:24 Kiruki, Evelyn, R.N.

10:06 08/28/20.
SOCIAL HX: The patient has not traveled outside the U.S. No infectious disease exposure.

SELF HARM ASSESSMENT: a self harm assessment was performed. The patient answered "no" to the question(s) "Have you recently felt down, depressed, or hopeless?", "Have you noticed less interest or pleasure in doing things?", "Do you have thoughts of harming or killing yourself?", "Are you here because you tried to hurt yourself?", "Have you ever tried to hurt yourself before today?", "Have you recently had thoughts about harming or killing others?" and "Do you have any dangerous items in your possession?".

FALL RISK ASSESSMENT: Fall risk assessment completed. Risk factors identified include patient history of fall.
--11:36 Kiruki, Evelyn, R.N.

**Interventions**
Identification band on patient.  To treatment room.  --10:24 Kiruki, Evelyn, R.N.

**PHYSICAL ASSESSMENT**
HEENT: Head: laceration present in the left parietal area.  Nasal injury: subcutaneous 1.0 cm laceration with controlled bleeding involving the left nasolacrimal duct.  Mucous membranes are pink.
CVS: Capillary refill less than 2 seconds.
SKIN: Skin is warm and dry.  --10:26 Kiruki, Evelyn, R.N.

**NURSING PROGRESS NOTES**
10:06 08/28/20.  Reassurance given.  Two patient identifiers checked.  Bed placed in lowest position.  Brakes of bed on.  Patient ready for evaluation- ED physician notified.  --10:27 Kiruki, Evelyn, R.N.

10:06 08/28/2020 Site #1 started prior to arrival by EMS via IV in the left hand with an 20g angiocath, with aseptic technique and good blood return. Saline lock flushed with 5 mL saline.  --11:09 Kiruki, Evelyn, R.N.

10:48 08/28/20.  Patient transported to CT by stretcher with tech. (With 4 Cert officers at side).  --10:53 Barela, Mary, CNA

10:50 08/28/20.  ( Patient shaved on the areas with lacerations).  --11:30 Kiruki, Evelyn, R.N.

11:00 08/28/2020 Arrived with bag #1 1000 mL IV Fluids IV NS; bolus of 500 mL wide open via site #1. Started by EMS. Allergies verified and confirmed 5 rights. IV patency established. IV site checked: no pain, redness, or swelling. IV flushed thoroughly pre- and post-medication administration. Information reviewed with patient including reason for taking this medication, signs of allergic reaction and precautions. Verbalizes understanding.  --11:09 Kiruki, Evelyn, R.N.

11:02 08/28/20.  Patient returned by stretcher with tech. (With 4 cert officers).  --11:02 Kiruki, Evelyn, R.N.

11:15 08/28/20.  ( med x notified).  --11:15 Jill Desteunder, R.N.

11:26 08/28/20.  BP: 141/81. HR: 105. RR: 18. O2 saturation: 94%. Temp: 98.3 F. Pain level now: 0/10.  --11:26 Barela, Mary, CNA

11:15 08/28/20.  ( Foleys catheter inserted by Jeff RN, draining clear urine).  --11:31 Kiruki, Evelyn, R.N.

11:20 08/28/2020 Started 1000 mg of KEPPRA (LevETIRAcetam) IVPB in bag #1 100 mL; at 400 mL/hr over 15 minute(s) via site #1. Allergies verified. IV patency established. IV site checked: no pain, redness, or swelling. IV

RECEIVED 12/08/2021 05:27PM 7026654120          SGRO ROGER
12/08/2021 WED 17:24 FAX 7752894206 Medical Records                                    ☑053/053

flushed thoroughly pre- and post-medication administration. Information reviewed with patient including reason for taking this medication, signs of allergic reaction and precautions. Verbalizes understanding (DRIP RATE CONFIRMED WITH PHARMACY).  --11:28 Kiruki, Evelyn, R.N.

11:30 08/28/20.  ( Respiratory therapy, CRNA in attendance).  --11:30 Kiruki, Evelyn, R.N.

11:38 08/28/20.  BP: 128/83. HR: 89. RR: 16. O2 saturation: 100%. Temp: 98 F. Pain level now unable to obtain due to patient condition. Additional comments: Patient intubated at this time.  --11:43 Kiruki, Evelyn, R.N.

11:42 08/28/20.  --11:43 Kiruki, Evelyn, R.N.

11:49 08/28/20.  BP: 126/78. HR: 100. RR: 12. O2 saturation: 100%.  --11:50 Barela, Mary, CNA

11:53 08/28/20.  ( patient medical history faxed from Prisons).  --11:53 Kiruki, Evelyn, R.N.

12:01 08/28/2020 IV Fluids IV NS Discontinued: bag #1 upon transfer. Total amount infused: 500 mL. IV patency established. IV site checked; no pain, redness, or swelling. IV flushed thoroughly.  --12:03 Kiruki, Evelyn, R.N.

12:03 08/28/2020 katemine 500 mg in 500 mls saline  * Drip IV 500mgs started by flight team  --12:03 Kiruki, Evelyn, R.N.

## DISPOSITION / DISCHARGE
11:49 08/28/2020,  BP: 126/78. HR: 100. RR: 12. O2 saturation: 100%.  --12:06 Kiruki, Evelyn, R.N.

11:49 08/28/2020  Temp: 98.0 F.  --12:15 Kiruki, Evelyn, R.N.

12:15 08/28/20.  Pain level now unable to obtain due to patient condition.  --12:15 Kiruki, Evelyn, R.N.

11:49 08/28/20.  --12:15 Kiruki, Evelyn, R.N.

12:02 08/28/20.
Departure time: 12:02 08/28/2020.  Condition at departure: unchanged.  Transferred to University Medical Center, Las Vegas Nevada. Emtala forms provided to transport team and EMS via paper.  Transported via stretcher by EMS with monitor, IV, ambu bag and ventilator.  --12:06 Kiruki, Evelyn, R.N.

12:14 08/28/20.  Report was given via a phone call. Report included patient's care, treatment and condition (including any anticipated changes) and medications given to the patient in the ED. All questions were answered. Report was acknowledged and care was transferred. (Dominic).  --12:14 Kiruki, Evelyn, R.N.

Locked/Released at 08/28/2020 17:27 by Kiruki, Evelyn, R.N.

EXHIBIT - I - "Injury 2"

BLS Injury

2 Pages

# MEDICAL ORDERS / LAY-IN

DISTRIBUTION:   Inmate Medical Record

COPY PROVIDED TO:   ☐ Property   ☐ Custody   ☐ Classification   ☐ Inmate

FROM:   Health Services

DATE:   _5-20-21_

Please be advised that the following has been ordered by the medical provider for the inmate named below:

_Double Mattress x180days R/T Chronic Pain c̄_
_(R) UIE Flexion Contracture & Syncope c̄ Collapse_

Days:   ☐ 5   ☐ 10   ☐ 20   ☐ 30   ☐ 45   ☐ 60   ☐ 90

| | | | | |
|---|---|---|---|---|
| ☐ | Inmate is to lay-in _____ days | From: _____ | To: _____ | |
| ☐ | Inmate is to lay-in _____ weeks | From: _____ | To: _____ | |
| ☐ | Inmate is to be medically unassigned | From: _____ | To: _____ | |
| ☐ | Inmate is on athletic restrictions | From: _____ | To: _____ | |
| ☐ | Other: _____ | | | |

_APRN Rc_
Medical Practitioner Signature          Date: _5-20-21_

I understand that I <u>will not</u> receive work credits until such time as I have been released by the Practitioner from this medical orders/lay-in or have been returned to work by the Classification Committee.

_A.H_
Inmate Signature     ID# _1116547_     Housing Unit _9A-6_     Date _5-26-21_

**If Required:**

☒ APPROVED          ☐ DISAPPROVED

Warden Signature          Date: _5/28/21_

Note:   Warden must confer with health authority to determine what appropriate alternative treatment will be given before any disapproval is finalized.

NEVADA DEPARTMENT OF CORRECTIONS

## MEDICAL ORDERS
## LAY-IN

NAME   HARRIS, AMMAR
1116547

ID:

MI

C 2531 (01/13)

# MEDICAL ORDERS / LAY-IN

DISTRIBUTION:   Inmate Medical Record

COPY PROVIDED TO:  ☐ Property   ☐ Custody   ☐ Classification   ☐ **Inmate**

FROM:   Health Services

DATE:   5·20·21

---

Please be advised that the following has been ordered by the medical provider for the inmate named below:

Wheelchair for Movement in/out of Unit
RIT TBI & Syncope c̄ Collapse x 180 days

Days:   ☐ 5   ☐ 10   ☐ 20   ☐ 30   ☐ 45   ☐ 60   ☐ 90

---

| | | From: | To: |
|---|---|---|---|
| ☐ | Inmate is to lay-in _____ days | | |
| ☐ | Inmate is to lay-in _____ weeks | | |
| ☐ | Inmate is to be medically unassigned | | |
| ☐ | Inmate is on athletic restrictions | | |
| ☐ | Other: | | |

Medical Practitioner Signature   APRN BC

Date:   5-20-21

---

I understand that I will not receive work credits until such time as I have been released by the Practitioner from this medical orders/lay-in or have been returned to work by the Classification Committee.

Inmate Signature   A.H

ID#   1116547

Housing Unit   9A-6

Date   5-26-21

---

If Required:

☒ APPROVED   ☐ DISAPPROVED

Warden Signature

Date:   5/28/21

**Note:**   Warden must confer with health authority to determine what appropriate alternative treatment will be given before any disapproval is finalized.

---

NEVADA DEPARTMENT OF CORRECTIONS

# MEDICAL ORDERS
## LAY-IN

NAME:   Harris, Ammar
Last   First   MI

ID#   1116547   INSTITUTION:   ESP

DOC 2531 (01/13)

EXHIBIT - I "Injury 3"

CONTinuing Library

LAS Vegas Neurology Center

9 Pages



ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
JAYME N. RICHARDSON
EDGAR C. SMITH
DANIELLE E. DUMIRE
KELLY B. STOUT

February 3, 2022

**VIA USPS**
Ammar Harris, #1116547
PO Box 650
High Desert Prison
Indian Springs, Nevada 89070-0650

      **Re:**   *STATE OF NEVADA VS. AMMAR HARRIS*
            **CASE NO. A-19-797786-W**

Dear Mr. Harris:

      Enclosed are the medical records we received in response to the subpoena to Las Vegas Neurology Center and the Notice of Witnesses that you requested.

      If you have any questions or concerns regarding the foregoing, please do not hesitate to contact our office.

                              Respectfully,

                              */s/Tanya Hayden*

                              TANYA HAYDEN., *Paralegal*
                              *to Sgro & Roger*

ACB/th

Enclosures: As stated



**Nina Aisa**
Las Vegas Neurology
702-800-5456 || **Fax**
702-432-2233 || **Phone**

**To:**
Fax: (702) 665-4120

**Total Pages:**  16 (including this cover)

**Message:**

Medical and Billing records for HARRIS, AMMAR. Thank you!

This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. Healthcare information is personal and sensitive and must be treated accordingly. If this correspondence contains healthcare information it is being provided to you after appropriate authorization from the patient or under circumstances that don't require patient authorization. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Redisclosure without additional patient consent or as permitted by law is prohibited. Unauthorized redisclosure or failure to maintain confidentiality subjects you to application of appropriate sanction. If you have received this correspondence in error, please notify the sender at once and destroy any copies you have made.





*Powered By*

www.providerflow.com

Want to view this fax online? Visit www.providerflow.com/invite
and enter code 93c9-e675 or scan the QR code with your
smartphone or tablet

Case 3:21-cv-00380-RCB-CLB Document 41 27 Filed 12/06/24 Page 254 of 276

RECEIVED 01/31/2022 08:39AM 7026654120     SGRO ROGER
31-Jan-2022  16:43   Las Vegas Neurology                     7028805456          p.10
[1/31/2022][Page 1 of 5]

# Las Vegas Neurology Center
# History and Physical

| | | | |
|---|---|---|---|
| **Patient Name:** | Ammar Harris | **Visit Date:** | October 19, 2021 |
| **Patient ID:** | 89585 | **Provider:** | Emmy Foster, APRN |
| **Sex:** | Male | **Location:** | Las Vegas Neurology Center |
| **Birthdate:** | March 31, 1986 | **Location Address:** | 2020 Wellness Way #800 |
| | | | Las Vegas, NV 891084145 |
| | | **Location Phone:** | (702) 432 2233 |

## Chief Complaint

TBI with residual R sided deficits;
Headache;
Syncope

## History Of Present Illness

This is a 35-year-old right-handed male patient presents to the clinic for consultation with PMH significant for assault resulting in intracranial hemorrhage and TBI August 2020. There are limited medical records available for review.

Per patients report August 2020 he was assaulted- stabbed on the left side of his head. He was seen at William B Hospital in Ely and transferred to UMC trauma and reports also being seen at Summerlin Hospital. Patient suffered left frontal skull fracture and left sided hemorrhage. He has chronic and residual right-sided spasticity. Patient is in a wheelchair. Most recent available CT head is from August 31, 2020 demonstrated evolving left parietal region hemorrhage. No new or worsening bleed.

During todays visit the patient reports frequent episodes of blacking out & losing consciousness on multiple occasions over the last year. He reports disequilibrium, dizziness and issues with balance. He has significant right upper and lower extremity spasticity. He is not doing physical therapy. Per present guards PT in-house is not available and the patient will require a referral to outpatient physical therapy. Patient reports he also has residual metal fragments in his buttocks due to previous GSW. We will defer MRIs due to this finding.

He reports daily headaches and numbness and tingling to his right upper and lower extremity. Endorses headaches are associated with photophobia. He denies phonophobia or nausea. He is utilizing aspirin and ibuprofen which are minimally effective. He endorses difficulty with sleep.

Plan of care was reviewed with Dr. Janda today who is in agreement with repeat CT brain, conventional EEG, ultrasound carotid, EMG and EMG/NCV. Hell commence Lyrica trial. Side effects discussed.

Hell also be referred to commence physical therapy and commence Botox for his RUE RLE.

## Past Medical History

| Disease Name | Date Onset | Notes |
|---|---|---|
| Stroke | -- | - Phreesia 10/19/2021 |

## Past Surgical History

| Procedure Name | Date | Notes |
|---|---|---|
| Other | | Phreesia 10/19/2021 |

## Medication List

| Name | Date Started | Instructions |
|---|---|---|
| aspirin 81 mg oral tablet,delayed release (DR/EC) | | take 1 tablet by oral route 2 times a day |
| ibuprofen 800 mg oral tablet | | take 1 tablet by oral route 2 times a day |

[Digital Signature Validated]

## Allergy List

| Allergen Name | Date | Reaction | Notes |
|---|---|---|---|
| NO KNOWN DRUG ALLERGIES | -- | -- | - Phreesia 10/19/2021 |

Allergies Reconciled

## Family Medical History

| Disease Name | Relative/ Age | Notes |
|---|---|---|
| Alzheimer's | Father/ | - Phreesia 10/19/2021 |
| Diabetes Mellitus, Type II | Father/ | Phreesia 10/19/2021 |

## Social History

| Finding | Status | Start/ Stop | Quantity | Notes |
|---|---|---|---|---|
| Alcohol | Never | --/-- | -- | - Phreesia 10/19/2021 |
| Cocaine | | / | | Phreesia 10/19/2021 |
| Disabled | | / | | Phreesia 10/19/2021 |
| High school graduate | | / | | Phreesia 10/19/2021 |
| Sedentary | | / | | Phreesia 10/19/2021 |
| Tobacco | Former | --/-- | -- | - Phreesia 10/19/2021 |

## Review of Systems

**Constitutional**
- Denies : weight change, fatigue, fever

**Eyes**
- Denies : acute visual changes, tearing or blurriness

**HENT**
- Denies : recent surgery, bleeding gums, hoarseness, sore throat

**Cardiovascular**
- Denies : chest palpitations, angina, murmurs

**Respiratory**
- Denies : wheezing, cough, hemoptysis

**Gastrointestinal**
- Denies : constipation, diarrhea, nausea

**Genitourinary**
- Denies : hematuria, frequency, hesitation

**Integument**
- Denies : rash, itching

**Musculoskeletal**
- Denies : gout, trivial fractures

**Endocrine**
- Denies : heat intolerance, cold intolerance, excessive sweating, polyuria

**Psychiatric**
- Denies : visual hallucinations, auditory hallucinations

**Heme-Lymph**
- Denies : anemia, easy bruising, bleeding

## Vitals

| Date | Time | BP | Position | Site | Cuff L/R Size | HR | RR | TEMP (F) | WT | HT | BMI kg/m² | BSA m² | O2 Sat | L/min FIO2 | HC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/19/2021 | 09:33 AM | 126/83 | Sitting | | | 91 - R | 16 | | 190lbs 0oz | 5' 11" | 26.5 | 2.08 | 99 % | | |

## Physical Examination

**Constitutional**
- Appearance : Alert and oriented to person, place, and time. In no acute distress

[Digital Signature Validated]

89585 Harris, Ammar DOB: 1986-03-31 (History and Physical | 10/19/2021 | Page 2)

**Head**
- Cranium :
  - Inspection : Atraumatic, normocephalic

**Neck**
- Neck : Supple, non tender

**Gastrointestinal**
- Abdominal Examination : Soft, nontender, no guarding

**Skin and Subcutaneous Tissue**
- Extremities : No clubbing, no cyanosis, no edema

**Neurologic**
- Mental Status Examination :
  - Attention : Attention intact. Concentration intact
  - Language : Speech is fluent. No expressive or receptive aphasia
  - Fund of Knowledge : Fund of knowledge age appropriate
- Cranial Nerves :
  - Olfactory Nerve : Intact, no gross loss of smell sensation
  - Optic Nerve : Intact bilaterally without field cut
  - Oculomotor, Trochlear and Abducens Nerves : Extraocular movements are intact. Pupils equal round, reactive to light and accomodation. There is no nystagmus
  - Trigeminal Nerve : Facial sensation is normal along V1, V2, V3
  - Facial Nerve : No facial weakness present
  - Vestibuloacoustic Nerve : Hearing is grossly intact to finger rub
  - Glossopharyngeal and Vagus Nerves : Palate elevates and moves symetrically
  - Spinal Accessory Nerve : Sternocleidomastoid and trapezius strength is asymetrical
  - Hypoglossal Nerve : Tongue is midline without atrophy
- Motor Examination : Motor strength is 3/5 R arm, 3/5 R leg, 5/5 L arm, 5/5 L leg. RUE RLE spasticity and ridigity
- Sensation :
  - Light Touch : Sensation and vibration intact to light touch. Numbness and tingling to RUE RLE
- Cerebellar Function : Finger-nose-finger testing & Heel-to-shin testing abnormal to right
- Gait and Station : Ambulation deferred due to right sided weakness

**Psychiatric**
- Mood and Affect : Mood is appropriate. Affect appropriate

## Results

CT HEAD WO CONTRAST (DR) 8/28/2020: 1. Left frontal skull fracture with posttraumatic left-sided hemorrhage as above.

CT CERVICAL SPINE WO CONTRAST (DR) 8/28/2020: No evidence of acute cervical spine fracture.

CT LUMBAR SPINE RECONS (DR) 8/28/2020: 1. No acute osseous injury. 2. Suspected degenerative changes as above. CT is suboptimal for evaluation of degenerative changes. Follow-up nonemergent MRI may be of further diagnostic value.

CT THORACIC SPINE RECONS (DR) 8/28/2020:: No acute fracture or dislocation of the thoracic spine

CT HEAD WO CONTRAST (DR) 8/29/2020:1. Stable left-sided subarachnoid and falcine/left tentorial subdural hemorrhage, as well as left frontoparietal edema. No new hemorrhage. 2. Posterior left frontal calvarial depressed fracture again seen, and scalp hematoma without significant change.

CT HEAD WO CONTRAST (DR) 8/31/2020:Evolving left parietal and redistributing extra-axial hemorrhage. No new or worsening blood.

## Assessment

- Headache    784.0/R51.9
- Syncope and collapse    780.2/R55
- History of ICH (Intracerebral hemorrhage)    431/I61.9
- Chronic Right sided weakness    728.87/R53.1
- Numbness and tingling

[Digital Signature Validated]

Anesthesia of skin    782.0/R20.0
Paresthesia of skin    782.0/R20.2
ı Dizziness    780.4/R42
ı Vertigo    780.4/R42
ı Spasticity due to old stroke
  Other sequelae of cerebral infarction    438.89/I69.398
  Cramp and spasm    438.89/H25.2

## Plan
### Orders
ı Follow up - - 10/19/2021
    after testing in the AM
ı Medical Records request - - 10/19/2021
    all neurology notes from UMC
ı CT Brain w/o contrast (70450) - - 10/19/2021
ı EEG; Awake and Drowsy 20 MINUTES (95816) - - 10/19/2021
ı Nerve Conduction Studies,(4 extremities) with SSR (95913) - - 10/19/2021
ı EMG (95886) - - 10/19/2021
ı SSR (95923) - - 10/19/2021
ı Ultrasound carotid (93880, 93882) - - 10/19/2021
ı VNG with Balance Plate (92540) - - 10/19/2021
ı Referral to Physical Therapy - - 10/19/2021
    for RLE and RUE
ı Botox for Spasticity (J0585, 64644) - - 10/19/2021
    for RUE and RLE

### Medications
ı Lyrica 50 mg oral capsule
  SIG: take 1 capsule (50 mg) by oral route 3 times per day for 30 days
  DISP: (90) Capsule with 5 refills
  **Prescribed on 10/19/2021**

ı Medications have been Reconciled
ı Transition of Care or Provider Policy

### Instructions
ı Electronically Identified Patient Education Materials Provided Electronically

Plan:

Obtain EEG to rule out epileptiform discharges and/or focal abnormalities.
Obtain EMG/NCV x4 extremities to rule out neuropathy versus radiculopathy and for prognostication.
Obtain VNG to assess for central versus peripheral vestibular dysfunction
Obtain CT brain to rule out structural abnormality
Obtain Ultrasound carotid to rule out structural abnormality/ evaluate vasculature
Obtain authorization for botox for spasticity of RLE and RUE
Referral to Physical Therapy for RUE and RLE
Obtain medical records from UMC hospital.

Commence Lyrica 50mg TID, side effect profile discussed.

Follow up after testing in the AM
Continue follow up with PCP & Specialist
Continue current medications
Maintain lifestyle modifications as discussed.
Patient knows to go to ED immediately if s/s worsen, recur or persist

Thank you for allowing us to care for your patient; please call anytime with any questions, Emmy Foster APRN, Board
Certified. Agree with above, patient seen and examined with the above plan discussed in detail- Dr. Paul H. Janda, D.O.,
J.D. Board Certified in Neurology. Neurology Residency Program Director, Las Vegas Neurology Center 2020 Wellness
Way, Suite # 300 Las Vegas, NV 89106 702.432.2233

Report generated with voice recognition software. Effort has been made to ensure accuracy of this report, however

[Digital Signature Validated]

89585 Harris, Ammar DOB: 1986-03-31 (History and Physical | 10/19/2021 | Page 4)

occasional wording errors may persist. Please call with any questions.

**Electronically Signed by:** Emmy Foster, APRN -Author on October 19, 2021 10.10.48 AM

**Harris, Ammar [89585]**
22010 Gold Creek
Indian Springs, NV 89070

**Las Vegas Neurology Center**
**Account Information Report**
Include:All

Show: Expanded Details

Page: 1
Date: 01/26/2022
Time: 4:59:08 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 12/29/2021 | | AB | Contractual Adjustment: [302.36] Hometown Health; Insurance Plan ID: 1182 (ERA);<br>Batch: 17465 12/29/2021 Insurance Payments | ($302.36) | |
| 12/29/2021 | 10/19/2021 | AB | APPLIED TO CHARGE:    99204 [418.50 x 1] Billable: Foster; Emmy APRN; Rendering: Foster,<br>Emmy APRN<br>Practice Location: Las Vegas Neurology Center Service Location Las Vegas Neurology Center;<br>Referring: Janda, Paul H. DO, JD<br>[907.0, 342.11, 784.0, 750.4, 506.6X95, G31.11, R51.9, R42] CoPay: $0.00; Visit Type: Office<br>Visit; Visit ID: 263305; Stmt Recipient: Ammar Harris<br>Office or other outpatient visit for the evaluation and manageme<br>ClaimID 404856 CO45: Charge exceeds fee schedule/maximum allowable or contracted/legislated<br>fee arrangement. Usage: This adjustment amount cannot equal the total service or claim charge<br>amount; and must not duplicate provider adjustment amounts (payments and contractual<br>reductions) that have resulted from prior payer(s) | $302.36 | |
| 12/29/2021 | | AB | Insurance Payment [116.14] Hometown Health; Check: 8887808; Insurance Plan ID 1182 (ERA)<br>Batch: 17465 12/29/2021 Insurance Payments | ($116.14) | |
| 12/29/2021 | 10/19/2021 | AB | APPLIED TO CHARGE:    99204 [418.50 x 1] Billable: Foster; Emmy APRN; Rendering: Foster,<br>Emmy APRN<br>Practice Location: Las Vegas Neurology Center Service Location Las Vegas Neurology Center;<br>Referring: Janda, Paul H. DO, JD<br>[907.0, 342.11, 784.0, 750.4, 506.6X95, G31.11, R51.9, R42] CoPay: $0.00; Visit Type: Office<br>Visit; Visit ID: 263305; Stmt Recipient: Ammar Harris<br>Office or other outpatient visit for the evaluation and manageme<br>ClaimID 404856 | $116.14 | |
| 11/01/2021 | 10/19/2021 | HH | 99204 [418.50 x 1] Billable: Foster; Emmy APRN; Rendering: Foster, Emmy APRN<br>Practice Location: Las Vegas Neurology Center Service Location Las Vegas Neurology Center;<br>Referring: Janda, Paul H. DO, JD<br>[907.0, 342.11, 784.0, 750.4, 506.6X95, G31.11, R51.9, R42] CoPay: $0.00; Visit Type: Office<br>Visit; Visit ID: 263305; Stmt Recipient: Ammar Harris<br>Office or other outpatient visit for the evaluation and manageme | $418.50 | $0.00 |
| 12/29/2021 | | AB | APPLIED TO CHARGE:    Contractual Adjustment [302.36] Hometown Health: Insurance Plan ID:<br>1182 (ERA);<br>ClaimID 404856<br>CO45: Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement.<br>Usage: This adjustment amount cannot equal the total service or claim charge amount; and must<br>not duplicate provider adjustment amounts (payments and contractual reductions) that have resulted<br>from prior payer(s) | ($302.36) | |
| 12/29/2021 | | AB | APPLIED TO CHARGE:    Insurance Payment [116.14] Hometown Health; Check: 8887808;<br>Insurance Plan ID: 1182 (ERA);<br>ClaimID 404856 | ($116.14) | |

RECEIVED 01/31/2022 08:39AM 7026654120          SGRO ROGER
31-Jan-2022 16:44    Las Vegas Neurology                    7028005456          p.16

Harris, Ammar [89585]
22010 Cold Creek
Indian Springs, NV 89070

Las Vegas Neurology Center
Account Information Report
Include:All

Show: Expanded Details

Page: 2
Date: 01/26/2022
Time: 4:59:08 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 11/01/2021 | | * | CLAIM NOTE: Submitted Claim# 404856 to Insurance Plan: Hometown Health: $419.50 : Batch# 15910: Successful Submission: E-File Plan: 3CH CLAIMS AND ERA: E-File Plan Format: 837-P 5010: Follow-Up Date set to 12/1/2021 | | |

# EXHIBIT - N - "NOTICE"

# NOTICE PER NRS 41.031
# AND NRS 41.0337

Sisolak - LETTER/mailed (2 pgs)

Cegavske - LETTER/mailed (2 pgs)

Ford - LETTER/mailed (2 pgs)

DOJ'S - HARRIS v. NDOC
21-OCR-1883 (2 pgs)

Nov 7th, 21

Steven Sisolak
Governor
State Capitol Building
101 N. Carson Street
Carson City, NV 89701

    Notice of Intent: Pursuant to NRS 41.031 and NRS 41.0337, Civil Action will be brought against you as a member of the Board of Prison Commissioners.
    In regards to the following grievances; 2006-31-18343 and 2006-31-20319, copies of said grievances are included for your convenience.

Respectfully Submitted
Ammar Harris # 1116547
High Desert State Prison
P.O. Box 650
Indian Springs, NV
89070

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116647 | 6Br1 | 11/30/21 |

4.) REQUEST FORM TO: (CHECK BOX)

__MENTAL HEALTH   ___CANTEEN
___CASEWORKER   ___MEDICAL   ___LAW LIBRARY   ___DENTAL
___EDUCATION   ___VISITING   ___SHIFT COMMAND
___LAUNDRY   ___PROPERTY ROOM   X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

6.) REQUEST: (PRINT BELOW) Please mail the following 9X12 manilla envelope USPS Priority Mail for $7.95 to;

Steven Sisolak
State Capitol Building
101 N. Carson Street
Carson City, NV 89701

Press Slip # 2541652

7.) INMATE SIGNATURE A.H.   DOC # 1116647

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

9.) RESPONSE TO INMATE

Processed

10.) RESPONDING STAFF SIGNATURE  SC/   DATE 11-30-2021

DOC - 3012 (REV. 7/01)

Nov 7th, 21

Barbara K. Cegavske
Secretary of State
State Capitol Building
101 N. Carson Street
Carson City, NV 89701

Notice of Intent: Pursuant to NRS 41.031 and NRS 41.0337, Civil Action will be brought against you as a member of the Board of Prison Commissioners.

In regards to the following grievances; 2006-31-18343 and 2006-31-20319, copies of said grievances are included for your convenience.

Respectfully Submitted,
Ammar Harris #1116547
High Desert State Prison
P.O. Box 650
Indian Springs, NV
89070

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 116547 | 6B-1 | 11/30/21 |

4.) REQUEST FORM TO: (CHECK BOX)

___MENTAL HEALTH     ___CANTEEN

___CASEWORKER     ___MEDICAL     ___LAW LIBRARY     ___DENTAL

___EDUCATION     ___VISITING     ___SHIFT COMMAND

___LAUNDRY     ___PROPERTY ROOM     X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

6.) REQUEST: (PRINT BELOW) Please mail the following 9X12 Manilla envelope USPS Priority Mail for $7.95 to;

Barbara K. Cegavske
State Capitol Building
101 N. Carson Street
Carson City, NV 89701

Brass Slip # 2482021

7.) INMATE SIGNATURE A.H.     DOC # 116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

9.) RESPONSE TO INMATE

Processed

10.) RESPONDING STAFF SIGNATURE SC/G _____ DATE 11-30-2021

DOC - 3012 (REV. 7/01)

Nov 7th, 21

Aaron D. Ford
Attorney General
555 E. Washington Ave, Ste 3900
Las Vegas, NV 89101

    Notice of Intent: Pursuant to NRS 41.031 and NRS 41.0337, Civil Action will be brought against you as a member of the Board of Prison Commissioners.

    In regards to the following grievances; 2006-31-19343 and 2006-31-20319, copies of said grievances are included for your convenience.

             Respectfully Submitted,
             Ammar Harris #1116547
             High Desert State Prison
                   P.O. Box 650
             Indian Springs, NV
                 89070

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1165477 | 6B-1 | 11/30/21 |

4.) REQUEST FORM TO: (CHECK BOX)

___MENTAL HEALTH     ___CANTEEN

___CASEWORKER     ___MEDICAL     ___LAW LIBRARY     ___DENTAL

___EDUCATION     ___VISITING     ___SHIFT COMMAND

___LAUNDRY     ___PROPERTY ROOM     X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

6.) REQUEST: (PRINT BELOW) Please mail the following 4X12
Manilla envelope USPS Priority Mail for $7.95 to:

Aaron D. Ford
Attorney General
555 E. Washington Ave, Ste 3900
Las Vegas, NV 89101
Brass Slip # 2538972

7.) INMATE SIGNATURE _____A.H._____ DOC # 1165477

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

9.) RESPONSE TO INMATE

Processed

10.) RESPONDING STAFF SIGNATURE _SC/_____ DATE 11-30-2021

DOC - 3012 (REV. 7/01)

**U.S. Department of Justice**

Office of Justice Programs

*Office for Civil Rights*

_____

*Washington, D.C. 20531*

February 15, 2022

Ammar Harris, #1116547
High Desert State Prison
P.O. Box 650
Indian Springs, NV 89070-0650

     Re:    *Harris v. Nev. Dep't of Corr. (21-OCR-1883)*

Dear Mr. Harris:

The Office for Civil Rights (OCR), Office of Justice Programs, U.S. Department of Justice (DOJ) has received your Complainant Verification Information form that you submitted in connection with your above-referenced Complaint against the Nevada Department of Corrections (DOC). In your Complaint, you alleged that the DOC discriminated against you based on race and disability when DOC officers failed to prevent and protect you from being assaulted by other inmates and then took action to cover it up. You further alleged that the DOC is failing to provide you with medical treatment and rehabilitation for injuries that you experienced as a result of the assault.

The OCR has the administrative responsibility for ensuring that recipients of DOJ financial assistance do not discriminate on the basis of race, color, national origin, disability, sex, religion, and age.

All administrative complaints of disability discrimination must be filed with the DOJ within 180 days from the date of the alleged discrimination. 28 C.F.R. §§ 35.170(b), 42.530(a). Because the DOJ initially received your Complaint on August 19, 2021, the OCR only has jurisdiction, or authority, to investigate your allegations of disability discrimination occurring on or after February 19, 2021 (i.e., within 180 days of August 19, 2021). Pursuant to the DOJ's regulations related to the law under which the DOC receives financial assistance, all complaints of race discrimination must be filed with the DOJ within one year from the date of the alleged discrimination. 28 C.F.R. § 42.205(b). Accordingly, the OCR only has jurisdiction to investigate your allegations of race discrimination occurring on or after August 19, 2020 (i.e., within one year of August 19, 2021).

In your Complaint, you alleged that the DOC failed to prevent and protect you from an August 28, 2020, assault by other inmates, and then took action to cover it up by issuing disciplinary charges against you in connection with this incident on August 28, 2020. As this incident and the issuance of disciplinary charges occurred prior to February 19, 2021, the OCR does not have

Ammar Harris, #1116547
February 15, 2022
Page 2 of 2

jurisdiction to investigate any allegation of disability discrimination in connection with the
assault. While your allegation of race discrimination in connection with the assault is timely,
you did not present any information to demonstrate that the DOC's alleged actions of failing to
prevent the assault and covering it up occurred due to your race. Accordingly, the OCR will take
no further action on these allegations.

In regard to your allegations that the DOC has failed to provide you with necessary medical
treatment and rehabilitation for the injuries you experienced during the assault, it appears that
this allegation may be ongoing. As for your allegation of race discrimination, you have not
provided any information demonstrating that any failure of the DOC to provide you with medical
treatment is due to your race. Based on the information that you provided in your Complaint and
the OCR's research, the OCR understands that you have filed a lawsuit in the U.S. District Court
for the District of Nevada, Civil Action No. 3:21-cv-00380, alleging in part that the DOC
discriminated against you based on disability by failing to provide you with adequate medical
treatment following the assault. Pursuant to our regulations and related policies, the OCR will
not initiate an investigation regarding these allegations while this related federal case is pending.
Since your allegation of disability discrimination in connection with inadequate medical
treatment is already being addressed in federal court, the OCR will also administratively close
this allegation. If you elect to re-file a complaint regarding this allegation following the
conclusion of your court proceeding, the OCR will evaluate it for jurisdiction and timeliness and
may adopt the findings of the Court.

Based on the foregoing, the OCR has administratively closed your Complaint.

Thank you for raising your concerns with the DOJ. Our closure of your Complaint does not
prevent you from raising your concerns with other agencies or courts.

Sincerely,

X _Michael L. Alston_

Michael L Alston
Director
Signed by: MICHAEL ALSTON

# Exhibit 1 - Grievance 2006-31-18343

GRIEVANCES

| | | |
|---|---|---|
| A - NDOC Memo, | E(5) - Page 4 | , F(17) - Baltierra |
| A(1) - Informal | , E(6) - Murder | , F(18) - ESP AW Drummond |
| A(2) - Page 1 | , E(7) - NDOC Claim | , F(18)a - C/o Thomas |
| A(3) - Page 2 | , E(8) - NDOC Claim 2 | , F(19) - ESP Warden |
| A(4) - Murder | , E(9) - NDOC Claim 3 | , F(19)a - ESP Warden |
| A(5) - Sgro | , - CORRESPONDENCE - | , F(20) - Mollet |
| A(6) - Sgro 2 | , F - ESP Warden | , F(21) - C/o Coulston |
| B - NDOC Memo, | F(1) : P. Hernandez | , F(22) - ESP AW Reubart |
| B(1) - 1st Level | , F(2) - P. Hernandez | , F(23) - C/o A. Montes |
| B(2) - Page 1 | , F(3) - Baltierra | , GRIEVANCES |
| B(3) - Page 2 | , F(3)a - Baltierra | , G - NDOC Memo HDSP |
| B(4) - Page 3 | , F(4) - Baltierra | , G(1) - Informal |
| B(5) - Page 4 | , F(5) - Baltierra | , G(2) - Page 1 |
| C - NDOC Memo, | F(6) - Baltierra | , G(3) - Page 2 |
| C(1) - 1st Level | , F(7) - P. Hernandez | , G(4) - Murder |
| C(2) - Page 1 | , F(8) - P. Hernandez | , H - ESP Memo |
| C(3) - Page 2 | , F(8)a - ESP Warden | , H(1) - 2nd Level |
| C(4) - Page 3 | , F(9) - P. Hernandez | , H(2) - Declaration |
| C(5) - Page 4 | , F(10) - P. Hernandez | , I - NDOC Memo |
| D - ESP Memo, | F(11) - C/o Thomas | , I(1) - Informal |
| D(1) - 2nd Level | , F(11)a - C/o Thomas | , I(2) - Page 1 |
| E - ESP Memo | , F(12) - ESP AW Reubart | , I(3) - Page 2 |
| E(1) - 1st Level | , F(13) - P. Hernandez | , I(4) - Murder |
| E(2) - Page 1 | , F(14) - P. Hernandez | , I(6) - Sgro |
| F(3) - Page 2 | , F(15) - Baltierra | |
| E(4) - Page 3 | , F(16) - Baltierra | |



Mailed 4/7/21



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:**   _Harris, Ammar      #1116547_      HDSP 6A 21

**FROM:**   _David Drummond, AW – Ely State Prison_

**DATE:**   _April 6, 2021_

**RE: Improper Grievance #** _2006.31.18343_      _2nd Rejection_

---

The attached grievance is being returned to you for the following reason(s):

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**
- ☐ Non-grievable issues
  - ☐ State and federal court decision
  - ☐ State, federal and local laws and regulations
  - ☐ Parole Board decision
  - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
  - ☐ A threat of serious bodily injury to a specific individual
  - ☐ Specific claims or incidents previously filed by the same inmate
  - ☐ Obscene, profane and derogatory language
  - ☐ More than one (1) grievance per week, Monday through Sunday
  - ☐ Other specify:

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.
- ☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted and/or no remedy requested.
- ☐ More than two (2) continuation forms (DOC 3097) per grievance
- ☐ Alteration of the grievance forms or continuation forms.
- ☑ Other specify: *Inmate Harris, Per AR 740 grievance will be submitted correctly. You failed to follow AR 740 by submitting this grievance to the grievance coordinator to be properly be signed and mailed to Ely State Prison. However you must attached an Administrative Claim form when requesting compensation. Re-submit at the informal level with all forms attached.*

| Witness Signature | Date | Inmate Signature | Date |
|---|---|---|---|
| | | | |

cc: Original – Inmate
    Copy - Grievance File



DOC-3098 (01/19)

Log Number 2006 118 342

# NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT: 1A-21

GRIEVANT'S STATEMENT: I was involved in an altercation at Eli State Prison which has left me severely disabled, if it hadn't been for the failure of C/O D. Cole and Boyd and following proper procedures by the administration the incident would have never occurred. See Attachments!

## SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: _____ DATE: 3-14-21 TIME: 8am

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: _____ TIME: _____

GRIEVANCE RESPONSE: _____

Doc 3098

_____
_____
_____
_____

CASEWORKER SIGNATURE: _____ DATE: _____

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _____ DATE: 4/6/?

_____ INMATE AGREES _____ INMATE DISAGREES

INMATE SIGNATURE: _____ DATE: _____

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

A(1)

DOC 3091 (12 / 01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: _Ammar Harris_          I.D. NUMBER: _1116547_

INSTITUTION: _ESP_          UNIT #: _1A-21_

GRIEVANCE #: _____          GRIEVANCE LEVEL: _Informal_

GRIEVANT'S STATEMENT CONTINUATION:     PG. _1_   OF _2_

Per NDOC Ely State Prison's offender orientation hand-
book, Maximum Custody: classification of maximum
custody inmates is the designated Status for administrative
or disciplinary segregation or disciplinary detention for
close custody inmates. Maximum custody characteristics
consist of fenced perimeters and gun towers, Single
occupancy cells, confinement to a cell except for Schedule
exercise periods, showers, visits, professional interviews,
telephone calls and hearings, Direct Supervision when
inmates are outside of their cells, out of cell activities
are limited to separate and secure areas, Unclothed
Body Searches on inmates Exiting and Returning to
housing units, movement will be in restraints under
escort, inmates designated as High Risk Potential, inmates
under Sentence of Death, and transportation outside
the institution will be under restraints, under armed

Original:     Attached to Grievance
Pink:        Inmate's Copy

A(2)

DOC – 3097 (01/02)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris     I.D. NUMBER: 1116549

INSTITUTION: ESP     UNIT #: 1A-21

GRIEVANCE #: _____     GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION: PG. 2 OF 2

escorts, may include chase vehicle if designated by the Warden. Included is the incident report, OIC# 485309, if officer Cole and Boyd would have simply performed their duties by conducting an unclothed body search before yard, as outlined in the Orientation Handbook, I would have never been injured. The whole incident was captured on camera.

I would like the following remedies:
* Access to an outside institution for rehabilitation.
* Compensation in the sums of a $1,000,000. for pain/suffering.
* Media credits in the sums of $50,000.
* A device that stimulates muscle activity. (Biomess)
* A stereo, TV w/ remote control.
* An actual mattress. (Back pains)
* The termination of Cole and Boyd.

Original:     Attached to Grievance
Pink:     Inmate's Copy

A(3)

DOC – 3097 (01/02)



# State of Nevada
## Department of Corrections
### DISCIPLINARY FORM I
### NOTICE OF CHARGES

| INMATE INFORMATION | VIOLATION INFORMATION |
|---|---|

**INMATE NAME:** HARRIS, AMMAR 1116547

**CURRENT LOCATION** HDSP-U4-B-1-A; ; ;NC

**OIC#:** 485309  **IR#:** IR-2020-ESP-001727

**CHARGING EMPLOYEE** D. Cole

**DATE OF INCIDENT:** 08/28/2020

**DATE CHARGES WRITTEN:** 08/28/2020

## CHARGES AND EVIDENCE

| Chrg | Description | Evidence | Evidence Disposition |
|---|---|---|---|
| MJ16: | Murder | Staff reports | |

## REPORT OF VIOLATION

On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris? #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio. Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand. At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied. I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

| CHARGING EMPLOYEE SIGNATURE | SUPERVISOR SIGNATURE |
|---|---|

| SERVICE OF NOTICE OF CHARGES | DISTRIBUTION |
|---|---|

**DATE OF SERVICE:** _____ **TIME OF SERVICE:** _____

**PRINTED NAME OF HEARING OFFICER** _____

**SIGNATURE OF HEARING OFFICER** _____

**SIGNATURE OF INMATE** _____

(Signature indicates receipt of notice only. It is not a plea; refusal to sign should be noted)

Primary Hearing Officer (Original)

Charging employee (Copy)

Inmate (Copy)

A(4)

-----

Report Name: NVRNOC

Reference Name: NOTIS-RPT-OR-0061.3

Run Date: NOV-16-20 11:46 PM

Page 1 of 1



**SGRO | ROGER**
ATTORNEYS AT LAW

ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
MICHAEL R. BRUNET

March 30, 2021

ELY STATE PRISON

APR - 2 2021

WARDEN'S OFFICE

**VIA USPS**
Nevada Ely State Prison
4569 North State Route
Ely, Nevada 89301

Attn: Warden William Gittere

**Re:** *AMMAR HARRIS, High Desert State Prison Inmate # 1116547*

Dear Warden Gittere,

This office represents Ammar Harris, High Desert State Prison Inmate # 1116547, in two matters pending before the Eighth Judicial District Court, Clark County, Nevada. Mr. Harris has requested that we forward you the enclosed documents on his behalf in an unrelated matter that we do not represent him in.

Respectfully,

ALANNA BONDY, ESQ.
**SGRO & ROGER**

A(5)

Enclosures: As stated

ACB/bs

720 S. 7th St., 3rd Floor, Las Vegas, NV 89101 | Tel.: (702) 384-9800 | Fax: (702) 665-4120



$0.7140
US POSTAGE
FIRST-CLASS
9625S001431783
FROM 89101

ELY STATE PRISON
APR - 2 2021

WARDEN'S OFFICE

Nevada Ely State Prison
4569 N. State Route
Ely, NV 89301
ATTN: Warden William Gittere



SGRO | ROGER
ATTORNEYS AT LAW
720 S 7TH ST #300
LAS VEGAS, NV 89101

A(6)



*Mailed 5/17/21*



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:**   <u>Harris, Ammar   #116547</u>     HDSP 6A 21

**FROM:**   <u>David Drummond, AW- Ely State Prison</u>     4AW *(EH)*

**DATE:**   <u>May 12, 2021</u>

**RE: Improper Grievance #**   <u>2006.31.18343     3rd</u>Rejection

The attached grievance is being returned to you for the following reason(s):

---

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**

- ☐ Non-grievable issues
  - ☐ State and federal court decision
  - ☐ State, federal and local laws and regulations
  - ☐ Parole Board decision
  - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
  - ☐ A threat of serious bodily injury to a specific individual
  - ☐ Specific claims or incidents previously filed by the same inmate
  - ☐ Obscene, profane and derogatory language
  - ☐ More than one (1) grievance per week, Monday through Sunday
  - ☐ Other specify:

---

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

- ☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted **and/or** no remedy requested.
- ☐ More than two (2) continuation forms (DOC 3097) per grievance
- ☐ Alteration of the grievance forms or continuation forms
- ■ Other specify: **Per AR 740 grievance was not submitted properly. The Grievance was not placed directly in the Grievance Box nor signed and dated by the High Desert State Prison Grievance Coordinator. However you failed to attach DOC 3098 1st rejection, 2nd rejection with ALL forms attached. Re-submit properly with the missing forms at the Informal level.**

_____     _____
Witness Signature                    Date        Inmate Signature              Date

---

cc: Original – Inmate

*B*

DOC-3098 (01/19)

Log Number _____

2006 21 18343

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: Amanda Harris          I.D. NUMBER: 1106119

INSTITUTION: ESP          UNIT: 10 2

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER _____ N/A _____ , IN A FORMAL MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: _____ A.H. _____          DATE: 5-5-21

WHY DISAGREE: It's been more than 45 days. My informal grievance has been unanswered. Proceeding with my first level grievance. - Filed informal on 3/11/21

(See Attachment)

GRIEVANCE COORDINATOR SIGNATURE: _____          DATE: 5/12/21

FIRST LEVEL RESPONSE: _____

Doc 3075

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 5/12/21

_____ INMATE AGREES _____ INMATE DISAGREES

INMATE SIGNATURE: _____ DATE: _____

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

Ely State Prison

MAY 1 1 2021

B(1)

Grievance Coordinator

DOC 3093 (12/01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT #: 1A21

GRIEVANCE #: _____     GRIEVANCE LEVEL: first level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 1 OF 4

I was stabbed by another inmate on Aug 28th, 2020
at Ely State Prison, which has left me severely disabled,
at roughly 8:30Am, an inmate stood at my door, and was
attempting to make entry, I refused yard when asked, so
when my door started to open, I instantly decided to get
out the cell, to prevent the inmate from entering, noticed
the inmate had a weapon in hand upon my exiting of the
cell, I alert the officers for aid, but none was given,
I attempted to defend myself to the best of my ability
but was unsuccessful.
(Failure to follow safety procedures)
AR 400, 403, 420, 422, 457, 507, 521.
C/O Cole and/or Boyd didn't perform inmate searches
upon their exiting from cells, wasn't directly supervising,
and opened my cell for me to be attacked, constitutes
deliberate indifference.

Original:     Attached to Grievance
Pink:          Inmate's Copy     Ely State Prison

B(2)                    MAY 1 1 2021

                  Grievance Coordinator

                              DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT #: 1A 21

GRIEVANCE #: _____          GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 2 OF 4

( Failure to protect )

C/o Cole and/or Boyd had duties to protect me from harm, which they failed to do by abandoning the policies set forth by NDOC, because of negligence I was stabbed in the brain which has left me with the following, Acquired Aphasia, Hemianopsia, Apraxia, Hemiparesis.

( Failure to supervise )

A.W. Reubart had a duties to train / supervise his subordinates, fail to establish if staff error or mis conduct was cause, fail to discipline.

( Failure to supervise )

Warden Gittere had duties to train / supervise his subordinates, fail to establish if staff error or mis- conduct was cause, fail to discipline, fail to review or investigate.

Original:     Attached to Grievance
Pink:         Inmate's Copy

Ely State Prison

MAY 11 2021

B(3)

Grievance Coordinator

DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME. Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT #: 1A21

GRIEVANCE #: _____          GRIEVANCE LEVEL: first level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 3 OF 4

(Failure to supervise.)

Deputy Director (name unknown), had duties to train and supervise his subordinates, fail to establish if staff error or misconduct was cause, fail to discipline, fail to review or investigate, fail to terminate a series of actions by others.

(Failure to supervise.)

Director Charles Daniels had duties to train and supervise his subordinates, fail to establish if staff error or misconduct was cause, fail to discipline, fail to review or investigate, fail to terminate a series of actions by others, fail to set a series of actions by others, fail to protect inmates under his care, despite his knowledge they were in danger, because of acts by his subordinates, and didn't take actions that would have protect them.

Original:     Attached to Grievance
Pink:         Inmate's Copy     Ely State Prison

B(4)

MAY 1 1 2021

Grievance Coordinator

DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris           I.D. NUMBER: 1116547

INSTITUTION: EBP           UNIT #: 1A21

GRIEVANCE #: _____  GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:  PG. 4 OF 4

I would like the following remedies,

* Access to an outside institution for rehabilitation.
* Compensation for pain/suffering, $1,000,000.
* A device that stimulate muscle activity (Bioness)
* Medical credits, $50,000.
* Phone credits, $50,000.
* A stereo.
* TV with remote control.
* An actual mattress.
* Termination of C/O Cole and Boyd.

(OIC # 485309)

Original:     Attached to Grievance
Pink:         Inmate's Copy
                              Ely State Prison

B(5)                          MAY 11 2021

                              Grievance Coordinator

                                        DOC – 3097 (01/02)



# Nevada Department of Corrections
# Improper Grievance Memo

ESP

**TO INMATE:** _____ *Harris, Ammar  #116547* _____ **HDSP 6A 21**

**FROM:** *David Drummond, AW- Ely State Prison*    4AW

**DATE:** _____ *May 12, 2021* _____

**RE: Improper Grievance #** _2006.31.18343_    _3rd Rejection_

---

The attached grievance is being returned to you for the following reason(s):

| |
|---|
| **NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**<br>☐ Non-grievable issues<br>  ☐ State and federal court decision<br>  ☐ State, federal and local laws and regulations<br>  ☐ Parole Board decision<br>  ☐ Lacks standing<br>☐ Untimely submission.<br>☐ Inmate elected NOT to sign and date any grievance form.<br>☐ Grievance was granted.<br>☐ Abuse of Inmate Grievance Procedure<br>  ☐ A threat of serious bodily injury to a specific individual<br>  ☐ Specific claims or incidents previously filed by the same inmate<br>  ☐ Obscene, profane and derogatory language<br>  ☐ More than one (1) grievance per week, Monday through Sunday<br>  ☐ Other specify: |
| **REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.<br>☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.<br>☐ No factual harm/loss noted **and/or** no remedy requested.<br>☐ More than two (2) continuation forms (DOC 3097) per grievance<br>☐ Alteration of the grievance forms or continuation forms<br>■ Other specify: **Per AR 740 grievance was not submitted properly. The Grievance was not placed directly in the Grievance Box nor signed and dated by the High Desert State Prison Grievance Coordinator. However you failed to attach DOC 3098 1st rejection, 2nd rejection with ALL forms attached. Re-submit properly with the missing forms at the Informal level.** |

| Witness Signature | Date | Inmate Signature | Date |
|---|---|---|---|
| COSII 8/6/21 | | AH 5/8/21 8/6/21 | |

cc: Original – Inmate

DOC-3098 (01/19)

2006 3118343

**Log Number** _____

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: Ammar Harris _____ I.D. NUMBER: 1116549

INSTITUTION: ESP _____ UNIT: 1A 21

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER _____ N/A _____ , IN A FORMAL
MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED
FOR REVIEW.

SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: _____ A.H. _____ DATE: 5-5-21

WHY DISAGREE: Its been more than 45 days, my informal
grievance has went unanswered, procceding with my
first level grievance. - Filed informal on 3/14/21
(see Attachment)

GRIEVANCE COORDINATOR SIGNATURE: PHernandez DATE: 5/12/21

FIRST LEVEL RESPONSE: _____

Doc 3098

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: PHernandez DATE: 5/12/21

_____ INMATE AGREES AH. INMATE DISAGREES
AH
INMATE SIGNATURE: A.H _____ DATE: 8/7/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE
PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

Ely State Prison

C(1)

MAY 11 2021

Grievance Coordinator

DOC 3093 (12/01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP            UNIT #: 1 A 21

GRIEVANCE #: _____    GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:    PG. 1    OF 4

I was stabbed by another inmate on Aug 28th, 2020 at Ely State Prison, which has left me severely disabled, at roughly 8:30Am, an inmate stood at my door, and was attempting to make entry, I refused yard when asked, so when my door started to open, I instantly decided to get out the cell, to prevent the inmate from entering, noticed the inmate had a weapon in hand upon my exiting of the cell, I alert the officers for aid, but none was given, I attempted to defend myself to the best of my ability but was unsuccessful.

(Failure to Follow safety procedures)
AR 400, 403, 420, 422, 457, 507, 521
C/O Cole and/or Boyd didn't perform inmate searches upon their exiting from cells, wasn't directly supervising, and opened my cell for me to be attacked, constitutes deliberate indifference.

Original:    Attached to Grievance
Pink:        Inmate's Copy      Ely State Prison

C(2)                    MAY 1 1 2021

                        Grievance Coordinator

                                        DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT #: 1A 21

GRIEVANCE #: _____          GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 2  OF  4

( Failure to protect )

C/O Cole and/or Boyd had duties to protect me from harm, which they Failed to so by abandoning the policies set forth by NDOC, because of negligence I was stabbed in the brain which has left me with the Following, Acquired Aphasia, Hemianopsia, Apraxia, Hemiparesis.

(Failure to supervise)

A.W. Reubart had a duties to train/ supervise his Subordinates, Fail to establish if staff error or mis conduct was cause, Fail to discipline.

( Failure to supervise )

Warden Gittere had duties to train/ supervise his Subordinates, Fail to establish if staff error or mis- conduct was cause, Fail to discipline, Fail to review or investigate.

Original:     Attached to Grievance
Pink:         Inmate's Copy

( 3 )

Ely State Prison

MAY 11 2021

Grievance Coordinator

DOC – 3097 (01/02)

**NEVADA DEPARTMENT OF CORRECTIONS**
**GRIEVANT'S STATEMENT CONTINUATION FORM**

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT #: 1A 21

GRIEVANCE #: _____     GRIEVANCE LEVEL: first level

GRIEVANT'S STATEMENT CONTINUATION: PG. 3 OF 4

(Failure to supervise)

Deputy Director (name unknown), had duties to train and supervise his subordinates, fail to establish if staff error or misconduct was cause, fail to discipline, Fail to review or investigate, fail to terminate a series of actions by others.

(Failure to supervise)

Director Charles Daniels had duties to train and supervise his subordinates, fail to establish if staff error or misconduct was cause, fail to discipline, fail to review or investigate, fail to terminate a series of actions by others, fail to set a series of actions by others, fail to protect inmates under his care, despite his knowledge, they were in danger, because of acts by his subordinates, and didn't take actions that would have protect them.

Original:     Attached to Grievance
Pink:         Inmate's Copy     Ely State Prison

C(4)

MAY 11 2021

Grievance Coordinator

DOC – 3097 (01/02)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: EBP          UNIT #: 1A21

GRIEVANCE #: _____          GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 4 OF 4

I would like the following remedies,

\* Access to an outside institution for rehabilitation.

\* Compensation for pain/suffering, $1,000,000.

\* A device that stimulate muscle activity. (Bioness)

\* Media credits, $50,000.

\* Phone credits, $50,000.

\* A stereo.

\* TV with remote control.

\* An actual mattress.

\* Termination of C/O Cole and Boyd.

(OIC # 485309)

Original:     Attached to Grievance
Pink:         Inmate's Copy          Ely State Prison

(5)                                MAY 11 2021

                                Grievance Coordinator

                                          DOC – 3097 (01/02)

NEVADA DEPARTMENT OF CORRECTIONS
ELY STATE PRISON

MEMORANDUM

Date:        August 4, 2021

Inmate: Harris, Ammar      # 1116547       9A 3

FROM:
              David Drummond, AW – Ely State Prison

SUBJECT:   **Grievance 2006.31.18343**

_____

    This grievance has been rejected 3 times.   Per OP 740 If a grievance has been rejected and returned to the inmate for additional information and this information has not been provided the grievance will be considered abandoned. Your grievance may not be resubmitted and if it is re-submitted, it will be placed in your grievance file without any action.

Note: Missing DOC 3098 forms, Per AR 740 more than 2 continuation forms.


_____         _____
Inmate's signature              Date received

_____         _____
Caseworker's signature          Date received

LOG NUMBER: _____

## NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31-18343, ON THE SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.          DATE: 8/1/21

WHY DISAGREE: I filed an informal on 3/14/21 which went unanswered, proceeded to first level, filed my first level on 5/5/21 which went unanswered, proceeding with my second level - Regarding Fly Altercation

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 8/4/21

SECOND LEVEL RESPONSE: _____

_____ Memorandum. _____

_____

_____

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 8/5/21

INMATE SIGNATURE: A.H _____ DATE: 8/6/21

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |



D(1)

DOC 3094 (12/01)

NEVADA DEPARTMENT OF CORRECTIONS
ELY STATE PRISON

MEMORANDUM

Date:       June 4, 2021

Inmate:     Ammar Harris        # 1116547        9A 6

FROM:
            David Drummond, AW – Ely State Prison

SUBJECT:    **Grievance 2006.31.18343**

This grievance has been rejected 3 times. Per OP 740 If a grievance has been rejected and returned to the inmate for additional information and this information has not been provided the grievance will be considered abandoned. Your grievance may not be resubmitted and if it is re-submitted, it will be placed in your grievance file without any action.

_____
Inmate's signature

_____
Date received    8/6/21

_____
Caseworker's signature

_____
Date received    8/6/21

4th Reject

**Log Number** 2000-31-18343

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: HDSP          UNIT: 6A21

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER _____N/A_____ , IN A FORMAL MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A. H.          DATE: 5-5-21

WHY DISAGREE: I filed an informal on 3/14/21, its been more than 45 days, my grievance has went unanswered, I'm proceeding with my first level grievance.
                    (see Attachments)

GRIEVANCE COORDINATOR SIGNATURE: _____          DATE: 6/8/21

FIRST LEVEL RESPONSE: _____
Memorandum

_____ GRIEVANCE UPHELD_____ GRIEVANCE DENIED_____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE:_____          TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE:_____          DATE: 6/8/21

_____ INMATE AGREES AH ___ INMATE DISAGREES

INMATE SIGNATURE: A. H.          DATE: 8/6/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

RECEIVED
MAY 06 2021

E(1)

DOC 3093 (12/01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris     I.D. NUMBER: 1116647

INSTITUTION: HDSP     UNIT #: 6A 21

GRIEVANCE #: _____     GRIEVANCE LEVEL: First Level

GRIEVANT'S STATEMENT CONTINUATION:    PG. 1 OF 4

On Aug 28th, 2020, I was stabbed by another inmate at Ely State Prison, it has left me severely disabled. At roughly 8:30AM, c/o cole asked me was I attending yard, I refused, an inmate stood at my door and was trying to gain entry into my cell, when my door began to open, all I could do was try to exit my cell before the inmate could enter, as I made exit I noticed a weapon in the inmate's hand, I alerted the officers to render aid, none was provided, attempted to defend myself to the best of my abilities, but was unsuccessful. AR 400, 403, 420, 422, 454, 507, 521
(Failure to follow safety procedures)
C/o Cole/ Boyd didn't follow safety protocols that were in place to prevent this kind of situation from occurring, inmate searches upon exiting from cells and opening wrongly my cell door for me to be attacked.

Original:    Attached to Grievance
Pink:    Inmate's Copy

E(2)

RECEIVED

MAY 06 2021

HDSP

DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: HDSP          UNIT #: 6A 21

GRIEVANCE #: _____          GRIEVANCE LEVEL: First level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 2    OF 4

( Failure to protect )

C/O Cole / Boyd had duties to protect me from harm, they failed to do so by abandoning their responsibilities set forth by NDOC policies, because of their negligence I was stabbed in the brain, which has left me with the following, Acquired Aphasia, Hemianopsia, Apraxia, and Hemiparesis.

( Failure to supervise )

A.W. Reubart had duties to train / supervise his subordinates, fail to establish if staff error or misconduct was cause, fail to discipline.

( Failure to supervise )

Warden Gittere had duties to train / supervise his subordinates, fail to review or investigate, fail to establish if staff error or misconduct was cause, fail to discipline, fail to protect me from harm.

Original:      Attached to Grievance
Pink:          Inmate's Copy

E(3)

RECEIVED

MAY 06

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: HDSP     UNIT #: 6A21

GRIEVANCE #: _____     GRIEVANCE LEVEL: first level

GRIEVANT'S STATEMENT CONTINUATION:     PG. 3     OF 4

( Failure to supervise )

Deputy Director (name Unknown) had duties to train and supervise his subordinates, fail to review or investigate, fail to establish if staff error or misconduct was cause, fail to discipline, Fail to terminate a series of actions by others, fail to enforce policies, fail to protect me from harm.

( Failure to supervise )

Director Daniels had duties to train/supervise his subordinates, fail to review or investigate, fail to establish if staff error or misconduct was cause, fail to discipline, fail to terminate a series of actions by others, fail to enforce policies, fail to protect me from harm, despite his knowledge they were in danger, because of acts by his subordinates, and didn't take actions that would have protected me.

Original:     Attached to Grievance
Pink:     Inmate's Copy

E(4)

RECEIVED
MAY 06 2021

DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris        I.D. NUMBER: 1116547

INSTITUTION: HDSD         UNIT #: 6A 21

GRIEVANCE #: _____      GRIEVANCE LEVEL: first level

GRIEVANT'S STATEMENT CONTINUATION:   PG. 4 OF 4

I would like the following remedies.

* Access to an outside institution for rehabilitation.
* $1,000,000 compensation for pain/suffering.
* A device that stimulate muscle activity. (Bioness)
* Media credits. $50,000
* Phone credits. $50,000
* A Stereo
* TV with remote control
* An actual mattress
* Termination of c/o Cole and Boyd

(OIC #485309)

Original:    Attached to Grievance
Pink:        Inmate's Copy

E(5)

RECEIVED MAY 06

DOC – 3097 (01/02)



# State of Nevada
# Department of Corrections
## DISCIPLINARY FORM I
## NOTICE OF CHARGES

### INMATE INFORMATION
**INMATE NAME:** HARRIS, AMMAR 1116547
**CURRENT LOCATION** HDSP-U4-B-1-A; : ;NC
**OIC#:** 485309 **IR#:** IR-2020-ESP-001727

### VIOLATION INFORMATION
**CHARGING EMPLOYEE** D. Cole
**DATE OF INCIDENT:** 08/28/2020
**DATE CHARGES WRITTEN:** 08/28/2020

### CHARGES AND EVIDENCE

| Chrg | Description | Evidence | Evidence Disposition |
|------|-------------|----------|----------------------|
| MJ16: | Murder | Staff reports | |

### REPORT OF VIOLATION

On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris? #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. . Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio. Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand. At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied. I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

### CHARGING EMPLOYEE SIGNATURE
### SUPERVISOR SIGNATURE

### SERVICE OF NOTICE OF CHARGES
**DATE OF SERVICE:** _____ **TIME OF SERVICE:** _____
**PRINTED NAME OF HEARING OFFICER** _____
**SIGNATURE OF HEARING OFFICER** _____
**SIGNATURE OF INMATE** _____

(Signature indicates receipt of notice only. It is not a plea; refusal to sign should be noted)

### DISTRIBUTION
Primary Hearing Officer (Original)
Charging employee (Copy)
Inmate (Copy)

E(6)

Report Name: NVRNOC
Reference Name: NOTIS-RPT-OR-0061.3
Run Date: NOV-16-20 11:46 PM

Page 1 of 1


MAY 06 2021

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE CLAIM FORM

> THIS FORM MUST BE COMPLETED PER NRS 41.036, 41.0322, 209.243 AND ADMINISTRATIVE REGULATION 740

> DO **NOT** SEND DIRECTLY TO ATTORNEY GENERAL'S OFFICE, BOARD OF EXAMINERS, OR DIRECTOR

> This form is to be attached to your grievance form for any injuries or any other claim (except property) arising out of a tort alleged to have occurred during your incarceration as a result of an act or omission of the Department of Corrections or any of its agents, former officers, employees or contractors.

The following information is necessary to fairly evaluate your claim. Please provide complete information. If you need more space, attach a separate sheet of paper. You may submit additional evidence if available. Such additional evidence will be returned.

CLAIM IN THE AMOUNT OF $ _1,000,000_ is hereby made against the Department of Corrections, based upon the following facts:

| 1. NAME OF CLAIMANT (Please print full name) | 2. I.D. # | 3. INSTITUTION |
|---|---|---|
| Ammar Asim Faruq, Harris | 1116547 | ~~ESP~~ HDSP |
| 4. AMOUNT OF CLAIM | 5. DATE AND DAY OF OCCURRENCE | 6. TIME (a.m. or p.m.) |
| $1,000,000 | 8/28/20 - Friday | 8:30 Am |
| 7. PLACE OF OCCURRENCE | | |
| Ely State Prison | | |

E(7)

DOC 3095 (12/01)

RECD
MAY 06
HDSP

8.  Describe here, in complete detail, exactly how your claim loss or damage occurred and why you believe the institution is responsible or liable:

    I was Stabbed by another inmate on 8/28/21 at Ely
    State Prison, C/O Cole asked if I wanted yard at 8:25am,
    I refused, an inmate stood at my door attempting to enter,
    C/O Cole started to open my door so the inmate could enter,
    at which point I made my way out of the cell, the inmate
    had a weapon in hand, called the c/o's for aid, tried to defend
    myself but was unsuccessful.

9.  Witnesses. Be sure to include any staff member who may have been involved in, or has any knowledge of, your alleged loss; also, list any inmate who has actual knowledge of facts pertinent to your claim:

    Warden Gittere
    Associate Warden Reubart
    Inmate Alfonso Blake
    Inmate Timonty Burnside
    Inmate Carl Williams
    Inmate Donte Johnson

10. Other pertinent information:

    C/O Cole and Boyd fail to follow safety procedures,
    inmates aren't to exit their cells without being searched,
    because of Cole/Boyd laziness, they simply popped doors
    without following guidelines, if it wasn't for their actions
    I would have not been injuried, I'm disabled cause they
    abandoned their duties.

E(8)

REC
MAY 06 2021
HDSP

STATE OF _Nevada_ )
                              ) SS
COUNTY OF _Clark_ )

I, _Ammar Harris_, do hereby swear under penalty of perjury that I am the claimant named above, that I have read the foregoing claim and know the contents thereof, that the same is true of my own knowledge, except those matters stated upon information and belief, and as to those maters, I believe them to be true, and that THIS IS MY ENTIRE CLAIM AGAINST THE STATE OF NEVADA/DEPARTMENT OF CORRECTIONS.

I FULLY UNDERSTAND THAT I WILL HAVE TO SIGN A GENERAL RELEASE OF ALL CLAIMS IN THE PRESENCE OF A NOTARY PUBLIC FOR THE EXACT AMOUNT I AM CLAIMING BEFORE ANY PAYMENT WILL BE OFFERED TO ME. THIS GENERAL RELEASE WILL BECOME EFFECTIVE ONLY UPON ACTUAL PAYMENT OF THE CLAIM BY THE STATE OF NEVADA.

DATED this _5_ day of _May_, 20_21_

_A.H._
Signature of Claimant

**NOTICE**

NEVADA REVISED STATUTE 197.160 provides that every person who knowingly presents a false or fraudulent claim is guilty of a gross misdemeanor, and is subject to criminal penalties of imprisonment of up to one year, and a fine of up to $2,000.00.

E(9)

DOC - 3095 (12/01)

## INMATE REQUEST FORM

To/

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116545 | 9A-6 | 5-23-21 |

4. ) __REQUEST FORM TO:__ (CHECK BOX)

| ___CASEWORKER | ___MEDICAL | ___MENTAL HEALTH | ___CANTEEN |
|---|---|---|---|
| ___EDUCATION | ___VISITING | ___LAW LIBRARY | ___DENTAL |
| ___LAUNDRY | ___PROPERTY ROOM | ___SHIFT COMMAND | |
| | | X OTHER_____ | |

ELY STATE PRISON

MAY 2 4 2021

WARDEN'S OFFICE

5.) __NAME OF INDIVIDUAL TO CONTACT:__ Warden Gittere

6.) __REQUEST:__ (PRINT BELOW) __May I Speak with you?__

7.) INMATE SIGNATURE __A. H.__ DOC # __1116547__

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

*******************************************************************************

### 9.) RESPONSE TO INMATE

What about ? hmm

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

JUN 07 2021

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A-6 | 6-6-21 |

4.) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER     ___MEDICAL     ___MENTAL HEALTH     ___CANTEEN

___EDUCATION     ___VISITING     ___LAW LIBRARY     ___DENTAL

___LAUNDRY     ___PROPERTY ROOM     ___SHIFT COMMAND

    ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: PH?

6.) REQUEST: (PRINT BELOW) Can I pay for a copy of all grievances Filed? (see attachment)

Thank you for your time.

7.) INMATE SIGNATURE ___ W/R A.H. ___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

9.) RESPONSE TO INMATE

You have to attach Brass Slip

10.) RESPONDING STAFF SIGNATURE _____ DATE 6/14

F(1)

DOC - 3012 (REV. 7/01)

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris 116547 | | 9H-3 | 6-16-21 |

4.) **REQUEST FORM TO:** (CHECK BOX)          ___MENTAL HEALTH          ___CANTEEN

X CASEWORKER          ___MEDICAL          ___LAW LIBRARY          ___DENTAL

___EDUCATION          ___VISITING          ___SHIFT COMMAND

___LAUNDRY          ___PROPERTY ROOM          ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: PH

6.) REQUEST: (PRINT BELOW) Brass Slip attached for copies
of the following grievances; 2006-31-21783,
2006-31-20314, 2006-31-18343, 2006-31-15899,
2006-31-15897, 2006-30-98583.

Think you

7.) INMATE SIGNATURE  W/R A.H.          DOC # 116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____
************************************************************************************************************************
9.) RESPONSE TO INMATE

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(2)

DOC - 3012 (REV. 7/01)

## INMATE REQUEST FORM

JUL 07 2021

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A-3 | 7/7/21 |

4. ) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER    ___MEDICAL     ___MENTAL HEALTH    ___CANTEEN

___EDUCATION    ___VISITING     ___LAW LIBRARY    ___DENTAL

___LAUNDRY    ___PROPERTY ROOM    ___SHIFT COMMAND

___LAUNDRY    ___PROPERTY ROOM    ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: _____Grievance_____

6.) REQUEST: (PRINT BELOW) May I have a list of all my grievances Filed, as well as an exact page count so I may provide a brass slip for payment of copies.

Thank you

7.) INMATE SIGNATURE _____W/R A.H._____ DOC # __1116547__

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

### 9.) RESPONSE TO INMATE

Inmate Harris, Year 2021 109 #

2006.31.23427 - Mail. UA 6/8/11

2006.31.23018 - Pr at HDSP

2006 31.22952 - PR. UA 5/25/21

2006 31 21783 - PR - Hobbycraft

2006 31 20319 - Med.

Pick two (2)

10.) RESPONDING STAFF SIGNATURE _Baltierra, Grievance_ DATE _7/8/21_

F(3)

DOC - 3012 (REV. 7/01)

JUL 1 3 2021

### INMATE REQUEST FORM

| 1.) INMATE NAME          DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|
| Ammar Harris  1116547 | 9A-3 | 7/12/21 |

4. )  REQUEST FORM TO:  (CHECK BOX)          ___MENTAL HEALTH          ___CANTEEN

X̶CASEWORKER          ___MEDICAL          ___LAW LIBRARY          ___DENTAL

___EDUCATION          ___VISITING          ___SHIFT COMMAND

___LAUNDRY          ___PROPERTY ROOM          ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: _Grievance_____

6.) REQUEST: (PRINT BELOW) _2006-31-20319, 2006-31-21783__

_____

_____

_____

_____

_____

_____

_____

7.) INMATE SIGNATURE _____ DOC # _____

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

### 9.) RESPONSE TO INMATE

_____

_Log 2006 31 20319,_

_HDSP, ESP DOESN'T Have those copies._

_requested from HDSP._

_____

_log 2006 31 21783, was rcvd from HDSP._

_Eoday. Caseworker will returned._

10.) RESPONDING STAFF SIGNATURE _Suldana Grievances_ DATE _7/12/21_

F(3)a

DOC - 3012 (REV. 7/01)

JUL 19 2021

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A-3 | 7/18/21 |

4.)  REQUEST FORM TO:  (CHECK BOX)

X CASEWORKER    ___MEDICAL

___EDUCATION    ___VISITING

___LAUNDRY    ___PROPERTY ROOM

___MENTAL HEALTH    ___CANTEEN

___LAW LIBRARY    ___DENTAL

___SHIFT COMMAND

___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Grievance

6.) REQUEST: (PRINT BELOW) Thank you, can you please provide me
with a brief description of the following;
2006-31-18343, 2006-31-15897
2006-31-15899, 2006-30-98583

The same way you did the other ones is fine.

7.) INMATE SIGNATURE ___W/R A.H___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

**************************************************************************************

### 9.) RESPONSE TO INMATE

Inmate Harris,
2006 31 18345- Ely Altercation
2006 31 15899— Property — HDSP - Issue
2006 31 15897— U/A — HDSP Issue
2006 30 98583 U/A- Ely Issue out of time Frame

10.) RESPONDING STAFF SIGNATURE Balterra, Grievance DATE 7/26/21

F(4)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A-3 | 7/28/21 |

4. ) REQUEST FORM TO:  (CHECK BOX)          ___MENTAL HEALTH      ___CANTEEN

X_CASEWORKER        ___MEDICAL          ___LAW LIBRARY        ___DENTAL

___EDUCATION        ___VISITING         ___SHIFT COMMAND

___LAUNDRY          ___PROPERTY ROOM    ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Grievance

6.) REQUEST: (PRINT BELOW) Thank you, I would like a copy of all
grievances filed within the last 2 yrs, 2020, 2021 at HDSP and
Ely, please provide exact process I may issue a press slip for
payment of copies. My attorney sent two grievances on my behalf
directly to the warden at Ely which isn't stolling, if that's true.
I might be able to bypass the grievance process by violating clearly
established rights. Also the purge count for 2006-31-18343 - Ely
Altercation.

7.) INMATE SIGNATURE  WR  A.H                         DOC #  1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____
*************************************************************************************************
9.) RESPONSE TO INMATE

Inmate Harris,
I will only make copies of ESP
Gr. You must provide the log number

10.) RESPONDING STAFF SIGNATURE Grievances.       DATE 8/2/21

F(5)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris 1116547 | | 9A-3 | 8-3-21 |

4.) REQUEST FORM TO: (CHECK BOX)  ___MENTAL HEALTH  ___CANTEEN

X CASEWORKER  ___MEDICAL  ___LAW LIBRARY  ___DENTAL

___EDUCATION  ___VISITING  ___SHIFT COMMAND

___LAUNDRY  ___PROPERTY ROOM  ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Grievance \ Baltierra

6.) REQUEST: (PRINT BELOW) Thank you, my only problem is
I don't know all of the log numbers for grievances
filed at ESP.

Can you please provide me with log numbers / page
count of grievances filed within the last 365 days
at ESP2, I recently filed a 2nd level (8-1-21), is
that entered into the system yet?

7.) INMATE SIGNATURE  W/R  DOC #  1116547

8.) RECEIVING STAFF SIGNATURE _____  DATE _____

9.) RESPONSE TO INMATE

Again log#. only ESP.
Please pick one.
2006 31 25765 - ML
2006 31 23427 - MLL UA - LL8h/
2006 31 23018 - fr
2006 3 1 22952 PR UA 5/25/21

10.) RESPONDING STAFF SIGNATURE  Baltierra  DATE 8/4/21

F(6)

DOC - 3012 (REV. 7/01)

SEP 0 9 2021

INMATE REQUEST FORM

AUG 1 0 2021

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 4A-3 | 8/9/21 |

4.) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER    ___MEDICAL     ___MENTAL HEALTH     ___CANTEEN

___EDUCATION     ___VISITING     ___LAW LIBRARY     ___DENTAL

___LAUNDRY     ___PROPERTY ROOM     ___SHIFT COMMAND

    ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Ms. Hernandez

6.) REQUEST: (PRINT BELOW) Thank you for the form, however I've noticed a major issue concerning 2006-31-18343, there is absolutely no first rejection, it merely skips to two, oh and per AR, I have to receive actual knowledge of a rejection for it to count, surely there's no signed first rejection in your records, thank you for your time regarding the matter.

7.) INMATE SIGNATURE _AH_     DOC # _1116547_

8.) RECEIVING STAFF SIGNATURE _____     DATE 8/9/2021

9.) RESPONSE TO INMATE

There is not a copy of Rejection number 1 for grievance # 2006-31-18343. It shows it as Rejected on 3/22/21.

10.) RESPONDING STAFF SIGNATURE _____     DATE 8/18/21

F(7)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris 1116547 | | 9A3 | 8/16/21 |

4. ) REQUEST FORM TO: (CHECK BOX)          ___MENTAL HEALTH     ___CANTEEN

___CASEWORKER          ___MEDICAL          ___LAW LIBRARY       ___DENTAL

___EDUCATION           ___VISITING         ___SHIFT COMMAND

___LAUNDRY             ___PROPERTY ROOM    X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Associate Warden of Programs

6.) REQUEST: (PRINT BELOW) I who instructed to contact you
regarding release of records to my attorney.

(see attachment)

7.) INMATE SIGNATURE ___W/R AH___          DOC # ___1116547___

8.) RECEIVING STAFF SIGNATURE _____          DATE 8/16/2021

*********************************************************************
9.) RESPONSE TO INMATE

You need to contact medical to release medical
Records. They will get you the release.
According to AR 568.08 and OP 560 you must
sign a release of information. It is attachment
A in OP 560. See attachment.

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(4)

DOC - 3012 (REV. 7/01)

CC: Sgro and Rogers

To:

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 8/9/21 |

4.) REQUEST FORM TO: (CHECK BOX)

___MENTAL HEALTH    ___CANTEEN

___CASEWORKER    ___MEDICAL    ___LAW LIBRARY    ___DENTAL

___EDUCATION    ___VISITING    ___SHIFT COMMAND

___LAUNDRY    ___PROPERTY ROOM    X OTHER_____

**ELY STATE PRISON**

AUG 1 0 2021

5.) NAME OF INDIVIDUAL TO CONTACT: Warden

**WARDEN'S OFFICE**

6.) REQUEST: (PRINT BELOW) Per AR 568 and AR 569, I would like to grant access to my I-File, C-File and Medical Records my attorney pertaining to a habeas corpus proceeding case # A-19-797786-W and C-13-289274-1. The only available form is a Doc. 2022, which doesn't include a waiver. My Attorney is;

Anthony P. Sgro (Sgro and Rogers) 702-384-9800
720 5th St. 3rd Floor, Las Vegas, NV 89101

7.) INMATE SIGNATURE ___AH___ DOC # ___1116547___

8.) RECEIVING STAFF SIGNATURE _____ DATE 8/9/2021

*************************************************************

### 9.) RESPONSE TO INMATE

You may kite the AW/P about this request. bw

*[round stamp: WARDEN'S OFFICE / AUG 1 0 2021 / W.A. Gittere Warden / ELY STATE PRISON]*

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

cc: AW/P    F(8)a

DOC - 3012 (REV. 7/01)

AUG 18 2021

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 8/17/21 |

4. ) REQUEST FORM TO: (CHECK BOX)  ___MENTAL HEALTH   ___CANTEEN

X CASEWORKER   ___MEDICAL   ___LAW LIBRARY   ___DENTAL

___EDUCATION   ___VISITING   ___SHIFT COMMAND

___LAUNDRY   ___PROPERTY ROOM   ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: ___Hernandez

6.) REQUEST: (PRINT BELOW) on 8/11/21 I wrote you regarding certain matters, on 8/12/21 you came and spoke with me regarding issues, I requested a written response, in which you agreed to provide, I've yet to receive one as of yet, just sending a reminder.

Thank you for your time.
P.S. May you also respond to my 8/9/21 kite?

7.) INMATE SIGNATURE ___W/R AH___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE 8/17/2021

9.) RESPONSE TO INMATE

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F (9)

DOC - 3012 (REV. 7/01)

AUG 23 2021

AUG 24 2021

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammur Harris | 1116547 | 9A-3 | 8/22/21 |

4.) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER  ___MEDICAL  ___MENTAL HEALTH  ___CANTEEN
___EDUCATION  ___VISITING  ___LAW LIBRARY  ___DENTAL
___LAUNDRY  ___PROPERTY ROOM  ___SHIFT COMMAND
  ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: ___Caseworker_____

6.) REQUEST: (PRINT BELOW) On Aug 3rd, 21 I submitted an Accounting Inquiry regarding the removal of $700, it was signed by C/o Sunday, I've yet to hear anything back, attached were two financial statements.

Thanks for your time regarding this matter.

7.) INMATE SIGNATURE ___AH_____ DOC # ___1116547___

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

9.) RESPONSE TO INMATE

Account inquiry forms are sent to carson and take several weeks to get back.

10.) RESPONDING STAFF SIGNATURE _____ DATE 8/24

F(10)

DOC - 3012 (REV. 7/01)

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 8/23/21 |

4. ) REQUEST FORM TO: (CHECK BOX)         ___MENTAL HEALTH      ___CANTEEN

___CASEWORKER          ___MEDICAL          ___LAW LIBRARY       ___DENTAL

___EDUCATION           ___VISITING         ___SHIFT COMMAND

___LAUNDRY             ___PROPERTY ROOM    X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

6.) REQUEST: (PRINT BELOW) Mail out the following;
Certified mail $ 3.60
Return Receipt $ 2.45
Postage for Priority $7.95
Total: $14.40
Brass # 2565297
Tracking # 7015 0640 0001 3947 2030

7.) INMATE SIGNATURE ___AH___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE _____

### 9.) RESPONSE TO INMATE

SHIPPED
AUG 24 2021
BY MAIL ROOM
ELY STATE PRISON

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(11)

DOC - 3012 (REV. 7/01)

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

■ Expected deli
■ Most domesti
■ USPS Trackin
■ Limited inter
■ When used in
Insurance does no
Domestic Mail Man
fees. International

FLAT R
ONE RATE ■

TRACK

PRIORITY
MAIL ®

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*

OFFICIAL USE

Certified Mail Fee
$  3.60

Extra Services & Fees *(check box, add fee as appropriate)*
☒ Return Receipt (hardcopy)       $ 2.85
☐ Return Receipt (electronic)     $ _____      Postmark
☐ Certified Mail Restricted Delivery $ _____      Here
☐ Adult Signature Required        $ _____
☐ Adult Signature Restricted Delivery $ _____

Postage
$  7.95   7.95

Total Postage and Fees
$  14.30   14.40

Sent To
Ammar Harris #1116547

Street and Apt. No., or PO Box No.
P.O. Box 1989 (ESP)

City, State, ZIP+4®
Ely, NV 89301

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

Receipt Please

Harris #1116547

Sent 8-24-21

**FROM:**
Ammar Harris #1116547
Ely State Prison
P.O. Box 1989
Ely, NV 89301

**TO:**
Sgro and Roger
Attorneys at Law
105, 7th Street # 300
Las Vegas, NV 89101

F(11)a



INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 8/25/21 |

4. ) REQUEST FORM TO: (CHECK BOX)        ___MENTAL HEALTH        ___CANTEEN

___CASEWORKER        ___MEDICAL        ___LAW LIBRARY        ___DENTAL

___EDUCATION        ___VISITING        ___SHIFT COMMAND

___LAUNDRY        ___PROPERTY ROOM        X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: AW Reubart

6.) REQUEST: (PRINT BELOW) On Aug 16th, 21 I wrote you including a response from warden Gittere but received no response, nevertheless it was CC'd to you as well. I would like a review of my Departmental records Per AR 568.

If you would be so kind as to provide me with Oct 2021 so my attorney can request records from CCRM.

Thank you for your time.

7.) INMATE SIGNATURE __W/R A.H__        DOC # __1116547__

8.) RECEIVING STAFF SIGNATURE __M3.__        DATE __8-25-21__

9.) RESPONSE TO INMATE

Please schedule I-File renal

with you assigned caseworker CC2 Hernandez

10.) RESPONDING STAFF SIGNATURE ____        DATE __09/13/21__

F(12)

DOC - 3012 (REV. 7/01)

AUG 3 0 2021

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1165HT | 9A3 | 9/29/21 |

4. ) REQUEST FORM TO:  (CHECK BOX)

X CASEWORKER    ___MEDICAL

___EDUCATION    ___VISITING

___LAUNDRY    ___PROPERTY ROOM

___MENTAL HEALTH    ___CANTEEN

___LAW LIBRARY    ___DENTAL

___SHIFT COMMAND

___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT:  Ms. Hernandez

6.) REQUEST (PRINT BELOW) Thank you for responding to my 8/9/21 Kite, I want mention that log # moving forward. If you may provide me with copies of the last 6 months of my financial statement pursuant to AE USDC of Nevada case number 3:21-cv-00380-RCJ-CLB, and I will need your signature for a Financial Certificate. By the way may you provide me with the log # for grievances filed 8/17/21, 8/15/21 and 8/23/21, thank you for assisting me regarding these matters.

7.) INMATE SIGNATURE   W/R  A.H.     DOC #  1165HT

8.) RECEIVING STAFF SIGNATURE _____ DATE  8·27·4

*****************************************************************

### 9.) RESPONSE TO INMATE

See attached - Turn in and I will sign or tell C/O and I will come sign.

10.) RESPONDING STAFF SIGNATURE _____ DATE  8/30

F(13)

INMATE REQUEST FORM

SEP 0 7 2021

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/6/21 |

4.) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER     ___MEDICAL

___EDUCATION     ___VISITING

___LAUNDRY       ___PROPERTY ROOM

___MENTAL HEALTH     ___CANTEEN

___LAW LIBRARY       ___DENTAL

___SHIFT COMMAND

___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Ms. Hernandez

6.) REQUEST: (PRINT BELOW) On Aug 30th, I attached a Doc 544 requesting copies of my last 6 month financial statement pursuant to a civil action in the USDC of Nevada, case # 3:21-CV-00380-RCT-CLB, you never acknowledged receipt of receiving it, I have a deadline with the Court of Oct 25th any intentional delay is denying me access to the Courts, if asked to provide documentation, I will be forced to submit ALL articles to avoid a dismissal. C/O Strickly signed on 8/30

7.) INMATE SIGNATURE _____ A.H. _____ DOC # ___1116547___

8.) RECEIVING STAFF SIGNATURE _____ DATE 9/6/2021

*************************************************************************

9.) RESPONSE TO INMATE

It was submitted to accounting.

10.) RESPONDING STAFF SIGNATURE _____ DATE 9/8/21

F(14)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/6/21 |

4.) REQUEST FORM TO: (CHECK BOX)     ___MENTAL HEALTH     ___CANTEEN

___CASEWORKER     ___MEDICAL     ___LAW LIBRARY     ___DENTAL

___EDUCATION     ___VISITING     ___SHIFT COMMAND

___LAUNDRY     ___PROPERTY ROOM     X OTHER_____

**ELY STATE PRISON**

**SEP - 7 2021**

**WARDEN'S OFFICE**

5.) NAME OF INDIVIDUAL TO CONTACT: Warden Gittere

6.) REQUEST: (PRINT BELOW) May you please provide me with the log numbers for the following grievances filed on: 8/7/21, 8/15/21, 8/23/21 and 8/31/21. I attempted to obtain the log numbers from caseworker Hernandez and Mollet respectfully, but yet to be provided. I can only assume its to preclude me from meeting the requirements of the Prison Litigation Reform Act, which if true is a U.S. Constitution violation in itself.

7.) INMATE SIGNATURE ___AH___     DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____     DATE 9/6/2021

............................................................................................................................

9.) RESPONSE TO INMATE

Inmate Harris,

I have No records for those dates.

10.) RESPONDING STAFF SIGNATURE R altuna, fnrvance DATE 9/22/21

F(15)

DOC - 3012 (REV. 7/01)

SEP 09 2021

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A·3 | 9/9/21 |

4. ) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER     ___MEDICAL     ___MENTAL HEALTH     ___CANTEEN

___EDUCATION     ___VISITING     ___LAW LIBRARY     ___DENTAL

___LAUNDRY     ___PROPERTY ROOM     ___SHIFT COMMAND

                                       ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mb. Hernandez.

6.) REQUEST: (PRINT BELOW) Today you provided me with a rejection for 2006.31.20319, although its a first level grievance stating that the informal went unanswered, a copy of the formal grievance was not attached in order for me to proceed to the second level, clearly it was simply an oversight, can you please provide a copy of the HDSP informal grievance? I'm trying to avoid a second rejection for failing to submit ALL documents. Thank you

7.) INMATE SIGNATURE  W/R A.H.        DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____        DATE 9/8/2021

*******************************************************************************

9.) RESPONSE TO INMATE

Inmate Harris,

       Kite HDSP. We do not have access to HDSP records.

10.) RESPONDING STAFF SIGNATURE Grievances        DATE 9/27/21

F(16)

DOC - 3012 (REV. 7/01)

SEP 09 2021

### INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/5/21 |

4.) REQUEST FORM TO: (CHECK BOX)    ___MENTAL HEALTH    ___CANTEEN

X CASEWORKER    ___MEDICAL    ___LAW LIBRARY    ___DENTAL

___EDUCATION    ___VISITING    ___SHIFT COMMAND

___LAUNDRY    ___PROPERTY ROOM    ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Ms. Hernandez

6.) REQUEST: (PRINT BELOW) You along with John Doe caseworker, provided me with a copy of my second rejection for 2006-31-18343 today, I would like a copy of my first rejection on 3/22/21 from HDSP.
(Attached is Request form)
From me dated 8/9/21
Receiving Staff C/o Sunday signed 8/9/21
Responding Staff CW Hernandez signed 8/24/21

7.) INMATE SIGNATURE A.H.    DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____    DATE 9/8/2021

### 9.) RESPONSE TO INMATE

Inmate Harris,
ESP does not have copies of your 1st rejection as it was done at HDSP.

10.) RESPONDING STAFF SIGNATURE Balterra, ESP Grievance    DATE 9/22/21

F(17)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 993 | 9/9/21 |

4. ) REQUEST FORM TO: (CHECK BOX)     ___MENTAL HEALTH     ___CANTEEN

___CASEWORKER     ___MEDICAL     ___LAW LIBRARY     ___DENTAL

___EDUCATION     ___VISITING     ___SHIFT COMMAND     *ELY STATE PRISON*

___LAUNDRY     ___PROPERTY ROC     X OTHER_____     *SEP 1 0 2021*

5.) NAME OF INDIVIDUAL TO CONTACT: Warc.     *WARDEN'S OFFICE*

6.) REQUEST: (PRINT BELOW) Thank you for addressing my concerns in my previous kite, I'm having mail issues involving a Law Book pertaining to USDC of Nevada case # 3:21-CV-00380-RCJ-CLB and Legal mail from my Attorney Saro and Roger law firm. Attached is a kite (copy) A.H. from 9/7/21. You will notice the staff members intentionally avoiding signing in order to escape liability or to assert plausible deniability, I'm noticing it from alot of your deptments, and will address when appropriate.

7.) INMATE SIGNATURE     W/R. A.H.     DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____     DATE 9/9/2021

9.) RESPONSE TO INMATE

All mail is handled As per OP 750 and AR 750. I went to the mailroom on 9/10/21 And there was no legal mail for you there at the time (M)

*ELY STATE PRISON*

*SEP 1 0 2021*

*ASSOCIATE WARDEN*

10.) RESPONDING STAFF SIGNATURE _____     DATE 9/10/21

F(18)

DOC - 3012 (REV. 7/01)

## INMATE REQUEST FORM

3

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/7/21 |

4.) **REQUEST FORM TO:** (CHECK BOX)

___MENTAL HEALTH    ___CANTEEN

___CASEWORKER    ___MEDICAL    ___LAW LIBRARY    ___DENTAL

___EDUCATION    ___VISITING    ___SHIFT COMMAND

___LAUNDRY    ___PROPERTY ROOM    X OTHER_____

*ELY STATE PRISON*
*SEP 10 2021*
*WARDEN'S OFFICE*

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom C/O Thomas

6.) REQUEST: (PRINT BELOW) My mother sent a law Book via Amazon, it was received by the institution on Sept 1st. I have yet to receive it, the title is Federal Rules of Civil Procedure, its pursuant to my USDC of Nevada, case # 3:21-CV-00380-RCJ-CLB.

Also my attorney informed me that some legal mail was sent, yet I haven't received it.

7.) INMATE SIGNATURE ___A.H.___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____ DATE 9/7/2021

9.) RESPONSE TO INMATE

Mail is processed Mon-Fri 8am-4pm as it is recieved.

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(18)a

DOC - 3012 (REV. 7/01)

TO⁸

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9H3 | 9/12/21 |

4.) REQUEST FORM TO: (CHECK BOX) ELY STATE PRISON ___MENTAL HEALTH  ___CANTEEN

___CASEWORKER  ___MEDICAL  SEP 13 2021  ___LAW LIBRARY  ___DENTAL

___EDUCATION  ___VISITING WARDEN'S OFFICE ___SHIFT COMMAND

___LAUNDRY  ___PROPERTY ROOM  X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Warden

6.) REQUEST: (PRINT BELOW) Ms. Hernandez responded to my request for log numbers on 9/8/21, stating "There is nothing to give you" The following officers can verify grievances placement in the box; C/O Sunday, C/O Velezquez, C/O Montoya, Senior C/O Gutitierrez, not only that, the Unit has 24hr surveillance.

Senior C/O Gutitierrez helped staple 3 grievances and placed in the Box 9/10/21 after your visit to the Unit that mornin

7.) INMATE SIGNATURE AH  DOC # 1116547

8.) RECEIVING STAFF SIGNATURE _____  DATE 9/12-21

### 9.) RESPONSE TO INMATE

I wasn't here on 9/10. Which warden did you see? bsg

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(19)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/15/21 |

4. ) REQUEST FORM TO: (CHECK BOX)

| | | ___MENTAL HEALTH | ___CANTEEN |
|---|---|---|---|
| ___CASEWORKER | ___MEDICAL | ___LAW LIBRARY | ___DENTAL |
| ___EDUCATION | ___VISITING | ___SHIFT COMMAND | **ELY STATE PRISON** |
| ___LAUNDRY | ___PROPERTY ROOM | _X_OTHER_____ | SEP 16 2021 |

5.) NAME OF INDIVIDUAL TO CONTACT: Warden Gittere     **WARDEN'S OFFICE**

6.) REQUEST: (PRINT BELOW) A.W. Reubart

7.) INMATE SIGNATURE __A.H._____ DOC # __1116547__

8.) RECEIVING STAFF SIGNATURE _____ DATE __9/15/2021__

9.) RESPONSE TO INMATE

? hy

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(19)a

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | (116547) | 9A3 | 9/18/21 |

4.) REQUEST FORM TO: (CHECK BOX)

X CASEWORKER ___MEDICAL

___MENTAL HEALTH ___CANTEEN

___LAW LIBRARY ___DENTAL

___EDUCATION ___VISITING ___SHIFT COMMAND

___LAUNDRY ___PROPERTY ROOM ___OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: Mr. Mollet

6.) REQUEST: (PRINT BELOW) Mr. Will please provide the log numbers for grievances submitted on the following days; 8/7/21, 8/15/21, 8/23/21, 8/31/21, and 9/9/21

Thank you

7.) INMATE SIGNATURE  A. H                                      DOC # 116547

8.) RECEIVING STAFF SIGNATURE                               DATE 09/18/2021

9.) RESPONSE TO INMATE

No NEW GRIEVANCES enTERED FOR THOSE DATES.

10.) RESPONDING STAFF SIGNATURE _____ DATE 09/18/2021

F(20)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris | 1116547 | 9A3 | 9/19/21 |

4. )  REQUEST FORM TO:  (CHECK BOX)

| | | ___MENTAL HEALTH | ___CANTEEN |
|---|---|---|---|
| ___CASEWORKER | ___MEDICAL | ___LAW LIBRARY | ___DENTAL |
| ___EDUCATION | ___VISITING | ___SHIFT COMMAND | |
| ___LAUNDRY | ___PROPERTY ROOM | X OTHER_____ | |

*13*

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

6.) REQUEST:  (PRINT BELOW) May I/we please mail the following:
Certified Mail : $3.60
Return Receipt : $ 2.85
Bross #2565301 (Total: $6.45)

National Legal Aid and Defender Association
1140 Connecticut Avenue, N.W., Suite 900
Washington, DC 20036

7.) INMATE SIGNATURE ___A.H___ DOC # 1116547

8.) RECEIVING STAFF SIGNATURE ___Coulston___ DATE 9/19/2021

9.) RESPONSE TO INMATE

10.) RESPONDING STAFF SIGNATURE _____ DATE _____

F(21)

DOC - 3012 (REV. 7/01)

INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Ammar Harris 1116547 | | 9A3 | 9/20/21 |

4. ) REQUEST FORM TO: (CHECK BOX)    ___MENTAL HEALTH    ___CANTEEN

___CASEWORKER    ___MEDICAL    ___LAW LIBRARY    ___DENTAL

___EDUCATION    ___VISITING    ___SHIFT COMMAND

___LAUNDRY    ___PROPERTY ROOM    X OTHER_____

5.) NAME OF INDIVIDUAL TO CONTACT: A.W. Reubart

6.) QUEST: (PRINT BELOW) May I have an exception to the four box policy due to on going capital proceedings in District Court of Clark County case# A-19-MANN66-W.

Currently I possess 3 legal boxes and 1 personal box. I would like a Total of 6 boxes, 5 Legal and 1 Personal

Thank you for your time

7.) INMATE SIGNATURE _____ A.H _____    DOC # 1116547

8) RECEIVING STAFF SIGNATURE _____ scro A, MONTES _____    DATE 9/21/21

9.) RESPONSE TO INMATE

Denied. Kite law library to address the need for legal boxes.

10.) RESPONDING STAFF SIGNATURE _____ [signature] _____ AW

Ely State Prison

SEP 2 3 2021

DATE Associate Warden
Operations

F(22)

DOC - 3012 (REV. 7/01)

## INMATE REQUEST FORM

| 1.) INMATE NAME          DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|
| Ammar Harris  116547 | 4A3 | 9/22/21 |

4.) REQUEST FORM TO: (CHECK BOX)

___CASEWORKER    ___MEDICAL    ___MENTAL HEALTH    ___CANTEEN

___EDUCATION    ___VISITING    ___LAW LIBRARY    ___DENTAL

___LAUNDRY    ___PROPERTY ROOM    ___SHIFT COMMAND

X OTHER_____

ELY STATE PRISON

SEP 22 2021

Inf.

5.) NAME OF INDIVIDUAL TO CONTACT: Mailroom

REQUEST: (PRINT BELOW) May you please mail the following:
Certified mail: $3.60 $3.75
Postage: $7.95
Brass # 2565309 2565312 Attached
Brass# 2565315, for $200 Attached to envelope.
Ann Ingram
1106 Elk Ridge Court
Jonesboro, GA 30238

7.) INMATE SIGNATURE _____ A.H. _____ DOC # 116547

.) RECEIVING STAFF SIGNATURE _____ S/O A. MONTES _____ DATE 9/22/21

## 9.) RESPONSE TO INMATE

Brass Slip #2565315 has been voided due to no envelope
being attached. Please resubmit brass slip with
stamped envelope.

10.) RESPONDING STAFF SIGNATURE ESP Accounting _____ DATE 9-27-21.

F(23)



# Nevada Department of Corrections
# Improper Grievance Memo – High Desert State Prison

Steve Sisolak
*Governor*

Charles Daniels
*Director*

Calvin Johnson
*Warden, HDSP*

TO:     Harris, Ammar #1116547
FROM: F. Dreesen, AW
DATE: 7/14/2021
RE: Improper Grievance #2006-31-18343     1st Reject     Informal Level Grievance

The attached grievance is being returned to you for the following reason(s):

**This grievance may NOT proceed to the next level Per AR 740 due to the following:**

■   Non-grievable issue.
     ☐   State and federal court decision.
     ☐   State, federal and local laws and regulations.
     ■   Parole Board decision.
     ☐   Lacks Standing

☐   Grievance is not signed and dated. Per AR 740.03 number 6B, an inmate's election **not to sign and date** this form at any level shall constitute abandonment of the claim.

☐   Untimely submission.
☐   Abuse of Inmate Grievance Procedure.
     ☐   Contains more than one (1) appropriate issue, per grievance.
     ☐   **Missing Documents.**
         Per AR 740.08 number 4D (5), ALL **documentation** and factual allegations available to the inmate must be submitted at this level with the grievance.
     ☐   The claim or requested remedy changes or is modified from one level to another.
     ☐   Specific claims or incidents previously filed by the same inmate.
     ☐   More than two (2) Continuation Forms (Doc 3097) per grievance.
     ☐   Alteration of the grievance form or continuation forms. This includes writing more than one line, on each line provided on the grievance form. Additionally, per OP 740.04 Abuse of Inmate Grievance Procedure, number 2(H), "Altercation of the grievance forms or continuation forms. This includes writing more than one line, on each line provided on the grievance form Writing in the margins will not be accepted. Inmates must not use tape on any portion of the grievance.

**After correcting the deficiencies listed below, you may re-submit your grievance.**

■   Per AR 740.08 number 7B, if the inmate's remedy to their grievance includes monetary restitution or damages then the Inmate will get the following forms from unit staff, unit caseworker or Law libraries: Form DOC-3096, **Administrative Claim Form**, which shall be completed and submitted in addition to the grievance for all personal injury, tort, or civil rights claims.

■   **Instructions**: Please correct and resubmit within 5 days of receipt of this memo on a new DOC 3091 Informal Grievance form restating the factual harm or loss, action, and the remedy, complete the attached Administrative Claim Form and attach it, attach ALL previously submitted documents including prior submitted grievance(s) under this grievance number, and attach the prior Improper Grievance Memo(s) under this grievance number so that this can be fully researched.

Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

_____     6/1/21         AH 10/1/21
Witness Signature             Date             Inmate Signature         Date
cc: Original – Inmate     Copy - Grievance File

DOC-3098 (01/17)

ELY

Log Number 2000·31·1 93343

## NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: HDSP     UNIT: 4B-1

GRIEVANT'S STATEMENT: I was involved in an altercation at Ely State Prison which has left me severely disabled, if it hadn't been for the failure of C/O D. Cole and Boyd not following proper procedures set by administration, this incident would have never occurred. SEE ATTACHMENTS!

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: _____ MM _____ DATE: 3-14-21 TIME: 8am

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 3/19/21 TIME: 8A

GRIEVANCE RESPONSE: _____

_____

_____

_____

_____

CASEWORKER SIGNATURE: _____ DATE: _____

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _____ DATE: 3/24/21

_____ INMATE AGREES _AH_ INMATE DISAGREES

INMATE SIGNATURE: _AH_ DATE: 10/1/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | | |
|---|---|---|
| Original: | To inmate when complete, or attached to formal grievance | |
| Canary: | To Grievance Coordinator | |
| Pink: | Inmate's receipt when formal grievance filed | |
| Gold: | Inmate's initial receipt | |

RECEIVED

MAR 16 2021

HDSP

G(1)

DOC 3091 (12 / 01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: __Ammar Harris__     I.D. NUMBER: __1116549__

INSTITUTION: __HDSP__     UNIT #: __4B-1__

GRIEVANCE #: _____     GRIEVANCE LEVEL: __Informal__

GRIEVANT'S STATEMENT CONTINUATION:     PG. __1__     OF __2__

Per NDOC Ely State Prison's Offender Orientation Handbook,
Maximum Custody: Classification of maximum custody
inmates is the designated status for administrative or
disciplinary segregation or disciplinary detention for
close custody inmates. Maximum custody characteristics
consist of fenced perimeters and gun towers, single
occupancy cells, confinement to a cell except for
scheduled exercise periods, showers, visits, professional
interviews, telephone calls, and hearings, Direct Supervision
when inmates are outside of their cells, out of cell
activities are limited to separate and secure areas,
UNCLOTHED BODY SEARCHES on inmates exiting and
returning to housing units, movement will be in restraints
under escort, inmates designated as High Risk Potential,
inmates under Sentence of Death, and transportation out
side the institution will be under restraints, under armed

Original:     Attached to Grievance
Pink:     Inmate's Copy

G(2)

RECEIVED

MAR 16 2021

HDSP

DOC – 3097 (01/02)

# NEVADA DEPARTMENT OF CORRECTIONS
# GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: _Ammar Harris_   I.D. NUMBER: _1116547_

INSTITUTION: _HDSP_   UNIT #: _4B-1_

GRIEVANCE #: _____   GRIEVANCE LEVEL: _informal_

GRIEVANT'S STATEMENT CONTINUATION:   PG. _2_ OF _2_

escort, may include chase vehicles if designated by
the Warden. Included is the incident report, OIC 485369,
if the c/o's would have simply performed their duties
by performing an unclothed body search before yard
as outlined in the Orientation Handbook, I would
have never been injured.

I would like the following remedies;

* Access to an outside institution for rehabilitation.
* Compensation in the sums of a $1,000,000.
* Media credits in the sums of $25,000
* A device that stimulates muscles. (Bioness)
* A stereo, TV w/ remote control
* An actual mattress. (Back pains)

   — The whole incident was caught on camera.

Original:   Attached to Grievance
Pink:   Inmate's Copy

RECEIVED

MAR 16 2021

HDSP

G(3)

DOC – 3097 (01/02)

# State of Nevada
# Department of Corrections

## DISCIPLINARY FORM II
## SUMMARY OF HEARING OFFICER'S INQUIRY AND DISPOSITION

| INMATE INFORMATION | HEARING INFORMATION |
|---|---|

| INMATE NAME: HARRIS, AMMAR 1116547 | DATE OF HEARING: 11/17/2020 | TIME OF HEARING: 06:29 pm |
|---|---|---|

CURRENT LOCATION: HDSP-U4-B-1-A; ; NC    NAME OF HEARING OFFICER: BRYANT, ANTONIO

OIC#: 485309    IR#: IR 2020-ESP-001727    DATE OF SERVICE OF NOTICE OF CHARGES: 08/28/2020

WAIVE PREPARATION: N    WAIVE HEARING: N    REFUSE TO SIGN: N

### IF LATE, PROVIDE EXPLANATION OF EXCEPTIONAL CIRCUMSTANCE

Work load

### CHARGES

| Chrg | Description | Plea |
|---|---|---|
| MJ16 | Murder | Not Guilty |

### PRELIMINARY STATEMENT OF OFFENDER

Inmate was asked and did not want to make a statement.

### PRELIMINARY INSTITUTION PRESENTATION

  On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening  the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris? #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. . Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio.  Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand.  At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied.  I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

### PRELIMINARY HEARING OFFICER ACTION

| Chrg | Description | RChrg | Description | Finding |
|---|---|---|---|---|
| MJ16 | Murder | MJ16 | Murder | Refer to Disciplinary Hearing |

### RESULTS OF INFORMAL SUMMARY HEARING

| Line | Description | Mths | Days | Eff. Date | End Date | SSL | Rest. Act | Penalty Comment |
|---|---|---|---|---|---|---|---|---|

### EVIDENCE RELIED ON FOR PRELIMINARY HEARING

| Date | UserName | Statement |
|---|---|---|
| 11/17/2020 | A. Bryant | Officer report and inmate statement. |

### ADVISEMENT TO DISCIPLINARY COMMITTEE

Counsel Substitute Requested: ☐    Name of Counsel Substitute:

### WITNESS INFORMATION

Witness Decision Justification:    Inmate was asked and does not want any witnesses.

| Name | NDOC/ID# | Decision | Reason | Table |
|---|---|---|---|---|

G(4)

RECEIVED

MAR 16 2021

HDSP

# NEVADA DEPARTMENT OF CORRECTIONS
## ELY STATE PRISON

## MEMORANDUM

Date: September 23, 2021

Inmate: Ammar Harris     # 1116547     9A 3

FROM:
David Drummond, AW – Ely State Prison

SUBJECT:  **Grievance 2006.31.18343**

---

This grievance has been rejected 3 times.  Per OP 740 If a grievance has been rejected and returned to the inmate for additional information and this information has not been provided the grievance will be considered abandoned. Your grievance may not be resubmitted and if it is re-submitted, it will be placed in your grievance file without any action.

Note: Inmate Harris, failed resubmit at the informal level to proceed the grievance process.

_____A.H._____          __10/1/ : 21__
Inmate's signature          Date received

_____          __10/1/21__
Caseworker's signature          Date received

H

LOG NUMBER: 20063118343

## NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31.18343 , ON THE SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.     DATE: 8/7/21

WHY DISAGREE: I disagree. 28

GRIEVANCE COORDINATOR SIGNATURE:     DATE: 9/17/21

SECOND LEVEL RESPONSE: Memorandum

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 9/23/21

INMATE SIGNATURE: A.H.     DATE: 10/1/21

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

H(1)

DOC 3094 (12/01)

Declaration Pursuant To: N.R.S 208.165

I, Ammar Harris, of inmate identification number: 1116547, am a lawfully committed prisoner of the Nevada Department of Corrections, presently in the lawful care and custody of Ely State Prison, located at: 12000 North Bottwitch Road, (Mailing) P.O. Box 1989, in City of: Ely, County: White Pine, State: Nevada, 89301. Does affirm that the attached document entitled: 2006.31.18343, is true and correct to the best of my knowledge and belief, and any false statement of material fact made there in shall be subjected to the pains and penalties of perjury pursuant to: N.R.S 208.165,

This, 7th, Day of: August, 2021.

Inmate signature: A.H.
Inmate Name (Printed): Ammar Harris
Address: Ely State Prison
          P.O. Box 1989, Ely, Nevada 89301

(+(2)



# Nevada Department of Corrections
# Improper Grievance Memo

*t0A121A*
*ESP*

**TO INMATE:** *Harris, Ammar    #1116547*        H SP 6A 21

**FROM:** *David Drummond, AW – Ely State Prison*

**DATE:** *April 6, 2021*

**RE: Improper Grievance #** *2006.31.18343    2nd Rejection*

---

The attached grievance is being returned to you for the following reason(s):

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**
- ☐ Non-grievable issues
  - ☐ State and federal court decision
  - ☐ State, federal and local laws and regulations
  - ☐ Parole Board decision
  - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
  - ☐ A threat of serious bodily injury to a specific individual
  - ☐ Specific claims or incidents previously filed by the same inmate
  - ☐ Obscene, profane and derogatory language
  - ☐ More than one (1) grievance per week, Monday through Sunday
  - ☐ Other specify:

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified. Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.**
- ☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted and/or no remedy requested.
- ☐ More than two (2) continuation forms (DOC 3097) per grievance
- ☐ Alteration of the grievance forms or continuation forms.
- ■ Other specify*: Inmate Harris, Per AR 740 grievance will be submitted correctly. You failed to follow AR 740 by submitting this grievance to the grievance coordinator to be properly be signed and mailed to Ely State Prison. However you must attached an Administrative Claim form when requesting compensation. Re-submit at the informal level with all forms attached.*

| Witness Signature | 7/8/21 Date | Inmate Signature A.H. 7/8/21 | Date |

cc: Original – Inmate
    Copy - Grievance File   

DOC-3098 (01/19)

Log Number 2006 3118 343

# NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116549

INSTITUTION: ESP     UNIT: 1A-21

GRIEVANT'S STATEMENT: I was involved in an altercation at Ely State Prison which has left me severely disabled, if it hadn't been for the failure of C/O D. Cole and Boyd not following proper procedures set by administration, this incident would have never occurred. See Attachments!

## SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: _____ DATE: 3-14-21 TIME: 8am

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: _____ TIME: _____

GRIEVANCE RESPONSE: _____
Doc 3098

CASEWORKER SIGNATURE: _____ DATE: _____

____ GRIEVANCE UPHELD ____ GRIEVANCE DENIED ____ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _____ DATE: 4/6/21

_____ INMATE AGREES A.H. INMATE DISAGREES

INMATE SIGNATURE: A.H. DATE: 7/8/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

I(1)

DOC 3091 (12 / 01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME. Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT #: 1A-21

GRIEVANCE #: _____     GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:    PG. 1 OF 2

Per NDOC Ely State Prison's Offender orientation hand-
book, Maximum Custody: Classification of maximum
custody inmates is the designated Status for administrative
or disciplinary segregation or disciplinary detention for
close custody inmates. Maximum custody characteristics
consist of fenced perimeters and gun towers, single
occupancy cells, confinement to a cell except for schedule
exercise periods, showers, visits, professional interviews,
telephone calls and hearings, Direct Supervision when
inmates are outside of their cells, out of cell activities
are limited to separate and secure areas, Unclothed
Body Searches on inmates Exiting and Returning to
housing units, movement will be in restraints under
escort, inmates designated as High Risk Potential, inmates
under Sentence of Death, and transportation outside
the institution will be under restraints, under armed

Original:     Attached to Grievance
Pink:     Inmate's Copy

I(2)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Ammar Harris     I.D. NUMBER: 1116549

INSTITUTION: ESP     UNIT #: 1A-21

GRIEVANCE #: _____     GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:    PG. 2   OF 2

escorts, may include chase vehicle if designated by the Warden.
Included is the incident report, OIC # 485309, if officer
Cole and Boyd would have simply performed their duties
by conducting an unclothed body search before yard, as
outlined in the Orientation Handbook, I would have never
been injuried. The whole incident was captured on camera.

I would like the following remedies:
* Access to an outside institution for rehabilitation.
* Compensation in the sums of a $1,000,000. For pain/suffering.
* Media credits in the sums of $50,000.
* A device that stimulates muscle activity. (Biomess)
* A stereo, TV w/ remote control.
* An actual mattress. (Back pains)
* The termination of Cole and Boyd.

Original:    Attached to Grievance
Pink:      Inmate's Copy

I (3)

DOC – 3097 (01/02)



# State of Nevada
# Department of Corrections
## DISCIPLINARY FORM I
## NOTICE OF CHARGES

| INMATE INFORMATION | VIOLATION INFORMATION |
|---|---|
| **INMATE NAME:** HARRIS, AMMAR 1116547 | **CHARGING EMPLOYEE** D. Cole |
| **CURRENT LOCATION** HDSP-U4-B-1-A; : ;NC | **DATE OF INCIDENT:** 08/28/2020 |
| **OIC#:** 485309  **IR#:** IR-2020-ESP-001727 | **DATE CHARGES WRITTEN:** 08/28/2020 |

### CHARGES AND EVIDENCE

| Chrg | Description | Evidence | Evidence Disposition |
|---|---|---|---|
| MJ16: | Murder | Staff reports | |

### REPORT OF VIOLATION

On August 28, 2020 I Correctional Officer D. Cole was working my assigned post at Ely State prison in Unit 1. At approximately 0830 hours I was letting yard group B (cells 13 through 24) out for small recreation yard time. In the midst of opening the cell doors I noticed inmate Righetti #1177953 was trying to enter inmate Harris? #1116547 cell 1A 21. I immediately tried to close 1A21 to keep the inmate from the attack but Harris forced open the door and squeezed out. . Inmate Blake 81931 exited his cell and grabbed Righetti from behind to hold him. Inmate Maestas #93345 moved from the base of the stair area to join the fight. I verbally announced to Officer Boyd that we had a fight. I told Boyd to call the fight on the portable radio. Boyd took over controls of the doors while I grabbed the 40mm foam baton launcher. I immediately took out the round that was in the launcher and replaced it with a high velocity foam round. The reason I did this was due where the fight was occurring, it was beyond the recommended distance to switch to the high velocity. It was a 2 on 2 fight with weapons. The fight moved to under the stairs. I could see the inmates on the ground and I saw Righetti moving his arm in a stabbing motion. It appeared Righetti had an inmate made stabbing device in his right hand. At this point I yelled verbal commands to stop or I will shoot. The inmates did not obey my verbal orders. I saw I had only one clear shot at inmate Righetti. So I took aim at his lower extremities I then proceeded to take the shot. After the round had landed on the intended target the fight stopped and all inmates complied. I keep the launcher trained on the inmates until other officers responded to give assistance.
End of report

| CHARGING EMPLOYEE SIGNATURE | SUPERVISOR SIGNATURE |
|---|---|
| _____ | _____ |

| SERVICE OF NOTICE OF CHARGES | DISTRIBUTION |
|---|---|
| **DATE OF SERVICE:** _____ **TIME OF SERVICE:** _____ | Primary Hearing Officer (Original) |
| **PRINTED NAME OF HEARING OFFICER**_____ | Charging employee (Copy) |
| **SIGNATURE OF HEARING OFFICER** _____ | |
| **SIGNATURE OF INMATE** _____ | Inmate (Copy) |

(Signature indicates receipt of notice only. It is not a plea; refusal to sign should be noted)

I(4)



ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
MICHAEL R. BRUNET

March 30, 2021

**ELY STATE PRISON**

**APR - 2 2021**

**WARDEN'S OFFICE**

**VIA USPS**
Nevada Ely State Prison
4569 North State Route
Ely, Nevada 89301

Attn: Warden William Gittere

    **Re:**   *AMMAR HARRIS, High Desert State Prison Inmate # 1116547*

Dear Warden Gittere,

    This office represents Ammar Harris, High Desert State Prison Inmate # 1116547, in two matters pending before the Eighth Judicial District Court, Clark County, Nevada. Mr. Harris has requested that we forward you the enclosed documents on his behalf in an unrelated matter that we do not represent him in.

                Respectfully,

                ALANNA BONDY, ESQ.
                **SGRO & ROGER**

I(5)

Enclosures: As stated

ACB/bs



Exhibit - 2 - Grievance 2066-31-20319
GRIEVANCES
A- NDOC memo
A(1)- 2nd Level
A(2)- NDOC memo
A(3)- 1st Level
A(4)- Page 1
A(5)- Page 2
A(6)- Page 3
A(7)- Declaration



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:**  _Harris, Ammar_          _#1116547_          **9A 3**

**FROM:**  _David Drummond, AW – Ely State Prison_

**DATE:**  _____September 23, 2021_____

**RE: Improper Grievance #** __2006.31.20319__      __2nd__Rejection

The attached grievance is being returned to you for the following reason(s):

| | |
|---|---|
| **NOT ACCEPTED – If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.** | |

☐ Non-grievable issues
    ☐ State and federal court decision
    ☐ State, federal and local laws and regulations
    ☐ Parole Board decision
    ☐ Lacks standing
☐ Untimely submission.
☐ Inmate elected NOT to sign and date any grievance form.
☐ Grievance was granted.
☐ Abuse of Inmate Grievance Procedure
    ☐ A threat of serious bodily injury to a specific individual
    ☐ Specific claims or incidents previously filed by the same inmate
    ☐ Obscene, profane and derogatory language
    ☐ More than one (1) grievance per week, Monday through Sunday
    ☐ Other specify:

**REJECTED – After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.
☐ The grievance contains more than one (1) appropriate issue. Only 1 issue is allowed per grievance.
☐ No factual harm/loss noted and/or no remedy requested.
☐ More than two (2) continuation forms (DOC 3097) per grievance
☐ Alteration of the grievance forms or continuation forms.
■ Other specify: _Inmate Harris, wrong form, resubmit at the First level with all forms attached._

_____  10/1/21  _____ A.H.  10/1/21 _____
Witness Signature        Date        Inmate Signature        Date

cc: Original – Inmate
Copy - Grievance File

DOC-3098 (01/19)

LOG NUMBER: 20063120319

# NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31-20319 , ON THE SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.     DATE: 9/9/21

WHY DISAGREE: Because not providing adequate medical care due to financial restraint is not a justifiable reason.

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 9/7/21

SECOND LEVEL RESPONSE: _____

Doc 3098

_____ GRIEVANCE UPHELD_____ GRIEVANCE DENIED_____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 9/23/21

INMATE SIGNATURE: AH _____ DATE: 10/1/21

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |


A(1)

DOC 3094 (12/01)



# Nevada Department of Corrections
# Improper Grievance Memo

**TO INMATE:** _Harris, Ammar    #1116547_    9A 3

**FROM:** _David Drummond, AW – Ely State Prison_

**DATE:** _____July 27, 2021_____

**RE: Improper Grievance #** _2006.31.20319_    _1st Rejection_

---

The attached grievance is being returned to you for the following reason(s):

**NOT ACCEPTED - If not accepted do to any of the reasons in this box, the grievance may NOT proceed to the next level Per AR 740.03,5 and 740.04,G.**

- ☐ Non-grievable issues
  - ☐ State and federal court decision
  - ☐ State, federal and local laws and regulations
  - ☐ Parole Board decision
  - ☐ Lacks standing
- ☐ Untimely submission.
- ☐ Inmate elected NOT to sign and date any grievance form.
- ☐ Grievance was granted.
- ☐ Abuse of Inmate Grievance Procedure
  - ☐ A threat of serious bodily injury to a specific individual
  - ☐ Specific claims or incidents previously filed by the same inmate
  - ☐ Obscene, profane and derogatory language
  - ☐ More than one (1) grievance per week, Monday through Sunday
  - ☐ Other specify:

**REJECTED - After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level unless specified.** Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

- ☐ The grievance contains more than one (1) appropriate issue. Only 1 issue is allowed per grievance.
- ☐ No factual harm/loss noted **and/or** no remedy requested.
- ■ _**More than two (2) continuation forms (DOC 3097) per grievance. Per AR 740.04.2.E.**_
- ☐ Alteration of the grievance forms or continuation forms
- ☐ Other specify:

_____ 9/8/21    A.H. 9/8/21
Witness Signature    Date    Inmate Signature    Date

cc: Original – Inmate
    Copy - Grievance File

A(2)

DOC-3098 (01/19)

Log Number 20219

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT: 9A-3

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-31-20319 , IN A FORMAL MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: A.H.     DATE: 7/16/21

WHY DISAGREE: Filed an informal on 3/21/21, its been more than 90 days without a response, proceeding to my first level grievance.

( Medical )

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 7/21/21

FIRST LEVEL RESPONSE: _____

Doc 3098

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE: _____ TITLE: _____ DATE: _____

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE 8/27/21

_____ INMATE AGREES A.H. _____ INMATE DISAGREES

INMATE SIGNATURE: A.H.     DATE: 9/9/21

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

A(3)

DOC 3093 (12/01)

**NEVADA DEPARTMENT OF CORRECTIONS**
**GRIEVANT'S STATEMENT CONTINUATION FORM**

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT #: 9A-3

GRIEVANCE #: 2006-31-20319   GRIEVANCE LEVEL: First

GRIEVANT'S STATEMENT CONTINUATION:   PG. 1   OF 3

On Oct 16, 2020, I was placed in the infirmary at HDSP after returning from Summerlin Hospital where I was being treated for a traumatic brain injury, which resulted in me having a stroke, the right side of my body has severely been affected, the uses of my right arm/hand and the ability to walk, just recently regained my cognitive capabilities. I was assigned to Dr. Bryan, asked him about me receiving rehabilitation, his response," No, we don't have the money to send you to rehab." "You're just going to have too help yourself." The discharge paperwork from the hospital had recommendations for Continuity of care, I was diagnosed with the following, Acquired Aphasia, Hemianopsia, Apraxia and Hemiparess, which can only be improved with rehabilitation, failure to do so my condition will get

Original:     Attached to Grievance
Pink:        Inmate's Copy

A(4)

DOC – 3097 (01/02)

**NEVADA DEPARTMENT OF CORRECTIONS**
**GRIEVANT'S STATEMENT CONTINUATION FORM**

NAME: Ammar Harris     I.D. NUMBER: 1116547

INSTITUTION: ESP     UNIT #: 4A-3

GRIEVANCE #: 2006-31-20314     GRIEVANCE LEVEL: First

GRIEVANT'S STATEMENT CONTINUATION:    PG. 2 OF 3

worse, by not taking any action would be consider medical neglect / indifference. I've made several attempts before being discharged on Nov. 19th, 2020 to be given proper care for the following; Headaches, Dizzyness, Stomach Pain, Blurry Vision, Poor Blood Circulation and Blackouts, the only remedy given for these problems were Ibuprofen, I sent numerous medical kites requesting help. I requested a medical device that stimulates muscle contraction to retain function of my affected limbs, Dr. Bryan said he was ordering one for me cause sending me to rehab was too expensive, that hasn't happened which has cause atrophy in my right arm, possibly preventing future recovery due to neglect. Dr. Rios informed that I would be sent to see a Neurologist in Nov 2020 to diagnose my on-going problem. Because of the extent of my injuries,

Original:    Attached to Grievance
Pink:      Inmate's Copy

A(5)

DOC – 3097 (01/02)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME. Ammar Harris          I.D. NUMBER: 1116547

INSTITUTION: ESP          UNIT #: 9A-3

GRIEVANCE #: 2006-31-20319   GRIEVANCE LEVEL: First

GRIEVANT'S STATEMENT CONTINUATION:   PG. 3 OF 3

Medical indifference for failure to follow
recommendations made regarding Continuity of
Care by Summerlin Hospital.

     I request the following remedies;
Access to an outside rehabilitation facility.
Medical device that stimulate muscle contraction.
To see a Neurologist
TV with remote.
Stereo
Compensation in the sums of $250,000 for neglect
Medit credits in the sums of $50,000 for Pain/Suffering

Original:     Attached to Grievance
Pink:         Inmate's Copy

A(b)

# DECLARATION PURSUANT TO: N.R.S. 208.165

I, _Ammar Harris_, OF INMATE IDENTIFICATION NUMBER: _1116547_, AM A LAWFULLY COMMITTED PRISONER OF THE NEVADA DEPARTMENT OF CORRECTIONS, PRESENTLY IN THE LAWFUL CARE AND CUSTODY OF ELY STATE PRISON, LOCATED AT: 12000 NORTH BOTHWICK ROAD, (MAILING) P.O. BOX 1989, IN CITY OF: ELY, COUNTY: WHITE PINE, STATE: NEVADA, 89301. DOES AFFIRM THAT THE ATTACHED DOCUMENT ENTITLED: _2006-31-20319_, IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE & BELIEF, AND ANY FALSE STATEMENT OF MATERIAL FACT MADE THERE IN SHALL BE SUBJECTED TO THE PAINS AND PENALTIES OF PERJURY PURSUANT TO: N.R.S. 208.165, THIS, _16th_ DAY OF: _July_, 20_21_.

INMATE SIGNATURE: _A.H._

INMATE NAME (PRINTED): _Ammar Harris_
ADDRESS: ELY STATE PRISON
       P.O. BOX 1989, ELY, NEVADA 89301

A(7)

EXHIBIT 3 - "AdminReg"

A.R: 400 (General Security/Supervision)
3 Pages

A.R: 420 (Death or Serials Injury)
11 pages

A.R: 600 (Medical transfer of Inmates)
2 Pages

A.R: 615 (Continuity of Care)
3 Pages

A.R. 639 (Medical Records)
6 Pages

A.R. 740 (Grievance Procedure)
14 Pages

# NEVADA DEPARTMENT OF CORRECTIONS
# ADMINISTRATIVE REGULATION
# 400

## GENERAL SECURITY/SUPERVISION GUIDELINES

**Supersedes:**    AR 400 (01/05/12) and AR 400 (Temporary, 03/01/13)
**Effective Date:**    03/19/13

### AUTHORITY

NRS 209.131, NRS 209.161, 42 U.S.C. § 15601, *et seq.* and 28 C.F.R. Part 115

### RESPONSIBILITY

The Deputy Directors are responsible for the Department's overall security programs and operations.

The Warden is responsible for maintaining a secure institutional environment that ensures the safety of the public, provides a safe working climate for employees, and offers humane and safe living conditions for inmates confined therein.

The Associate Warden/Designee is responsible for the management of the institution/facility security program and operations.

All employees of the Department have the responsibility to have knowledge of and comply with this regulation.

### 400.01 GENERAL SECURITY SUPERVISION GUIDELINES

1. The Warden will develop and maintain a local security and staff management plan that is available to all staff. The plan will include, at a minimum the following information:

    A. Administrative Regulations;

    B. Operational Procedures

    C. Memoranda and other instructional materials issued by the Warden and Associate Wardens to facilitate the implementation of the policies and procedures;

    D. All necessary staff assignment, roster and timekeeping records, in accordance with Department administrative regulations and policy;

E.   Post Orders that are current and which are readily available for employees assigned to posts.

F.   Emergency Response Manual.

2.   The Warden/Designee will develop a written schedule to ensure that checks are performed in all areas where information is maintained to ensure that current policies and procedures are in place.

3.   Daily Administrative Officer Inspection Tours:  A high priority will be placed in all Department institutions/facilities to ensure the visibility of top staff in the facility, where they are available to inmates, line staff, and mid-level managers for communication. Such actions will include, but are not limited to:

A.   The Warden or Associate Wardens will visit all housing areas every 48 hours during the standard work week, including but not limited to PREA mandated unannounced rounds as designated by the PREA Manager guide;

B.   The Warden or Associate Wardens will visit all activity areas every 72 hours during the standard work week;

C.   The Warden or Associate Wardens shall conduct a formal inspection of Prison Industries during each working day.

D.   Supervisory staff will tour the entire facility at least once each shift every day, including weekends and holidays, including but not limited to PREA mandated unannounced rounds as designated by the PREA Manager (Warden);

E.   Unoccupied areas may be toured once a week;

F.   An Associate Warden will receive a written report or logbook of all such tours will reflect any deficiencies observed and corrective actions taken; and

G.   Correctional staff will conduct a visual inspection of all cells and other living quarters once each shift.  A formalized report will be submitted to the Associate Wardens for each inspection or noted on the local post log and shift report.

H.   Correctional Officers will conduct formal inspections/searches in accordance with the provisions of AR 422, Search and Shakedown Procedure, and the applicable Post Orders.

4.   The Associate Wardens/Designees will conduct at least weekly inspections of all security devices and report results of the inspections in writing to the Warden.

5. No inmates or groups of inmates will be given authority over other inmates, manage any institutional program, or have any policy or procedure setting role in the institution/facility.

**APPLICABILITY**

1. This AR requires an Operational Procedure for all institutions/facilities.

2. This AR requires an audit.

**REFERENCES**

ACA Standards, 4-4174, 4-4178, and 4-4182 through 4-4186; and 2008, 2010, and 2012 Standards Supplement

_James G. Cox_
James G. Cox, Director

_3/19/13_
Date



# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 420

## INMATE DEATH OR SERIOUS INJURY PROCEDURE

**Supersedes:** AR 420 (06/17/12); AR 420 (Temporary, 12/02/13); and AR 420 (Temporary, 02/18/14); 3/18/14; (Temporary, 01/03/17)
**Effective Date:** 03/07/17

**AUTHORITY:** NRS 120A.590, NRS 134.120, NRS 146.080; NRS 209.131; NRS 209.3815; NRS 440.165: NRS 440.175, NRS 440.415; NRS 450B; NRS 451.400

**PURPOSE:** To strive to avoid preventable deaths and injuries, to ensure appropriate care and notification; and to review the appropriateness of clinical and correctional policies and procedures; and to identify changes or the ability to improve operations.

**RESPONSIBILITY:**

The Deputy Director of Operations is responsible for the implementation of this procedure at all institutions and facilities.

The Warden is responsible for ensuring compliance with the Inmate Death Procedure at their respective facility and ensuring operational policies and procedures are developed; and staff is trained on the procedures.

All Department staff involved are responsible to have knowledge of and comply with this procedure.

### 420.01   INMATE DEATHS OR SERIOUS INJURY PROCEDURE – DISCOVERY

1. The first staff member(s) present at the scene of a serious injury or inmate death will call for assistance; and initiate first aid and/or cardiopulmonary resuscitation (CPR) as needed. If the offender is found hanging, the responder(s) will immediately cut him/her down and begin appropriate medical care. All NDOC housing locations and areas where inmates may be present will have approved cutting devices available to be used for the purpose of cutting down the inmate or removing ligatures (*note: custody staff do not have the authority to determine death or time of death.*)

   A. Every precaution should be taken to ensure the safety and security of all persons present;

   B. The response to the serious injury or possible inmate death will be based upon the unit's operating policies and procedures for the inmate population housed within. Every precaution should be taken to ensure that all evidence is protected.

2. Upon discovery of what appears to be a deceased inmate, the Shift Supervisor shall be notified immediately. The immediate area shall be secured and no one other than a medical staff member will be allowed to enter the cell until designated investigators, the coroner, or outside law enforcement officials arrive. The Shift Supervisor shall make the proper notifications in accordance with Section 420.02 of this administrative regulation.

3. Humane treatment of the inmate shall prevail.

    A. A hanging inmate shall immediately be cut down, leaving the ligature in place if the inmate is deceased.

    B. If the inmate does not appear to be deceased, life saving measures should be immediately initiated and the ligature removed and placed in secure location where the least amount of disturbance should occur.

    C. The body shall not be left unattended.

    D. The area or cell shall be secured.

    C. No item shall be moved from or about the secured area.

4. The scene shall be photographed and videotaped following the guidelines established in Administrative Regulation 458.

5. In any case where the inmate appears deceased , the staff person(s) who discovers the body shall write a comprehensive incident report prior to leaving the institution/facility. This report shall be approved by a supervisor and entered into NOTIS. The report will include at a minimum the following:

    A. Name of the staff person discovering the body, the name of the inmate and the names of any witnesses and name and number of cell partner if the body was discovered in the cell.

    B. Time of the discovery of the body, the body's appearance such as discoloration, puncture wounds or other evidence of trauma.

    C. A description of the scene such as cell number or area and the appearance of the area such as the cell was in disarray, or neat, bodily fluids such as blood in order to assist in the collection of evidence and investigative reports.

    D. Describe action taken upon discovery of the body such notification of other staff, supervisors or medical and the time of the notifications.

    E. Describe any attempts to provide first-aide or other actions such using the cut-down tool and the time that first-aide ceased and medical arrived.

F. Enter the time that the body was released to medical or the body was removed from the scene.

G. If investigators arrive at the scene and the staff person is still at the scene, enter the time that the investigators arrived.

6. Upon notification, Medical personnel shall proceed to the scene and confirm the death, but will in no way disturb the scene or any of the evidence.

A. Only a Doctor of Medicine, a Doctor of Osteopathic Medicine, the Coroner, and a Coroner's Deputy; or when authorized, a Registered Nurse, or a Physician Assistant, can pronounce a person legally dead.

B. In all instances, the appropriate Coroner will be contacted to examine the body and determine the cause of death.

C. The Supervisory Staff member will notify the Inspector General for investigative response to the scene.

7. The Shift Supervisor shall have the primary responsibility for assuring that no evidence is moved or tampered with, including the complete preservation of the scene, prior to the arrival of the representative from the Inspector General's Office and the Coroner. Upon the arrival of the Coroner, staff shall assist and cooperate with the investigation as is appropriate and necessary.

8. Next of kin notification procedures will be initiated by the institutional Chaplain and/or Associate Warden of Programs.

9. After obtaining permission from the Coroner, and after the initial investigation is completed; the body of the deceased shall be covered and removed to the morgue, mortuary, or private room in the infirmary.

A. The Director, in consultation with the designated medical director and the Inspector General of the Department, shall request the Coroner, or any other persons so authorized, to conduct an autopsy of any offender who dies while in the custody of the Department, if the next of kin.

(1) Consents to the autopsy; or

(2) Does not notify the Director of any objection to the autopsy within 72 hours after the death. Unless an objection is received by the Director from the next of kin within 72 hours of death, an autopsy will be requested in all cases.

(3) In those cases where the next of kin declines the autopsy, the next of kin must submit their intent to refuse the autopsy, in writing, within the 72 hour time frame.

B. If the death is suspected to be a suicide (which will be considered an unresolved death) or if the death is under suspicious circumstances, the Coroner shall be requested to inform the morgue/mortuary that the body is not to be embalmed until a full and complete criminal investigation is conducted.

C. Bodies shall be removed as expeditiously as circumstances will permit.

10. Investigation of crimes involving great bodily injury or homicides shall be coordinated between the Department's Inspector General's Office and relevant law enforcement officials.

A. The local sheriff's office may be requested to assist in appropriate aspects of the investigation, as circumstances require.

B. Requests for assistance from the Department of Public Safety, Investigations Division and the Attorney General's Office shall comply with related agency assist agreements and will be coordinated by the Department and local sheriff's office.

11. Employees of the Department should assist the coroner or local law enforcement in the investigation, as is appropriate and to cooperate in every way necessary.

12. States housing contract and interstate compact inmates in the Department will be notified concerning the incident by the Offender Management Division Administrator.

## 420.02   DEATHS OR SERIOUS INJURY REPORTING REQUIREMENTS

1. If an inmate death or serious injury occurs in one of the institutions or facilities, the Shift Supervisor, Associate Warden or Warden shall immediately notify the following in sequential order and will include who the involved inmate(s) is/was, when the incident occurred, where the incident occurred and how the incident occurred:

A. On-duty medical staff;

B. The Warden, Associate Wardens or Facility Manager;

C. Inspector General;

D. Local Police Department or Sheriff's Office;

E. The Warden shall immediately notify the Director and the Deputy Director of Operations;

F. The Administrator of the Offender Management Division;

G. The Chaplain;

H.  The Next of Kin;

    1)  The Chaplain shall inform the next of kin; and provide information that an autopsy will be requested unless the next of kin provides notification to the Director in writing, within 72 hours of the death.  If the Chaplain is not available, the Associate Warden or designee shall notify the next of kin, and provide the autopsy information.

I)  The Public Information Officer (PIO), who is responsible to notify the media;

    1)  The Warden/Designee is responsible for completing the PIO Information (NDOC Form 4520) and sending it to the PIO, within 24-hours, or as soon as possible.

## 420.03  DUTIES OF OTHERS

1.  Physician/Doctor: The physician may consult with the Coroner to determine if the death was caused by natural or unnatural causes, or if suspicious circumstances exist.

2.  Coroner

    A.  In the case of a death, the body shall be released only upon instructions from the coroner.

    B.  Prior to the removal of the deceased from institutional grounds, a body receipt for the remains will be obtained from the Coroner, mortuary, medical examiner, or otherwise authorized/designated personnel.

    C.  The body shall not be moved, except at the direction of the Coroner, and upon the completion of the initial investigation.

    D.  Autopsies and toxicology reports will be performed at the request of the Director as authorized by NRS 209.3815.

3.  Institutional Warden or Facility Manager shall:

    A.  Initiate an investigation or take other custody measures as necessary, to include securing the crime scene.

    B.  Make appropriate notifications as set forth in Sections 420.02 and 420.03 of this Regulation.

4.  Upon receiving information that an inmate has died, the Associate Warden shall:

    A.  Assure that all available records, including the "I" file, medical records, mail, and visiting records are secured.

   B. Ensure that the Chaplain has access to information on the next-of-kin and/or to the list of names, relationships, and addresses of relative and friends to be notified in case of death as indicated previously by the inmate.

   C. Ensure all reports are received and an incident report is submitted.

   D. Prior to the release of the body, ensure that the inmate is positively identified.

   E. Coordinate the Department's and other agency activities related to the incident.

   F. Other duties as assigned.

5. Chaplain:

   A. The Chaplain shall make reasonable efforts to promptly notify the next of kin.

   B. When the Chaplain is not available, the Associate Warden or a designee shall notify the next-of-kin.

   C. The next-of-kin information shall be maintained and updated every six-months by the institution/facility staff during the inmate's periodic classification review as directed in AR 636.

6. Offender Management Division Administrator will notify the Department's Statistician to obtain the death certificate.

## 420.04   DEATHS OCCURRING AT A PLACE REMOTE FROM AN INSTITUTION

1. If a death occurs in a camp, while fighting fire, or while in transit between institutions, the Department's officer in charge shall take the following actions:

   A. Summon proper custodial support, as appropriate to the situation.

   B. If necessary, summon nearest medical response for life support.

   C. Notify the Inspector General.

   D. Notify the Administrator of the OMD and the Warden of the gatekeeper institution by telephone and seek further instructions.

   E. The Warden of the gatekeeper institution will notify the Director and the Deputy Director of Operations.

   F. Notify all local officials, as required.

G. Complete and submit a final report containing the circumstances, investigations, all arrangements, etc., to the Warden of the gatekeeper institution, if applicable.

## 420.05  DISPOSITION OF THE DECEASED INMATE'S PROPERTY

1. The property of the deceased inmate shall be immediately secured, inventoried, and placed in safe storage at the institution or facility, pursuant to AR 711.

2. If all or part of the inmate's property is required for an investigation into the circumstances of the death, that property shall be accounted for by receipt to the investigative agency.

3. The Associate Warden or Facility Manager shall conduct such inquiry necessary to determine if that inmate died with or without a will. The Chaplain may be asked to help with this inquiry.

4. If a will exists, the inmate's property and any money on their account, after deductions, with the Department, shall be released to the executor of the estate by the Associate Warden or the Facility Manager, but only after any investigations are complete.

   A. Funds received after the inmate's death will be returned to sender.

   B. Distribution of dividends and other income received after the inmate's death will be determined on a case-by-case basis.

   C. Without a known will, the inmate's property and any money on their account with the Department shall be released to the next-of-kin.

5. When an Inmate Dies:

   A. Offender Management Division is to notify Chief of Inmate Banking or Designee by email within two (2) working days. Information to include Inmate name, Inmate number, date of death and institution/facility.

   B. Inmate Banking Services will freeze inmate accounts until receipt of Affidavit of Distribution without Administration or after consultation with the Deputy Attorney General (DAG) concerning the appropriate legal documentation.

   (1) The Associate Warden/Facility Manager is responsible to coordinate the release of all funds/property.

   (2) All investigations shall be completed prior to the release of funds/property.

   (3) The Associate Warden, Facility Manager, the Administrator of the OMD and an Administrator from Support Services, in consultation with a DAG shall determine the appropriate distribution of all funds and property.

(4) Without a known will and with no known next-of-kin, the accounts of the inmate shall remain frozen and the property held in safe storage.

6. If the inmate's property and funds are valued under $20,000, the Affidavit of Distribution without Administration requires the signature of the next-of-kin prior to distribution of funds and/or property per NRS 146.080, regardless if an inmate dies with or without a will.

    A. The original document shall be placed in the C-File.

    B. One copy shall be placed in the I-File.

    C. One copy shall remain with the property records.

    D. One copy shall be forwarded to Inmate Services.

7. The Associate Warden or the Facility Manager shall prepare documentation that serves to facilitate these actions and to record the results.

8. In any case there the inmate refuses to provide next of kin information and no last will and testament exists, and the Department cannot verify identification of an approved next of kin, all property of value will be maintained at the institution for a determined amount of time until the property can be reviewed distributed or destroyed according to the value of the property.

9. In any case where the inmate refuses to provide next of kin information and no last will and testament exists, and the Department cannot verify identification of an approved next of kin, all money will be referred to as abandoned property and relocated to its proper distribution authority.

## 420.06   INMATE DONATION OF REMAINS FOR ANATOMICAL PURPOSES

1. Inmates may, if they choose, sign a Consent Anatomical Disposition, DOC-2567, authorizing release of the inmate's body in the event of death to the School of Medical Science, University of Nevada, Reno. The acceptance shall be governed by the Uniform Anatomical Gift Act, NRS 451.440.

2. The next-of-kin of a deceased inmate may authorize release of the body for medical science according to the Uniform Anatomical Gift Act.   Form DOC-2567 Consent Anatomical Disposition is available for this purpose.

## 420.07   FUNERAL EXPENSES

1. When the family elects to claim the body of a deceased inmate, they shall be responsible for all costs incurred. The Department may, upon approval of the Director or Deputy Director of Support Services, pay for shipping costs of the body, if the costs are less than cremation expenses.

2. In the event the family declines to claim the body, the Department will only pay for cremation costs for the deceased inmate.

## 420.08  AUTOPSIES OR POST-MORTEM EXAMINATIONS

Autopsies and toxicology reports should be performed on all deceased NDOC inmates per NRS 209.3815.

## 420.09  DOCUMENTATION

Records and reports required for deaths occurring on the Department's property, or during official absences from the institution, shall meet the following requirements:

    A. All personnel who possess information regarding the circumstances surrounding the death shall submit a report to the Warden/Facility Manager. These reports shall be completed in accordance with the provisions of AR 332.

    B. The following personnel shall submit reports:

        (1) Any staff member who was on the scene at the time of an incident or who responded to the scene during initial response;

        (2) Any staff member(s) discovering the body; and

        (3) Any medical personnel who attempted life-saving emergency treatment, including Form DOC-2514, Medical Report of Incident, Injury or Unusual Occurrence.

    C. Reports shall be as specific as possible, listing the employee's role, names of other persons on the scene, observations, and timing of events.

    D. The OMD is responsible for obtaining a death certificate, which will be placed in a locked filing cabinet to allow for confidentiality of the certificate. .

        (1) In accordance with NRS 440.165 and 440.175, NDOC is not authorized to reproduce and/or disseminate any vital record such as a certificate of death.

## 420.10  NEXT-OF-KIN DOCUMENTATION

1. The Warden shall send a letter to the next-of-kin within one week of the inmate's death. The letter shall express condolences and refer the next-of-kin to the Associate Warden or Facility Manager for the disbursement and distribution of personal property.

2. It is imperative that the "Next-of-Kin" form be maintained and updated in the Institutional file and in the case notes in the Nevada Offender Tracking Information System (NOTIS) to assure accurate information is available to administration at the time of illness or death of an inmate.

This information shall be entered at the initial intake process and shall be reviewed with the inmate and updated when applicable by Caseworkers at all regular reclassification hearings.

**APPLICABILTY**

1. This AR requires an Operational Procedure for all institutions/facilities and impacted divisions of the Department.

2. This AR requires an audit.

**REFERENCES**

ACA Standards 4-4425; 4-4395,


James Dzurenda, Director

3/7/17
Date



## NEXT OF KIN AUTOPSY REFUSAL FORM

Pursuant to Nevada Revised Statute 209.3815, the Director of the Nevada Department of Corrections (NDOC), in consultation with the Medical Director of the NDOC and the Inspector General of the NDOC, shall request that the coroner conduct an autopsy of any offender who dies while in the custody of the NDOC if the next of kin either: (1) consents to the autopsy, or (2) does not notify the Director of any objection to the autopsy within 72 hours after the death.

Because the language of the statute is mandatory and requires the Director to request an autopsy unless he receives direct notification otherwise, any next of kin refusing an autopsy must waive in writing their desire for same.

You, as the next of kin for deceased inmate _____
                                              (inmate name and back number)

have been notified of your relative's passing while in NDOC custody. You have been notified within 72 hours of death and have opted to decline consent to an autopsy. By signing the form below, you acknowledge your intent to decline an autopsy for your next of kin and affirmatively state your objection to an autopsy.

By signing this form, you also acknowledge and agree that you will forgo any claims against the NDOC related to not knowing the cause of death and/or the reasons for death, since causation of death will not be able to be affirmatively determined once autopsy is refused and the body is released for burial or cremation.

_____          _____
Next of Kin Printed Name                    Date


_____
Next of Kin Signature


_____          _____
Receiving NDOC Staff Printed Name           Date of Receipt


_____
Receiving NDOC Staff Signature



## NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 608

## MEDICAL REQUIREMENTS FOR ROUTINE TRANSFER OF INMATES

**Supersedes:** AR 608 (Temporary, 11/23/11)
**Effective date:** 06/17/12

**AUTHORITY:** NRS 209.131; NRS 209.291; NRS 209.381

**RESPONSIBILITY**

Medical Division staff has the responsibility to have knowledge of and comply with this procedure.

### 608.01 MEDICAL REQUIREMENTS FOR ROUTINE TRANSFER OF INMATES

1. Medical Division staff should be given at least twenty-four (24) hours notice prior to routine transfers in order to prepare for the continuity of care at the receiving institution and prevent unnecessary interruptions of medical care.

   A. Inmates being transferred from one institution to another where medical care is available may be cleared by a qualified member of the nursing staff.

   B. Inmates being transferred from an institution to a rural camp must be qualified for this housing based on their medical/dental/mental health classification.

   C. Inmates with mental health diagnoses or recent mental health care or treatment should be cleared by mental health staff of the departing institution prior to transfer.

2. Essential medications or other special treatment required en route, along with specific written instructions should be furnished to the transportation staff.

3. The transporting officer should hand deliver the sealed medical record and any non-KOP essential medications to authorized medical staff at the receiving institution.

AR 608 Page 1 of 2

4. Inmates may keep KOP (Keep On Person) medications approved by the medical staff during transportation.

5. The inmate's medical records should be transferred to the receiving institution Medical Records Section or to the camp medical officer.

**APPLICABILITY**

1. This regulation requires a Medical Directive for intrasystem transfers.

2. This regulation does not require an audit.


_____         $5-30-12$
R. Bruce Bannister, D.O., Medical Director         Date


_____         $6/12/12$
James G. Cox, Director         Date



# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 615

# LEVELS AND CONTINUITY OF CARE

**Supersedes:** AR 615 (06/17/12) and AR 615 (Temporary, 04/23/13)
**Effective date:** 10/15/13

**AUTHORITY:** NRS 209.131; NRS 209.381

**RESPONSIBILITY**

Medical Division staff has the responsibility to have knowledge of and comply with this procedure.

**615.01   LEVELS AND CONTINUITY OF CARE**

1.  It is the policy of the Nevada Department of Corrections (NDOC) to make available the level of health care required by the inmates' medical condition and follow through by continuing with a treatment plan to an appropriate medical conclusion.  The care should be commensurate with proven effective, evidence based, medical practice.

2.  Each infirmary and health care unit will have procedures for assuring expedient access to the following levels of health care.

   A.  Self Care - Treatment for a condition that can be accomplished solely by the inmate and may include "over the counter" medications, i.e., aspirin.

   B.  First Aid - Care for a condition that requires the attention of a person trained in first aid procedures.  First aid kits will be available at designated areas of the institutions/facilities based on need.

   C.  Non-Emergent - situation in which the patient's condition requires medical attention, but can be scheduled in a timely manner and the individual will not suffer any adverse consequences.

   D.  Emergency Care - Treatment of an acute illness, injury, or unanticipated medical need which requires the immediate attention of a qualified health care provider and cannot be deferred until the next scheduled sick call or access period. Emergency care does not require pre-approval by the Utilization Review Panel (URP).

E. <u>Consultant Care</u> - Treatment of medical complaints beyond the scope available at the institution. The need for this level of care is determined by the medical staff at the institution, and approved by the URP.

F. <u>Infirmary Care</u> - In-patient and out-patient care for illnesses, which require observation and/or clinical management, but do not require admission to an acute care hospital. This level may include long term convalescent care.

G. <u>Health Care Unit</u> - Treatment for the ambulatory inmate with health care complaints that are evaluated and appropriate disposition is rendered.

H. <u>Hospital Care</u> - In-patient bed care for an illness or diagnosis that requires twenty-four (24) hour clinical management in a hospital facility licensed to provide such service and approved by the URP.

3. The Medical Director/designee will develop a system of procedures that provide inmates with continuity of medical care from admission to discharge from the institution, including referral to community care when needed. The procedure(s) will include, but are not limited to:

A. Providing adequate access to health care facilities and licensed health care providers.

B. Timely initiation and follow through of medical treatment.

C. Referral to medical personnel and facilities outside the institution when indicated.

D. Providing for the continuity of medical care when the inmate is transferred to other facilities and sharing health information.

E. Providing adequate information regarding the current clinical status of the inmate during community or institutional medical transfer or referrals.

**APPLICABILITY**

1. This regulation requires a Medical Directive for Continuity of Care at each institutional Infirmary and at the Regional Medical Facility.

2. This regulation requires an audit.

_____ Romeo Aranas, Medical Director

_____ 10/30/13 Date

_____ James G. Cox, Director

_____ 11/7/13 Date



# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 639

## MEDICAL RECORDS

**Supersedes:**  AR 639 (01/05/12); (05/06/14, Temporary); 09/16/14; (01/11/18, Temporary)
**Effective date:**  03/01/18

**AUTHORITY:** NRS 49.265; 209.131; 458.055; 629.051; 629.061

### RESPONSIBILITY

The Director has the overall responsibility for this administrative regulation.

The Director of the Medical Division and the Health Information Director have the responsibility to implement this regulation.

The Directors of Nursing have the responsibility to ensure that all staff within the Medical Division have knowledge of and comply with this regulation.

All medical records initiated by a practitioner operating within an institution must comply with this regulation.

### 639.01   MEDICAL RECORDS

1. The Nevada Department of Corrections (NDOC) maintains medical, dental, and mental health records for each inmate throughout the period of incarceration.

2. Medical records are initiated during the intake process.

3. The record will be standardized and uniform throughout the Department.

4. All original medical, dental, mental health care and substance abuse treatment data will be maintained in the medical record.

5. The record shall include documentation of all health related service provided to the inmate, both on-site and offsite

6. Copies of the medical record shall be kept in the outpatient mental-health services to facilitate mental health care.

7. Practitioners responsible for conservation camps and transition centers will document medical information on any treatment received by inmates under their care. Physicians, Physician Assistants, or Advanced Practitioners of Nursing are considered to be practitioners.

8. Medical records or portions of medical records will not be destroyed, deleted or expunged. If a mistake is made in a notation, the correction will be noted, dated and initialed by the medical person making the correction.

9. The Directors of Nursing will provide On-The-Job Training for all medical staff to ensure that medical personnel are trained on how to make entries to the medical records and that staff are trained on HIPAA requirements and medical records confidentiality.

10. A staff person designated by the Director of the Medical Division will review departmental training to ensure that all NDOC personnel are trained on the requirements of HIPAA and inmate medical records privacy requirements.

11. The Director of Nursing or designee will provide only medically necessary information to correctional staff, regarding contagious or infectious diseases from the inmate's medical record, when an inmate has to be escorted, transported, guarded or restrained for the purposes of ensuring that correctional staff are taking the appropriate universal precautions whether the issue is an air-borne, blood or saliva contagion. The information will not include specific diseases but only the precautions necessary.

12. The Director of Nursing or designee will provide enough information to correctional staff from the inmate's medical record when the information is necessary for the taking or providing or medication to the inmate during escort, guarding or transporting.

## 639.02   CONFIDENTIALITY OF MEDICAL RECORDS

1. Medical records will be maintained in secure files and will only be handled by authorized medical division staff and the following persons, on a need to know basis as authorized by the Medical Director:

    A.  Director or designee;

    B.  Deputy Directors;

    C.  Wardens;

    D.  Associate Wardens;

    E.  Attorney General staff; or

    F.  Other staff as authorized by the Director or Medical Director.

G. If medical records are transported from one facility to another, the medical records will be labeled confidential and sealed, so that they are not accessible by unauthorized personnel to include inmate clerks.

2. Inmates are only allowed access to their own medical file and will not be allowed access to any other inmate's medical file.

3. Medical information, such as progress notes, laboratory and radiology results, and other pertinent information, should be made available to authorized staff and practitioners in the Department.

4. Medical information should be released to outside healthcare providers only with written authorization (Form DOC 2548 Consent – Release of Medical Information) from the inmate, except for pertinent copies of the inmate medical records sent for approved outside consultations at the request of institutional physicians, or as required by law.

A. Original medical records should not leave the possession of department staff at any time. If consulting physicians need to maintain a medical record, copies should be made and the original record will be retained at the institution.

B. A notation will be made in the medical file that copies were made, which agency or outside provider is the recipient of the copies, the date which the copies were made and the reason the copies were made a copy of the court order will be maintained with the medical record.

5. Where required by law, appropriate public health agencies will be notified of reportable diseases.

6. Inmate's attorneys may obtain a copy of the medical records with the written request and authorization by the inmate.

7. Inmates are not constitutionally entitled to free copy work. Inmates may request limited copies of medical records for legal purposes by submitting a brass slip for the cost of the copies requested.

A. In order to receive the requested copies, inmates must have sufficient funds in their individual account in the Prisoners Personal Property Fund (PPF) to cover the cost of the requested copies.

B. Copies should be charged to the requesting attorney or inmate at the rate set by NRS 629.061.

C. Indigent inmates will be provided with copies.

8. Copies of the health record shall not be released directly to the inmate while incarcerated. Exception to this release shall be made only when an inmate is personally involved in a lawsuit

directly involving medical issues that would require the use of his/her medical records, as verified by the Office of the Attorney General.

9. Original medical records should not be sent to outside agencies unless ordered by the court.

    A. In the event original records are ordered in cases of litigation, they should be hand delivered by authorized Department staff.

10. All other requests for medical records will be transferred to the Health Information Archives Coordinator.

## 639.03   INMATE REVIEW OF MEDICAL RECORDS

1.      An inmate is prohibited from possessing any portion of their medical file on their person, in their cell or on the yard unless otherwise permitted by a court order.

2.      Inmates may request to review their medical record. The review will occur under the direct supervision of medical staff.

3.      Prior to an inmate's review of their medical record, the record shall be purged of all psychiatric/psychological materials, any materials received from an outside source which NDOC has requested with authorization from the inmate, and any information which may jeopardize the safety of the inmate or institution.

4.      Absent an inmate's personal litigation directly involving these psychiatric/psychological records, the records shall not be reviewed with an inmate without consultation with the treating (or a knowledgeable) psychiatric/psychological professional. If this consultant believes that the content of the psychological records, or any part thereof, may be counter-therapeutic or detrimental to the inmate's mental health, the records may be withheld pending a court order to release the records.

    A. Except under special circumstances, as determined by the Medical Director, attending practitioner or by court order, an inmate should only be permitted to review their medical records once per calendar year.

        a) Exception to this once annual review, during the course of litigation involving a medical issue of the inmates, the inmate will be allowed additional opportunity to review the medical record. Upon a request from the inmate to review his medical records for litigation purposes, all efforts will be made to make the records available within 3-5 working days from the date of the request.

        b) The inmate will be given one hour to review the medical record. If the inmate feels that additional time is needed for the review, the inmate is permitted to:
            i.     Request an additional review.
            ii.    Review the Medical Record at a date and time that is convenient and does not conflict with staff workload priorities.

    c) The inmate will be allowed to make separate notes regarding the information contained in his/her own medical record.

    d) Inmates are not permitted to remove documents from the medical record.

5.     Any inmate request for review that is denied by the Medical Director or attending practitioner shall be documented in the medical record, stating the reason for the denial.

## 639.04   TRANSFER OF INMATE MEDICAL RECORDS

1. When an inmate is transferred between institutions or facilities, the complete medical, mental health, and dental records will be transferred with the inmate.

    A. If the medical record cannot be found, a temporary record shall be used until the original is found.

2. All medical information accumulated and not filed shall be filed appropriately in the medical record before it is transferred. If for unforeseen circumstances this cannot be accomplished the reasons will be documented and placed in the medical record. *For example; the inmate had to be emergency transferred due to enemy or safety reasons without notice.*

3. Medical record should be reviewed at the receiving institution by the nursing staff for the pertinent information, noting in the progress notes that this review was accomplished.

    A. Appointments and referrals will be made as indicated. The relevant documentation will then be given to the Health Information Coordinator for quality control functions.

4. When an inmate is transferred out for treatment for an indefinite period of time, the institutional medical records office shall contact the Health Information Archives Coordinator to obtain pertinent medical records.

5. A copy of the medical record shall be sent to the receiving institution, the original medical record should remain in the medical records archives.

6. When an inmate is released from the Department, his medical records shall be forwarded to the medical records archives to be maintained according to applicable state, federal, and local laws, rules and regulations.

## APPLICABILITY

1. This regulation requires a Medical Directive for the management, format, access, and confidentiality of the health care record.

2. This regulation requires an audit.

**REFERENCES**:  ACA Standards 4th Edition, 4-4414 – 4416; 4-4413; 4-4415; 4-4352; 4-4400; 4-4393; 4-4096

_(signature)_ , M D

Medical Director

$\dfrac{5}{}$ / 1 / 18

Date

_(signature)_

James Dzurenda Director

$\dfrac{3}{}$ / 1 / 18

Date



# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 740

## INMATE GRIEVANCE PROCEDURE

**Supersedes:** AR 740 (02/12/10); and AR 740 (Temporary, 06/16/14); 09/16/14; (Temporary, 01/03/17); 03/07/17; 08/30/17
**Effective Date:** Temporary 11/20/18

**AUTHORITY:** NRS 209.131, 209.243; 41.031; 41.0322; 41.0375; 42 U.S.C. § 15601, *et seq*. and 28 C.F.R. Part 115

### PURPOSE:

The purpose of this Administrative Regulation ("AR") is to set forth the requirements and procedures of the administrative process that Nevada Department of Corrections ("NDOC") inmates must utilize to resolve addressable grievances and claims including, but not limited to, claims for personal property, property damage, disciplinary appeals, personal injuries, and any other tort or civil rights claim relating to conditions of confinement. Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims only if the inmate can factually demonstrate a loss or harm. This procedure describes the formal grievance processes and will guide NDOC employees in the administration, investigation, response and resolution of inmate grievances.
The provisions of this AR shall be effective on or after the effective date of this AR. The provisions of this AR are not retroactive and do not apply to incidents and/or claims that occurred prior to the effective date of this AR. Only inmate claims arising out of, or relating to, issues within the authority and control of the NDOC may be submitted for review and resolution by way of the grievance process. A good faith effort will be made to resolve legitimate inmate claims without requiring the inmate to file a formal grievance. This AR does not create any right, liberty or property interest, or establish the basis for any cause of action against the State of Nevada, its political subdivisions, agencies, boards, commissions, departments, officers or employees.

### RESPONSIBILITY

1.      The Director, through the Deputy Directors (DDs), shall be responsible in establishing and supervising an inmate grievance process that provides an appropriate response to an inmate's claim, as well as an administrative means for prompt and fair resolution of, inmate problems and concerns.

2.      The Deputy Director or designated Administrator shall be responsible for 2nd level grievances.

3.      The Warden through the Associate Wardens (AWs) shall be responsible in managing the grievance process at each institution and any facilities under the control of the parent institution. The AW may designate an Inmate Grievance Coordinator to conduct functions

required by this regulation under the AW authority and supervision.

## 740.01  ADMINISTRATION OF INMATE GRIEVANCES

1. All grievances, whether accepted or not, will be entered into NOTIS.

2. Each institution/facility shall establish locked boxes where all inmates have access to submit their grievances directly to the box. Keys will be issued by the Warden, to an AW and/or a designated staff.

   A. Lock boxes will be maintained in segregation/max units in a manner in which the inmate will be allowed to have direct access. A designated staff may go cell to cell to pick up grievances in segregation /max units due to security and safety concerns, if necessary.

   B. Emergency grievances will be handed to any staff member for immediate processing per this regulation.

3. Grievances will be treated as legal correspondence and will be gathered daily, Monday through Friday, excluding holidays, by the AW or designated Grievance Coordinator(s) and or designated staff member.

4. Grievance forms will be kept in housing units and may be accessed through the unit staff, the unit caseworker or in the Institutional Law Library.

5. Grievances may be GRANTED, DENIED, PARTIALLY GRANTED, ABANDONED DUPLICATE NOT ACCEPTED, OR GRIEVABLE, RESOLVED, SETTLEMENT OR WITHDRAWN or referred to the Investigator General's Office at any level as deemed appropriate after the claim in the grievance has been investigated. PREA grievances shall immediately be referred to the Inspector General. Grievance findings or responses will not be titled "Substantiated."

6. The Grievance Coordinator should record receipts, transmittals, actions, and responses on all grievances to NOTIS within three (3) working days of receipt.

   A. The coordinator should sign, date and enter the approximate time as noted on DOC 3091, 3093 and 3094.

   B. The front page of the grievance should be date stamped the day entered into NOTIS.

7. Monthly and annual grievance reports generated by NOTIS will be reviewed by the Deputy Directors (DDs), Wardens and Associate Wardens (AWs) on a quarterly and annual basis.

## 740.02  GRIEVANCE RECORDS

1. Grievance documents shall be stored at the facility/institution where the grievance issue occurred. The results of the grievance shall be stored in NOTIS.

A.   Grievance files shall be in separate files for each inmate and maintained in alphabetical order.

B.   Grievance copies shall not be placed in an inmate's Institutional or Central File, nor shall they be available to employees not involved in the grievance process, unless the employee has a need for the information in the grievance or the responses to the grievance.

2.   Grievance files shall be maintained at each institution for a minimum of five (5) years following final disposition of the grievance.

3.   Employees who are participating in the disposition of a grievance shall have access to records essential to the disposition of the grievance only.

4.   Inmates will not have access to grievance records unless ordered by a court, as grievance records are considered confidential and they may be redacted, if appropriate.

5.   Upon completion of each level of the grievance process, the form and copies of all relevant attachments shall be maintained in the inmate's separate grievance file. Originals shall be given to the inmate.

## 740.03   GRIEVANCE ISSUES

1.   Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims, only if the inmate can factually demonstrate a loss or harm. Grievances may be filed to include, but not limited to, personal property, property damage, disciplinary appeals, personal injuries, and any other tort claim or civil rights claim relating to conditions of institutional life. The inmate must state the action or remedy that will satisfy the claim in the grievance.

A.   If the inmate does not factually demonstrate a loss or harm and does not state the action or remedy that will satisfy the claim in the grievance, the grievance will not be accepted and returned to the inmate with an explanation as to what was missing in order for the grievance to be processed.

B.   A Grievance will not be used as an inmate request form (DOC 3012) to advise staff of issues, actions or conditions that they do not like but suffered no harm or loss.

C.   A Grievance must be legible, with a clearly defined remedy requested.

2.   All allegations of inmate abuse by Department staff, employees, agents or independent contractors, shall be immediately reported to the Warden, AWs, and the Inspector General's Office, in accordance with investigator guidelines via the NOTIS reporting system.

A.   Any grievance reporting of sexual abuse against an inmate will be referred to the Warden or designee for entry into the NOTIS reporting system and referral to the Office of the Inspector General.

B.   Inmates who allege abuse other than sexual abuse will be interviewed by a supervisor of the staff who allegedly committed the abuse to ascertain if he/she agrees to pursue administrative remedies, which will be documented in the NOTIS system.

3.   Only inmate claims arising out of, or relating to, issues within the authority and control of the Department may be submitted for review and resolution. Non-grievable issues include:

A.   State and federal court decisions.

B.   State, federal and local laws and regulations.

C.   Parole Board actions and/or decisions.

D.   Medical diagnosis, medication or treatment/care provided by a private/contract community hospital.

4.   Claims for which the inmate lacks standing will not be accepted, including, but not limited to:

A.   Filing a grievance on behalf of another inmate unless the inmate is so physically or emotionally handicapped as to be incapable of filing a grievance, and with the other inmate's approval, or in the case(s) of any third party reporting of Sexual Abuse.

B.   The inmate filing the grievance was not a direct participant in the matter being grieved, except a third party allegation of sexual abuse.

C.   An inmate may not file more than one (1) grievance per seven (7) day week, Monday through Sunday. More than one (1) grievance filed during the seven day week period will not be accepted, .unless it alleges sexual abuse or it is an emergency grievance that involves health or safety claims.

D.   The inclusion of more than one grievance issue, per form will be cause for the grievance to not be accepted.

E.   Grievances that have the same issue in a previously filed grievance will not be accepted, even if the requested action or remedy is different on the subsequent grievance.

5.   In the event an inmate's claim is not accepted ornot within the intended scope of this Regulation, the inmate may not appeal that decision to the next procedural level.

AR 740                                      Page 4 of 14

6.     An inmate whose grievance is denied in its entirety may appeal the grievance to the next level, within the substantive and procedural requirements outlined herein, <u>unless the action requested has already been Granted at a lower level</u>.

    A.     Administrators or employees of the institution shall automatically allow appeals without interference unless the grievance is granted..

    B.     An inmate's election not to sign and date any grievance form at any level shall constitute abandonment of the claim.

    C.     If the Grievance is **"Granted"** at any level, the grievance process is considered complete and the inmate's administrative remedies exhausted, and the inmate cannot appeal the decision to a higher level.

7.     Time limits shall begin to run from the date an inmate receives a response.

8.     An overdue grievance response at any level is not an automatic finding for the inmate.

    A.     The response must be completed, even if it is overdue.

    B.     The inmate may proceed to the next grievance level, if a response is overdue.

    C.     The overdue response does not count against the inmate's timeframe for an appeal if he or she waits for the response before initiating the appeal.

9.     Inmates who participate in or utilize the Inmate Grievance Procedure shall <u>not be subjected to retaliation</u>, i.e. an assertion that an employee took some adverse action against an inmate for filing a grievance, except as noted in 740.05, where the action did not reasonably advance a legitimate correctional goal.

    A.     Retaliation is a grievable issue.

    B.     An unfounded claim of retaliation will be handled as an abuse of the grievance procedure and a disciplinary action may be taken.

10.     Comprehensive responses are required for inmate grievances. Statements such as "Your grievance is denied" are not acceptable. <u>An explanation is necessary.</u>

## 740.04   ABUSE OF THE INMATE GRIEVANCE PROCEDURE

1.     Inmates are encouraged to use the Grievance Procedure to resolve addressable claims where the inmate can define a specific loss or harm, however, they are prohibited from abusing the system by knowingly, willfully or maliciously filing excessive, frivolous or vexatious grievances, which are considered to be an abuse of the Inmate Grievance Procedure. Any of the below listed violations will result in the grievance being not accepted and disciplinary action may be taken.

2. It is considered abuse of the inmate grievance procedure when an inmate files a grievance that contains, but is not limited to:

    A.    A threat of serious bodily injury to a specific individual.

    B.    Specific claims or incidents previously filed by the same inmate.

    C.    Filing two (2) or more emergency grievances in a seven (7) day week period, Monday through Sunday which is deemed not to be emergencies may result in disciplinary action against the inmate for abuse of the grievance system. Disciplinary action may be generated by the Warden or designee for abuse of the emergency grievance process.

    D.    Obscene, profane, and derogatory language.

    E.    Contains more than one (1) appropriate issue, per grievance.

    F.    The claim or requested remedy changes or is modified from one level to another.

    G.    More than two (2) continuation forms (DOC 3097) per grievance.

    H.    Alteration of the grievance forms or continuation forms. This includes writing more than one line, on each line provided on the grievance form.

3. If an inmate files a grievance as listed in (2), the Grievance Coordinator shall:

    A.    Return the original improper grievance with a Form DOC-3098, Improper Grievance Memorandum, noting the specific violation.

    B.    A copy will be put in the inmate's grievance file.

4. An inmate who satisfies the criteria contained in 740.04 Section 2 above should:

    A.    Be brought to the attention of the Grievance Coordinator as soon as possible.

    B.    The Grievance Coordinator should review all documentation supporting the alleged abuse to determine if abuse has occurred and forward a written recommendation to the Warden.

    C.    If the recommendation is approved the Warden can assign the appropriate level supervisor or administrator to write a Notice of Charges on the inmate.

    D.    The supervisor or administrator will forward the Notice of Charges to the Warden for processing through the inmate disciplinary process.

E.  A conduct violation of this nature is not a form of retaliation.

F.  An inmate may not be disciplined for filing a grievance related to alleged sexual abuse unless the Department has demonstrated that the inmate filed the grievance in bad faith.

G.  NDOC will not respond to an improper grievance that results in a DOC-3098 under AR 740.

## 740.05   REMEDIES TO GRIEVANCES

1.  Grievance remedies should be determined with the goal of appropriately resolving legitimate claims at the lowest level of review possible, considering each institution's particular operational, security and safety concerns.

2.  Remedies available for grievances may include, but are not limited to, the following:

    A.  Resolve unsafe or unsanitary conditions of confinement.

    B.  Address the violation of an inmate's constitutional, civil or statutory rights.

    C.  Protect inmates from criminal or prohibited acts committed by Departmental employees and staff or other inmates.

    D.  Revise, clarify and implement written Departmental and institutional rules or procedures necessary to prevent further violations.

    E.  To provide a disabled or physically impaired inmate with reasonable accommodation or reasonable modification.

    F.  Monetary reimbursement for property loss, damage, personal injury, tort, or civil rights claims arising out of an act or omission of the Department of Corrections or any of its agents, former officers, employees or contractors.

3.  The staff person rendering a decision on a grievance for a proposed monetary remedy may be submitted to the Deputy Director of Support Services who may award monetary damages at any level of the Inmate Grievance.  Once approved:

    A.  A Form DOC-3096, Administrative Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims, except for personal property damage or loss.

B.     A Form DOC-3027, Property Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims for personal property damage or loss.

C.     When property claims are settled informally at an institution, DOC-3027 Property Release Agreement will be completed.

4.     Compensation for loss of personal property, property damage, personal injury or any other claim arising out of a tort shall not exceed five hundred ($500.00).

## 740.06   INMATE TRANSFERS

1.     Inmates transferred to another institution pending the resolution of a filed grievance shall have the grievance completed at the sending institution at all levels.

A.     The receiving institution is responsible for logging in and tracking the grievance through NOTIS.

B.     All responses and correspondence shall be conducted via first class mail to the Grievance Coordinator at the receiving institution.

2.     Timeframes do not apply if the inmate has been transferred. Grievances shall be processed as soon as practicable and timeframes shall be adhered to as closely as possible If an inmate's sentence expires or leaves the Department on parole, the grievance will be finalized on the current level. No further appeal may occur. It is the responsibility of the inmate to provide a forwarding address during the release process in order to receive a grievance response.

## 740.07   EMERGENCY GRIEVANCE PROCEDURE

1.     An emergency shall be considered life threatening for the inmate or a Safety and Security risk for the institution.

2.     An Emergency Grievance (Form DOC-1564) received by any staff member shall be immediately delivered to the nearest supervisor no later than is reasonable and necessary to prevent serious injury or a breach of security. The Emergency Grievance shall be reviewed within 24-hours of receipt and documented in NOTIS.

3.     Any emergency grievance alleging that an inmate is subject to substantial risk of imminent sexual abuse shall be immediately forwarded to the highest ranking staff member on duty so that corrective action may be taken immediately which may include moving the inmate to administrative segregation for protective custody.

A.     The inmate shall receive a response to the emergency grievance within 24-hours, with a final facility decision about whether the inmate is in substantial risk of imminent sexual abuse within two (2) regular calendar days.

      B.      The response, final decision and the action taken in response to the emergency grievance will be documented. Action taken can include, but is not limited to:

          (1)     Refer the information to the Inspector General's Office;

          (2)     Afford the inmate appropriate medical, mental health care; and

          (3)     Address any safety considerations.

4.     The shift supervisor may confer with the on duty medical staff, Warden or Associate Warden, to determine whether the grievance constitutes an emergency.

5.     The highest-ranking staff member on duty, with the aid of an authorized Department official, shall immediately take any corrective measures necessary to prevent a substantial risk of injury or breach of security.

6.     The Department official receiving the Emergency Grievance should respond to the filing inmate no later than is necessary to prevent serious injury or a breach of security.

7.     In the event the inmate requests further review of a claim not deemed an emergency, the inmate may file a grievance appeal commencing at the Informal Level.

8.     A copy of the emergency grievance will be forwarded to the Grievance Coordinator for entry into NOTIS for processing and tracking purposes.

**740.08      INFORMAL GRIEVANCE**

1.     At the Informal Level, an inmate shall file a grievance (Form DOC-3091) after failing to resolve the matter by other means such as discussion with staff or submitting an inmate request form (DOC 3012).

2.     Grievances should be reviewed, investigated and responded to by the Department Supervisor that has responsibility over the issue that is being grieved or designated person.

      A.      High Risk Prisoner (HRP) status. HRP is a high risk potential offender that creates risk to inmates and staff.

          (1) Informal Level grievances will be responded to by the Warden or designee.

          (2) First Level grievances will be responded to by the Deputy Director or designee.

          (3) Second level grievances will be responded to by the Director or designee.

      B.      Informal grievances addressing medical or dental issues should be responded to by a charge nurse or designee of the Director of Nursing at the institution.

C.  Informal grievances addressing mental health issues should be responded to by the Psychologist III, or Mental Health Supervisor at each facility.

D.  If the person who would normally respond to a grievance is the subject of the grievance, the Supervisor over the person should respond to the Informal Grievance.

3.  The response to the grievance should be substantial, referencing all policies, procedures, rationale, and/or circumstances in finding for or against the inmate.

4.  The inmate shall file an informal grievance within the time frames noted below:

A.  Within six (6) months, in compliance with NRS 209.243, if the issue involves personal property damage or loss, personal injury, medical claims or any other tort claims, including civil rights claims.

B.  Within ten (10) calendar days if the issue involves any other issues within the authority and control of the Department including, but not limited to, classification, disciplinary, mail and correspondence, religious items, and food.

C.  When a grievance cannot be filed because of circumstances beyond the inmate's control, the time will begin to start from the date in which such circumstances cease to exist.

D.  Time frames are waived for allegations of sexual abuse regardless of when the incident is alleged to have occurred.

5.  An inmate shall use Form DOC-3097, Grievant Statement Continuation Form, if unable to present the details of their claim in the space provided, limited to two continuation form pages or a maximum of twon continuation form pages. All documentation and factual allegations available to the inmate must be submitted at this level with the grievance.

6.  All grievances submitted should also include the remedy sought by the inmate to resolve this claim. Failure to submit a remedy will be considered an improper grievance and shall not be accepted.

7.  If the inmate's remedy to their grievance includes monetary restitution or damages, then the inmate will get the following forms from unit staff, unit caseworker, or law libraries:

A.  Form DOC-3026, Inmate Property Claim, which shall be completed and submitted in addition to the grievance for all property loss or damage claims.

B.  Form DOC-3095, Administrative Claim Form, which shall be completed and submitted in addition to the grievance for all personal injury, tort, or civil rights claims.

8.  Failure by the inmate to submit a proper Informal Grievance form to the Grievance Coordinator or designated employee, within the time frame noted in 740.08, number 4, shall constitute abandonment of the inmate's grievance at this, and all subsequent levels.

    A.  When overdue grievances are received, they will be logged into NOTIS.

    B.  The grievance response Form DOC-3098 will note that the inmate exceeded the timeframe and no action will be taken.

9.  If the issue raised is not grievable, or the grievance is a duplicate of a prior grievance, the Grievance Coordinator will return the grievance to the inmate with Form 3098 noting the reason.

10. The inmate shall file an Informal Grievance form that states "for tracking purposes" when an issue goes directly to the Warden (first level) for a decision such as disciplinary appeals, visiting denials, any allegation of sexual abuse or mail censorship.

11. Grievances alleging staff misconduct pursuant to *Administrative Regulation (AR) 339 "Employee Ethics and Conduct, Corrective or Disciplinary Action, and Prohibitions and Penalties"* will be reviewed by the Warden and if deemed appropriate will be forwarded to the Office of the Inspector General through NOTIS.

    A.  The Informal Response will reflect this action being initiated.

    B.  The Inspector General's Office will have 90 calendar days to respond to this allegation.

12. The time limit for a response to the informal grievance is forty-five (45) calendar days from the date the grievance is received by the grievance coordinator to the date returned to the inmate.

    A.  The inmate must file an appeal within five (5) calendar days of receipt of the response to proceed to the next grievance level.

    B.  Transmission of the grievance to another institution may result in exceeding this timeframe.

## 740.09  FIRST LEVEL GRIEVANCE

1.  A First Level Grievance (Form DOC-3093) should be reviewed, investigated and responded to by the Warden at the institution where the incident being grieved occurred, even if the Warden is the subject of the grievance.

    A.  The Warden may utilize any staff in the development of a grievance response. The grievance will be responded to by a supervisor that has authority over the issue claimed in the grievance.

B. First Level medical/dental issues should be responded to by the highest level of Nursing Administration at the institution (DONs I or II).

C. First Level mental health issues should be responded to by the Psychologist IV or highest ranking Psychologist at the institution.

D. First Level property issues should be responded to by the Associate Warden of Operations.

2. All grievances containing allegations of sexual abuse will be referred to the Inspector General's Office for investigation.

A. Allegations of sexual abuse will not be referred to a staff member who is the subject of the accusation of sexual abuse.

B. The Inspector General's Office shall make a final decision on the merits of any portion of the sexual abuse grievance within 90 calendar days of the initial filing of the grievance and if applicable the matter assigned for official investigation.

C. The Inspector General's Office may claim an extension of time to respond to a sexual abuse grievance of up to an additional 70 calendar days if the normal time period for response is insufficient to make an appropriate decision.

D. The Inspector General's Office shall notify the inmate in writing of any such extension and provide a date by which a decision will be made.

E. Upon the completion of the investigation into sexual abuse the inmate shall be informed of the outcome of the investigation by the Inspector General's Office.

3. At this level the inmate shall provide a justification to continue to the first level.

4. A First Level Grievance that does not comply with procedural guidelines shall be returned to the inmate, with instructions using Form DOC-3098.

A. Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates shall be permitted to assist inmates in filing a grievance(s) relating to allegations of sexual abuse.

B.  If a third party files on behalf of the inmate, the facility may require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf.

C.  If a third party files on behalf of the inmate, the facility may also require as a condition of processing the grievance, the alleged victim to personally pursue any subsequent steps in the grievance process.

5.  The time limit for a response to the inmate for the First Level grievance is forty-five (45) calendar days from the date the grievance is received by the grievance coordinator to the date returned to inmate.

A.  The inmate must file an appeal within five (5) calendar days of receipt of the response to proceed to the next grievance level.

B.  Transmission of the grievance to another institution may result in exceeding this timeframe.

## 740.10 SECOND LEVEL GRIEVANCE

1.  A Second Level Grievance (Form DOC - 3094) should be reviewed and responded to by the:

A.  Deputy Director of Operations for facility custody or security operations that do not include programs.

B.  Deputy Director of Programs for all program issues such as education, visiting, or religious programming.

C.  The Deputy Director of Support Services for fiscal, property and telephone issues.

D.  The Offender Management Administrator (OMA) for classification and timekeeping issues.

E.  The Medical Director for medical/ dental issues, including medical co-pays or charges.

F.  The Mental Health Director for mental health issues.

G.  The inmate may appeal the decision related to a sexual abuse grievance response from the Inspector General's Office within five (5) calendar days of the grievance, with a subsequent response from the Deputy Director for security, program, religious and operations.

2.  The Grievance Coordinator shall forward copies of all related documents and the appeal to the Deputy Director for review and distribution to other Appointing Authorities and Division Heads.

3. The time limit for a response to the inmate for the Second Level grievance is sixty (60) calendar days, not including transmittal time, from the date the grievance is received by the grievance coordinator to the date it is returned to inmate.

4. Administrators shall respond to the Second Level Grievance, specifying the decision and the reasons for the decision, and return it to the Grievance Coordinator.

**APPLICABILITY**

1. This regulation requires an operational procedure for each institution and facility.

2. This regulation requires an audit.

**REFERENCES**

ACA Standards, 4th Edition and 2008 Supplement, 4-4105, 4-4276, 4-4284, 4-4344, 4-4394, 4-4429, 4-4429-1

James Dzurenda, Director

11/20/18

Date

EXHIBIT K – "Kallas"

AG Referral

2 Pgs



**SGRO | ROGER**
A T T O R N E Y S   A T   L A W

ANTHONY P. SGRO
DAVID J. J. ROGER
JENNIFER W. ARLEDGE
COLLEEN N. SAVAGE
ALANNA C. BONDY
NICHOLAS V. SCOTTI
JAYME N. RICHARDSON
KELLY B. STOUT
DANIELLE E. DUMIRE
JESSICA S. GUERRA

April 25, 2022

**VIA USPS**
Ammar Harris, #1116547
PO Box 650
High Desert Prison
Indian Springs, Nevada 89070-0650

> **Re:** *STATE OF NEVADA VS. AMMAR HARRIS*
> **CASE NO. A-19-797786 and C-19-289275**

Dear Mr. Harris:

Enclosed is a copy of the correspondence mailed to our office from the State of Nevada Office of Attorney General.

If you have any questions or concerns regarding the foregoing, please do not hesitate to contact our office.

Respectfully,

*/s/Tanya Hayden*

TANYA HAYDEN., *Paralegal to Sgro & Roger*

ACB/th

Enclosures: As stated



AARON D. FORD
*Attorney General*

KYLE E. N. GEORGE
*First Assistant Attorney General*

CHRISTINE JONES BRADY
*Second Assistant Attorney General*

**STATE OF NEVADA**

OFFICE OF THE ATTORNEY GENERAL

555 E. Washington Ave. Suite 3900
Las Vegas, Nevada 89101

JESSICA L. ADAIR
*Chief of Staff*

LESLIE NINO PIRO
*General Counsel*

HEIDI PARRY STERN
*Solicitor General*

October 06, 2021

Ammar Harris, #1116547
c/o Anthony Sgro
Sgro & Roger, Attorneys at Law
720 South 7th St., #300
Las Vegas, NV 89101

      **Re:**    **Notice of New Court Date**
               Case:  *State v. Javier Righetti*
               Court Case No.: EJC 20-CR-00265-7K

Dear Mr. Harris,,

      You are receiving this notice and status update because you are named as a victim of a crime committed by the above-named defendant. There has been a new court date set:

    -  **Preliminary Hearing – October 15, 2021 at 9:00am**

      Our office will provide you with an update regarding the above hearing once it has been held. If there are any court hearings or case updates in the future, you will be notified of those dates as well.

      If you have any questions or concerns in the meantime, please don't hesitate to reach out to me at the contact information listed below.

      Sincerely,

      /s/Chelsea Kallas
      Chelsea Kallas
      Senior Deputy Attorney General
      (702) 486-5707
      ckallas@ag.nv.gov