1

**UNITED STATES DISTRICT COURT**

2

**DISTRICT OF NEVADA**

3

* * *

4

AMMAR HARRIS,                                      Case No. 3:21-CV-00380-CLB

5

            Plaintiff,          **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'**

6

   v.                                              **MOTION FOR SUMMARY JUDGMENT**

7

ELY STATE PRISON STAFF, *et al.*,                  [ECF No. 175]

8

           Defendants.

9

10

      This case involves a civil rights action filed by Plaintiff Ammar Harris ("Harris")

11

against Defendants Joshua Boyd ("J. Boyd"), Mark Boyd ("M. Boyd"), Frank Dreesen

12

("Dreesen"), and David Drummond ("Drummond") (collectively referred to as

13

"Defendants"). Currently pending before the Court is Defendants' motion for summary

14

judgment.[1] (ECF No. 175.) For the reasons stated below, Defendants' motion for

15

summary judgment is granted in part and denied in part.

16

**I.    BACKGROUND**

17

    **A.    Procedural History**

18

      Harris initiated this civil suit on August 23, 2021. (ECF No. 1.) Harris filed an

19

application to proceed in forma pauperis and a civil rights complaint under 42 U.S.C. §

20

1983 on November 15, 2021, followed by a first amended complaint on January 11, 2022.

21

(ECF Nos. 9, 9-1, 11-1.) Harris filed the suit based on events that occurred while he was

22

incarcerated with the Nevada Department of Corrections ("NDOC") at Ely State Prison

23

("ESP") and High Desert State Prison ("HDSP"). (ECF No. 11.) The Court screened

24

Harris's third amended complaint pursuant to 28 U.S.C. § 1915A(a) and allowed Harris

25

to proceed on the following claims: (1) Eighth Amendment deliberate indifference against

26

27

28

---

[1]    Plaintiff responded, (ECF No. 195), and Defendants replied. (ECF No. 198.) Defendants also provided an exhibit under seal. (*See* ECF No. 179-1 (sealed).)

1   Cole[2] and Boyd; and (2) First Amendment retaliation against Dreesen and Drummond.

2   (ECF Nos. 40, 41.) Harris alleges that on August 28, 2020, Cole and Boyd violated his

3   Eighth Amendment rights because they failed to protect him from an attack by another

4   inmate. (*See* ECF No. 94.) Harris further alleges that after he filed a grievance regarding

5   the August 28, 2020, incident, Dreesen and Drummond retaliated against him by having

6   him transferred from HDSP to ESP. (*Id.*) [3]Currently pending before the Court is

7   Defendants' motion for summary judgment. (ECF No. 175.) Defendants argue they are

8   entitled to summary judgment because: (1) Harris failed to exhaust available

9   administrative grievances prior to filing this lawsuit; (2) Defendants are entitled to qualified

10  immunity as no constitutional violations occurred and no clearly established constitutional

11  rights existed; (3) Defendants Mark Boyd, Dreesen, and Drummond did not personally

12  participate in any alleged constitutional violations; and (4) any claims for punitive

13  damages should be dismissed as unavailable. (*Id.*)

14      Harris opposed the motion. (ECF No. 195.) In his opposition, Harris argues

15  Defendants' motion should be denied because: (1) the exhibits to Defendants' motion for

16  summary judgment are improper and inadmissible; (2) administrative remedies were not

17  available; and (3) Defendants are not entitled to qualified immunity because his clearly

18  established constitutional rights were violated. (*Id.*)

19      In reply, Defendants reiterate their argument regarding exhaustion, argue that the

20  exhibits to the motion for summary judgment are properly authenticated, and argue that

21  Harris failed to identify any clearly established case law in his response.  (ECF No. 198.)

22  _____

23  [2]    On December 13, 2023, the Court warned Plaintiff that if Cole was not served by January 9, 2024, she would be dismissed for failure to complete service of process pursuant to Fed. R. Civ. P. 4(m). (ECF No. 90.) To date, no proof of service has

24  been filed as to Defendant Cole. Thus, the claims against Defendant Cole are dismissed without prejudice based on a failure to effectuate service pursuant to Fed. R. Civ. P. 4(m).

25

26  [3]    Subsequently, the Court granted Harris leave to file a Fourth Amended Complaint ("FAC"), the operative complaint in this case. (ECF No. 94.) Defendants filed a motion to dismiss, (ECF No. 118). Ultimately, the Court granted the motion in part and

27  denied it in part allowing Harris to proceed on the same claims previously proceeding under the Third Amended Complaint. (ECF No. 148.)

28

**B.    Factual Background[4]**

Before discussing the facts of the case, the Court must first address Harris's objections to Defendants' exhibits submitted in support of their motion. First, Harris objects to the sworn declarations of Donald Southworth ("Southworth"), the Offender Management Division Administrator for the NDOC, and Curtis Rigney ("Rigney"), Acting Associate Warden of Operations at ESP, because the declarations acknowledge that neither is a "fact-based witness." (ECF No. 195 at 2-3.) Next, Harris objects to the admissibility of certain exhibits because they are "deficient reproductions, altering or distorting the integrity of the original." (*Id.* 3-6.) For the reasons discussed below, the Court overrules these objections and finds that Defendants' exhibits are properly before the Court for consideration in evaluating Defendants' motion for summary judgment.

When arguing for or against a motion for summary judgment, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . documents." Fed. R. Civ. P. 56(c)(1)(a). "A party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). An "objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Advisory Committee's Notes on 2010 Amendment to Fed. R. Civ. P. 56.

First, as to Southworth's declaration, Southworth provides the statements based on his "own personal knowledge of [Harris's] institutional classification history." (ECF No. 175-5.) Thus, although Southworth may not be a "fact-based witness" insofar as personally witnessing the events underlying this case, he does have personal knowledge of circumstances relevant to the claims alleged. Consequently, Southworth's declaration is proper in its current form and does not need to be authenticated because the

---

[4]    The facts as stated herein are undisputed unless otherwise noted by the Court.

declaration provides information based on his personal knowledge.

Turning to Rigney's declaration, this document was submitted to authenticate other exhibits submitted in support of Defendants' motion for summary judgment. (ECF No. 175-11.) Rigney is therefore attesting to the authenticity of exhibits that cannot be deemed authentic by merely reviewing their contents. Although authenticating declarations are not required to be submitted in order to consider exhibits to a motion for summary judgment, once an objection such as Harris's has been made, the party providing the exhibits must then show that the exhibit would be admissible as presented or explain the admissible form that is anticipated. *See* Advisory Committee's Notes on 2010 Amendment to Fed. R. Civ. P. 56. To admit a business record at trial, such as grievance logs kept by NDOC, they must be introduced by "the testimony of the custodian or other qualified witness." F.R.E. 803(6). Rigney can authenticate the identified exhibits because as part of his job, he is custodian of records for Inmate Institutional Grievance Files and Institutional Files of all inmates who currently reside at ESP. (ECF No. 175-11 at 3.) Therefore, he is capable of reviewing the attached exhibits and comparing the contents with the records kept by NDOC to confirm that what is being submitted is a true and accurate copy. Although the declaration itself might be inadmissible evidence at trial, the submission of the declaration shows that Defendants have identified an individual who is willing to "declare under penalty of perjury" that the exhibits are authentic. Thus, the material cited to support Defendants' motion could be presented in a form that would be admissible in evidence – Rigney himself testifying on the witness stand. *See* Advisory Committee's Notes on 2010 Amendment to Fed. R. Civ. P. 56.

Furthermore, although the exhibits themselves may be copies, because they are properly authenticated as true and correct copies of the documents, they are available to be used as evidence in evaluating a motion for summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage," the court "do[es] not focus on the admissibility of the evidence's form" but "instead focus[es] on the admissibility of its contents."); *see also Hughes v. United States*, 953 F.2d 531,

543 (9th Cir. 1992) (holding that court was not precluded from considering declaration in awarding summary judgment even if declaration violated best evidence rule if the underlying facts would be admissible as evidence). Therefore, Defendants' exhibits are proper and admissible as evidence for the pending motion for summary judgment and Harris' objections are overruled.

### 1.    Facts Relating to Failure to Protect Claim

The Court now turns to the underlying facts of this case, starting with Harris' Eighth Amendment failure to protect claim against Cole and "Boyd" for actions that occurred on August 28, 2020. (ECF No. 40 at 18; ECF No. 148 at 7, 9.) As previously noted, Cole was never served and is therefore dismissed from the current suit. Thus, currently named as Defendants with respect to this claim are two individuals with the last name Boyd: J. Boyd and M. Boyd. Defendants provide M. Boyd's sworn responses to Harris's requests for admission, which demonstrate that M. Boyd was not present at ESP on August 28, 2020. (ECF No. 175-10.)

On the morning of August 28, 2020, Harris was housed at ESP in Unit 1, Cell A21. (ECF No. 175-2 at 3; ECF No. 175-11.) Harris provides a sworn declaration stating that he told Cole, Boyd, or "Harry", who is not named in this case, that he would not be going into the yard that morning.[5] (ECF No. 195 at 32.)

Defendants provide video footage of ESP Unit 1 on the morning of August 28, 2020, from multiple views. (ECF No. 179-1 (sealed); ECF No. 175-11.) Three views are of the common area of Unit 1 from different angles and the fourth view is of the guard shack. (*See* ECF No. 179-1 (sealed).) The view into the guard shack is not clear because bars cover the windows, and the image is backlit from what appears to be sunlight coming from behind and to the right. (*Id.*)

The video begins at 8:29:51 AM on August 28, 2020. (*Id.*) At that time, all cell doors in Unit 1 are closed. (*Id.*) Guards are moving around in the guard shack; however, it is

---

[5]    Harris declares that he told one of the three individuals that he did not want to go outside. (ECF No. 195 at 32.) As such, this is insufficient to establish that Boyd specifically knew this information.

virtually impossible to see the facial features, distinguishing characteristics, or any subtle movements of the individuals through the glass. (*Id.*) At first, three individuals are inside the guard shack, but it appears the third individual exits before the cell doors in Unit 1 are opened. (*Id.*)

Some cell doors begin to open at 8:30:40 AM. (*Id.*) The doors do not all open at once, but rather a few at a time. (*Id.*) From the video, it is not clear when each door is released or whether the doors were released individually. (*Id.*) At 8:30:55 AM, two inmates are seen outside of Cell A21, where Harris was housed. (*Id.*) The door to Cell A20, the door right next to A21, then begins to open slowly. (*Id.*) One of the inmates walks away from Cells A20 and A21. (*Id.*) However, the other inmate ("Inmate A") remains in front of Cell A21 and the inmate in Cell A20 ("Inmate B") remains inside the cell, with the door open halfway. (*Id.*) It appears from the video that Inmates A and B are waiting outside of Cell A21 for the person inside to come out.[6] (*Id.*) At that time, all other inmates in Unit 1 are walking away from the cells towards the gate to the right of the guard shack, on the opposite side of Unit 1 from Cell A21. (*Id.*)

Cell A21 begins to open at 8:31:20 AM. (*Id.*) As the door opens, Inmate A approaches.[7] (*Id.*) At 8:31:24, Harris swings an arm out of the door with his body remaining inside the cell and appears to almost hit Inmate A. (*Id.*) The door to Cell A21 immediately begins to close. (*Id.*) Inmate B exits Cell A20 and appears to pull Inmate A away from Cell A21. (*Id.*) Harris then exits Cell A21, using his leg to prevent the door from closing and keeping him inside the cell. (*Id.*) At 8:31:30 AM, a third inmate ("Inmate C"), who was walking towards the exit but was still in the common area of Unit 1, runs up to

---

[6]    Defendants are more direct in describing the scene by noting that "an offender was seen trying to enter Harris' cell to attack him." (ECF No. 175 at 2.) However, that level of detail is not clear to the Court by viewing the video.

[7]    Harris writes in a sworn declaration that he saw Inmate A holding a "hook style weapon" in his hand. (ECF No. 195 at 33.) Harris states that Inmate A signaled to Cole and Boyd to open Harris's door. (*Id.*) Harris declares he yelled at Cole and Boyd for help and to close the door, but they laughed and smiled instead of helping. (*Id.*) However, the Court cannot discern from the video whether Inmate A is holding a hook style weapon, whether Harris yelled at Cole and Boyd to close the door, or whether Cole and Boyd reacted by laughing and smiling. (*See* ECF No. 179-1 (sealed).)

1    Inmates A and B as Harris is leaving his cell. (*Id.*) By 8:31:31 AM, the door to Cell A21 is

2    completely closed.[8] (*Id.*) All four individuals, Inmates A, B, C, and Harris, then begin to

3    fight and end up in a scrum on the floor. (*Id.*) Only two camera views show the actual

4    fight, and both views are from a far corner. (*Id.*) As the fight is ongoing, other inmates

5    begin reentering the common area of Unit 1 and go back into their cells. (*Id.*)

6         At 8:32:25 AM, the camera view of the guard shack moves to focus on the corner

7    of Unit 1 where the fight occurred. (*Id.*) This view is closer and shows a clearer picture of

8    the corner, however, by this point all four inmates are laying on the ground and have

9    ceased fighting. (*Id.*) After the camera view moves to focus on the inmates who had been

10   fighting, the Court cannot see the guard shack or any guards. (*Id.*) Guards do not appear

11   in the common area of Unit 1 until 8:34:22 AM. (*Id.*)

12                    **2.    Facts Relating to Retaliation Claim**

13        Before the altercation on August 28, 2020, Harris was housed at ESP in Unit 1,

14   Cell A21. (ECF No. 175-2 at 3.) According to Southworth's declaration, Harris is

15   appropriately classified to be housed in the condemned men's unit ("CMU") based on his

16   sentence. (ECF No. 175-5 at 3.) Consequently, Harris must be housed under a maximum-

17   security classification pursuant to NDOC Administrative Regulation ("AR") 521. (*Id.*)

18   During the time relevant to this case, ESP was NDOC's maximum-security facility. (*Id.* at

19   4.)

20        Harris was seriously injured on August 28, 2020, after the altercation described

21   above, which required him to be airlifted to the University Medical Center ("UMC") in Las

22   Vegas. (*Id.* at 3.) Harris remained at UMC until October 16, 2020. (*Id.*) After being

23   released from UMC, Harris was housed at HDSP because ESP's medical facilities could

24   not meet his needs. (*Id.*) This was a mandatory change in housing and Harris was

25   _____

26   ⁸      Defendants represent that the video clearly shows Cole and J. Boyd
     attempting to close the door immediately when they notice a fight breaking out. (ECF No.
     175 at 3.) However, Harris provides a sworn declaration stating that Cole and Boyd "tried
27   to impale [him] with the door while cheering for attacker." (ECF No. 195 at 33.) Here, the
     Court cannot clearly see into the guard shack to determine what Cole and J. Boyd did
28   inside. (*See* ECF No. 179-1 (sealed).) Consequently, while the fact that the door was
     closed is undisputed, the reason the door was closed is in dispute.

classified as a "treat and return" to the CMU at ESP. (*Id.*) While at HDSP, Harris was housed in administrative segregation because his sentence structure made him inappropriate for placement in the general population. (*Id.*)

Harris was recommended to be returned to ESP on December 29, 2020, because his medical appointments were completed. (*Id.*) On January 15, 2021, it was confirmed that HDSP medical department had cleared Harris to return to ESP. (*Id.*) Harris was returned to ESP on May 19, 2021. (*Id.*; ECF No. 175-2 at 3.)

According to Southworth's declaration, neither Dreesen nor Drummond had control over whether Harris needed to be housed at ESP. (ECF No. 175-5 at 4.) The decision to return Harris to ESP on May 19, 2021, was made by the Offender Management Division based solely on Harris's sentence structure, requirement for him to be housed in the CMU, and his medical clearance. (*Id.* at 3.)

### 3.    NDOC Inmate Grievance Procedure

Prior to filing a civil rights lawsuit, inmates are required to "exhaust" their administrative remedies pursuant to the grievance procedure implemented by NDOC. AR 740 governs the grievance process at NDOC institutions. (ECF No. 175-9; ECF No. 175-11.) To properly exhaust administrative remedies, an inmate must grieve through all three levels: (1) Informal; (2) First Level; and (3) Second Level. (*See* ECF No. 175-9.) First, the inmate must file an informal grievance within six months "if the issue involves personal property damages or loss, personal injury, medical claims or any other tort claims, including civil rights claims." (*Id.* at 11 (AR 740.08(4)).) The inmate's failure to submit the informal grievance within this period "shall constitute abandonment of the inmate's grievance at this, and all subsequent levels." (*Id.* at 12 (AR 740.08(8)).)  NDOC staff is required to respond within 45 days. (*Id.* (AR 740.08(2)).) An inmate who is dissatisfied with the response to the informal grievance may appeal to the next grievance level within five calendar days. (*Id.*)

This next grievance level is called a "First Level Grievance." (*Id.* (AR 740.09)) A First Level Grievance should be reviewed, investigated, and responded to by the Warden

at the institution where the incident occurred; however, the Warden may utilize any staff in the development of a grievance response. (*Id.* at 12-13 (AR 740.09(1)).) The time limit for a response to the inmate is 45 days. (*Id.* at 14 (AR 740.09(5)).) Within five days of receiving a dissatisfactory response to the First Level grievance, the inmate must then appeal to the next level, called the "Second Level Grievance." (*Id.* (AR 740.10).) Officials are to respond to a Second Level Grievance within 60 days, which must include the decision and the reasons for the decision. (*Id.* at 15.) Once the 60-day time frame expires, or after the inmate receives a response to the Second Level Grievance, they are considered to have exhausted available administrative remedies and may pursue civil rights litigation in federal court.  (*Id.* at 6 (AR 740.03).)

A grievance is not fully exhausted until a response is received, or the period for a response has expired. (*Id.* (AR 740.03(6)-(8)).) An overdue grievance is not an automatic finding for the inmate, however, "the inmate may proceed to the next grievance level." (*Id.* (*AR* 740.03(8)).) When an inmate has been transferred, the timeframes do not apply. (*Id.* at 9 (AR 740.06(2)).) However, "[g]rievances shall be processed as soon as practicable and timeframes shall be adhered to as closely as possible" and "[a]ll responses and correspondence shall be conducted via first class mail to the Grievance Coordinator at the receiving institution." (*Id.* (AR 740.06).)

### 4.    Harris's Administrative Grievances

Following the above events, Harris filed informal grievance 2006-31-18343 on March 14, 2021, by submitting a copy of the grievance to both ESP and HDSP. (ECF No. 175-6 at 2-4; ECF No. 175-7 at 2-4, ECF No. 175-11.) The copies differ slightly, as each identifies the respective institutions, and the copy sent to ESP ("ESP Grievance") includes a request for the termination of "Cole and Boyd" where the HDSP grievance ("HDSP Grievance") does not. (*Compare* ECF No. 175-6 at 2-4 *with* ECF No. 175-7 at 2-4.) The grievance explains that Harris was involved in an altercation at ESP and claims that if Cole and Boyd had not failed to follow proper procedures, the incident would have never occurred. (ECF No. 175-6 at 2-4; ECF No. 175-7 at 2-4.) Harris requests many items as

1    remedies, including one million dollars for pain and suffering, various devices, and "an
2    actual mattress." (ECF No. 175-6 at 4; ECF No. 175-7 at 4.) On March 14, 2021, Harris
3    was housed at HDSP. (ECF No. 175-2 at 3.) Harris submitted the HDSP Grievance to the
4    grievance coordinator at HDSP and mailed the ESP Grievance to ESP. (*See* ECF Nos.
5    175-6, 175-7.)

6          For clarity, the Court will now discuss the subsequent grievance history of the ESP
7    Grievance and HDSP Grievance in turn.

8                   **i.**     **ESP Grievance**

9          The informal ESP Grievance was returned as improper on April 6, 2021, and was
10   mailed to Harris at HDSP the following day. (ECF No. 175-6 at 8.) The improper grievance
11   memo, or a DOC 3098, states that the grievance was submitted incorrectly and failed to
12   include an administrative claim form. (*Id.*) The memo further states that Harris should
13   resubmit the grievance to the grievance coordinator at HDSP who will then sign and mail
14   the grievance to be processed at ESP and that failure to resubmit the grievance "through
15   the prescribed timeframe" shall constitute abandonment of the grievance. (*Id.*) However,
16   based on Harris's inmate grievance history, he did not sign and date the response to his
17   informal ESP Grievance until September 24, 2021, indicating Harris did not receive the
18   rejection until that date. (ECF No. 175-8 at 27, ECF No. 175-11.)

19         On May 5, 2021, Harris filed a first level grievance for his ESP Grievance. (ECF
20   No. 175-6 at 9-13.) Harris noted that it had been more than 45 days since he filed his
21   informal grievance and was therefore proceeding with a first level grievance. (*Id.* at 9.)
22   The first level ESP Grievance was denied on May 12, 2021, because the grievance was
23   neither placed directly in the grievance box, nor signed and dated by the HDSP Grievance
24   Coordinator, and Harris failed to attach the rejection from the informal level with all forms
25   attached. (*Id.* at 14.) However, a witness signature on the bottom alongside Harris's
26   signature is dated August 6, 2021, indicating Harris did not receive this rejection until that
27   date. (*Id.*)

28   ///

1        Harris filed a second level grievance for his ESP Grievance on August 1, 2021, 88

2    days after he submitted the first level ESP Grievance. (ECF No. 175-6 at 15-21.) Harris

3    stated that he filed an informal and first level grievance which both went unanswered. (*Id.*

4    at 15.) Harris included six continuation pages. (*Id.* at 16-21.) Drummond issued a memo

5    on August 4, 2021, stating that the grievance had been rejected three times and could

6    not be re-submitted, along with a note that Harris did not submit the prior two DOC 3098

7    rejection forms and improperly included more than two continuation pages. (*Id.* at 22.)

8    Harris's signature does not appear on this memo; however, it is signed by a caseworker

9    on August 6, 2021. (*Id.*)

10            **ii.**    **HDSP Grievance**

11        The informal HDSP Grievance was denied on July 14, 2021, for failure to provide

12    an administrative claim form. (ECF No. 175-7 at 6.) Although Dreesen prepared the DOC

13    3098 rejecting the informal HDSP Grievance on July 17, 2021, Harris did not sign and

14    date the response to the grievance until October 1, 2021. (*Id.* at 2, 6.)

15        On May 5, 2021, Harris submitted a first level HDSP Grievance, stating it had been

16    more than 45 days since he submitted his informal grievance and was therefore

17    proceeding with the first level. (*Id.* at 7.) As of May 5, 2021, Harris had not received any

18    rejection memos, either for the ESP or HDSP Grievances.

19        In response to this first level HDSP Grievance, Drummond prepared a memo

20    explaining that because grievance 2006-31-18343 had been rejected three times, and

21    Harris failed to resubmit the grievance without the requested additional information, his

22    grievance may not be resubmitted. (*Id.* at 8.) The memo further warns that if the grievance

23    is resubmitted, "it will be placed in [Harris's] grievance file without any action." (*Id.*) Based

24    on a copy of the memo provided by Defendants, the memo was prepared by Drummond

25    on June 4, 2021, signed by a caseworker on August 6, 2021, but not signed by Harris

26    until February 24, 2022. (*Id.*) The first level HDSP Grievance is the final entry in Harris's

27    inmate grievance history log attached to grievance 2006-31-18343. (*See* ECF No. 175-

28    8.) Based on the dates on each DOC 3098 rejection, Harris had not received any

rejections as of June 4, 2021, when Drummond's memo was prepared, and did not receive any by August 1, 2021, when he submitted the second level ESP Grievance.

On November 20, 2021, Harris filed another first level HDSP Grievance, explaining that he was given an improper grievance memo for the first time on August 6, 2021, and was now resubmitting the grievance with all previous rejections attached, as directed. (ECF No. 175-7 at 9-11.) This grievance also only had two continuation pages. (*Id.*) There is no information in the record as to whether this grievance received a response.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law applicable to the claim or claims determines which facts are material. *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). Only disputes over facts that address the main legal question of the suit can preclude summary judgment, and factual disputes that are irrelevant are not material. *Frlekin v. Apple, Inc.*, 979 F.3d 639, 644 (9th Cir. 2020). A dispute is "genuine" only where a reasonable jury could find for the nonmoving party. *Anderson*, 477 U.S. at 248.

The parties subject to a motion for summary judgment must: (1) cite facts from the record, including but not limited to depositions, documents, and declarations, and then (2) "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Conclusory statements, speculative opinions, pleading allegations, or other assertions uncorroborated by facts are insufficient to establish the absence or presence of a genuine dispute. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute. *Soremekun*, 509 F.3d at 984. "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. However, if the moving party does not bear the burden of proof at trial, the moving party may meet their initial burden by demonstrating either: (1) there is an absence of evidence to support an essential element of the nonmoving party's claim or claims; or (2) submitting admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 593-94 (9th Cir. 2018); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party. *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014). If the moving party does not meet its burden for summary judgment, the nonmoving party is not required to provide evidentiary materials to oppose the motion, and the court will deny summary judgment. *Celotex*, 477 U.S. at 322-23.

Where the moving party has met its burden, however, the burden shifts to the nonmoving party to establish that a genuine issue of material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving must "go beyond the pleadings" to meet this burden. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (internal quotation omitted). In other words, the nonmoving party may not simply rely upon the allegations or denials of its pleadings; rather, they must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. *See* Fed. R. Civ. P. 56(c); *Matsushita,* 475 U.S. at 586 n. 11. This burden is "not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The non-moving party "must come forth with evidence from

which a jury could reasonably render a verdict in the non-moving party's favor." *Pac. Gulf Shipping Co.*, 992 F.3d at 898 (quoting *Oracle Corp. Sec. Litig.*, 627 F.3d at 387). Mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion. *Matsushita*, 475 U.S. at 586-87.

When a pro se litigant opposes summary judgment, his or her contentions in motions and pleadings may be considered as evidence to meet the non-party's burden to the extent: (1) contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## III.    DISCUSSION

### A.    Personal Participation

First, the Court will address Defendants' arguments that M. Boyd, Dreesen, and Drummond are entitled to summary judgment because they did not personally participate in any alleged constitutional violations. (ECF No. 175 at 20-21.)

"There are two elements to a section 1983 claim: (1) the conduct complained of must have been under color of state law, and (2) the conduct must have subjected the plaintiff to a deprivation of constitutional rights." *Jones v. Cmty. Redevelopment Agency of Los Angeles*, 733 F.2d 646, 649 (9th Cir. 1984). A prerequisite to recovery under the Civil Rights Act, 42 U.S.C. § 1983, is that the plaintiff prove that the defendants deprived him of a right secured by the Constitution and the laws of the United States. *Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985). Liability under § 1983 arises only upon a showing of personal participation by the defendant. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). "[V]icarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

"[I]n general, one does not 'subject' someone to a deprivation of a constitutional right— or 'cause [someone] to be subjected' to such a deprivation—simply by watching others violate the Constitution." *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) ("To be liable under section 1983, a defendant official 'must be more than a mere bystander.'" (quoting *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020))).

Because "[t]here is no respondeat superior liability under section 1983 . . . [o]fficers may not be held liable merely for being present at the scene of a constitutional violation or for being a member of the same operational unit as a wrongdoer." *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) ("An official may be liable as a supervisor only if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists between the supervisor's wrongful conduct and the constitutional violation.")

### 1.    Mark Boyd

Defendants argue that Harris fails to establish the personal participation of Mark Boyd because the undisputed facts establish that Mark Boyd was not present at ESP on August 28, 2020. (ECF No. 175 at 21.) The Court allowed Harris to proceed with his Eighth Amendment failure to protect claim against an individual named "Boyd." (*See* ECF Nos. 40; 148.) There are two Defendants with the last name Boyd currently proceeding in this lawsuit: M. Boyd and J. Boyd. Harris does not allege that multiple individuals named Boyd were involved in this suit and the screening order did not allow Harris to proceed against multiple Boyds. Therefore, logically, either M. Boyd or J. Boyd are erroneously named in this suit.

Defendants provide evidence showing that M. Boyd was not present at ESP on August 28, 2020, satisfying their initial burden on summary judgment and shifting the burden to Harris to establish that a genuine dispute of material facts exists. *Matsushita*, 475 U.S. at 586. Harris does not provide any evidence other than to allege that he has

established the personal participation of "Boyd." (ECF No. 195 at 30.) As mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion, Defendants' motion is granted as to M. Boyd. *Matsushita*, 475 U.S. at 586-87.

### 2.    Dreesen and Drummond

Next, the Court turns to Harris's retaliation claim, which is proceeding against Dreesen and Drummond. Defendants argue Dreesen and Drummond should be dismissed because they did not personally participate in the decision to return Harris to ESP on May 19, 2021. (ECF No. 175 at 21.) Defendants argue the decision was made by the Offender Management Division and provide evidence showing AR 521 mandated that Harris be housed at ESP. (*Id.*) Thus, Defendants show that neither Dreesen nor Drummond had any discretion in moving Harris and therefore neither made "an affirmative act, participate[d] in another's affirmative acts, or omit[ted] to perform an act which he is legally required to do that cause[d]" Harris to be transferred. *Leer*, 844 F.2d at 633. Defendants consequently meet their burden on summary judgment and the burden shifts to Harris to establish that a genuine dispute of material facts exists. *Matsushita*, 475 U.S. at 586.

However, Harris again does not provide evidence but rather alleges, without support, that Dreesen and Drummond transferred him back to ESP to thwart his attempt to file grievances related to the August 28, 2020, incident. (ECF No. 195.) This is insufficient to create a genuine dispute of material facts and therefore Defendants' motion for summary judgment is granted as to Dreesen and Drummond with respect to Harris' retaliation claim. *Matsushita*, 475 U.S. at 586-87 (mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion).

### B.    First Amendment Retaliation

Although the Court previously granted Defendants' motion for summary judgment as to Dreesen and Drummond for lack of personal participation, summary judgment is

also proper with respect to Harris' retaliation claim because the Court finds that no retaliation occurred.

It is well established in the Ninth Circuit that prisoners may seek redress for retaliatory conduct by prison officials under § 1983. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). Prisoners may not be transferred in retaliation for exercising their First Amendment rights. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985)

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *see also Jones v. Slade*, 23 F.4th 1124, 1134 (9th Cir. 2022). Within the prison context, a viable retaliation claim has five elements: (1) a state actor took some adverse action against the inmate, (2) because of, (3) the inmate's protected conduct, and that the action, (4) chilled the inmate's exercise of his First Amendment rights, and (5) did not reasonably advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567–68. The adverse action must be such that it "would chill or silence a person of ordinary firmness from future First Amendment activities." *Watison*, 668 F.3d at 1114 (quoting *Rhodes*, 408 F.3d at 568). To prevail against Defendants' motion for summary judgment, Plaintiff must demonstrate a triable issue of material fact on each element of his retaliation claim. *Brodheim*, 584 F.3d at 1269 n.3.

An inmate must submit evidence, either direct or circumstantial to establish a link between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt v. Rowland*, 65 F.3d 802, 806-07 (9th Cir. 1995). "[A] plaintiff must show that his protected conduct was 'the "substantial" or "motivating" factor behind the defendant's conduct.'" *Brodheim*, 584 F.3d at 1271 (quoting *Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). The plaintiff "need only 'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material

fact as to [the defendant's] intent.'" *Id.* (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).

To raise a triable issue as to motive, plaintiff must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *McCollum v. Cal. Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (citation and quotation marks omitted). Circumstantial motive evidence may include: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse ... action were false and pretextual." *Id.* (internal citation and quotation marks omitted). However, "mere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).

Defendants argue they are entitled to summary judgment on the merits of Harris's Frist Amendment retaliation claim because Harris cannot show that an adverse action was taken or that he was transferred because he exercised his free speech. (ECF No. 175 at 19.) Defendants also argue Harris was transferred in furtherance of a legitimate correctional goal. (*Id.*) As the moving party, Defendants must either establish there is an absence of evidence to support an essential element of the nonmoving party's claim or claims or submit admissible evidence that establishes the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party. *See Pakootas*, 905 F.3d at 593-94.

Here, Defendants provide evidence that Harris must be housed under a maximum-security classification pursuant to AR 521, which at the time meant Harris must be housed at ESP specifically. (ECF No. 175-5.) Defendants also provide evidence that Harris was classified as a "treat and return" to ESP while he was housed at HDSP. (*Id.*) Critically, Defendants also provide evidence that HDSP medical had cleared Harris for return to HDSP on January 15, 2021, two months *before* Harris filed any grievances on March 14, 2021. Thus, Defendants have met their burden in showing that Plaintiff cannot establish

that his protected conduct was the "substantial" or "motivating" factor behind his transfer back to ESP because the transfer was scheduled before he engaged in the protected conduct. *Brodheim*, 584 F.3d at 1271 (citations omitted).

The burden now shifts to Harris to establish a genuine issue of material fact does exist. *Matsushita,* 475 U.S. at 586. Harris argues that Defendants retaliated by initiating a prison transfer after he engaged in the protected conduct of filing a grievance. (ECF No. 195 at 29.) However, Harris does not provide evidence to negate the evidence provided by Defendants that shows Harris was scheduled to be transferred before he filed any grievances. Therefore, Harris has failed to meet his burden and Dreesen and Drummond are also entitled to summary judgment on the merits of his First Amendment retaliation claim. *Matsushita,* 475 U.S. at 586-87 (mere assertions and "metaphysical doubt as to the material facts" will not defeat a properly supported and meritorious summary judgment motion).

### C.    Exhaustion of Available Administrative Remedies

The Court will now address Defendants' argument that Harris failed to exhaust his administrative remedies before filing this lawsuit However, because the Court finds that Harris's retaliation claim fails for lack of personal participation and on the merits of the claim for the reasons discussed above, the Court will only address the issue of exhaustion as it relates to Harris' Eight Amendment failure to protect claim.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The requirement's underlying premise is to "reduce the quantity and improve the quality of prisoner suits" by affording prison officials the "time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Id.*

at 524-25.

The PLRA requires "proper exhaustion" of an inmate's claims. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Proper exhaustion means an inmate must "use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing *Woodford*, 548 U.S. at 90). Thus, exhaustion "demands compliance with an agency's deadlines and other critical procedural rules because no adjudication system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91.

However, an inmate need not exhaust when circumstances render administrative remedies "effectively unavailable." *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010). In *Ross v. Blake*, the Supreme Court provided a non-exhaustive list of circumstances where administrative remedies were not capable of use: (1) where the procedure "operates as a simple dead end" because officers are "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 578 U.S. 632, 642-44.

In the Ninth Circuit, a motion for summary judgment will typically be the appropriate vehicle to determine whether an inmate has properly exhausted his or her administrative remedies. *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014). "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166.

Failure to exhaust is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). The defendant bears the burden of proving that an available administrative remedy was unexhausted by the inmate. *Albino*, 747 F.3d at 1172. If the defendant makes

such a showing, the burden shifts to the inmate to "show there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).

In determining whether Defendants are entitled to the affirmative defense for failure to exhaust, Defendants must first prove that an available administrative remedy was unexhausted by Harris. *Albino*, 747 F.3d at 1172. Defendants argue Harris failed to exhaust his available administrative grievances because he did not comply with the procedures established by AR 740 as required. (ECF No. 175 at 12-13.) Specifically, Defendants argue the Court should find that administrative remedies were available to Harris, but he failed to exhaust based on his "own actions in sewing (sic) chaos in the grievance process." (*Id.* at 13.) Defendants emphasize that Harris improperly submitted two informal level grievances on the same day to two different institutions, which "created chaos" for Drummond and Dreesen in attempting to respond. (*Id.* at 12.) Defendants argue that Harris additionally failed to comply with AR 740 by not including an administrative claim form with either grievance, which was required because he sought monetary compensation as a grievance remedy. (*Id.*) Defendants argue that Harris caused further chaos by again submitting first-level grievances to two different instructions on the same day. (*Id.* at 13.) Defendants additionally argue that Harris's grievances were improper because he attached an excessive amount of continuation pages to his grievances and failed to attach copies of his prior level results. (*Id.*)

Harris argues that administrative remedies were not available. (ECF No. 195.) Specifically, Harris argues that his ability to exhaust was thwarted because his grievances were denied pursuant to Drummond's memo stating the grievance may not be resubmitted. (*Id.* at 11.) Harris argues his ability to exhaust was also hampered because he was transferred while the grievances were pending. (*Id.* at 13.)

The Ninth Circuit has held that "[w]hen prison officials improperly fail to process a

prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies" because prison officials have thwart[ed] inmates from taking advantage of [the] grievance process, making that process unavailable." *Andres*, 867 F.3d at 1078 (internal quotation marks and citations omitted); *cf. Brown v. Valoff*, 422 F.3d 926, 943 n.18 (9th Cir. 2005) ("Delay in responding to a grievance, particularly a time-sensitive one, may demonstrate that no administrative process is in fact available."). Other circuits have held similarly. C*f. Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (joining other circuits in holding "a prison's failure to timely respond to an inmate's properly filed grievance renders its remedies 'unavailable' under the PLRA"); *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004) ("Following the lead of the four other circuits that have considered this issue, we conclude that administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance."); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[T]he failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable."); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) ("[W]e refuse to interpret the PLRA so narrowly as to permit prison officials to exploit the exhaustion requirement through indefinite delay in responding to grievances." (alterations and internal quotation marks omitted)).

Defendants' argument is essentially that Harris failed to exhaust because he failed to resubmit his rejected grievances with all of the paperwork from previous attempts to grieve, including the improper grievance memo, that in some instances Harris did not receive until almost one year after he submitted the grievances. This is a situation wherein Defendants caused Harris to not receive everything he needed to resubmit his grievance – including any notice that his grievances needed to be resubmitted in the first place – until after the time wherein AR 740 requires a response to be provided. Harris was transferred, and per AR 740, this means the exact time periods for responding to the grievances did not apply. (ECF No. 175-9 at 9 (AR 740.06).) However, AR 740 is clear that those timeframes must be adhered to as closely as possible. (*Id.*)

For example, where Harris did properly submit his grievance to the HDSP grievance coordinator on March 14, 2021, a rejection memorandum was not prepared until July 14, 2021, 122 days later. (ECF No. 175-7 at 6.) Furthermore, Harris did not receive this improper grievance memo until October 1, 2021, over 200 days after he submitted the initial informal grievance. This clearly qualifies as an instance where a prisoner should be deemed to have exhausted his administrative remedies because prison officials improperly failed to process his grievance, thereby thwarting his ability to take advantage of the grievance process. *Ross*, 578 U.S. at 642-44; *Andres*, 867 F.3d at 1078. Although Harris's transfer meant prison officials were not strictly held to the 45-day time frame to respond to an informal grievance, waiting over 122 days to create an improper grievance memo clearly demonstrates that the time frame was not "adhered to as closely as possible." Although Defendants allege Harris "created chaos" by filing duplicate grievances in multiple institutions, it makes little sense that where a grievance was properly submitted to the grievance coordinator at the institution where he resided at that time, the grievance could not be resolved within 122 days. Additionally, Harris was not transferred until May 19, 2021, *after* the 45-day window to respond to his informal grievance had already expired. Even if the transfer had caused delays in transporting the grievances and responses, AR 740.06(1)(B) states that these must be sent by first class mail, meaning those delays could not have amounted to more than two weeks.

These delays are significant because of the impact they had on Harris's ability to successfully grieve this issue. By June 4, 2021, Harris's grievances had received over three rejections, prompting Drummond to write the memo stating Harris could not resubmit this grievance. (ECF No. 175-7 at 8.) However, based on the delays in processing his grievances, Harris did not receive notice of any rejections until August 6, 2024. Thus, Harris had no opportunity to cure the issues with his grievances before NDOC had issued a memo stating they would not accept any resubmittals. This means Harris's ability to exhaust his administrative remedies was thwarted by the NDOC's failure to process his grievances in a timely manner. Therefore, Harris is deemed to have

1    exhausted his available administrative remedies because NDOC officials thwarted his
2    ability to take advantage of the grievance process, making that process unavailable to
3    him. *Ross*, 578 U.S. at 642-44; *Andres*, 867 F.3d at 1078 (citations omitted).

4        **D.    Eighth Amendment Failure to Protect**

5        The Court will now turn to the merits of Harris's Failure to Protect claim. Defendants
6    argue Harris cannot show that a constitutional violation occurred because he fails to meet
7    the subjective standard prong of an Eighth Amendment failure to protect claim. (ECF No.
8    175 at 16-18.)

9        Under the Eighth Amendment, prison conditions should not "involve the wanton
10   and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the
11   crime warranting imprisonment." *Rhodes v. MO Chapman*, 452 U.S. 337, 347 (1981).
12   "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food,
13   clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726,
14   731 (9th Cir. 2000).

15       To establish a violation of these duties, the inmate must establish that prison
16   officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*,
17   511 U.S. at 834. Under the deliberate indifference standard, a violation of the Eighth
18   Amendment is only found when an objective and subjective component are met. *See id.*
19   at 834.

20       When an inmate claims prison officials failed to take reasonable steps
21   to protect him, he must show that "he is incarcerated under conditions posing a substantial
22   risk of serious harm." *Id.* (citations omitted). This is a question of fact, and "must be
23   decided by the jury if there is any room for doubt." *Lemire v. Cal. Dep't of Corr. and
24   Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citation omitted). "[T]o satisfy the objective
25   prong, it is enough for the inmate to demonstrate that he was exposed to a substantial
26   risk of some range of serious harms; the harm he actually suffered need not have been
27   the most likely result among this range of outcomes." *Id.* at 1076 (citing *Gibson v. Cnty.
28   of Washoe, Nev.*, 290 F.3d 1175, 1193 (9th Cir. 2002)). It does not matter "whether a

1    prisoner faces an excessive risk ... for reasons personal to him or because all prisoners

2    in his situation face such a risk." *Farmer*, 511 U.S. at 843.

3         The inmate must also satisfy the subjective element. This means that the prison

4    official being sued must have known of and disregarded the risk to the inmate's safety.

5    *Farmer*, 511 U.S. at 837. "Mere negligence is not sufficient to establish liability." *Frost v.*

6    *Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Further, a plaintiff "must also demonstrate

7    that the defendants' actions were both an actual and proximate cause of their injuries."

8    *Lemire v. California*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citing *Conn v. City of Reno*,

9    591 F.3d 1081, 1098-1101 (9th Cir. 2010), *vacated by City of Reno, Nev. v. Conn*, 563

10   U.S. 915 (2011), *reinstated in relevant part* 658 F.3d 897 (9th Cir. 2011). Prison officials

11   may not escape liability because they cannot, or did not, identify the specific source of

12   the risk; the serious threat can be one to which all prisoners are exposed. *See Farmer*,

13   511 U.S. at 843. Prison officials may, however, avoid liability by presenting evidence that

14   they lacked knowledge of the risk. *See Farmer*, 511 U.S. at 844; *Gibson v. County of*

15   *Washoe, Nev.*, 290 F.3d 1175, 1187–88 (9th Cir. 2002), *overruled on other grounds by*

16   *Castro*, 833 F.3d at 1076. Moreover, prison officials may avoid liability by presenting

17   evidence of a reasonable, albeit unsuccessful, response to the risk. *See Farmer*, 511 U.S.

18   at 844–45; *see generally Berg v. Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986).

19        As the party moving for summary judgment, Defendants must first meet their

20   burden by either establishing an absence of evidence to support an essential element of

21   the nonmoving party's claim or claims or submitting admissible evidence that establishes

22   the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving

23   party. *See Pakootas*, 905 F.3d at 593-94. First, Defendants concede that based on

24   Harris's allegations in his complaint and the limited view of the video footage, there is a

25   genuine issue of fact as to the objective standard.[9] (ECF No. 175 at 17.) The Court agrees

26   that the video does not definitively resolve the issues of fact as to the objective standard

27

---

28   ⁹    Defendants concede this point "for purposes of this motion only." (ECF No.
     175 at 17.)

1    and therefore Defendants' motion for summary judgment cannot be granted as to the

2    objective element.

3          Turning to the subjective element, Defendants argue J. Boyd is entitled to

4    summary judgment because he provided a reasonable response to the risk. (ECF No.

5    175 at 18.) Defendants argue Harris cannot meet his burden as to the subjective element

6    because J. Boyd did everything he could to protect Harris after Harris took the first swing

7    at another offender. (*Id.*) Defendants further argue J. Boyd would not have had to

8    intervene had Harris not forced his way out of the cell. (*Id.*)

9          However, Harris argues Cole and Boyd knew he would not be going into the yard

10   on the morning of August 28, 2020, but still opened his cell door so that he could be

11   attacked.[10] (ECF No. 195 at 7, 32-33.) Thus, Harris alleges Boyd failed to protect him

12   because his cell door should not have been opened in the first place. (*Id.*) Even if the

13   Court accepted as true that Boyd closed the door as soon as he could once he observed

14   Harris swing at another inmate, that still does not negate Harris's argument that his door

15   should have remained closed. Defendants acknowledge, and the video shows, at least

16   one inmate was waiting outside Harris's cell door. By Defendants' own words, that inmate

17   was waiting to attack Harris. (ECF No. 175 at 2.) As the video provided does not clearly

18   show Cole or Boyd, the Court can neither confirm nor disprove Harris's allegations that

19   both laughed and smiled while opening Harris's cell door. The same is true for

20   Defendants' representation that Cole and Boyd moved to close the door as soon as the

21   fight began.

22   ///

23

24          [10]    Harris argues in opposition that the Court has already made constitutional
     violation determinations and cites to ECF No. 40, the screening order for his third
25   amended complaint in this case. (ECF No. 195 at 20.) Harris misconstrues the Court
     reiterating the allegations made in his complaint in order to screen the complaint as finding
26   those allegations to be undisputed facts. (*See* ECF No. 40 ("The TAC *alleges* the
     following.") (emphasis added).) Federal courts are required to conduct a preliminary
27   screening in any case in which a prisoner seeks redress from a governmental entity or
     officer or employee of a governmental entity under 28 U.S.C. § 1915A(a), and a
28   determination that the *allegations* in a complaint survive a preliminary screening does not
     constitute the Court adopting those *allegations* as *facts.*

Consequently, Defendants do not provide evidence sufficient to foreclose the possibility that Harris can prevail on this claim. Rather, the Court finds that there is a genuine dispute over whether Boyd knew Harris did not want to go to the yard that morning but still opened Harris's cell door to allow an inmate to attack or whether Boyd closed Harris's door as soon as the fight began, meaning there is a genuine dispute over Boyd's knowledge of the substantial risk of harm to Harris. This constitutes a question of fact that is properly decided by a jury at trial. *See Farmer* at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (internal citation omitted)). Defendants' motion for summary judgment therefore cannot be granted as to the subjective element of Harris's Eighth Amendment failure to protect claim. *See Delgado v. Barnes*, 465 Fed. Appx. 712, 712 (9th Cir. 2012) (holding summary judgment was improper where a genuine dispute of material fact existed as to whether prison official knew of and disregarded an excessive risk that other inmates would attack and injure plaintiff). As Defendants do not meet their burden on summary judgment, summary judgment on the merits of Harris's Eighth Amendment failure to protect claim is denied. *Celotex*, 477 U.S. at 322-23.

### E.    Qualified Immunity

The Court will now address the issue of whether J. Boyd is entitled to the defense of qualified immunity.[11] "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)); *see Hernandez v. City of San Jose*, 897 F.3d 1125, 1132–33 (9th Cir. 2018); *Reese v. County of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018). "In § 1983 actions, qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly

---

[11]    As the Court finds that Cole, M. Boyd, Drummond, and Dreesen should be dismissed for the reasons discussed above, the Court need not reach the issue of qualified immunity as to these defendants.

established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (citations and internal quotation marks omitted); *see also Smith v. Agdeppa*, 81 F.4th 994, 1001-02 (9th Cir. 2023); *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022)

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White*, 580 U.S. at 78-79); *see also Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 825 (9th Cir. 2023); *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam); *Reese*, 888 F.3d at 1037. The reasonableness of the officer's conduct is "judged against the backdrop of the law at the time of the conduct." *Kisela*, 584 U.S. at 104 (citation and internal quotation marks omitted).

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. at 236; *see Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (discussing the *Saucier* analysis). Under this analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (citation and internal quotation marks omitted); *see Wood v. Moss*, 572 U.S. 744, 757 (2014) ("The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *Seidner v. de Vries*, 39 F.4th 591, 595 (9th Cir. 2022); *Ballentine*, 28 F.4th at 61.

First, the court must consider whether the facts "[t]aken in the light most favorable to the party asserting the injury … show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201; *see also Scott v. Harris*, 550 U.S. 372,

377 (2007); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam); *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Seidner*, 39 F.4th at 595; *Ballentine*, 28 F.4th at 61. "If there is no constitutional violation, the inquiry ends and the officer is entitled to qualified immunity." *Ioane v. Hodges*, 939 F.3d 945, 950 (9th Cir. 2018).

Second, the court must determine whether the right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201; *see also Brosseau*, 543 U.S. at 199–201; *Hope*, 536 U.S. at 739; *Seidner*, 39 F.4th at 595. Even if the violated right was clearly established at the time of the violation, it may be "difficult for [the defendant] to determine how the relevant legal doctrine … will apply to the factual situation the [defendant] confronts… [Therefore, i]f the [defendant's] mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." *Saucier*, 533 U.S. at 205; *see also Estate of Ford*, 301 F.3d at 1050; *cf. Inouye v. Kemna*, 504 F.3d 705, 712 n.6 (9th Cir. 2007) (explaining that the inquiry into the reasonableness of the defendant's mistake is not the "third" step in the *Saucier* analysis, but rather, part of the second step of *Saucier*'s two-step analysis).

Defendants argue J. Boyd is entitled to qualified immunity on Harris's failure to protect claim because no constitutional violation occurred and no constitutional violation was clearly established by law. (ECF No. 175 at 13-20.) As explained above, a genuine dispute of material fact exists as to whether J. Boyd knew of the substantial risk of harm to Harris such that reasonable jury could find that J. Boyd violated Harris's Eighth Amendment rights. Therefore, the Court cannot find that J. Boyd is entitled to qualified immunity because no constitutional violation occurred. However, the Court must still determine whether, if a constitutional violation did occur, the unlawfulness of that conduct was clearly established at the time. *Cuevas*, 107 F.4th at 898 (citation omitted). In conducting the clearly established analysis, courts must resolve factual disputes in the plaintiff's favor. *Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) ("we must consider only 'whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences

are drawn, in plaintiff's favor.' "); S*ee Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (evaluating whether the constitutional violation was established based on the facts as alleged by the plaintiff).

After resolving the factual disputes in Harris's favor for the purposes of the clearly established analysis, the issue is: does a prison guard, knowing of the substantial risk of inmates violently attacking another inmate, allowing the attack by unlocking and opening the victims cell after the victim called for help because another inmate was waiting outside of it with a hook style weapon, constitute deliberate indifference to safety?

The duty of prison officials to protect prisoners from violence at the hands of other prisoners was established by the Supreme Court almost three decades before the incident on August 28, 2020. *Farmer,* 511 U.S. at 832-33 (clearly establishing that the Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners). Courts have also repeatedly held that a prison official violates the Eighth Amendment where officials knew of an attack or risk of violence between inmates and failed to take reasonable action to protect the Plaintiffs in those cases from harm. *See Clem v. Lomeli*, 566 F.3d 1177, 1180 (9th Cir. 2009) (finding deliberate indifference where Plaintiff informed prison official of threat from cellmate, prison official did nothing and Plaintiff was attacked); *Cortez v. Skol*, 776 F.3d 1046, 1049 (9th Cir. 2015) (finding deliberate indifference where prison official transported three high-security inmates hostile to each other through a back alley passage, blocked from security cameras where Plaintiff was attacked); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016) (finding deliberate indifference where county failed to consistently and adequately monitor holding cell where Plaintiff was attacked).

The alleged constitutional violation occurred on August 28, 2020, after the allegedly violated right had been clearly established. Consequently, J. Boyd is not entitled to qualified immunity based on the record before the Court at the summary judgment stage and Defendants' motion is denied as to qualified immunity.

///

**F.    Punitive Damages**

Finally, the Court will address Defendants argument that punitive damages are improper in this case.  "[P]unitive damages in an action under § 1983 [may be assessed] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citation omitted, "malicious, wanton, or oppressive acts or omissions are within the boundaries of traditional tort standards for assessing punitive damages"); Ninth Circuit Model Civil Jury Instruction 5.5.  Punitive damages "are never awarded as of right, no matter how egregious the defendant's conduct." *Id*. at 52. In Nevada, "punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is 'guilty of oppression[;] fraud[;] or malice, express or implied.'" *Bongiovi v. Sullivan*, 138 P.3d 433, 450–51 (Nev. 2006) (quoting NRS § 42.005(1)). Oppression is "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregards of the rights of the person." NRS § 42.001(4). Fraud is "an intentional misrepresentation, deception[,] or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person." *Id*. at § 42.001(2). And malice, express or implied, is "conduct [that] is intended to injure a person or despicable conduct [that] is engaged in with a conscious disregard of the rights or safety of others." *Id*. at § 42.001(3); *see also Countrywide Home Loans v. Thitchener*, 192 P.3d 243, 255 (Nev. 2008).

Defendants argue that Harris will be unable to establish the malice or despicable conduct necessary to support a claim for punitive damages. (ECF No. 175 at 22.) However, as stated above, the Court cannot resolve at the summary judgment stage whether J. Boyd "laughed and smiled" while opening Harris's cell door to allow him to be attacked, as Harris alleges, or whether J. Boyd closed the cell door as soon as he observed a fight break out, as Defendants claim. Based on these competing scenarios, the Court finds that a reasonable jury could find that punitive damages are available and

therefore dismissing the possibility of punitive damages at this stage is premature. Other courts have found that the issue of whether punitive damages are available should be presented to the jury if the case proceeds past dispositive motions. *See Spears v. Balaam*, No. 3:21-cv-00373-MMD-CSD, 2022 WL 2162799 at *6-7 (D. Nev Apr. 12, 2022) (issue of punitive damages "should be presented to the jury should the case proceed past dispositive motions"); *Elias v. Navasartian*, No. 1:15-cv-01567-LJO-GSA-PC, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17, 2017) (in a prisoner civil rights case, "the decision whether to award damages is ordinarily made by the jury at trial"); *Pullano v. No. 8170, CCDC Guard*, No. 2:10-cv-00335-MMD-VCF, 2013 WL 1758999, at *2 (D. Nev. Apr. 24, 2013) (whether a plaintiff is entitled to punitive damages is ordinarily decided by the trier of fact at trial, and not by a judge because it requires a factual inquiry into the defendant's motives).

As Defendants do not meet their burden of showing that Harris cannot support punitive damages in this case, summary judgment as to Harris's claim for punitive damages is denied. *Celotex*, 477 U.S. at 322-23.

### III.    CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment, (ECF No. 175), is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' motion for summary judgment is **GRANTED** as to the claim for First Amendment retaliation;

- Defendants' motion for summary judgment is **GRANTED** as to Mark Boyd, Frank Dreesen, and David Drummond; and

- Defendants' motion for summary judgment is **DENIED** as to the claim for Eighth Amendment failure to protect against Joshua Boyd.

///

///

///

///

1   **IT IS FURTHER ORDERED** that judgment be entered in favor of Mark Boyd, Frank

2 Dreesen, and David Drummond.

3   **IT IS FURTHER ORDERED** that Dana Cole be **DISMISSED** from this case.

4   **IT IS FURTHER ORDERED** that a joint pretrial order is due on **November 2, 2025**.

5 **DATED**: ___October 2, 2025___.

6         _____

7         **UNITED STATES MAGISTRATE JUDGE**